# Exhibit B

87 UCC Rep.Serv.2d 766

2015 WL 5310765
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

ARMENIAN MISSIONARY ASSOCIATION
OF AMERICA, INC., Plaintiff,
v.
TD BANK, N.A. and Jpmorgan
Chase Bank, N.A., Defendants.

Civil Action No. 15–cv–03328–SDW–SCM.
|
Signed Sept. 11, 2015.

**Attorneys and Law Firms**

Gregg S. Sodini, Law Offices of Gregg S. Sodini, LLC, Neptune, NJ, for Plaintiff.

Lynne E. Evans, Ryan E. Borneman, Duane Morris LLP, Philadelphia, PA, Tyler Jay Kandel, Emmet Marvin & Martin LLP, Morristown, NJ, for Defendants.

**OPINION**

WIGENTON, District Judge.

**\*1** Before the Court are two motions to dismiss Plaintiff Armenian Missionary Association of America, Inc.'s ("Plaintiff" or "AMAA") Complaint. Defendants TD Bank, N.A. and JPMorgan Chase Bank, N.A. (collectively "Defendants") seek dismissal for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). [1] (ECF Nos. 9, 10.) This Court has jurisdiction over this action pursuant to ⚑28 U.S.C. § 1332. Venue is proper pursuant to ⚑28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, this Court **GRANTS** Defendants' Motions to Dismiss.

**I. BACKGROUND**

Plaintiff is a non-profit organization that relies on donations to provide aid and assistance to Armenians throughout the world. (Amend.Compl.¶ 1.) Plaintiff seeks relief against Defendants for failure to conduct proper due diligence under N.J.S.A. 12A:3–420(a) (Count I), failure to exercise good

faith and/or ordinary care under N.J.S.A. § 12A–405(b) (Count II), and seeks damages for breach of a duty of care under common law negligence (Count III). (Id. ¶¶ 22–32.) Plaintiff's claims stem from a series of alleged thefts by its former employee, Tigran Melkonyan ("Melkonyan"), of over $800,000 in donations. (Id. ¶ 11.)

Melkonyan is alleged to have commenced this scheme in 2006 by opening an account at TD Bank in the name of "Armenian Mission Association of America" and depositing donation checks made payable to, for example, the "Armenian Missionary Association of America," or the "Armenian Missionary Assoc. / America" or, in the vast majority, simply "AMAA." [2] (Id. ¶¶ 11, 12.) AMAA claims that it "believes" donation checks were also deposited into a Chase Bank account opened by Melkonyan under the same name. (Id . ¶¶ 18, 20.) AMAA does not, however, identify or attach a single check belonging to AMAA that was deposited into the Chase account. (Id. ¶ 20.)

AMAA employed Melkonyan from August 1999 until his resignation in April 2014. (Id. ¶¶ 5–6.) Melkonyan's job duties centered on AMAA's child sponsorship and child education programs, but did not include responsibility for processing, recording, or depositing AMAA's donation checks. (Id. ¶ 6.) However, Plaintiff admits that "on a very rare occasion, Melkonyan was asked to go to the bank to deposit donation checks when the person responsible for depositing checks was unavailable." (Id.)

In February of 2015 AMAA demanded documents relating to Melkonyan's account from Defendants, in which deposits of donation checks made payable to AMAA were discovered. (Id. ¶¶ 12–14.)

Based on the Melkonyan's conduct, AMAA asserts the following claims against Defendants: 1) Relief under N.J.S.A. § 12A:3–420(a) (Count I), alleging that Defendants are liable for failing to conduct proper due diligence when Melkonyan opened the bank accounts under the name of "Armenian Mission Association of America" (Id. ¶¶ 22–24.); 2) Relief under N.J.S.A. § 12A:3–405(b) (Count II), alleging that Defendants failed to exercise good faith and/or ordinary care by accepting the deposits, especially if at least some checks were made payable to the "Armenian Missionary Association of America"—a facially different payee than the entity assigned to the TD account (Id. ¶¶ 25–28.); 3) Common law negligence (Count III), on the grounds that Defendants'

actions substantially contributed to the loss that resulted from the fraud, in breach of a duty owed to Plaintiff. (*Id.* ¶¶ 29–32.)

**\*2** Defendants now move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 9.)

## II. LEGAL STANDARD

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]"

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted); *see also Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips,* 515 F.3d at 231 (external citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[ ] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

## III. DISCUSSION

Defendants seek dismissal on three grounds: 1) the statute of limitations under the New Jersey Uniform Commercial Code ("NJ UCC") bars recovery on Plaintiff's claims that accrued prior to April 2, 2012; 2) the NJ UCC precludes Plaintiff's statutory claims; and 3) Plaintiff's claims are unduly speculative and do not satisfy the *Twombly* pleading standard. (Def.'s R. Br. ¶ 1.)

### Plaintiff's NJ UCC claims

The NJ UCC provides a three-year statute of limitations on negotiable instruments. N.J.S.A. § 12A:3–118(g) (applying a three-year statute of limitations to chapter 3 of the NJ UCC for checks containing a forged or blank endorsement). New Jersey courts have held that an action involving negotiable instruments accrues at the time the item or check is negotiated. *New Jersey Lawyers' Fund for Client Protection v. Pace,* 374 N.J.Super. 57, 67, 863 A.2d 402 (App.Div.2005), *aff'd per curiam,* 186 N.J. 123, 892 A.2d 661 (2006); *Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat'l Bank,* 390 N.J.Super. 199, 204, 915 A.2d 42 (App.Div.2007).

**\*3** Plaintiff commenced this action on April 2, 2015. (Amend.Compl.¶ 1.) Pursuant to NJ UCC's three-year statute of limitations, Plaintiff's claims regarding checks that were negotiated prior to April 2, 2012 are time barred. N.J.S.A. § 12A:3–118(g). Plaintiff concedes that the NJ UCC imposes a three-year statute of limitations, but asserts that, "to the extent that the AMAA is able to establish a common law claim outside of the UCC, the three year statute of limitations will not apply at all." (Amend.Compl.¶ 17.) In essence, Plaintiff seeks to apply the so-called "time of discovery rule" which provides that in an appropriate case, the accrual of a claim may be tolled "until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Lopez v. Swyer,* 62 N.J. 267, 300 A.2d 563 (1973).

This Court rejects Plaintiff's invocation of the time of discovery rule here because the New Jersey Supreme Court has held, and the Third Circuit agrees, that the time of discovery rule impedes uniform applicability of the NJ UCC's across commercial transactions and thus will "not apply to actions against banks for conversions of negotiable instruments where there was no assertion of fraudulent concealment by the bank." *Pace,* 374 N.J.Super. at 65, 863 A.2d 402; *Psak, Graziano, Piasecki & Whitelaw,* 390 N.J.Super. at 204–205, 915 A.2d 42; *Menichini v. Grant,* 995 F.2d 1224, 1229–31 (3d Cir.1993) ("vigorous application of the statute of limitations is a reasonable means of achieving certainty in commercial transactions."). Here, Plaintiff has not alleged that Defendants colluded with Melkonyan or were complicit in his scheme to misappropriate

his employer's funds. Therefore, the NJ UCC's three-year statute of limitations apply.

### Conversion

Under N.J.S.A. § 12A:3–420(a), a depositary bank is liable for conversion only where there is a forged indorsement. *See* § 12A:3–420, cmt. 1 (explaining that this provision "covers cases in which a depositary bank or payor bank takes an instrument bearing a forged indorsement."). However, a "deposit in a depositary bank in an account in a name substantially similar to that of Employer is the equivalent of an indorsement in the name of the Employer" and does not constitute a forged signature. *See* N.J.S.A. § 12A:3–405(c), cmt. 3.

Here, Plaintiff's allegation is insufficient to establish a claim for conversion because there is no proof of forgery. Melkonyan created a fake company ("Armenian Mission Association of America") that was very similar in name to the named payee indicated on the checks at issue (compare "Armenian Missionary Association of America" and "Armenian Missionary Assoc. /America"). (Amend.Compl .¶ 12.) The NJ UCC deems a substantially similar payee to be the same as the intended payee, and not a forgery. *See* N.J.S.A. § 12A:3–405(c). Therefore, Plaintiff is not entitled to relief under its theory for conversion.

**\*4** Ordinarily, a bank will "bear[ ] the risk of loss when it makes or obtains payment on a fraudulently indorsed check." *Schrier Bros. v. Golub,* 123 Fed. Appx. 484, 487 (3d Cir.2005). However, N .J.S.A. § 12A:3–405(b) provides that the burden of loss shifts to the named payee where a "bank has acted in good faith and the indorsement is made by an employee of the payee entrusted with 'responsibility' for the check." § 12A:3–405(b).

There is no dispute that Melkonyan was partially responsible for depositing checks on his employer's behalf. Furthermore, Plaintiff's complaint is devoid of factual allegations that suggest that Defendants did not act in good faith in depositing the checks in the accounts associated with the similarly named payees. Plaintiff's allegations that Defendants "failed to exercise good faith and/or ordinary care by accepting the deposits, especially when at least some checks were made payable to the 'Armenian Missionary Association of America'—a different payee than the entity to the [ ] bank account" can only be described as conclusory at best. (Amend.Compl.¶ 16.) As such, Plaintiff's statutory claims will be dismissed.

### Plaintiff's Common Law claims

It is well settled New Jersey law that a bank does not owe a general duty of care to non-customers. ⚑*Brunson v. Affinity Fed. Credit Union,* 199 N.J. 381, 400, 972 A.2d 1112 (2009) ("[I]n the unique context of whether a bank owes a duty to a non-customer, it is clear that '[a]bsent a special relationship, courts will typically bar claims of non-customers against banks'.") (internal citations omitted); ⚑*Pennsylvania Nat'l Turf Club, Inc. v. Bank of West Jersey,* 158 N.J.Super. 196, 203, 385 A.2d 932 (App.Div.1978) (holding that "bank owed no general duty to [non-constomer] Turf Club" for the bad checks of its customer). Here, Plaintiff's concedes that there is no banking relationship between Plaintiff and Defendants. (Amend.Compl.¶ 9.) Plaintiff does not identify or submit to this Court any "agreement, undertaking or contract" creating a special duty owed to it by Defendants. Further, the NJ "UCC displaces common law claims where reliance on the common law would thwart the purposes of the UCC". *See Psak, Graziano, Piasecki & Whitelaw,* 390 N.J.Super. at 204–205, 915 A.2d 42.

> The UCC "shall be liberally construed and applied to promote its underlying purposes and policies[,]" N.J.S.A. 12A:1–102(1) which are "to simplify, clarify and modernize the law governing commercial transactions", and "to make uniform the law among the various jurisdictions." N.J.S.A. 12A:1–102(2)(a). Thus, the UCC's limitations period applies broadly to actions to enforce "an obligation, duty, or right arising under [Article 4]," N.J.S.A. 12A:4111, and Article 4 generally "defines the rights between the parties with respect to bank deposits and collections." N.J.S.A. 12A:4–101, Official Comment 3. Necessarily then, the existence of such a comprehensive remedy to address plaintiff's claim of improper payment in this case precludes a common-law negligence claim against either party. "Only in very rare instances should a court upset the legislative scheme of loss allocation and permit a common-law cause of action." ⚑*Bank Polska Kasa Opieki v. Pamrapo Savings Bank,* 909 F.Supp. 948, 956 (D.N.J.1995); *see also Girard Bank v. Mount Holly State Bank,* 474 F.Supp. 1225, 1239 (D.N.J.1979) (noting that "[c]ourts should be hesitant to improvise new remedies outside the already intricate scheme of Articles 3 and 4.");
>
> *see also* ⚑*New Jersey Bank, N.A. v. Bradford Securities Operations, Inc.,* 690 F.2d 339, 345 (3d Cir.1982) (a

87 UCC Rep.Serv.2d 766

common-law tort action is barred where Article 8 provides a "comprehensive remedy").

**\*5** *Id.* at 205, 915 A.2d 42.

By Plaintiff's own admission, the NJ UCC displaces its common law negligence claims. (Amend.Compl.¶ 16.) Therefore, Plaintiff's common law negligence claims will be dismissed.

## IV. CONCLUSION

For the reasons discussed herein, Defendants' motions to dismiss all counts of the complaint are **GRANTED.** An appropriate order follows.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 5310765, 87 UCC Rep.Serv.2d 766

---

## Footnotes

1    As the arguments advanced by the Defendants are virtually identical, and the relief sought is the same, this Court will address both motions in this opinion.

2    According to AMAA, Melkonyan deposited at least one donation check in the amount of $295,000 that was explicitly made payable to "Armenian Missionary Association of America", and not the "Armenian Mission Association of America", into Melkonyan fraudulent TD bank account. (Amend.Compl.¶ 12.)

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

DeFazio v. Wells Fargo Bank National Association, Not Reported in Fed. Supp. (2020)
101 UCC Rep.Serv.2d 999

---

KeyCite Yellow Flag

Distinguished by Ben-Dor v. Alchemy Consultant LLC, N.Y.Sup., April 26, 2023

2020 WL 1888252
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Fred DEFAZIO , Plaintiff,
v.
WELLS FARGO BANK NATIONAL
ASSOCIATION , et al., Defendants.

Civil Action No. 20-375 (SRC)
|
Signed 04/16/2020

**Synopsis**
**Background:** Wire transfer originator brought action against beneficiary's bank and against attorney and law firm hired by originator to assist him in purchasing property in South Carolina. Bank filed motion to dismiss for failure to state claim, and attorney and firm filed motion to dismiss for lack of personal jurisdiction.

**Holdings:** The District Court, Stanley R. Chesler, Senior District Judge, held that:

[1] Article 4A of the Uniform Commercial Code (UCC) barred originator's negligence claims against bank based on its acceptance and transfer of funds;

[2] bank owed originator no duty under New Jersey law with regard to opening and management of account to which funds were transferred;

[3] originator could not assert claim against bank under Article 4A;

[4] originator failed to state claim against bank for aiding and abetting fraud;

[5] originator failed to state claim against bank for conversion; and

[6] attorney and firm's contacts with New Jersey were insufficient to support specific personal jurisdiction.

Motions granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Personal Jurisdiction.

West Headnotes (6)

**[1]** **Finance, Banking, and Credit** 🔑 Errors in Executing Payment Order

Article 4A of the Uniform Commercial Code (UCC), as adopted in New Jersey, barred wire transfer originator's negligence claims against beneficiary's bank insofar as they were predicated on bank's allegedly improper acceptance of transferred funds and/or the bank's transfer of funds out of the beneficiary's account; Article 4A's section governing misdescription of beneficiary specifically pertained to situations in which the originator sent a payment order in which the beneficiary's name and identifying account number did not match, as was true for the transfer at issue here, and Article 4A further established an obligation on the part of beneficiary's bank to make funds available to a beneficiary when the beneficiary's bank accepted the order. N.J. Stat. Ann. §§ 12A:4A-207(b), 12A:4A-404.

4 Cases that cite this headnote

**[2]** **Finance, Banking, and Credit** 🔑 Obligations of Receiving Bank in Execution of Payment Order

Under New Jersey law, beneficiary's bank owed no duty to wire transfer originator with regard to the opening and management of an account to which funds were transferred, and thus bank was not liable to originator for negligence in opening or managing the account; originator cited no binding legal authority supporting the existence of such a duty.

1 Case that cites this headnote

---

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 7 of 83 PageID: 107

DeFazio v. Wells Fargo Bank National Association, Not Reported in Fed. Supp. (2020)

101 UCC Rep.Serv.2d 999

**[3]    Finance, Banking, and Credit** 🔑 Right of action and defenses

Wire transfer originator, as a non-customer of bank to which his funds were transferred as result of a fraudulent scheme, could not assert a claim against bank under Article 4A of the Uniform Commercial Code (UCC), as adopted in New Jersey. N.J. Stat. Ann. § 12A:4A-105(1)(c).

1 Case that cites this headnote

**[4]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

**Finance, Banking, and Credit** 🔑 Funds transfers

Wire transfer originator's allegations that beneficiary's bank aided, abetted, and facilitated a fraudulent scheme by opening the account to which wired funds were fraudulently transferred, accepting wires into the account, allowing funds to be transferred out of the account, and failing to prevent further transfers after being put on notice of the fraud were insufficient to state a claim against bank under New Jersey law for aiding and abetting a fraud against originator; with regard to the bank's knowledge of any fraud, originator's complaint failed to allege what was communicated to bank, when and how such communication took place, and who was involved in the communication. Fed. R. Civ. P. 8, 🚩9(b).

3 Cases that cite this headnote

**[5]    Finance, Banking, and Credit** 🔑 Funds transfers

Wire transfer originator failed to state claim against beneficiary's bank for conversion, where originator's complaint alleged no facts regarding how bank exercised control over originator's funds or that any such control was exercised wrongfully and without authorization, but instead the claim was based on threadbare allegations that merely repeated the elements of the cause of action.

3 Cases that cite this headnote

**[6]    Federal Courts** 🔑 Professional services; malpractice

Contacts with New Jersey on part of attorney and law firm, who were citizens of South Carolina, and who represented a prospective purchaser of property in South Carolina, were insufficient to support exercise of specific personal jurisdiction over them in purchaser's action for breach of contract, legal malpractice, and negligent supervision/respondeat superior; the only suit-related conduct linking attorney and firm to New Jersey was their communication with purchaser, a New Jersey resident, which occurred primarily by email, there was no evidence that attorney and firm solicited client in New Jersey, and there was no evidence that any aspect of the underly property sale transaction occurred in New Jersey. U.S. Const. Amend. 14; Fed. R. Civ. P. 12(b)(2).

4 Cases that cite this headnote

**Attorneys and Law Firms**

Gregg S. Sodini, Law Offices of Gregg S. Sodini, LLC, Freehold, NJ, for Plaintiff.

Justin E. Kerner, Ballard Spahr LLP, Cherry Hill, NJ, Paul A. Carbon, Berkeley Heights, NJ, for Defendants.

**OPINION**

CHESLER, District Judge

**\*1**  This matter comes before the Court on two motions to dismiss the Complaint: Defendant Wells Fargo Bank N.A.'s ("Wells Fargo") motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and Defendants Stephen S. Bird and Law Offices of Stephen S. Bird, LLC's (the "Bird Defendants") motion to dismiss for lack of in personam jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6). Plaintiff Fred DeFazio ("Plaintiff" or "DeFazio") has opposed both motions. The Court has

considered the papers filed by the parties. It proceeds to rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons expressed below, the Court will grant both motions to dismiss.

## I. BACKGROUND

This action arises out of the attempt by Plaintiff DeFazio, a New Jersey resident, to purchase property in South Carolina. According to the Complaint, some unknown third party defrauded Plaintiff by gaining unauthorized access to the computer systems of the Bird Defendants and causing DeFazio to wire funds to the fraudster's Wells Fargo bank account instead of the Bird Defendants' escrow account. Plaintiff brings this action seeking to hold Wells Fargo and the Bird Defendants liable for their alleged role in allowing the fraud to be committed.

The following summary of the facts is drawn from the allegations of the Complaint, the documents referenced therein, and, where appropriate, sources outside of the Complaint insofar as the information concerns the question of personal jurisdiction.

In January 2019, DeFazio agreed to purchase real property located at 640 Flatwater Drive in Bluffton, South Carolina (the "Property") from non-party HL Development, LLC for $224,910.00. Upon the suggestion of HL Development, DeFazio contacted attorney Bird, who maintains a law office in Bluffton, to represent him in the real estate transaction and to act on DeFazio's behalf at the closing. In connection with retaining the Bird Defendants, DeFazio advised that he was a New Jersey resident. According to the Complaint, Bird assured him his firm regularly represented out-of-state clients in property closings. The Bird Defendants also advised DeFazio they would primarily communicate with him via email.

Over the next few weeks, DeFazio exchanged various emails with attorney Bird and two employees of the Bird law firm, namely Karin Cimino ("Cimino") and Krista Shooltz ("Shooltz"). To highlight the most important: On January 17, 2019, Cimino sent DeFazio an email confirming receipt of DeFazio's $25,000 deposit in connection with the Property purchase and advising that "all funds for closings must be in the form of a wire." (Compl. ¶ 7.) This email, copied to Bird and Shooltz, bore a sender's email address of "kcimino@sbirdlaw.com." (Id.) On January 25, 2019, Cimino again emailed DeFazio to advise that the closing would take place on January 31, 2019 and to provide various documents

which included wire instructions in connection with the closing. In particular, the email instructed DeFazio "to wire the sum of $203,000.19 to the account titled 'Law Office of Stephen S. Bird, LLC Escrow Account' as designated in the wire instructions." (Id. ¶ 9; see also Carbon Cert. Ex. C). Those referenced instructions were set forth in a document bearing the Bird law firm letter head. The document specified the payee account information, including the name of the receiving bank (Synovus Bank), routing and account number, and beneficiary (Law Office of Stephen S. Bird, LLC Escrow Account). The wire instructions also cautioned as follows: "Due to recent warnings from the South Carolina Bar Association, we ask that before you wire to Law Office of Stephen Bird, LLC, you call our office at (843) 815-3900 to verify the account information." (Carbon Cert. Ex. B.). Cimino's January 25 email reiterated the instruction to "be sure to call our office to verify the wire instructions prior to sending the money." (Id. Ex. C.) That same day, DeFazio emailed the Bird Defendants with questions about certain charges set forth on the Settlement Statement he had received. On January 28, 2019, Cimino responded, at approximately 10:12 a.m.

**\*2** A few hours later, on January 28 at 2:09 p.m., DeFazio received another email which appeared to be from Cimino, as it bore a sending address of kcimino@sbirdlaw.com. This email provided DeFazio different wire instructions than had previously been supplied. The new instructions, also printed on the Bird law firm letterhead, directed DeFazio to wire the funds to an account bearing the name "Law Office of Stephen S. Bird, LLC Escrow Account" but maintained at Wells Fargo under a different account number than set forth in the previous instructions. (For simplicity, the Court will hereinafter refer to this bank account as the "Wells Fargo Account".) Over the next few days, additional emails were exchanged between DeFazio and "kcimino@sbirdlaw.com" confirming the new wiring instructions and providing updates about the wire of funds. Finally, on January 30, 2019, DeFazio sent an email to Cimino confirming that the wire of $203,000.19 was "done" as instructed in the January 28, 2019 2:09 p.m. email from the Bird Defendants. A reply email from kcimino@sbirdlaw.com advised "Great thanks." (Compl. ¶ 13.)

However, the Bird Defendants did not receive the funds. On February 4, 2019, four days after the scheduled closing date, attorney Bird "contacted Mr. DeFazio by telephone and advised him that the funds had not been received and that the Bird Defendants did not have an account at Wells Fargo." (Id. ¶ 14.) Upon realizing that he had sent the funds to an

unintended payee, DeFazio contacted both his own bank, where the payor account was maintained, and Wells Fargo. DeFazio advised the banks that a fraud had been committed. According to the Complaint, Wells Fargo "acknowledged the receipt of funds into the account to which the funds were wired but would not provide any other information and apparently took no action to freeze the account into which the funds had been wired." (Id.) With the assistance of his bank, DeFazio was able to locate and recover $126,200.98 of the funds he had been misled to wire to the Wells Fargo Account.

DeFazio filed this lawsuit in the Superior Court of New Jersey on or about November 27, 2019. Defendant Wells Fargo removed the action, with the Bird Defendants' consent, on January 10, 2020. Wells Fargo is a citizen of South Dakota, and the Bird Defendants are citizens of South Carolina. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

## II. WELLS FARGO'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The Complaint pleads for relief from Wells Fargo under the following four causes of action: negligence, gross negligence and recklessness; aiding and abetting fraud and conversion; conversion; negligent supervision/respondeat superior. Wells Fargo moves to dismiss these claims for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). In turn, the Court will evaluate each of the claims against Wells Fargo according to the well-established legal standard for evaluating whether a claim has been sufficiently pleaded under the Federal Rules of Civil Procedure.

To meet the pleading requirements of Rule 8(a), a complaint must contain "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). Rule 9(b), which applies to claims sounding in fraud, sets a heightened requirement: the complaint must "state with particularity the circumstances constituting fraud

or mistake." Fed. R. Civ. P. 9(b). The Third Circuit has held that to satisfy Rule 9(b)'s stringent standard, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007). On a Rule 12(b)(6) motion, the Court must accept as true the well-pleaded facts of a complaint and any reasonable inference that may be drawn from those facts but need not credit conclusory statements couched as factual allegations. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

**\*3** In the First Count of the Complaint, Plaintiff alleges that Wells Fargo was negligent "in opening the Fraudulent Wells Fargo Account, allowing transfers of the proceeds from the Wire and possible other wires out of the Fraudulent Wells Fargo Account and failing to prevent further transfers of funds out of the Wells Fargo Account after being made aware of facts putting Wells Fargo on notice that the Fraudulent Wells Fargo Account was being utilized to facilitate fraud and steal money ...." (Compl., First Count, ¶ 3.) Wells Fargo raises two grounds for dismissal of this claim. One, it argues that insofar as the negligence claim relates to wire transfers, the claim is barred by Article 4A of the Uniform Commercial Code ("UCC") as adopted by New Jersey statute as N.J.S.A. 12:4A-101, et seq. Two, it argues that the negligence claim must be dismissed because Wells Fargo owed no duty to Plaintiff, a non-customer of the bank, regarding the opening and/or monitoring of the Account. The Court agrees with both arguments.

Article 4A of the UCC applies to the subject of electronic funds transfers, broadly defined as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." ADS Assoc. Group, Inc. v. Oritani Sav. Bank, 219 N.J. 496, 511-12, 99 A.3d 345 (2014) (quoting N.J.S.A. 12A:4A-104(1)). The New Jersey Supreme Court has held that, as made clear by Official Comment to the statute, "Article 4A comprehensively governs the rights and remedies of parties affected by funds transfers." Id. at 518, 99 A.3d 345 . Comment 1 expressly provides as follows:

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 10 of 83 PageID: 110

DeFazio v. Wells Fargo Bank National Association, Not Reported in Fed. Supp. (2020)
101 UCC Rep.Serv.2d 999

Funds transfers involve competing interests ... The rules that emerged [from the statutory drafting] represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

N.J.S.A. 12A:4A-102 cmt. 1. Guided by the New Jersey Legislature's comment and the plain language of Article 4A's provisions dealing with the issuance and acceptance of payment orders, the Supreme Court of New Jersey held in ADS that Article 4A preempts a common law negligence claim that "arises from a setting directly addressed by Article 4A." ADS, 219 N.J. at 519, 99 A.3d 345. Because the ADS plaintiff's negligence claim challenged a funds transfer, from one account at a bank to another at the same bank, the Court found that the claim fell within the purview of Article 4A, which therefore provided the exclusive remedy for the dispute. Id. The Supreme Court rejected the ADS plaintiff's common law negligence claim as an improper expansion of the statute's remedies, reasoning that permitting a non-customer to proceed with a cause of action for unauthorized transfers would upset the delicate balance of competing interests struck by the statute. Id. at 520, 99 A.3d 345.

[1] The New Jersey Supreme Court's decision in ADS is controlling. Following the reasoning and holding of that case, this Court concludes that DeFazio's negligence claims against Wells Fargo are likewise barred by Article 4A, insofar as they are predicated on the bank's allegedly improper acceptance of funds transferred to the Account and/or the bank's transfer of funds out of the Account. Matters concerning funds transfers into and out of banking institutions are covered by Article 4A. Indeed, Subsection 207(2) specifically pertains to situations

in which the originator of a funds transfer sends the receiving bank a payment order in which the beneficiary is described by name and by an identifying account number but the two pieces of information do not match, that is, the payment order contains conflicting information as to identification of the beneficiary. See N.J.S.A. 12A:4A-207(b). Under those circumstances, the statute provides that the bank "may rely on the number as the proper identification of the beneficiary of the order." Id. With regard to transfers out of account, Section 404 establishes a bank's obligation to make funds available to a payment order beneficiary when the beneficiary bank accepts the order, requiring a bank to pay the amount of the order upon acceptance. N.J.S.A. 12A:4A-404. Article 4A directly addresses the funds transfer actions on which Plaintiff's negligence claim is based. Accordingly, it precludes Plaintiff's claim that Wells Fargo acted with negligence or gross negligence in accepting the funds Plaintiff erroneously transferred into the Wells Fargo Account, in transferring funds out of the Wells Fargo Account and in otherwise failing to prevent transfers from the Wells Fargo Account. ADS, 219 N.J. at 519, 99 A.3d 345.

**\*4** Plaintiff's negligence claim is not, however, solely based on allegations involving wire transfers. The Complaint also alleges that Plaintiff was harmed by Well Fargo's lack of care in the management and maintenance of the accounts. It avers, in particular that the bank was negligent in opening the Wells Fargo Account and in failing to ensure that the Wells Fargo Account "was opened for legitimate purposes and not used in a manner to facilitate frauds and steal money." (Compl., First Count, ¶ 2.) [1] Plaintiff correctly notes this aspect of his negligence claim is not barred by Article 4A, as only claims inconsistent with Article 4A are displaced by the statute. ADS, 219 N.J. at 519-20, 99 A.3d 345; see also Remtek Svcs., Inc. v. Wells Fargo Bank, N.A., No. 19-12790, 2020 WL 241332, at *4 (D.N.J. Jan. 16, 2020) (holding that Article 4A did not bar the plaintiff's claim "asserting that Wells Fargo was negligent in allowing the fraudsters to open an account in the first place."); Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 223-24 (4th Cir. 2002) (holding that the plaintiff's negligence claims were not inconsistent with UCC Article 4A insofar as they challenged the opening and management of the bank account at issue in that case).

[2] Among other arguments raised in the motion to dismiss, Wells Fargo contends that there is no duty owed to Plaintiff relating to the manner in which the account was opened.

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 11 of 83 PageID: 111

DeFazio v. Wells Fargo Bank National Association, Not Reported in Fed. Supp. (2020)
101 UCC Rep.Serv.2d 999

It argues that the opening of bank accounts is governed by the Bank Secrecy Act of 1970, which does not "authorize a private cause of action against a financial institution or its employees." James v. Heritage Valley Fed. Credit Union, 197 F. App'x 102, 106 (3d Cir. 2006). Wells Fargo further argues that it is generally recognized that, absent special circumstances, banks do not owe non-customers a duty to exercise reasonable care or to protect them from the intentional torts of their customers. Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 400, 972 A.2d 1112 (2009) ("in the unique context of whether a bank owes a duty to a non-customer, it is clear that 'absent a special relationship, courts will typically bar claims of non-customers against banks.' ") (quoting City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 60, 764 A.2d 411 (2001)); see also Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006) ("[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers."; Eisenberg, 301 F.3d at 225-26 (noting that courts of numerous jurisdictions, including New Jersey, have held that a bank does not owe a duty of care to a non-customer, and holding that the plaintiff therefore had no negligence claim involving the opening of a fraudulent bank account).

**\*5** In response, Plaintiff maintains that Wells Fargo's argument is misplaced because the Complaint does not seek relief under the Bank Secrecy Act. What Plaintiff does not do is cite to any binding legal authority to rebut Wells Fargo's argument, supported by caselaw, that it did not owe Plaintiff a duty of care with regard to the opening of an account for some third party or, for that matter, with regard to its management of the account. It is axiomatic that a negligence claim requires "a duty of care owed by the defendant to the plaintiff." Robinson v. Vivirito, 217 N.J. 199, 208, 86 A.3d 119 (2014). Moreover, "the issues of whether defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide." Id. Here, the Complaint fails to plead facts establishing that Wells Fargo owed non-customer DeFazio a duty of care under New Jersey law. The lack of this essential element prevents DeFazio's negligence claim against Wells Fargo from proceeding.

**[3]** Accordingly, the Court will dismiss the negligence claim asserted in the First Count of the Complaint in its entirety. It will not, moreover, grant leave to amend so that Plaintiff may plead for relief under Article 4A or allege additional facts in support of his negligence claim, as such repleading would be futile. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (holding that upon granting a defendant's motion to dismiss a deficient complaint, a district court should grant the plaintiff leave to amend within a set period of time, unless amendment of the complaint would be inequitable or futile). Plaintiff is indisputably not a customer of Wells Fargo, as defined by Article 4A, and thus cannot assert the statutory cause of action. See 12A:4A-105(1)(c) (defining "customer" as one "having an account with a bank"); ADS, 219 N.J. at 519, 99 A.3d 345 (holding that the cause of action recognized by Article 4A to address unauthorized bank transfers is available only to a bank's customers). Moreover, there is no indication that he and Wells Fargo have the "special relationship" contemplated by the New Jersey Supreme Court that might give rise to a duty of care. See ADS, 219 N.J. at 517-18, 99 A.3d 345 (discussing City Check Cashing, 166 N.J. at 62, 764 A.2d 411 , and noting that, although it rejected the non-customer plaintiff's common law claim against a bank, the Court recognized that a "special relationship" may be "created by agreement, undertaking, or contract" giving rise to a duty of care owed by a bank to a non-customer).

**[4]** The Second Count of the Complaint pleads a claim against Wells Fargo for aiding and abetting an alleged fraud committed against Plaintiff. To establish liability for aiding and abetting fraud, a plaintiff must establish the underlying wrongdoing (i.e., the fraud committed by another party), that the defendant was aware of his role in the tortious activity at the time it was committed, and that the defendant "knowingly and substantially assist[ed] the principal violation." State Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, 387 N.J. Super. 469, 483, 904 A.2d 775 (App. Div. 2006) (quoting Tarr v. Ciasulli, 181 N.J. 70, 84, 853 A.2d 921 (2004) and finding that the New Jersey Supreme Court's adoption of the Restatement definition of aiding and abetting liability in the context of another tort applies with equal force to a claim for aiding and abetting a fraud); see also Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC, No. 12-7242, 2013 WL 5467093, at \*19 (D.N.J. Sept. 30, 2013) (applying the elements recognized by McCormac v. Qwest to a claim for aiding and abetting fraud). The Complaint is completely devoid of facts which, if true, would establish that Wells Fargo knowingly and substantially assisted a third party's fraud on Plaintiff, as described in the Complaint. It merely alleges that Wells Fargo "aided, abetted and facilitated the fraudulent scheme of one

or more of the Doe Defendants" by opening the Account, accepting wires into the Account, allowing funds to be transferred out of the Account, and failing to prevent further transfers after being put on notice of the fraud. (Compl., Second Count, ¶ 3.) As to the latter point, regarding Wells Fargo's knowledge that it was participating in or facilitating a fraud, the Complaint is particularly lacking in factual allegations. It states as follows: "Wells Fargo either had actual knowledge, is charged with actual knowledge, was on notice and/or chose to be willfully ignorant of the fact that the Fraudulent Wells Fargo Account was being utilized to facilitate frauds and steal money and, despite being made aware of these facts, refused to take steps to prevent damage to Mr. DeFazio and others similarly situated." ( Id. ) This conclusory allegation is precisely the type of "unadorned, the-defendant-unlawfully-harmed-me accusation" the Supreme Court has held does not suffice to withstand a Rule 12(b)(6) motion to dismiss. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. As Wells Fargo points out, the Complaint fails to allege what was communicated to Wells Fargo, when and how the communication took place, and who was involved in the communication. In short, the claim for aiding and abetting fraud meets neither the plausibility standard of Rule 8 nor the heightened standard Rule 9(b) applicable to claims sounding in fraud. [2]

**\*6** Plaintiff, in his opposition, gives no indication that he could allege particular facts showing that Wells Fargo knew it was assisting the alleged fraud at the time the violation was committed. Instead, he argues that Wells Fargo has failed to "produce a Certification from anyone nor has there been any discovery of what Wells Fargo knew and when it knew it with respect to the concededly fraudulent nature or [sic] the Account and transactions processed through the Account." (Pl. Br. at 10.) This approach reverses the applicable burdens of proof. The burden is on the Plaintiff to plead facts showing that Wells Fargo is liable for aiding and abetting the fraud, not on Wells Fargo to establish that it did not have the requisite knowledge.

**[5]** Next, in the Third Count, Plaintiff asserts a claim for conversion against Wells Fargo. To state a claim for unlawful conversion of money, a plaintiff must allege the "wrongful exercise of dominion or control over [the] property of another without authorization and to the exclusion of the owner's rights in that property." Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 456, 978 A.2d 281 (App. Div. 2009). The Complaint alleges no facts whatsoever regarding how

Wells Fargo exercised control over Plaintiff's funds, much less that such control was exercised wrongfully and without authorization. This claim is based on threadbare allegations that merely repeat the elements of the cause of action. It will be dismissed pursuant to Rule 12(b)(6), without leave to replead.

Finally, the Fourth Count of the Complaint asserts another negligence claim against Wells Fargo, seeking to hold the bank liable for the actions of its employees under a theory of respondeat superior. The allegedly wrongful conduct on which this claim is based is identical to the alleged misconduct on which the First Count is based. For the same reasons that the First Count fails to state a plausible negligence claim, this claim must likewise be dismissed.

### III. BIRD DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The Complaint asserts claims for breach of contract, legal malpractice and "negligent supervision/respondeat superior" against the Bird Defendants, based on their alleged failure to safeguard their computer network and email system. The Bird Defendants move to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(2), on the grounds that they lack sufficient contacts with the state of New Jersey to support personal jurisdiction. On a Rule 12(b)(2) motion, the burden is on the plaintiff to "prove by affidavits or other competent evidence that jurisdiction is proper." Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009).

The Third Circuit has held that a federal district court sitting in diversity, "may assert personal jurisdiction over a nonresident defendant to the extent allowed under the law of the forum state." Id. New Jersey's long-arm statute, N.J. Ct. R. 4:4-4, authorizes personal jurisdiction "as far as is permitted by the Fourteenth Amendment to the United States Constitution." Decker v. Circus Hotel, 49 F. Supp. 2d 743, 746 (D.N.J. 1999); see also Avdel Corp. v. Mecure, 58 N.J. 264, 268, 277 A.2d 207 (1971) (holding that New Jersey's long-arm rule "permits service on nonresident defendants subject only to 'due process of law' "). The Fourteenth Amendment's due process clause "limits the power of a state court to render a valid personal judgment against a nonresident defendant." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980). It is well-established that a determination of whether due process permits a court to assert its power

over a nonresident defendant must focus on "the defendant's relationship to the forum State." 🚩 Bristol-Myers Squibb Co. v. Superior Ct. of Cal., 582 U.S. ——, 137 S. Ct. 1773, 1779, 198 L.Ed.2d 395 (2017).

**\*7** In that regard, Supreme Court jurisprudence has recognized two types of personal jurisdiction, general ("all purpose") jurisdiction and specific ("case-linked") jurisdiction, which are distinct based on the nature and extent of the defendant's contacts with the forum. 🚩 Id. ; 🚩 Goodyear Dunlop Tires Operations., S.A. v. Brown, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011). General jurisdiction applies when the defendant's "affiliations with the State are so 'continuous and systematic as to render them essentially at home in the forum state." 🚩 Goodyear, 564 U.S. at 919, 131 S.Ct. 2846 (quoting 🚩 Int'l Shoe Co. v. Washington, 326 U.S. 310, 317, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Where general jurisdiction exists, the defendant's contacts with the state need not be related to the litigation, and, indeed, the forum court "may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different state." 🚩 Bristol-Myers Squibb, 137 S. Ct. at 1780 (citing 🚩 Goodyear, 564 U.S. at 919, 131 S.Ct. 2846 ). Specific jurisdiction, in contrast, exists where the litigation arises out of or relates to the defendant's contacts with the forum. 🚩 Id. This means that "there must be 'an affiliation between the forum and the underlying controversy, principally [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.' " 🚩 Id. (quoting 🚩 Goodyear, 564 U.S. at 919, 131 S.Ct. 2846 ) (alteration in original). Where a court has specific jurisdiction, its authority is limited to adjudicating issues related to the very controversy on which that jurisdiction is based. 🚩 Id. ; see also 🚩 Chavez v. Dole Food Co., Inc., 836 F.3d 205, 223 (3d Cir. 2016) (holding that courts may exercise specific jurisdiction over foreign defendants "when the cause of action arises from the defendant's forum related activities").

In their motion to dismiss, the Bird Defendants argue that Plaintiff cannot establish either general or specific jurisdiction over them in New Jersey. They point out that Bird and his law firm are citizens of South Carolina, maintain an office in South Carolina and represented DeFazio in connection with a real estate closing for property located in South Carolina. They further note that, according to the Complaint itself, DeFazio contacted them to retain the firm; in other words, there is no evidence that the Bird Defendants solicited business, and in particular DeFazio's business, in New Jersey. DeFazio "concedes that there is no general jurisdiction over either of the Bird Defendants in this matter" (Pl. Br. at 2). However, he maintains that there is specific jurisdiction in this forum because the Bird Defendants undertook the representation knowing that DeFazio resided in New Jersey and because they affirmatively initiated email communications directed to DeFazio in New Jersey. DeFazio adds that the Bird Defendants sent their retainer agreement to DeFazio, which he signed in New Jersey.

For specific personal jurisdiction to attach to an out-of-state defendant, the following three requirements must be met: (1) the defendant has 'purposefully directed' his activities at the forum; (2) the litigation arises out of or relates to those activities; and (3) the exercise of jurisdiction otherwise comports with fair play and substantial justice. 🚩 Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); 🚩⚠ O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007). The Supreme Court has consistently held that, to establish that a defendant has sufficient "minimum contacts" with a forum to support specific jurisdiction, "there must be an 'affiliation between the forum and the underlying controversy, principally [an] activity or occurrence that takes place in the forum State.' " 🚩 Bristol-Myers Squibb Co., 137 S. Ct. at 1781 (quoting 🚩 Goodyear, 564 U.S. at 919, 131 S.Ct. 2846 ); see also 🚩 Int'l Shoe, 326 U.S. at 316, 66 S.Ct. 154 (1945) (holding that, for a court to subject a defendant to personal jurisdiction, the defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.") (quotation omitted). "Minimum contacts" has been defined as "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 🚩 Asahi Metal Indus. Co., Ltd. v. Superior Court of California, 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (quoting 🚩 Burger King Corp., 471 U.S. at 475, 105 S.Ct. 2174 ). In other words, for specific jurisdiction to exist, the non-resident defendant's "suit-related conduct must create a substantial connection with the forum State." 🚩 Walden v.

101 UCC Rep.Serv.2d 999

Fiore, 571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014).

 **[6]**    ***8**  DeFazio's effort to establish specific jurisdiction falls far short of the minimum contacts required by well-established jurisprudence. The only "suit-related conduct" linking the Bird Defendants and New Jersey is their communication with New Jersey resident DeFazio, which occurred primarily by email. There is no evidence that the Bird Defendants solicited clients in New Jersey, either in general or specifically targeted to the transaction underlying this suit. There is no evidence that any aspect of the underlying property sale transaction occurred in New Jersey. And there is no evidence that the Bird Defendants traveled to New Jersey to meet with DeFazio in connection with their representation of DeFazio in the transaction. The fact that DeFazio received messages from the Bird Defendants in New Jersey and responded from that location does not, without more, establish a substantial connection with the state or demonstrate that the Bird Defendants purposefully availed themselves of the privileges and benefits of conducting business in New Jersey. IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 n.3 (3d Cir. 1998) (noting that the weight of authority among courts of appeal holds that phone calls and letters between a defendant and a plaintiff in the forum state, without more, do not provide sufficient minimum contacts to satisfy due process); see also Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452 (3d Cir. 2003) (holding, where a defendant's web site was accessible in the forum state, that evidence of the defendant's intentional targeting of the site to the forum state to conduct business was required to satisfy the "purposeful availment" requirement of a minimum contacts analysis); cf. Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 149-50 (3d Cir. 1992) (finding that the defendant's attendance at a meeting with the plaintiff in New Jersey coupled with the telephone calls and letters to New Jersey sufficed to establish minimum contacts).

The claims against the Bird Defendants involve South Carolina actors practicing law in South Carolina for the purpose of DeFazio's purchase of a South Carolina property. For the reasons set forth above, Plaintiff has failed to meet his burden of establishing that the Bird Defendants are subject to personal jurisdiction in New Jersey in connection with this lawsuit. Accordingly, all claims asserted in the Complaint against the Bird Defendants will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant Wells Fargo's motion to dismiss for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), and will also grant the Bird Defendants' motion to dismiss for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). An appropriate Order will be filed.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1888252, 101 UCC Rep.Serv.2d 999

---

### Footnotes

1    The Complaint has also alleged negligence for failure to prevent funds from being transferred out of the Wells Fargo Account after Wells Fargo was "made aware of facts putting [it] on notice that the Fraudulent Wells Fargo Account was being utilized to facilitate fraud and steal money." (Compl., First Count, ¶ 3.) Wells Fargo, in its moving brief, treats this allegation as sounding in negligence for failure to monitor, but Plaintiff expressly rejects this as an improper interpretation of its allegation. Indeed, Plaintiff states in his opposition brief that "[t]his is not an allegation of a duty to monitor. It is an allegation that the knowledge of Wells Fargo essentially made it complicit in the fraud and nothing in law allows a bank to sit idly by when it is aware that crimes are being committed." (Pl. Br. at 10.) Plaintiff clarifies that this aspect of the claim goes to the allegation that in preventing transfer after being made aware of facts that the Wells Fargo Account was being utilized to commit a fraud, "Wells Fargo aided, abetted and facilitate the fraudulent scheme of the holder of the Account in a manner that was negligent...." (Id.) Given that Plaintiff has expressly disclaimed a failure to monitor

---

claim, and given the Complaint's conflation of negligence and fraud theories of wrongdoing with regard to "after-notice" transfers from the Wells Fargo account, the Court will analyze the claim for failure to prevent transfer of funds in furtherance of a fraudulent scheme as part of the aiding and abetting fraud claim pleaded in the Third Count.

2    Additionally, DeFazio's reliance on published news reports related to Wells Fargo's involvement in schemes which include opening fraudulent bank accounts and the creation of fake accounts is completely unavailing. See, generally, Sodini Cert., Ex. A-C. Apart from raising these matters outside of the pleadings, Plaintiff fails to plead any facts linking the wrongdoing at issue in these reports and the allegations of wrongdoing committed against Plaintiff by some third party in using the Wells Fargo Account to defraud Plaintiff.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

## [Essgeekay Corp. v. TD Bank, N.A.](#)

United States District Court for the District of New Jersey

December 19, 2018, Decided; December 19, 2018, Filed

Civil Action No. 18-3663 (ES) (CLW)

**Reporter**

2018 U.S. Dist. LEXIS 214691 *; 97 U.C.C. Rep. Serv. 2d (Callaghan) 597; 2018 WL 6716830

ESSGEEKAY CORPORATION d/b/a AMERICAN PRESCRIPTION SURGICAL CENTER, Plaintiff, v. TD BANK, N.A., Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel: [*1]** For ESSGEEKAY CORPORATION, doing business as AMERICAN PRESCRIPTION SURGICAL CENTER, Plaintiff: A. ROSS PEARLSON, LEAD ATTORNEY, BRIGITTE M. GLADIS, Chiesa Shahinian & Giantomasi PC, WEST ORANGE, NJ.

For TD BANK N.A., Defendant: MICHAEL SALVATORE ZULLO, LEAD ATTORNEY, KELLY K. HUFF, DUANE MORRIS LLP, PHILADELPHIA, PA.

**Judges:** Esther Salas, United States District Judge.

**Opinion by:** Esther Salas

## Opinion

---

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant TD Bank, N.A.'s ("TD") motion to dismiss Plaintiff Essgeekay Corporation's ("Plaintiff") Complaint under [Federal Rule of Civil Procedure 12(b)(6)](#). (D.E. No. 3). The Court has jurisdiction pursuant to [28 U.S.C. § 1332](#). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* [Fed. R. Civ. P. 78(b)](#). As set forth below, the Court DENIES TD's motion to dismiss as to Count I and GRANTS TD's motion to dismiss as to Count II and Count III.

### I. BACKGROUND[1]

Plaintiff is a pharmacy located in Fort Lee, New Jersey, represented by Sreedhar Vajinepalli and Kalpesh Dave. (D.E. No. 1-1, Complaint ("Compl.") ¶¶ 5& 9). In February of 2009, Vajinepalli and Dave opened a TD business checking account on behalf of Plaintiff, over which they had sole control. (*Id.* at ¶¶ 8-9). Upon opening the account, TD provided each Vajinepalli **[*2]** and Dave independent login credentials to access the online banking system—credentials that they did not share with each other or anyone else. (*Id.* ¶¶ 10-12). As an additional security protocol, Vajinepalli and Dave selected individualized security questions and provided confidential responses. (*Id.* ¶¶ 11-12).

As a matter of business, each month Vajinepalli arranged five to six wire transfers to pay various pharmacy wholesalers operating in New York and New Jersey. (*Id.* ¶¶ 13-14). Plaintiff alleges that "wire transfers were not

---

[1] The Court must accept Plaintiff's factual allegations as true for purposes of resolving the pending motion to dismiss. *See* [Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)](#); [Bistrian v. Levi, 696 F.3d 352, 358 n.1 (3d Cir. 2012)](#).

generally made for any other purpose" and Dave was not involved in the wire transfers and never initiated a transfer from his online account. (*Id.* ¶¶ 13-14). Whenever Vajinepalli attempted to login to the online account from an unfamiliar computer, TD would lock the account and require him to call the bank and "provide identifying corporate information . . . as well as the answers to his specific security questions." (*Id.*).

Sometime after June 7, 2016, Vajinepalli logged into the online account with his personal username and noticed three unauthorized wire transfers to bank accounts in California, Oklahoma, and Texas. (*Id.* ¶¶ 16-17). The transfers totaled approximately **[\*3]** $176,000. (*Id.* ¶ 16). Plaintiff alleges that none of these transfers were consistent with either the identity or location of the usual payees involved in prior wire transfers. (*Id.*). Soon after, Vajinepalli discovered that the transfers were initiated from Dave's online account without Dave's approval, rather than Vajinepalli's account, as was the usual process. (*Id.* ¶¶ 15 & 17). Upon discovery of the transfers, Dave attempted to login to his account, but was unable to because security procedures had locked him out. (*Id.* ¶ 17).

When Dave called TD to report the issue, the representative informed him that TD had locked his account because TD suspected fraudulent activity. (*Id.* ¶ 18). TD did not, however, explain the basis of this suspicion. (*Id.* ¶ 25). TD claimed that before processing the transfers, it attempted to contact Dave by phone and email to obtain approval for the transfers. (*Id.* ¶¶ 26-27). TD "ultimately authorized the transfers" even though TD "never received such approval from Dave for any of the transfers." (*Id.* ¶ 27). Dave asked TD representatives to disclose the contact information they had used to contact him, but TD did not provide the information. (*Id.* ¶ 26).

On June **[\*4]** 13, 2016, Vajinepalli visited the Parsippany branch of TD seeking answers about the fraudulent transfers. (*Id.* ¶ 20). However, TD representatives informed Vajinepalli that the Bank required "a police report before TD . . . could take action with respect to recovering the funds." (*Id.* ¶ 19). Vajinepalli immediately filed a report with the Parsippany-Troy Hills Police department, but Plaintiff alleges that even then, TD failed to effectuate a reversal of the fraudulent transfers and failed to provide Plaintiff with any additional information about the transfers or TD's purported investigation. (*Id.* ¶¶ 20-22). This prompted Dave to call TD two to three times a day to seek more information, but each time he was transferred from one department to another without ever receiving the requested information. (*Id.* ¶ 23).

Four days later, on June 17, 2016, TD assigned the case to a corporate security representative and attempted to reverse the transfers, but was unable to do so as the transferee(s) had already removed the funds. (*Id.* ¶¶ 24, 28 & 30-31). On June 20, 2016, TD informed Plaintiff by phone that the funds were lost, and that they would be unable to process the reversal. (*Id.* ¶¶ 30-31). **[\*5]** Plaintiff filed this action in the Superior Court of New Jersey and TD subsequently removed the case to this Court. (*See* D.E. No. 1).

## II. LEGAL STANDARD

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"When reviewing a motion to dismiss, [a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). But the court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

---

[2] Unless otherwise indicated, all citations and internal quotation marks are omitted, and all emphasis is added.

2018 U.S. Dist. LEXIS 214691, *5

Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public **[*6]** record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006); *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426 (3d Cir. 1997).

## III. ANALYSIS

The parties make a number of arguments in favor of their respective positions. The Court addresses only arguments relevant to the disposition of TD's motion. As outlined below, the Court denies TD's motion as to Count I because Plaintiff has pleaded sufficient facts to state a claim for violation of the New Jersey Uniform Commercial Code ("UCC") provisions codified at N.J.S.A. § 12A:4A-202 and N.J.S.A. § 12A:4A-203. However, the Court dismisses Counts II and III because these common law claims are displaced by the New Jersey UCC.

### A. Count I: Violation of N.J.S.A. § 12A:4A-202 and N.J.S.A. § 12A:4A-203

TD argues the Court should dismiss Count I as a matter of law because Plaintiff admits that TD had security procedures in place, which were effective in the past, and which were followed for the alleged fraudulent transfers. (D.E. No. 4 ("Def. Mov. Br.") at 6).[3] As a result, TD avers that under the New Jersey UCC the risk of loss shifted to Plaintiff and TD is not liable for the loss. (Def. Mov. Br. at 7).

Plaintiff counters that it has sufficiently alleged that that TD's security procedures were not "commercially reasonable" **[*7]** as required by N.J.S.A. § 12A:4A-202. (Pl. Opp. at 9). Particularly, Plaintiff argues that while the determination of commercial reasonableness is a question of law, it requires consideration of fact-sensitive inquiries which are not appropriate at the motion to dismiss stage. (*Id.* at 10). Additionally, Plaintiff argues that even if TD's security measures were commercially reasonable, Plaintiff has sufficiently alleged that the bank failed prove that "it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer. . . ." (*Id.* at 14).

N.J.S.A. § 12A:4A-202(2) provides that the customer will be liable for an alleged fraudulent transfer if the bank and customer have agreed upon "a security procedure to verify the authenticity of payment orders" that is commercially reasonable and "the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer. . . ." Whether a bank's security procedure is commercially reasonable is an issue of law for the Court to determine. N.J.S.A. § 12A:4A-202(3). The comments to Article 4A-203 illustrate a desire to define commercial reasonableness based on the facts **[*8]** of each case. *See* N.J.S.A. § 12A:4A-203 cmt. 4. There is very little jurisprudence discussing commercially reasonable security procedures in the context of UCC Section 202. Therefore, the Court is guided primarily by the language of N.J.S.A. § 12A:4A-202 and standard industry practice.

According to the official comments the purpose of the statute, as it pertains to electronic transfers, is to authenticate the identity of the individual who sends the payment order as well as to prevent mistakes. N.J.S.A. § 12A:4A-203 cmt. 4. The Federal Financial Institutions Examinations Council ("FFIEC")[4] issued specific guidance to banks for

---

[3] TD attaches as an exhibit to its motion an account agreement allegedly binding Plaintiff. (*See* D.E. No. 3-2; Def. Mov. Br. at 2-3, 6 & 12). However, Plaintiff did not attach or otherwise referred to any such agreement in its Complaint, and Plaintiff disputes that the exhibit is the agreement it entered with TD when Plaintiff opened the account. (D.E. No. 13 ("Pl. Opp.") 12). Therefore, the Court does not rely on Defendant's exhibit or any of the arguments that rely or quote language from it. *Cf. Mayer,* 605 F.3d at 230.

2018 U.S. Dist. LEXIS 214691, *8

adopting security measures to avoid fraudulent transfers. *See* FFIEC, *Authentication in an Internet Banking Environment* (Oct. 12, 2005), *available at* https://www.ffiec.gov/pdf/authentication_guidance.pdf (hereinafter "FFIEC Guidelines"). The FFIEC Guidelines were intended to aid financial institutions in "evaluating and implementing authentication systems and practices whether they are provided internally or by a service provider." *Id.* at 1. The FFIEC recommends that modern banking security procedures involve two-factor authentication selected from three types of factors: (i) something the user knows (*e.g.*, PIN or security question answer); (ii) **[*9]** something the user has (*e.g.*, card or device); (iii) and something the user is (*e.g.*, biometrics). *Id.* at 3. Several sister courts in jurisdictions that have adopted very similar language to New Jersey's UCC section 202 have applied the FFIEC Guidelines when determining the commercial reasonableness of a bank's security procedures. *See, e.g., Choice Escrow and Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 619-20 (8th Cir. 2014); *Patco Const. Co., Inc. v. People's United Bank*, 684 F.3d 197, 201 (1st Cir. 2012).

As a threshold matter, the Court disagrees with Plaintiff's argument that the determination of commercial reasonableness is not appropriate at the motion to dismiss stage. While under the statute the determination of commercial reasonableness will depend on the facts of each case, N.J.S.A. § 12A:4A-203 cmt. 4, that does not prevent the Court from making a legal determination based on the facts as alleged by the Complaint. After all, the legal question at the motion to dismiss stage is whether, taking all the facts as alleged by Plaintiff to be true, the Complaint shows that Plaintiff has stated a claim for which relief can be granted. *See Iqbal*, 556 U.S. at 678. Answering that question at this stage does not require the Court to look beyond the facts alleged in the Complaint and the documents that are integral to the Complaint.

Here, Plaintiff concedes that TD had various security procedures in place and that these procedures **[*10]** effectively barred access to the online accounts on previous occasions. (*See* Pl. Opp. at 4). Plaintiff describes at least three protocols implemented by TD for the purpose of securing the account. First, both representatives for Plaintiff were "provided with independent login information to access the online banking system." (Compl. ¶ 10). Second, Vajinepalli and Dave selected independent security questions and answers that were to be used to identify themselves for the purpose of accessing the account. (*Id.* ¶ 11). Both the login information and security questions constitute "something the user knows." *See* FFIEC Guidelines at 3. Third, Plaintiff's account was configured to lock out a user if a login was attempted from an unrecognized computer, requiring Plaintiff's representatives to call TD and provide corporate information and security question answers to regain access. (Compl. ¶ 14). The unfamiliar device lockout constitutes "something the user has," i.e. a familiar computer. *See* FFIEC Guidelines at 3. Accordingly, the Court finds for purposes of the current motion that, as alleged by the Complaint, TD's implemented two-factor authentication procedure is commercially reasonable.

The risk of a fraudulent payment order remains **[*11]** with TD, however, unless TD "proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer. . . ." N.J.S.A § 12A:4A-202(2). This is a question of fact. N.J.S.A. § 12A:4A-203 cmt. 4. The code defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing." N.J.S.A. § 12A:1-201(20). "This two-pronged definition has both a subjective component—honesty in fact—and an objective component—the observance of reasonable commercial standards of fair dealing." *BancorpSouth Bank*, 754 F.3d at 622. The subjective prong concerns whether the bank accepted the payment order honestly. *See id.* at 623. The objective prong concerns whether the bank accepted the payment order in accordance with the security procedures "in a way that reflects the parties' reasonable expectations as to how those procedures will operate." *Id.* Thus, Defendant must show that its employees accepted and executed the payment orders in a way that comported with Plaintiff's "reasonable expectations, as established by reasonable commercial standards of fair dealing." *Id.*[5]

---

[4] The FFIEC is an interagency body created by Congressional statute and charged with "establish[ing] uniform principles and standards and report forms for the examination of financial institutions which shall be applied by the Federal financial institutions regulatory agencies." 12 U.S.C. § 3305(a).

[5] Though "there may be some evidentiary overlap" between evaluating the commercial reasonableness of the security procedure and the bank's compliance, "the commercial reasonableness inquiry concerns the *adequacy* of a bank's security procedures,

2018 U.S. Dist. LEXIS 214691, *11

Plaintiff notes that on previous occasions when Vajinepalli attempted to access the account from an unfamiliar computer, the **[*12]** bank's security procedures blocked access to the account before any transfers were made. (Compl. ¶ 14; Pl. Opp. at 13-14). Therefore, this effective response is the foundation upon which Plaintiff's expectations rest. Plaintiff claims that TD failed to act with this previously-demonstrated effectiveness. (Pl. Opp. at 13-14). To support this claim, Plaintiff asserts among other things that an unauthorized user was able to access the account using Dave's information "from a different computer" and made several large transfers, and TD failed to promptly recognize this activity and lock the account as it had previously done. (Compl. ¶ 15). At its core, Plaintiff essentially argues that the unfamiliar device lockout procedure failed to stop an individual from logging into the account on an unfamiliar device.

TD argues that the "Complaint admits that the transfers initiated from Dave's user login" and that the security procedure verified the transfers. (Def. Mov. Br. at 7). As such, TD argues that the "only reasonable inference to draw from [these] allegations is that" someone used Dave's login information on his own "known" computer to initiate the transfers; i.e. that this was an "inside **[*13]** job." (*Id.*). But this ignores that at the motion to dismiss stage the Court must draw all reasonable inferences in favor of Plaintiff. *See Malleus*, 641 F.3d at 563. Additionally, TD's argument ignores that TD apparently attempted to contact Dave to confirm the transfers, and ultimately locked Dave's account, because TD *suspected* that the activity was fraudulent. (Def. Mov. Br. at 3; Compl. ¶ 18 & 26-27). Thus, taking the Complaint's factual allegations as true and drawing all reasonable inferences in favor of Plaintiff, as the Court must do, the inference can be drawn that TD failed to prevent an unauthorized individual from accessing the account on an unknown computer, and that TD permitted these transfers to go through *despite* being unable to confirm their authenticity with Dave and *despite* suspicions that they were fraudulent. (*See* Compl. ¶ 18 & 26-27). As such, Plaintiff has sufficiently pleaded that TD failed to accept the payment orders in good faith and in compliance with the security procedure. Therefore, the Court finds that Plaintiff's Article 4A-202 claim is sufficiently well-pled and denies TD's motion to dismiss Count I.[6]

### B. Common Law Clams

TD argues that New Jersey's adoption of the above UCC provisions displaces **[*14]** the common law negligence claim in Count II and the fiduciary duty claim in Count III. (Def. Mov. Br. at 8). Plaintiff counters that upon creation of the account, TD "assumed a duty to use reasonable care to keep Plaintiff's [a]ccount information private and secure," and that by investigating the transfers TD "assumed a duty to assist Plaintiff in the recovery of the funds stolen from its Account." (Compl. ¶¶ 42-43; *see also* Pl. Opp. at 18). In reply, TD avers that "the facts pled support displacement of the common law claims by the UCC" and that in any event, Plaintiff's does not allege any facts supporting creating a special relationship. (D.E. No. 14 at 7).

---

[whereas] the objective good faith inquiry" concerns the manner in which the bank complied or acted in accordance with the implemented security procedure. *BancorpSouth Bank*, 754 F.3d at 623.

[6] Even assuming the transfers were valid under Article 4A-202, the Court finds that Plaintiff has sufficiently pleaded facts to support its claim under Article 4A-203. Article 4A-203 provides an exception to Article 4A-202 in which the customer may shift the loss to the bank upon proof that he is not responsible for compromising of the confidential access information. N.J.S.A. § 12A:4A-203 cmt. 5. New Jersey law places the burden of "safeguard[ing] confidential security information and access to transmitting facilities" on the customer. *Id.* at cmt. 4. The parties agree that the alleged fraudulent transfers were initiated using Dave's confidential login credentials. (Compl. ¶ 15). Thus, it appears that Plaintiff failed to meet its burden of safeguarding Dave's login credentials. But, as the exception allows, Plaintiff is permitted to rebut this apparent failure with evidence that it or its agents are not responsible for the disclosure of login credentials. N.J.S.A. § 12A:4A-203(1)(b).

A showing that the credentials were not obtained from the customer will shift the loss to the bank. *Id.* at cmt. 5. Plaintiff avers that Dave's security credentials were not disclosed to anyone, and that even Vajinepalli did not know Dave's login information or security question responses. (Compl. ¶ 12). Thus, for purposes of the present motion, the Court must draw the reasonable inference that Plaintiff was not at fault for the compromising of the confidential login information. As such, the Court finds that the Article 4A-203 claim is sufficiently pled for purposes of the present motion.

2018 U.S. Dist. LEXIS 214691, *14

The Official Comment to N.J.S.A. 12A:4A-102 "provides that Article 4A comprehensively governs the rights and remedies of parties affected by funds transfers." ADS Associates Group, Inc. v. Oritani Sav. Bank, 219 N.J. 496, 99 A.3d 345, 359 (N.J. 2014) (citing N.J.S.A. § 12A:4A-102 cmt. 1 ("Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.")). "[T]he UCC displaces the common law where reliance on the common law would thwart the purposes of the UCC." Psak, Graziano & Whitelaw v. Fleet Nat. Bank, 390 N.J. Super. 199, 915 A.2d 42, 45 (N.J. Super. Ct. 2007). "Only in very rare instances should a court upset the legislative scheme of loss [*15] allocation and permit a common law cause of action." City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 764 A.2d 411, 416 (N.J. 2001) (quoting Bank Polska Kasa Opieki v. Pamrapo Sav. Bank, 909 F. Supp. 948, 956 (D.N.J. 1995)). Thus, "unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [UCC]." City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 764 A.2d 411, 416 (N.J. 2001).

Under New Jersey law, "[t]he standard deposit agreement between a bank and a depositor does not create a special relationship." Estate of Paley v. Bank of Am., No. A-4391-07T3, 2011 N.J. Super. Unpub. LEXIS 1055, 2011 WL 1598974, at *12 (N.J. Super. Ct. App. Div. Apr. 29, 2011) (citing Globe Motor Car Co. v. First Fid. Bank, 273 N.J. Super. 388, 641 A.2d 1136 (Super. Ct. Law Div. 1993), aff'd, 291 N.J. Super. 428, 677 A.2d 794 (Super. Ct. App. Div. 1996)). Additionally, the relationship between a bank and a depositor is that of a creditor-debtor. Estate of Paley v. Bank of Am., No. A-4391-07T3, 2011 N.J. Super. Unpub. LEXIS 1055, 2011 WL 1598974, at * 12 (N.J. Super. Ct. App. Div. Apr. 29, 2011) (citing Klemm v. Labor Coop. Nat'l Bank, 117 N.J.L. 284, 187 A. 640 (N.J. 1936). A creditor-debtor relationship will rarely give rise to a fiduciary duty because the positions of the creditor and the debtor are essentially adversarial. See Paradise Hotel Corp. v. Bank of Nova Scotia, 842 F.2d 47, 53, 23 V.I. 450 (3d Cir. 1988); see also United Jersey Bank v. Kensey, 306 N.J. Super. 540, 704 A.2d 38, 44 (N.J. Super. Ct. App. Div. 1997) (noting that "there is no presumed fiduciary relationship between a bank and its customer" because "their respective positions are essentially adversarial"). As such, common law claims cannot proceed where they would "contravene the provisions of UCC Article 4." ADS Associates Group, Inc., 99 A.3d at 358.

The scope of Article 4A encompasses the very situation alleged by Plaintiff in which "[a] payment order purporting to be that of Customer is received by [*16] Receiving Bank but the order was fraudulently transmitted by a person who had no authority to act for Customer." See N.J.S.A. § 12A:4A-203 cmt. 2. Plaintiff's attempt to convert TD's conduct (the investigation of the transfers upon receiving a police report and the attempt to process a reversal of the transfers) into a special undertaking giving rise to a special relationship is thus, misplaced. Indeed, the comments to the UCC assume that such an investigation will occur. See N.J.S.A. § 12A:4A-203 cmt. 5 ("Because of bank regulation requirements, in this kind of case there will always be a criminal investigation as well as an internal investigation of the bank to determine the probable explanation for the breach of security.").

Further, Plaintiff does not identify any particular facts, or case law for that matter, to show that TD was acting on behalf of anyone else other than for its own self-interest when it undertook those actions. (See Pl. Opp.). After all, TD did not act until it had received a police report. And importantly, banks like TD are subject to various regulatory duties including the requirement to prepare Suspicious Activity Reports in connection with suspicious transactions and suspected violations of federal [*17] banking law. See, e.g., 12 C.F.R. § 21.11. Additionally, section 12A:4A-204(1) places the risk of loss on the bank when there is a violation of section 12A:4A-202 or section 12A:4A-203. N.J.S.A. § 12A:4A-204 cmt. 1 ("Subsection (a) of Section 4A-204 states that the bank must recredit the account or refund payment to the extent the bank is not entitled to enforce payment.").

Therefore, Plaintiff's allegations are insufficient to overcome the "heavy presumption" that a creditor-debtor relationship like the one at issue here does not give rise to a special relationship. Galayda v. Wachovia Mortg., FSB, No. 10-1065, 2010 U.S. Dist. LEXIS 135496, 2010 WL 5392743, at *17 (D.N.J. Dec. 22, 2010). Plainly, Article 4A provides a comprehensive remedy to address Plaintiff's injury arising out of the alleged fraudulent transfers, and to allow Plaintiff's common law claims to go forward in the absent of such a special relationship would be to allow Plaintiff to sidestep the "careful and delicate" scheme of loss allocation contemplated and expressed by the legislature. See ADS Assocs. Grp., Inc., 99 A.3d at 361 ("In Article 4A, the Legislature has treated electronic funds transfers as a distinct category of transactions governed by special rules, and has carefully limited the liability of

2018 U.S. Dist. LEXIS 214691, *17

banks to refund money transferred in accordance with a payment order that the customer has not authorized."); *Girard Bank v. Mount Holly State Bank*, 474 F.Supp. 1225, 1239 (D.N.J. 1979) ("Courts should be hesitant to improvise new remedies outside the already intricate scheme of **[\*18]** Articles 3 and 4"); *see also* New Jersey Bank, N.A. v. Bradford Securities Operations, Inc., 690 F.2d 339, 345 (3d Cir. 1982) (holding that a common-law tort action is barred where Article 8 provides a "comprehensive remedy").

For these reasons, the Court dismisses Counts II and III *with prejudice*.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES TD's motion to dismiss as to Count I and GRANTS TD's motion to dismiss as to Counts II and III *with prejudice*. An appropriate Order accompanies this Opinion.

*/s/ Esther Salas*

**Esther Salas, U.S.D.J.**

## ORDER

SALAS, DISTRICT JUDGE

Before the Court is Defendant TD Bank, N.A.'s motion to dismiss Plaintiff Essgeekay Corporation's Complaint under Federal Rule of Civil Procedure 12(b)(6) (D.E. No. 3); and the Court having considered the parties' submissions and having decided the matter without oral argument under Federal Rule of Civil Procedure 78(b); and for the reasons stated in the Court's accompanying Opinion,

IT IS on this 19 day of December 2018,

**ORDERED** that Defendant's motion to Dismiss (D.E. No. 3) is GRANTED-IN-PART and DENIED-IN-PART; and it is further

**ORDERED** that Defendant's motion is DENIED as to Count I but GRANTED as to Counts II and III; and it is further

**ORDERED** that Count II and Count III are DISMISSED *with prejudice*; and it is further

**ORDERED** that the Clerk of Court shall TERMINATE **[\*19]** Docket Entry Number 3.

*/s/ Esther Salas*

**Esther Salas, U.S.D.J.**

---

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 23 of 83 PageID: 123

Hudson v. Valcorp, Inc., Not Reported in F.Supp. (1990)

1990 WL 69173
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Paul C. HUDSON, P.A. Pension Trust, et al., Plaintiffs,

v.

VALCORP, INC., et al., Defendants.

CIV. A. No. 88–2383.
|
May 22, 1990.

**Attorneys and Law Firms**

Charles Jarvis Murray, San Francisco, for plaintiffs.

Daniel D. Caldwell, Wolff & Samson, Roseland, N.J., for defendant United Jersey Bank.

*OPINION*

WOLIN, District Judge.

**\*1** Defendant United Jersey Bank ("UJB") moves for summary judgment asserting that no genuine issues of material fact exist and UJB is entitled to judgment as a matter of law. Plaintiffs allege that fact issues remain which preclude the entry of summary judgment. The Court has reviewed all the submissions of the parties, including supplemental briefs allowed by the Court concerning certain newly discovered material, and has heard oral argument. For the reasons which follow, the Court finds that no genuine issues of material fact exist and defendant UJB is entitled to judgment as a matter of law. Therefore, the Court will grant UJB's motion for summary judgment and dismiss the complaint as against UJB.

## I. *BACKGROUND*

The facts in this case are either undisputed or have been admitted by the parties for the purposes of this summary judgment motion. Plaintiffs' claims against UJB all pertain to $500,000.00 deposited directly into UJB Account No. 101–136722 whose sole record owner was Valcorp, Inc. ("Valcorp"). Plaintiff Paul C. Hudson ("Hudson") wired the money directly into the Valcorp account. The source of the $500,000.00 was securities owned by plaintiff Paul C.

Hudson, P.A. Pension Trust ("the Trust"). The deposit was made to serve as collateral security for the extension of a line of credit to defendant Valcorp. In addition, Hudson signed a personal guarantee for the line of credit and signed a subordination agreement presented and executed by UJB. The funds were never placed in any account owned by any of plaintiffs. The funds were deposited into the Valcorp account on December 16, 1983 and remained in that account until June 9, 1986. At that time, the collateral was released to Valcorp, the record owner, because Valcorp had previously paid off the full balance due on its line of credit on June 2, 1986. No notice was given to plaintiffs of the release of the collateral. For the purposes of this motion, defendant UJB has assumed that Hudson orally told UJB when the funds were deposited, and that consequently, UJB knew, that Hudson, or the Trust was the source of the funds and that Hudson expected the funds to be returned to him when the Valcorp line of credit was paid off. On June 14, 1985, Valcorp and UJB increased the line of credit and altered the agreement between Valcorp and UJB, apparently without the knowledge, consent, or signature of Hudson. This agreement altered the conditions under which the deposit served as collateral, although it did not decrease the deposit in any manner. On January 22, 1986, Hudson telephoned UJB and informed the bank of his concern as guarantor and subordinated creditor that the deposit held as collateral might be in jeopardy unless efforts were made to pay down the line of credit. Hudson followed up his telephone conversation with a letter dated January 23, 1986. UJB did not reply to this letter. Apparently, no further communications took place between Hudson and UJB after this point, until after the collateral had been released by UJB.

## II. *DISCUSSION*

**\*2** Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hersch v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must make all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismd,* 465 U.S. 1091 (1984). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 24 of 83 PageID: 124

Hudson v. Valcorp, Inc., Not Reported in F.Supp. (1990)

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.* Moreover, if the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Therefore, when the non-moving party's evidence is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

There is no dispute that New Jersey law clearly governs this diversity action. UJB has moved for summary judgment on that grounds that N.J.Stat.Ann. § 17:9A–223 (West 1984) ("Section 223") controls the legal duties which UJB owed to Hudson and is a complete statutory defense to this action. UJB contends that the facts asserted by plaintiffs entitle UJB to summary judgment pursuant to section 223. Plaintiffs oppose this motion on the grounds that the statute "presumes" notice to a suspected adverse claimant prior to the release of any funds, that UJB failed to give the required notice, that the factual record is insufficient to support a motion for summary judgment, and that, if the Court should hold that the section is applicable to this situation, then it does not apply because Valcorp was a fiduciary to Hudson.

After reviewing the affidavits, exhibits and memoranda of counsel, the Court finds that a there is a sufficient factual record to support a motion for summary judgment under Fed.R.Civ.P. 56(b). Section 223 provides in pertinent part that:

Notice to any banking institution of an adverse claim to a deposit to the credit of any person shall not be effectual to cause the banking institution to recognize the adverse claimant unless the adverse claimant shall either procure a restraining order, injunction or other appropriate process against the banking institution ... or shall execute and deliver to the banking institution, in form and with surety acceptable to it, a bond indemnifying the banking institution against any liability, loss, damage, costs and expenses....

This section shall not apply when the person to whose credit the deposit stands is a fiduciary for the adverse claimant, and the facts showing such relationship and reasonable cause for

belief that the fiduciary is about to misappropriate the deposit are made to appear by affidavit of the claimant.

**\*3** Section 223 describes the conditions under which a bank may be held liable to a third party for the release of a deposit to a record owner where the third party has asserted an adverse claim to that deposit. The statute requires that specific affirmative measures be undertaken before a bank's duty to recognize and protect a person's interest in a deposit held by the bank where that person is not the denominated depositor is triggered. The statute requires that the adverse claimant either obtain a restraining order, injunction or other appropriate process against the bank, or execute and deliver to the bank a bond indemnifying the bank against any liability, loss, damage, costs and expenses for the bank's having failed to release funds to a record owner of those funds. It is undisputed by plaintiffs that none of these actions were undertaken. Section 223 specifically states that no other notice to the bank will be effectual to cause the bank to recognize an adverse claim.

Plaintiffs' argument that the language of the statute presumes prior notice by the bank is legally untenable. In fact, the very purpose of this statute was to put the initial onus on the adverse claimant to come forward and affirmatively assert his claim before any duty on the part of the bank would arise. \*cite\*. Requiring a bank to contact any person it might suspect of having an adverse claim to an account is counter to the express language of the statute and would create a logistical nightmare for banking institutions. *See Goldstein v. Riggs National Bank,* 459 F.2d 1161, 1163 (D.C.Cir.1972). Plaintiffs have offered no legal authority for their contention that UJB had a duty to provide prior notification to any potential adverse claimant. Plaintiffs also misconstrue the language of the statute concerning fiduciaries. Section 223 does not apply when the record owner of the account is a fiduciary for the adverse claimant and facts evidencing that relationship and reasonable cause for belief that the fiduciary is about to misappropriate the deposit are made to appear by affidavit of the adverse claimant. Plaintiffs ask this Court to consider Hudson's letter dated January 23, 1986 as the affidavit under this provision of the statute. The language of the section is specific and clear. Hudson's letter is not the equivalent of an affidavit and will not satisfy the statutory criteria.

Based on the foregoing discussion, the Court finds that section 223 is applicable to this situation and delineates the duties, obligations and potential liabilities of UJB to

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 25 of 83 PageID: 125

Hudson v. Valcorp, Inc., Not Reported in F.Supp. (1990)

plaintiffs. Plaintiffs' complaint alleges that UJB converted the $500,000.00 deposit (count one), breached the loan agreement by conspiring to convert the deposit with the other defendants (count three), committed negligence in allowing the conversion to be committed (count four), breached their fiduciary duty to plaintiffs by their alleged act of conversion (count five), conspired with the other defendants to convert the deposit (count six), and breached the covenant of good faith and fair dealing attendant to Hudson's personal guarantee of the line of credit by wrongfully releasing the deposit to the record owner of the account. (count seven). All the allegations of plaintiffs' complaint which are directed at defendant UJB concern the release of the $500,000.00 deposit to Valcorp, the record owner of the account. Section 223 declares that a bank will not be liable to any adverse claimant who has failed to affirmatively assert their claim in the manners prescribed in the section. It is without dispute that plaintiffs have failed to do so. The issue before this Court is not whether there was, or is, an adverse claim to that deposit. The issue for the Court to decide is whether plaintiffs properly asserted that claim so that a duty arose in the bank to recognize that adverse claim. Based on the facts plead by plaintiffs, this Court finds that plaintiffs did not satisfy the requirements of the section. Therefore, UJB was under no obligation to recognize any interest of plaintiffs in the $500,000.00 deposit. Also, it is undisputed that the deposit was at all times placed in an account whose sole record owner was Valcorp. As a matter of law, UJB can not be held liable to plaintiffs for conversion of property which plaintiffs did not own. Therefore, the Court will grant defendant UJB's motion for summary judgment and will dismiss all claims as against UJB.

### III. *CONCLUSION*

**\*4** For the foregoing reasons, the Court finds that no genuine issues of material fact exist and defendant UJB is entitled to judgment as a matter of law. Therefore, the Court will grant UJB's motion for summary judgment and dismiss the complaint as against UJB.

An appropriate order is attached.

### ORDER

In accordance with an opinion of the Court filed herewith,

It is on this 22nd day of May, 1990,

ORDERED that the motion for summary judgment of defendant United Jersey Bank is granted; and it is further

ORDERED that the complaint as against defendant United Jersey Bank is dismissed.

**All Citations**

Not Reported in F.Supp., 1990 WL 69173

---

**End of Document**　　　　© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Ludlow Essex Partners LLC v. Wells Fargo Bank, N.A., Not Reported in Fed. Supp. (2017)

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 26 of 83 PageID: 126

KeyCite Yellow Flag

Distinguished by   Ben-Dor v. Alchemy Consultant LLC,   N.Y.Sup.,   April 26, 2023

2017 WL 2963488
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

LUDLOW ESSEX PARTNERS LLC, Nathan Halegua and Martin D. Newman, Plaintiffs,
v.
WELLS FARGO BANK, N.A., Defendant.

17cv2042 (DLC)
|
Signed 07/11/2017

**Attorneys and Law Firms**

For the Plaintiffs: Christopher R. Clarke, Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036.

For the Defendant: Noreen A. Kelly, McGuire Woods LLP, 1345 Avenue of the Americas, 7th Floor, New York, New York 10105, Graham H. Claybrook, McGuire Woods LLP, 201 North Tryon Street, Suite 3000, Charlotte, North Carolina 28202.

OPINION AND ORDER

DENISE COTE, United States District Judge

 **\*1**  Plaintiffs Ludlow Essex Partners LLC ("Ludlow"), and two of its members—Nathan Halegua ("Halegua") and Martin D. Newman ("Newman")—bring this action against the defendant Wells Fargo Bank, N.A. ("Wells Fargo"), alleging that Wells Fargo was negligent in allowing JGM Global Ventures Inc. ("JGM") to open a "fraudulent" Wells Fargo account, and that this same activity violates New York's General Business Law § 349. The defendant has moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the defendant's motion is granted.

BACKGROUND

The following facts are drawn from the complaint and are construed in favor of the plaintiffs. See Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 68 (2d Cir. 2014). Ludlow is a New York limited liability company. In November 2015, Ludlow decided to make distributions to its members, including a $250,000 distribution to member David Levy ("Levy"). Levy maintains an email account ("Levy Email Account").

On December 1, 2015, at 9:46 a.m., Ludlow's controller received an email from the Levy Email Account instructing Ludlow to wire transfer Levy's distribution to a bank account maintained by Signature Bank. At 10:02 a.m., Ludlow's controller received another email from that same account (the "phishing email") informing him that the earlier referenced bank account could not accept wires due to an audit, and to instead wire Levy's distribution to the JGM Global Ventures Inc. bank account at Wells Fargo. On December 14, 2015, Ludlow wired the distribution to the JGM account at Wells Fargo. Levy never received the distribution.

Upon learning that Levy had not received his distribution, Halegua contacted a Wells Fargo employee who confirmed that the distribution had been paid to the JGM account, and that $159,247.55 had been withdrawn on December 16, 2015. Wells Fargo returned the remaining $90,752.45 to Ludlow, which Ludlow in turn paid to Levy. Halegua and Newman personally paid Levy the remaining $159,247.55 owed to him as part of his distribution. Ludlow was reimbursed a net total of $52,500 by its insurance company. While Levy was paid the entire amount he was owed, Halegua and Newman are owed $106,747.55.

The plaintiffs filed this action in New York state court on February 22, 2017. Wells Fargo removed the case to this Court pursuant to 28 U.S.C. § 1332 on March 21. The defendant filed a motion to dismiss pursuant to Rule 12(b)(6) on April 4. [1] On April 5, an Order provided the plaintiffs with the option of opposing the motion or filing an amended complaint by April 25. The Order noted that it is "unlikely that plaintiffs will have a further opportunity to amend." No amended complaint was filed. The motion to dismiss became fully submitted on May 19.

DISCUSSION

 **\*2**  When deciding a motion to dismiss, a court must "accept all allegations as true and draw all inferences in the non-

moving party's favor." LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." Keiler, 751 F.3d at 68; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation omitted)). A claim has facial plausibility when "the factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678 (citation omitted). In sum, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted).

## I. Negligence

To establish a prima facie case of negligence under New York law, a plaintiff must show: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty, and (3) injury to the plaintiff as a result thereof." In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 758 F.3d 202, 210 (2d Cir. 2014) (citation omitted). "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 177 (2d Cir. 2013) (citation omitted). "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts." Id. (citation omitted).

"[A]s a general matter under New York law, banks and other financial institutions do not owe non-customers a duty to protect them from the intentional torts of their customers." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 118, 126 (2d Cir. 2013) (citation omitted). [2] The plaintiffs nevertheless maintain that Wells Fargo owes a general duty of care in opening bank accounts to ensure that such accounts are used only for legitimate purposes. The plaintiffs have summoned no authority to support the existence of this duty. In sum,

because Wells Fargo owed no duty of care to the plaintiffs, the plaintiffs' negligence claim is dismissed with prejudice.

## II. New York General Business Law § 349

Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business ... or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). To state a claim under § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (citation omitted).

Conduct is "consumer-oriented" when it has "a broader impact on consumers at large," Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 490 (2d Cir. 2014) (citation omitted), or "potentially affects similarly situated consumers." Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 84 (2d Cir. 2015) (citation omitted). "Private contract disputes, unique to the parties ... [do] not fall within the ambit of the statute." Crawford, 758 F.3d at 490 (citation omitted). A misrepresentation is materially misleading if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 126 (2d Cir. 2007) (citation omitted). Finally, while reliance is not an element of a § 349 claim, a plaintiff must show that the defendant's material deceptive act caused the injury. Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (2000). In other words, there must be a causal "connection between the misrepresentation and some harm from, or failure of, the product." Orlander, 802 F.3d at 302 (citation omitted).

**\*3** Here, the plaintiffs allege that Wells Fargo engaged in deceptive conduct by incentivizing its employees to "open new accounts without taking proper precautions to make certain that these accounts belonged to bona fide individuals or businesses." While the plaintiffs were not among those consumers affected by the defendant bank's allegedly deceptive practices, the bank's alleged activities plausibly affected the consuming public, including those consumers in whose names bank accounts might be fraudulently opened.

Case 2:26-cv-06421-WJM-CF Document 16-4 Filed 07/14/26 Page 28 of 83 PageID: 128

Ludlow Essex Partners LLC v. Wells Fargo Bank, N.A., Not Reported in Fed. Supp. (2017)

Nevertheless, the plaintiffs have not pleaded that Wells Fargo's deceptive conduct caused their injuries. The plaintiffs' injuries were caused by the individual(s) who sent the phishing email and convinced Ludlow's controller to wire Levy's distribution to the JGM account. In other words, the issue here is not that the JGM account was "fake"; rather, the issue is that the individual(s) who gained access to the Levy Email Account, sent the phishing email, and controlled the Wells Fargo account used the Wells Fargo account to perpetrate fraud. Accordingly, the plaintiffs' 🚩§ 349 claim is dismissed with prejudice.

### III. Plaintiffs' Request for Leave to Amend
The plaintiffs seek to avoid dismissal by requesting an additional opportunity to amend their complaint. The plaintiffs have already been afforded an opportunity to amend

their complaint, and were warned that it would likely be their final opportunity. Moreover, where, as here, the plaintiff has failed to identify "how the complaint's defects would be cured," denial of a request for leave to amend is proper. 🚩Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015) (citation omitted).

### CONCLUSION

The defendant's April 4, 2017 motion to dismiss is granted. The Clerk of Court shall enter judgment for the defendant and close this case.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2963488

---

### Footnotes

1    The plaintiffs argue that the defendant's motion should be denied as untimely. The parties had previously stipulated to April 3 as the date by which the defendant must respond to the plaintiffs' complaint. On May 17, the defendant—on consent of the plaintiffs—filed a letter requesting that the deadline to file its motion to dismiss be extended to April 4, _nunc pro tunc_. The defendant's request was granted on May 30. Because the plaintiffs consented to the request for an extension _nunc pro tunc_, they cannot now complain that the defendant's motion was untimely.

2    The Second Circuit has, on occasion, recognized a narrow exception to this rule where a bank fails to act to safeguard trust funds on deposit in a fiduciary account after receiving "clear evidence" of misappropriation. See 🚩Lerner v. Fleet Bank, N.A., 459 F.3d 273, 295 (2d Cir. 2006). This exception is inapplicable here.

---

End of Document                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 5951583
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

MERRICK BANK CORPORATION, Plaintiff,
v.
VALLEY NATIONAL BANK, Defendant.
American Express Travel Related Services, Inc.
and Jetpay Merchant Services, LLC, Plaintiffs,
v.
Valley National Bank, Defendant.

Civil Action No. 13–7756, Civil Action No. 14–7827
|
Signed 11/30/2017

**Attorneys and Law Firms**

Walter A. Saurack, Satterlee Stephens Burke & Burke LLP, New York, NY, for Plaintiff.

Gregory Robert Haworth, Duane Morris, LLP, Newark, NJ, for Defendant.

Philip Andrew Goldstein, McGuire Woods LLP, New York, NY, for Plaintiffs.

**OPINION**

MADELINE COX ARLEO, United States District Judge

**\*1 THIS MATTER** comes before the Court on Plaintiff Merrick Bank Corporation's ("Merrick") and Defendant Valley National Bank's ("VNB") cross-motions for summary judgment in the matter Merrick Bank Corp. v. Valley National Bank, No. 13–7756 (D.N.J.) (the "Merrick" action), and Plaintiffs American Express Travel Related Services, Inc. ("American Express") and JetPay Merchant Services, LLC ("JetPay") and Defendant VNB's cross-motions for summary judgment in the matter American Express Travel Related Services, Inc. and JetPay Merchant Services, LLC v. Valley National Bank, No. 14–7827 (D.N.J.) (the "JetPay" action). [1] Merrick ECF Nos. 207, 208; JetPay ECF Nos. 113, 116–118. The parties oppose the respective motions. Merrick ECF Nos. 211, 212; JetPay ECF Nos. 124–27. For the reasons stated below, Plaintiffs' motions for summary judgment are **DENIED**, and VNB's motions for summary judgment are **GRANTED in part** and **DENIED in part**.

**I. BACKGROUND**

This matter arises from the fraudulent operation and eventual collapse of Southern Sky Air Tours (d/b/a Direct Air) ("Direct Air"), a public charter operator. Plaintiffs Merrick, JetPay, and American Express are banks and credit card processing companies that ultimately reimbursed Direct Air consumers who had paid for incomplete flights due to the company's demise. Plaintiffs seek payment from Defendant VNB, the manager of Direct Air's escrow account, which was formed with the purpose to ensure that sufficient funds were available to refund Direct Air customers in the event that their flights were not completed.

**A. Direct Air Relationship with Plaintiffs**

A credit card purchase typically involves four parties: (1) the cardholder; (2) the cardholder's bank (the "issuing bank"); (3) the merchant's acquiring bank; and (4) the merchant. Amex Stmt. ¶ 42. Following an introduction by JetPay, Merrick served as Direct Air's acquiring bank from its inception in 2006 to its eventual closure in 2012. [2] VNB Corrected R.56.1 Statement of Undisputed Facts ("VNB Stmt.") ¶¶ 55–64, Merrick ECF No. 209–1. [3] JetPay, an Independent Sales Organization, enters into contractual arrangements with association member banks such as Merrick to provide credit card processing services to its merchant customers, such as Direct Air. JetPay R.56.1 Statement of Undisputed Facts ("JetPay Stmt.") ¶ 1, JetPay ECF No. 116–2.

**\*2** In its capacity as an acquiring bank, Merrick cleared and settled certain credit and debit card transactions for Direct Air. VNB Stmt. Id. ¶ 63. When a cardholder purchased a flight with a credit or debit card, Merrick received a payment from the credit or debit card "issuing bank" through the applicable Card Association rules and regulations by which it is bound as a member bank. Id. ¶ 23. Merrick then made a payment to Direct Air. Id. ¶ 24. If the cardholder later disputed a card charge, the cardholder could demand the money back from its issuing bank, which credited the cardholder. Id. ¶ 25. The issuing bank then initiated a "chargeback." Id. ¶ 26. Pursuant to the Card Association regulations, Merrick is required to reimburse the card issuing bank the amount of the chargeback. Id. Once those funds are properly charged-back, Merrick would then attempt to collect the funds from Direct Air pursuant to a Merchant Agreement under which Direct Air was responsible for paying Merrick and JetPay for any chargebacks. Id. ¶ 67. Through additional agreements, JetPay

also agreed to indemnify Merrick for any chargebacks it could not collect from Direct Air. Id. ¶ 68. In addition, as a credit card process, JetPay was bound through card association agreements to refund Direct Air customers directly. JetPay Stmt. ¶ 79. Direct Air was a covered merchant under Merrick's uncollectable chargeback insurance policy at all relevant times. VNB Stmt. Id. ¶¶ 59–61.

Plaintiff American Express can serve as both an acquiring bank and the issuing bank or solely as an acquiring bank. American Express R.56.1 Statement of Undisputed Facts ("Amex Stmt.") ¶ 42, JetPay ECF No. 113–2. As the acquiring bank associated with American Express credit card transactions, when a merchant processes a cardholder's American Express credit card transaction, American Express issues payment to the merchant who accepted the credit card. Id. ¶ 43. If a cardholder disputes a credit card charge, then he/she can seek a reversal or reimbursement for the charge from American Express by initiating a "dispute." Id. ¶ 44. As an acquiring bank, American Express is required to honor valid disputes and issue a reimbursement to the cardholder. Id. ¶ 45. American Express can then seek to charge back the merchant. Id. ¶ 46.

In 2006, American Express entered in a Credit Card Acceptance Agreement with Direct Air, pursuant to which Direct Air accepted American Express credit cards as payment. Id. ¶ 17. As such, it served as the acquiring bank for Direct Air purchases with an American Express card. When American Express cardholders used their credit cards to purchase tickets for Direct Air flights, American Express deposited the entire purchase amount into Direct Air's escrow account with VNB. Id. ¶ 18. American Express was obligated to refund payments for cancelled Direct Air flights to customers who submitted claims in accordance with American Express's dispute procedures. Id. ¶ 47.

### B. The Direct Air Escrow with VNB

Direct Air was subject to regulations promulgated by the Department of Transportation (the "DOT Regulations"), which required it to maintain an escrow account in which payments made by Direct Air customers were held. VNB Stmt. Id. ¶ 36. On October 20, 2006, VNB and Direct Air entered into a Public Charter Depository Agreement pursuant to DOT Regulations. Id. VNB subsequently opened the Direct Air depository account on or around October 26, 2006. Id. ¶ 52. Direct Air made its first deposit into the account in January 2007, and began to accept bookings from consumers. Id. ¶¶ 53, 93. In its role as a depository bank, VNB also entered

into a number of tripartite Depository Agreements that each involved VNB, Direct Air, and either a Direct Air carrier or another charter operator. Id. ¶ 16.

VNB was to maintain an accounting of the funds it received from Direct Air pursuant to the DOT Regulations. Merrick R.56.1 Statement of Undisputed Facts ("Merrick Stmt.") ¶ 12, Merrick ECF No. 207–2; JetPay Stmt. ¶ 12; Amex Stmt. ¶ 12. The DOT Regulations provide that funds paid by passengers for services covered by the DOT Regulations are held until the air carrier certifies that the flight to which the charter operator has allocated funds has been completed. Merrick Stmt. ¶ 18; JetPay Stmt. ¶ 18; Amex Stmt. ¶ 16. At that point, the escrow bank must release the funds to the charter operator. Id. VNB filed a Form 4534 with the DOT certifying that it, along with Direct Air and an air carrier, "will completely fulfill [its] obligations" under the Depository Agreement and the DOT Regulations. Merrick Stmt. ¶ 18; JetPay Stmt. ¶ 18.

**\*3** During the course of Direct Air's operations, VNB released funds from the escrow account in response to written requests submitted by Direct Air, as well as chargebacks from Merrick and JetPay. VNB Stmt. ¶ 138. The parties dispute whether, during the course of Direct Air's operations, VNB knew if the escrow account was operating normally. Merrick Response to VNB Stmt. ¶ 135, Merrick ECF No. 211–21. Specifically, they dispute if VNB was required to do a flight-by-flight accounting for Direct Air and whether VNB was to ensure that the charter operator had sufficient funds in its account at any particular time to make refunds to all passengers on cancelled flights. Id. Plaintiffs further allege that VNB mismanaged the Direct Air account by: (1) failing to maintain a "flight by flight" accounting of passenger funds; (2) failing to verify information that Direct Air provided about the completion of flights; (3) and disbursing undifferentiated and unsegregated funds to Direct Air for Direct Air's "Family Ties" program in violation of DOT regulations. Merrick Stmt. ¶¶ 40–71; JetPay Stmt. ¶¶ 40–71.

### C. Direct Air Closure and Subsequent Litigation

Direct Air operated until March 12, 2012 when it suspended its operations. VNB Stmt. ¶ 116. On March 15, 2012, it filed for bankruptcy. Id. ¶ 117. Deposits into the Direct Air escrow account ceased, and the account was frozen. Id. ¶ 118. Direct Air had approximately $1.017 million in its escrow account when it ceased operations. Id. ¶ 119. Merrick alleges that this number reflects a shortfall of nearly 30 million that should have been in the account had VNB taken the proper

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 31 of 83 PageID: 131

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

steps to ensure that the escrow account complied with DOT Regulations.

In accordance with DOT advice, customers who had paid for future flights with Direct Air initiated chargebacks through their credit cards to recoup the price of the flights. Id. ¶ 122. Merrick ultimately incurred chargebacks totaling $26.2 million. Id. ¶ 125. JetPay incurred $1.4 million in chargeback damages. JetPay Stmt. ¶ 80. American Express ultimately paid out $3.7 million in reimbursements to its cardholders for cancelled Direct Air flights. Amex Stmt. ¶ 50. Plaintiffs were barred by the bankruptcy automatic stay from seeking reimbursement of the chargebacks from Direct Air. VNB Stmt. Id. ¶ 126; Amex Stmt. ¶ 51.

The CFO of Direct Air later pled guilty to bank fraud and wire fraud. VNB Stmt. ¶ 126. He admitted to sending false financial statements to creditors, as well as submitting false release requests to VNB containing inflated passenger figures. Id. ¶¶ 131–32. In addition to the CFO, two other original owners of Direct Air have also been indicted for wire and bank fraud. Id. ¶ 133.

Merrick filed a lawsuit against JetPay in the United States District Court in the District of Utah seeking indemnification. Id. ¶ 150. In June 2016, Merrick and JetPay reached a settlement in which JetPay paid Merrick $13.24 million. Id. ¶ 151. Merrick also filed a claim pursuant to its UCB policy with its insurer, Chartis. Id. ¶ 152. After Chartis denied Merrick's claim, Merrick filed a lawsuit against Chartis in the United States District Court for the Southern District of New York. Id. In December 2016, Merrick obtained a verdict on liability against Chartis. Id. ¶ 153. Pending motions for Judgment as a Matter of Law and for a new trial are still pending in the Chartis litigation. Id. ¶ 153.

### D. Procedural History

#### 1. Merrick Action

Merrick first filed suit in this District against VNB in December 2013. ECF No. 1. In its Second Amended Complaint ("SAC"), Merrick alleged the following ten causes of action: (1) breach of contract on behalf of Direct Air customers as intended third-party beneficiaries of the depository agreements; (2) negligence/gross negligence; (3) breach of fiduciary duty; (4) negligent misrepresentation; (5) aiding and abetting fraud; (6) conversion/aiding and abetting conversion; (7) violation of DOT Regulations, 14 C.F.R. § 380; (8) consumer fraud on Merrick and Direct Air customers;

(9) breach of contract on behalf of Direct Air as assignee of the bankruptcy trustee's claims against Valley; and (10) consumer fraud on Direct Air. SAC ¶¶ 82–141, Merrick ECF No. 64. In an Opinion dated March 31, 2015, the Court dismissed Merrick's claims for violations of DOT Regulations with prejudice, finding they do not afford a private right of action. Merrick Bank Corp. v. Valley National Bank, No. 13–7756, 2015 WL 1472497, at *5–6 (D.N.J. Mar. 31, 2015) ("Merrick I"). Merrick filed a Third Amended Complaint ("Merrick TAC"). See Merrick TAC, ECF No. 64. In an Order dated January 29, 2016, the Court dismissed Merrick's breach of contract claim on behalf of Direct Air customers and consumer fraud claims with prejudice. Id.

**\*4** Six counts remain at issue in Merrick: (2) negligence/ gross negligence; (3) breach of fiduciary duty; (4) negligent misrepresentation; (5) aiding and abetting fraud; (6) conversion/aiding and abetting conversion; (9) and breach of contract on behalf of Direct Air as assignee of the bankruptcy trustee's claims against Valley. VNB moves for summary judgment against Merrick on all counts. Merrick moves for summary judgment on counts two, three, and four.

#### 2. JetPay Action

JetPay and Amex jointly filed a complaint against VNB on December 16, 2014. JetPay ECF No.1. In March 2016, JetPay and Amex filed an Amended Complaint against VNB ("JetPay Am. Compl."), alleging the following eleven causes of action: : (1) breach of contract; (2) negligence/ gross negligence; (3) breach of fiduciary duty; (4) negligent misrepresentation; (5) aiding and abetting fraud as to consumers; (6) aiding and abetting fraud as to JetPay and Amex; (7) conversion/aiding and abetting conversion; (8) violation of DOT Regulations, 14 C.F.R. § 380; (9) consumer fraud on charter customers; (10) consumer fraud on Direct Air; and (11) indemnification. JetPay Am. Compl. ¶¶ 74–190, JetPay ECF No. 49. In an Order dated October 28, 2016, the Court dismissed counts One, Eight, Nine, Ten, and Eleven of JetPay and Amex's Amended Complaint. JetPay ECF No. 98.

Six counts remain at issue in JetPay: (2) negligence/gross negligence; (3) breach of fiduciary duty; (4) negligent misrepresentation; (5) aiding and abetting fraud as to consumers; (6) aiding and abetting fraud as to JetPay and Amex; and (7) conversion/aiding and abetting conversion. VNB moves for summary judgment on all counts. JetPay and Amex seek partial summary judgment on their claims for negligence and breach of fiduciary duty. Amex Br. at 1, JetPay ECF No. 113–1; JetPay Br. at 1, JetPay ECF No. 116–1.

## I. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

## II. ANALYSIS

### A. Claim Preclusion

In Merrick I, the Court dismissed Merrick's claims for violations of 14 C.F.R. § 380 because there is no private right of action under the DOT Regulations. 2015 WL 1472497, at *5–6. VNB argues that Plaintiffs' negligence, breach of fiduciary duty, and conversion claims are merely "back door" attempts to enforce the DOT Regulations, and must therefore be dismissed. See VNB Br. as to Merrick at 16–18, Merrick ECF No. 208–22; VNB Br. as to JetPay at 17–19, JetPay ECF No. 117–2; VNB Br. as to Amex at 16–18, JetPay ECF No. 118–4. The Court disagrees.

The absence of a private right of action may preclude common-law tort claims where the common law claim is based on a violation of the statute. See Astra USA, Inc. v. Santa Clara Cty., 563 U.S. 110, 117–19 (2011) (holding that a contract claim based on the violation of a policy that merely incorporated statutory language was "in essence a suit to enforce the statute itself," and therefore unenforceable in a private action); Umland v. PLANCO Fin. Servs., 542 F.3d 59, 66 (3d Cir. 2008) (holding that plaintiff could not bring common-law contract claim where the alleged implied contractual term reflected the provisions of the Federal Insurance Contributions Act, which did not provide a private right of action); Mankodi v. Trump Marina Assocs. LLC, 525 Fed.Appx. 161, 166 (3d Cir. 2013) (holding that plaintiff's causes of action for breach of contract and

conversion were really violations of the Casino Control Act where the complaint alleged, "when defendant's personnel breached the regulations of the New Jersey Gaming Control Commission ... it breached the gaming agreement ... that it had with plaintiff."). In other words, a plaintiff cannot assert a common law claim by simply stating that a defendant has violated a statute that does not in itself afford a private right of action.

**\*5** But that is not the case here. Plaintiffs' common law claims are not directly premised on violations of the DOT Regulations. In contrast to the cases cited by VNB, Plaintiffs here have asserted an independent basis for their common law claims. They allege that VNB was negligent in its failure to supervise Direct Air's depository account; that VNB owed Plaintiffs a fiduciary duty when it became an escrow agent to the depositors; and that VNB interfered with the possessory rights of passengers and Plaintiffs to the money in the account. See Merrick TAC ¶¶ 98–109, 123–29; JetPay Am. Comp. ¶¶ 90–114, 152–160. Therefore, Plaintiffs claims are not—contrary to VNB's argument—based solely on a "standard of conduct ... established by a regulation under which no private right of action exists." VNB Reply to Merrick at 5, Merrick ECF No. 216. Rather, Plaintiffs allegations are based on standards provided by common law tort, and are not predicated on violations of the DOT Regulations.

### B. Breach of Fiduciary Duty

Plaintiffs assert a breach of fiduciary duty claim on their own behalf and as subrogees of the Direct Air passengers. JetPay Am. Compl. ¶¶ 104–114; Merrick Reply at n.3, Merrick ECF No. 215. VNB contends that it must be granted summary judgment as VNB did not owe a fiduciary duty to either the Plaintiffs or the passengers of Direct Air. The Court agrees.

In order to establish a cause of action for a breach of fiduciary duty in New Jersey,[4] a plaintiff must show that the defendant had a duty to the plaintiff, that the duty was breached, that injury to plaintiff occurred as a result of the breach, and that the defendant caused that injury. In re ORFA Sec. Litig., 654 F.Supp. 1449, 1457 (D.N.J. 1987). Generally, a fiduciary relationship arises only in cases in which one of the parties " 'expressly reposes a trust or confidence in the other' or because of the circumstances 'such a trust or confidence is necessarily implied.' " United Jersey Bank v. Kensey, 306 N.J.Super. 540, 553 (App. Div. 1997).

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 33 of 83 PageID: 133

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

No such relationship exists here between Plaintiffs and VNB. Plaintiffs are sophisticated commercial entities experienced in the card processing industry. Plaintiffs have never been in privity with VNB, were not parties to the Depository Agreement, and did not rely on the Depository Agreement in establishing their own dealings with Direct Air.

In the analogous case, Synovus Bank of Tampa Bay v. Valley National Bank, 487 F. Supp. 2d 360 (S.D.N.Y. 2007), an acquiring bank asserted a breach of fiduciary claim against VNB for allegedly mismanaging the escrow account it held for the defunct air carrier, Southeast Airlines, pursuant to DOT Regulations. The Synovus court found that VNB did not owe a fiduciary duty to the acquiring bank, f/k/a United Bank and Trust Company ("United") as "the nature of the relationship between [VNB] and United ... was not one of confidence and special trust." 487 F. Supp. 2d at 373. The same is true under New Jersey law.

Plaintiffs further contend that VNB breached a fiduciary duty to them as subrogees of passengers. This is unavailing for the reasons articulated above. Like Plaintiffs, Direct Air passengers did not have any relationship with VNB. Plaintiffs counter that VNB served as an "escrow agent" to the passengers and—by extension—to Plaintiffs. They argue that "Direct Air passengers, Merrick and VNB all understood VNB's role as escrow agent." Merrick Br. at 8. But the record does not support such a finding. Indeed, the cases cited by Plaintiff identifying a fiduciary relationship between an escrow agent and both parties all involve a written agreement between the parties and the alleged agent. See Snyder v. Dietz & Watson, Inc., 837 F. Supp. 2d 428, 444 (D.N.J. 2011) (employer defendants had fiduciary duty as escrow holders to employees who were party to a collective bargaining agreement); In re Matter of Hollendonner, 102 N.J. 21, 23 (1985) (attorney breached fiduciary duty to both buyer and seller of a house who had contracted with attorney to hold funds in escrow); Laffan v. Santander Bank, N.A., No. 13–4040, 2014 WL 2693158, at *6 (E.D. Pa. June 12, 2014) (finding that on a motion to dismiss, plaintiff pled breach of fiduciary duty against mortgagor bank who also served as an escrow agent pursuant to a mortgage agreement). None involves the depository bank of an escrow account. Accordingly, Plaintiffs have not shown that VNB owed them or the passengers a fiduciary duty.

### C. Negligence

**\*6**  The parties each seek summary judgment on the issue of whether VNB acted negligently towards defendants Merrick, Amex, and JetPay in its maintenance of Direct Air's escrow account. VNB argues that it must be awarded summary judgment because it owes no duty towards Plaintiffs. The Court disagrees.

To establish a cause of action for negligence, a plaintiff must prove the following four elements: "(1) duty of care; (2) a breach of that duty; (3) proximate cause, and (4) actual damages." Townsend v. Pierre, 221 N.J. 36, 51 (2015) (citations omitted). Whether or not a legal duty exists within any given set of facts is a question of law to be decided in the first instance by the court. Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991). In determining whether a duty exists, the court must engage in a complex analysis that balances a number of related factors including "the risk, the foreseeability, or the likelihood of injury all weighed against the social utility of the actor's conduct, the opportunity and ability to exercise care to prevent the injury and the consequences of placing the burden of the duty on the actor." J.S. v. R.T.H., 155 N.J. 330, 337, 714 A.2d 924, 928 (1998) (citing Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

Here, any shortfall in the escrow account would affect the ability of customers to recoup the amount they paid in for future, incomplete flights. If a flight did not occur, customers who paid their tickets by check had no other recourse than to seek reimbursement from the escrow account. Customers are therefore a plainly foreseeable group that would be affected by insufficiencies in the escrow account.

By extension, entities with a foreseeable obligation to reimburse customers—including American Express JetPay, and Merrick—are also foreseeable plaintiffs. Under universal Credit Card Agreements, customers who paid with credit or debit card were reimbursed by their issuing banks. These banks in turn were reimbursed by Direct Air's acquiring bank, Merrick and credit card processor, JetPay. Likewise, American Express cardholders were reimbursed by American Express. But Plaintiffs' only recourse was to pursue Direct Air itself. Therefore, Plaintiffs bear the risk of a financial loss in the case of an uncollectable chargeback, and are foreseeably affected by any shortfall in the escrow account. The harm here is precisely the type of foreseeable economic damage that New Jersey courts recognize justifies the

Case 2:26-cv-06421-WJM-CF Document 16-4 Filed 07/14/26 Page 34 of 83 PageID: 134

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

imposition of a duty. See People Express Airlines, Inc. v. Consol. Rail Corp., 100 N.J. 246, 263 (1985) (finding that a railroad owed duty to airline for damages it suffered due to the evacuation of its offices following an accident at a nearby railroad yard).

VNB contends that "New Jersey courts do not recognize a duty by banks to a third party absent a statutory duty, contract or special relationship with that party." VNB Opp'n at 13, Merrick ECF No. 212. However, these cases do not reflect the situation presented here. Several of the cases cited by VNB pertain to a commercial bank's duties during the check depositing process. See Brunson v. Affinity Federal Credit Union, 199 N.J. 381, 407 (2009) (holding that bank did not owe duty to victim of identity theft who was incarcerated after importer used victim's identity to cash fraudulent checks); City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 62 (2001) (holding that bank had no duty of care to plaintiff check cashing service when the bank incorrectly verified the authenticity of a check); Penn. Nat'l Turf Club, Inc. v. Bank of West Jersey, 385 A.2d 932, 934 (N.J. App. Div. 1978), cert. denied, 77 N.J. 506 (1978) (dismissing negligence claim where bank deviated from good banking practices by failing to dishonor a depositor's returned checks within midnight deadline required by the Uniform Commercial Code). Other cases concerned a bank's inappropriate transfer of funds to third parties. See Wolens v. Morgan Stanley Smith Barney, LLC, 155 A.3d 1, 3 (N.J. App. Div. 2017) (holding that defendant bank owed no duty to daughter of deceased account holder whose account was changed from one solely in her name to a joint account with the daughter's sibling); ADS Associates Group, Inc. v. Oritani Sav. Bank, 219 N.J. 496, (2014) (holding bank had no duty of care to a business venturer whose co-venturer transferred funds from one corporate business checking account to other accounts). None involved the alleged mismanagement of an escrow account.

**\*7** Furthermore, considerations of fairness and policy support a finding that VNB owes a duty of care to Plaintiffs. First, such a duty does not impose an additional burden on VNB, in light of its obligations under the DOT Regulations and the Depository Agreement with its customer, Direct Air. Second, the foreseeability of the harm at issue, as outlined above, makes the finding of a duty particularly just. See Carter Lincoln–Mercury, Inc., Leasing Div. v. EMAR

Grp., Inc., 638 A.2d 1288, 1294 (N.J. 1994) ("[T]he more particular is the foreseeability that economic loss will be suffered by the plaintiff as a result of defendant's negligence, the more just is it that liability be imposed and recovery allowed."). Finally, a finding of common-law duty of care furthers the policy goals of the existing statutory scheme by protecting consumers from financial loss in the case of a flight operator's insolvency.

The Court next turns to the element of breach. In New Jersey, a breach of duty is a question of fact. Rustay v. Consolidated Rail Corp., 775 F. Supp. 161, 163 (D.N.J. 1991) (citations omitted). Plaintiffs claim that VNB breached its duty of reasonable care by failing to conduct a flight-by-flight accounting or holding customers' deposits until the relevant flight was complete. VNB, on the other hand, maintains that it properly maintained the charter accounts. Numerous questions of fact over VNB's accounting practices preclude summary judgment for either VNB or for Plaintiffs. For example, the parties dispute whether VNB normally conducted a flight-by-flight accounting for other charter-operator clients, and whether its treatment of Direct Air departed from its typical procedures. See VNB Resp. to Merrick Stmt. ¶¶ 36–46, ECF No. 212–1. The parties further dispute whether documentation that Direct Air provided to VNB revealed incorrect amounts. See Merrick Resp. to VNB Stmt. ¶ 139, ECF No. 211–21. Therefore, whether VNB breached its duty of reasonable care in its management of the escrow account is a question of fact for the jury.

### D. Breach of Contract

VNB and Merrick each seek summary judgment on Merrick's breach of contract claim against VNB as successor-in-bankruptcy to Direct Air. Specifically, Merrick claims that VNB breached the Depository Agreement with Direct Air by failing to provide a flight-by-flight accounting and to hold all passenger deposits until it received certification that the flight was complete pursuant to Sections 1.3 and 2.2. Merrick Br. at 23–24. VNB argues that Merrick has not established the elements of a contract claim, and that the claim is also barred by the doctrine of in pari delicto. The Court finds that fact issues preclude summary judgment for either VNB or Merrick.

To establish a breach of contract claim, a plaintiff must "prove a valid contract between the parties, the opposing party's failure to perform a define obligation under the contract, and the breach caused the claimant to [sustain] damages."

🚩EnviroFinance Group LLC v. Environmental Barrier Co., LLC, 113 A.3d 775, 787 (N.J. App. Div. 2015) (citing 🚩Murphy v. Implicito, 920 A.2d 678 (N.J. App. Div. 2007). Here, Merrick alleges that VNB breached the following terms of the Depository Agreement:

> 1.3 Bank shall maintain a separate account (an "Account") for each charter, flight or rotation but shall be under no obligation to segregate any funds received by it between inbound and out-bund flights in the absence of express instructions to do so. Bank may use funds deposited pursuant to this Agreement in its general banking business and may commingle such funds with its general funds.
>
> ....
>
> 2.2. ... Bank shall not pay to or remit any funds from an Account maintained for Charter Operator prior to two (2) Business Days after completion of such Charter.

VNB does not dispute its management of the Direct Air escrow account. Instead, it argues that, notwithstanding the language of the Depository Agreement, its management of the escrow account was consistent with Direct Air and VNB's performance during the course of the contract, and therefore did not constitute breach. Genuine issues of material fact exist as to whether Direct Air and VNB established a course of performance that permitted VNB to release funds before they received certification of the flight's completion. For example, contrary to Merrick's assertion, VNB states that it was ordinarily Direct Air's responsibility to allocate particular funds into the accounts of particular flights. See VNB R. 56.1 Resp. ¶¶ 44–45. The parties also dispute whether Direct Air ever provided VNB with detailed passenger information for it to allocate funds to different flights, or whether VNB employees expressly declined to manage these files. Id. ¶¶ 40–43. These factual questions preclude summary judgment on the issue of breach. See CSX Transp. Inc. v. Schuykill Rail Car Inc., No. 13–2014, WL 2864781, (M.D. Pa. June 24, 2014) (finding that summary judgment was precluded where a genuine issue of material fact existed as to whether parties established a course of conduct that modified a timing rule in the agreement at issue to permit defendants to dispute invoices outside a sixty day window).

**\*8** VNB also contends that it must be granted summary judgment because Direct Air breached first, and that it cannot establish any damages because Direct Air "received the exact amount it requested to be released from the account at the time requested." VNB Opp'n at 28. VNB further presents the affirmative defense of in pari delicto, arguing that even if Direct Air could establish damages, the claim is barred because it bears fault for the claim. Id. at 29–30. Merrick counters that Direct Air did not breach as the actions of its officers cannot be imputed to the corporation. As such, the corporation was damaged because VNB's alleged breached caused a $30 million shortfall in Direct Air's escrow account, which ultimately led to its insolvency. Merrick Br. at 24.

The parties' arguments all hinge on one question: can the conduct of the officers of Direct Air be imputed to the company? If so, then Direct Air breached, benefited financially, and is barred from bringing a contract claim. If not, then Direct Air did not breach, and may have suffered damages. Generally, fraud may be imputed to a corporation "when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation." 🚩⚠️Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 354–55 (3d Cir. 2001). Here, fact questions preclude summary judgment on this issue. Although the parties agree that the CFO of Direct Air pled guilty to bank and wire fraud, and that two other officers have also been indicted on the same charges, they appear to dispute whether the fraud was for the benefit of Direct Air. VNB states that "all funds withdrawn were received by Direct Air or its vendors; and all withdrawals were used for business purposes," VNB Opp'n at 27, but does not provide any evidence as to how the money was received or spent. VNB further asserts that "the funds released to Direct Air ... were not diverted to the Direct Air owners or other person for their own personal reasons" based on the deposition of Jessica Murphy, counsel for bankruptcy trustee. VNB Stmt. ¶ 147. But Merrick denies this, submitting that the Indictment filed against Direct Air former officers Judy Tull and Kay Ellison alleges that the individuals "in order to enrich themselves, diverted for their personal use funds paid by direct Air passengers." Merrick Resp. to VNB Stmt. ¶ 147. Neither party has provided direct evidence on whether the officers' ultimately used the funds for personal purposes. Accordingly, summary judgment on the breach of contract claim must be denied.

### E. Negligent Misrepresentation

Plaintiffs assert claims against VNB for negligent misrepresentation. In essence, they claim that VNB misrepresented to them that it operated Direct Air's escrow account in accordance with DOT Regulations. See Merrick

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 36 of 83 PageID: 136

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

TAC ¶¶ 110–14; JetPay Am. Compl ¶¶ 115–23. VNB seeks summary judgment on this issue, arguing that Plaintiffs have not demonstrated justifiable reliance. The Court agrees.

The elements for a claim of negligent misrepresentation are: "(1) an incorrect statement, (2) negligently made, (3) justifiably relied on, (4) resulting in economic loss." Andreula v. Capital One Financial Corp., No. 14–5276, 2016 WL 6953422, at *3 (D.N.J. Nov. 28, 2016) (internal quotations omitted); see also ⚑H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983) ("An incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance.").

#### 1. Communications to Merrick and JetPay

The communications at issue to Merrick and JetPay's claims occurred in November and December of 2006. First, On November 10, 2006, Lori Rooney of VNB emailed Trent Voigt at JetPay the following message:

**\*9**  This will confirm that Valley National Bank has been appointed Depository Bank for Southern Sky Air d/b/a Myrtle Beach Direct. We have opened a depository account for which all passenger funds are to be deposited per the regulations of the U.S. Department of Transportation. The following is our wire transfer instructions for depositing funds into the depository account:

[Wire transfer instructions omitted]

Decl. of James Regan, Ex. Z, ECF No. 207–30.

Later, on December 6, 2006, the Global Escrow Services department of VNB mailed Trent Voigt of JetPay a letter, which stated in its entirety:

Re: Public Charter Depository Agreement dated as of October 20, 2006 by and among Southern Sky Air & Tours d/b/a Myrtle Beach Direct Air & Tours, Sky King, Inc. and Valley National Bank

This letter serves as confirmation that Valley National Bank has been appointed Depository Bank by Southern Sky Air & Tours d/b/a Myrtle Beach Direct Air & Tours. All parties have executed the above referenced Depository Agreement and Valley National Bank has opened a depository account

pursuant to the regulations of the U.S. Department of Transportation ("DOT"). [5]

Southern Sky Air & Tours d/b/a Myrtle Beach Direct Air & Tours has filed their charter program with the DOT and has been issued filing number PC 06–163.

Decl. of James Regan, Ex. Y, ECF No. 207–29.

Merrick alleges that it "reasonably and justifiably relied upon VNB's representation in deciding to become the acquiring bank for Direct Air and in deciding to maintain that relationship." Merrick TAC ¶ 112. VNB argues that Merrick did not actually rely on VNB's representations in its decision making, and even if it did, the reliance would not be justified. VNB Br. as to Merrick at 10–11.

Although a fact question exists as to whether Merrick did in fact rely on VNB's assertions, the Court agrees with VNB that such reliance, as a matter of law, would be unjustified. Whether a party's reliance is justified for purposes of negligent misrepresentation is a fact-specific inquiry. See Andreula, 2016 WL 6953422, at *4 (finding that former employee could not justifiably rely on a statement that he would not be fired for collecting two incomes where he knew he was an at will employee). The Third Circuit has stated that a variety of factors should be considered in determining whether a plaintiffs' reliance was reasonable, including: "(1) the existence of a fiduciary relationship; (2) plaintiffs' opportunity to detect the fraud; (3) the sophistication of the plaintiffs; (4) the existence of long-standing business or personal relationships; and, (5) access to the relevant information." ⚑Kline v. First Western Gov't Secs., Inc., 24 F.3d 480, 488 (3d Cir.), cert. denied, Arvey, Hodes, Costello & Burman v. Kline, 513 U.S. 1032 (1994).

Here, the examination of each factor compels the conclusion that Merrick's reliance was not justified. As explained above, VNB owed no fiduciary duty to JetPay or Merrick. Plaintiffs are sophisticated financial institutions who were each aware of the DOT Regulations. Plaintiffs did not have a longstanding relationship of trust with VNB; indeed, Merrick and VNB did not even communicate directly. Although Merrick could not access VNB's internal escrow management guidelines or VNB's communications with Direct Air, Merrick was in a position to monitor Direct Air—including the details of its escrow account with VNB—as its acquiring bank.

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 37 of 83 PageID: 137

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

**\*10**  Moreover, the November email and the December letter do not change this conclusion. They simply convey that, pursuant to the DOT Regulations, VNB had been appointed the depository bank for Direct Air—not the specifics of how the account would be managed. Finally, the record shows that Merrick considered other factors before it agreed to become Direct Air's acquiring bank, including requiring Direct Air to become a covered merchant under Merrick's uncollectable chargeback insurance. In light of these factors, it would be unreasonable for Merrick or JetPay to rely on the two statements to make its final determination for Merrick to serve as Direct Air's acquiring bank.[6] Summary judgment is granted in favor of VNB.

### 2. Communications to American Express

American Express bases its negligent misrepresentation claim on two alleged representations: (1) a copy of the Depository Agreement between VNB and Direct Air on Direct Air's website, which it observed in March of 2012; and (2) a certification VNB signed pursuant to DOT Regulations stating that the Depository Agreement "complies with § 380.34 [and] § 380.34a of the DOT's Regulations, dated February 1, 2010." See Amex Stmt. ¶¶ 8, 26–30; Goldstein Decl., Exs. 6, 15. American Express claims that as a result, it understood that "VNB was obligated to maintain sufficient funds in the escrow account to cover all prepaid purchases for future flights." Amex Stmt. ¶ 28. American Express alleges that it "relied on the fact that Direct Air had an escrow account with VNB when assessing the risk associated with doing business with Direct Air and considering whether to continue to accept Direct Air as an American Express merchant." Id. ¶ 30. VNB seeks summary judgment on American Express's negligent misrepresentation claim, arguing that it made no representations of fact to American Express on which it could have relied. VNB Br. at 8–9, JetPay ECF No. 118–4. The Court agrees.

As an initial matter, the Court agrees with VNB that the copy of the Depository Agreement does not constitute a factual representation by VNB. It was posted on Direct Air's website, by Direct Air. VNB did not control and is not responsible for the Direct Air website. Even assuming that VNB is deemed to have communicated through Direct Air's website, the Depository Agreement does not constitute a representation of fact as to the manner in which VNB would operate Direct Air's depository account. It is merely a document showing that VNB and Direct Air entered into a Depository Agreement.

Although the document lays out the provisions by which VNB and Direct Air agreed and intended to abide, it is not a statement regarding how the account was actually maintained. Therefore, American Express's reliance on the mere existence of the Depository Agreement as an indication of how the depository account operated is unreasonable.

Likewise, the certification also fails to constitute a factual representation by VNB as to how the escrow account operated. The certification states that VNB and Direct Air "certify that we have entered into a depository agreement .... This agreement complies with (§ 380.34) (§ 380.34a) of DOT's Regulations." Goldstein Decl. Ex. 6. Again, the certification is merely a statement that the Depository Agreement itself complies with the DOT Regulations, and not a statement on the operation of the escrow account itself.

Furthermore, the record shows that American Express did not actually rely on either of the statements at issue here in making its decision allow Direct Air to become an American Express merchant or to continue this relationship with Direct Air. American Express entered into an agreement with Direct Air in 2006. The record shows that American Express reviewed Direct Air's website, and noted the existence of the Depository Agreement on March 12, 2013—three days before Direct Air ceased operations. Goldstein Decl. Ex. 15. It therefore could not have relied on the website as a deciding factor in whether to continue its relationship with Direct Air. Similarly, the certification that American Express has submitted is dated February 1, 2010, nearly four years after it initially accepted Direct Air as a merchant. Since American Express did not rely on the certification to accept Direct Air as a merchant, any reliance on the certification in its decision to maintain Direct Air's status is not justified. The Court grants VNB summary judgment on this claim.

### F. Aiding and Abetting Fraud

#### 1. Aiding and Abetting Fraud as Subrogees of Direct Air Passengers

**\*11**  Merrick brings an aiding and abetting claim solely as subrogees of Direct Air passengers' claims.[7] See Merrick TAC ¶¶ 115–22. JetPay and American Express also bring aiding and abetting claims as subrogrees of Direct Air passengers. JetPay Am. Compl. ¶¶ 124–34. VNB argues that —as an initial matter—Plaintiffs cannot sustain this claim because they cannot be subrogated to the claims of Direct

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 38 of 83 PageID: 138

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

Air passengers. VNB Br. as to Merrick at 25–27. The Court agrees.

To establish equitable subrogation in New Jersey, a plaintiff must show that (1) it paid a debt to a third party for which it was not primarily liable, (2) "in the performance of a legal duty or for the protection of a legal right," (3) and not as a "mere stranger or volunteer," (4) it paid the debt in full, and (5) equity favors subrogation." Schmid v. First Camden Nat'l Bank & Trust Co., 22 A.2d 246, 254 (N.J. Ch. 1941). See also Jorge v. Travelers Indem. Co., 947 F. Supp. 150, 155 (D.N.J. 1996) (holding that "subrogation applies where a party, not acting voluntarily, but under some compulsion pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscience ought to be discharged by the latter.").

The parties only dispute the first element: whether Plaintiffs, in completing chargebacks pursuant to the Card Association agreements they were party to, are deemed to have paid a debt to a third party for which it was not primarily liable. VNB contends that Plaintiffs did not, because the chargeback payments that they made were their own obligations. They therefore did not pay a debt on behalf of a third party. The Court agrees. In the analogous case NOVA Information Systems Inc. v. Greenwich Ins. Co., the Eleventh Circuit Court of Appeals held that the credit card processor plaintiff (NOVA) could not be subrogated to the claims of passengers who had purchased tickets for uncompleted cruises against Defendant surety company, Greenwich Insurance. 365 F. 3d 996 (11th Cir. 2004). The court reasoned:

> Greenwich was obligated to pay Premier passengers who made a claim for reimbursement under the surety bond. NOVA, on the other hand, was obligated to reimburse First Union as a result of reimbursements filed by Premier passengers with their card-issuing banks. Although, in essence, both NOVA and Greenwich were ultimately responsible for reimbursing Premier passengers— NOVA for those passengers who requested reimbursement from their card-issuing banks, and Greenwich for those passengers who requested reimbursement under the bond—

their obligations were, as the district court correctly noted, "separate and distinct."

**\*12**  Id. at 1005–06.

This Court finds that the Eleventh Circuit's reasoning applies with equal force here. Here, Plaintiffs paid their own debts to the card issuing banks. Merrick, contends that "as long as the escrow account had sufficient funds, [VNB] was responsible for reimbursing the passengers or Merrick." Merrick Opp'n at 26. But the relationship between a Plaintiff and VNB does not matter for an equitable subrogation analysis. Rather, courts consider the relationship between the plaintiff and the subrogated third party. Here, Merrick, American Express, and JetPay each had a legal obligation to complete chargeback requests from passengers regardless of VNB's ability to reimburse them.

Furthermore, VNB's position comports with Third Circuit precedent suggesting that equitable subrogation is only available where the party seeking subrogation has paid for the liabilities of the third party. In Citizens, the Third Circuit held that a plaintiff bank could not be subrogated to the claims of third party customers whom it had reimbursed for losses due to fraudulent transactions. The court reasoned:

> Citizens' equitable subrogation claim fails because, as the complaint establishes, it did not pay a debt on behalf of its customers. Rather, it re-credited its customers' bank accounts for the amounts of the fraudulent transactions pursuant to its obligations under the Uniform Commercial Code ... Given that Citizens did not plead that the payments it made to its customers were in satisfaction of a debt that ought to have been paid by RTI, we will affirm the District Court decision on this ground.

Id. Likewise, here Plaintiffs did not pay a debt on behalf of the Direct Air passengers, but re-credited their accounts pursuant to its contracts with credit card companies. Therefore,

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 39 of 83 PageID: 139

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

Plaintiffs cannot establish that they paid claims for which they were not liable, and cannot be subrogated to the passengers' aiding and abetting fraud claims. [8] [9]

### 2. Aiding and Abetting Fraud as to JetPay and American Express

JetPay and American Express bring an aiding and abetting fraud claim on their own behalf. See JetPay Am. Compl. ¶¶ 135–51. Specifically, they allege that Direct Air made representations to them that "advanced monies were ... directed to an escrow account operated in accordance with DOT guidelines that prevented the release of monies until the passenger's flight had been completed." Id. ¶ 138. They further allege that VNB knew that this statement was false and "gave substantial assistance to Direct Air ... by allowing Direct Air to deposit and remove escrow funds without complying with the DOT regulations." Id. ¶ 143. VNB seeks summary judgment on the basis that Plaintiffs have not shown that it was aware of Direct Air's fraud, or that it knowingly assisted in the fraud. The Court agrees.

**\*13** "Under New Jersey law, aiding and abetting requires a plaintiff to show that the principal performed an unlawful act; and the defendant knowingly and substantially assisted in the principal's violation, and was generally aware of his role as part of an overall tortious activity at the time he provided assistance." Delzotti v. Morris, No. 14–7223, 2015 WL 5306215, at \*8 (D.N.J. Sept. 10, 2015); see also Restatement (Second) of Torts § 876(b) (followed by Tarr v. Ciasulli, 853 A.2d 921, 929 (N.J.2004)); see also Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir.1998) (noting that New Jersey adopts a definition of civil aiding and abetting liability consistent with the Restatement (Second) of Torts § 876(b)).

The parties do not dispute whether the principal, Direct Air, performed an unlawful act by making misrepresentations to JetPay and American Express. Rather, they dispute whether VNB knew of Direct Air's fraudulent activity, and substantially assisted in the violation. Here, the record does not support any inference that VNB was aware of Direct Air's fraud or that it was "generally aware" of assisting Direct Air in its unlawful conduct.

American Express and JetPay's primary piece of evidence that VNB was aware of Direct Air's fraud is that VNB had

dealt with a similar merchant in the past. See Amex Opp'n at 21–22, JetPay ECF No. 124. VNB previously served as the depository bank for Southeast Airlines from 2000 to 2004. Amex Stmt. ¶ 113. When Southeast shut down in 2004, there was a $10.5 million shortfall in the escrow account. Id. ¶ 114. VNB then received a letter dated August 21, 2006, from the DOT informing it that the DOT had identified "several violations of the Department's charter regulations" by VNB. See Goldstein Decl., Ex. 23, JetPay ECF No. 113–26. American Express argues that the experience with Southeast "put VNB on notice that it was participating in an illegal and tortious activity by failing to comply with DOT Regulations." Amex Opp'n at 21.

Plaintiffs' theory fails because there is no indication from the DOT letter that Southeast had committed a fraud. Plaintiffs point to no other evidence indicating that Southeast had committed fraud. Accordingly, VNB had no reason to know that its conduct with respect to Southeast aided fraud, and would have no reason to know that the same conduct with respect to Direct Air would also assist fraud.

Instead, VNB has presented evidence in the form of employee affidavits that it was not aware of Direct Air's fraud. See Rooney Cert. ¶ 33, JetPay ECF No. 117–8. In addition, an Indictment by the US Attorney's office against the officers of Direct Air identify VNB as a victim, along with Merrick and JetPay. Haworth Cert., Ex. KK, JetPay ECF No. 117–18. Accordingly, VNB is granted summary judgment on JetPay and American Express's aiding and abetting fraud claim.

### G. Conversion / Aiding and Abetting Conversion

#### 1. Conversion

VNB seeks summary judgment on Merrick's conversion claims. Specifically, VNB argues that the direct conversation claims fail because VNB did not exercise dominion or control over the funds in the escrow account. The Court agrees.

"The tort of conversion is the wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights." Keon Hee Lee v. BSI Financial Servs., No. 15–1797, 2015 WL 4757935, at \*2 (D.N.J. Aug. 11, 2015) (quoting Advanced Enter. Recycling, Inc. v. Bercaw, 869 A.2d 468, 472 (N.J. App. Div. 2005)).

Merrick Bank Corporation v. Valley National Bank, Not Reported in Fed. Supp. (2017)

**\*14** Here, any direct claims brought by Merrick must fail because Merrick was not an owner of the funds in the escrow account. Indeed, it is well settled that the depositor holds title in escrow accounts until the completion of all escrow conditions. See 🚩In re Arrow Mill Dev. Corp., 185 B.R. 190, 194 (D.N.J. 1995) (finding "if the escrow condition which would have vested title in grantee does not occur, legal and equitable title remain in grantor"); 🚩In re Mushroom Transp. Co., Inc., 382 F.3d 325, 338 n.9 (noting, "under escrow arrangement, legal title remains in a depositor until a condition precedent is satisfied."). Merrick was not the depositor; the passengers were. As such, Merrick cannot show that it had title to the allegedly converted funds.

In addition, the record demonstrates that VNB did not and could not exercise dominion and control over the funds in the escrow account. In general, an entity does not exercise dominion and control over an account which is subject to the instructions of another. See North Haledon Fire Co. No. 1 v. Borough of North Haledon, 425 N.J. Super. 615 (App. Div. 2012) (finding that a conversion claim by a third party failed against entity having contract with borough to administer retirement account because entity did not exercise dominion and control over money in the account which was subject to the borough's instructions); 🚩Pereira v. United Jersey Bank, 201 B.R. 644, 676 (S.D.N.Y. 1996) (finding that a bank subject to a contract with its customer did not exercise dominion and control over funds in the customer's account). Here, the funds in the escrow account were subject to the Depository Agreement between Direct Air and VNB. VNB did not have the authority to release any funds without approval from Direct Air.

For the above reasons, VNB must be granted summary judgment as to Merrick's conversion claim.

### 2. Aiding and Abetting Conversion

Merrick and JetPay also seek to bring aiding and abetting conversion claims against VNB based on the theory that VNB aided and abetted Direct Air's conversion of passenger funds. Plaintiffs allege that they may bring these claims as subrogees to the passengers. For the same reasons that the Court finds that Merrick and JetPay cannot be equitably subrogated to the passengers' aiding and abetting fraud claims, they likewise cannot be subrogated to the passengers' aiding and abetting conversion claims. Summary judgment must be granted to VNB.

### III. CONCLUSION

For the reasons set forth herein, Defendant VNB's motion for summary judgment against Plaintiff American Express is **GRANTED** as to its claim for breach of fiduciary duty and **DENIED** as to its claim for negligence/gross negligence. VNB's motions for summary judgment against Plaintiffs JetPay and Merrick are **GRANTED** as to their claims for negligent misrepresentation, aiding and abetting fraud, conversion, aiding and abetting conversion, and breach of fiduciary duty, and **DENIED** as to their claims for negligence and breach of contract. Plaintiffs American Express, JetPay and Merrick's motions for summary judgment are **DENIED**. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5951583

---

**Footnotes**

1    This Opinion concerns motions in two related cases against Valley National Bank. As the Merrick and JetPay actions have been consolidated for "discovery, case management, and all other purposes as the Court deems appropriate," Order Dated February 4, 2015, Merrick ECF No. 54, this Opinion addresses the summary judgment motions in both actions.

2    Unless otherwise noted, the facts included here are not in dispute.

3    As VNB's three Corrected R.56.1 Statements of Undisputed Fact are substantially the same, the Court will cite to its Statement in the Merrick action. See VNB Corrected R.56.1 Statement of Undisputed Facts—

JetPay, <u>JetPay</u> ECF No. 120–1; VNB Corrected R.56.1 Statement of Undisputed Facts—AMEX, <u>JetPay</u> ECF No. 121–1.

4    Unless otherwise noted, the parties do not dispute that New Jersey law governs the common law claims at issue.

5    Merrick appears to allege that VNB made additional representations that in the event Direct Air "ceased operations," VNB "would release funds on transactions that could be proven to have been charged back." Merrick Stmt. ¶ 73. However, Merrick has not pointed to an actual statement made by VNB or its employees. This alleged statement cannot therefore serve as a basis for a negligent misrepresentation claim.

6    Because the Court finds that Plaintiffs JetPay and Merrick's alleged reliance on VNB's statements could not be justified, it does not consider VNB's alternate arguments.

7    Merrick does not appear to dispute that its aiding and abetting claim is brought as subrogees of the Direct Air passengers. Indeed, all of Merrick's allegations focus on Direct Air's alleged fraud against its passengers. <u>See</u> Merrick TAC ¶¶ 115, 120 (alleging that "Direct Air made representations through its website to passengers that advance monies were ... directed to an escrow account at VNB operated in accordance with DOT guidelines" and that "VNB gave substantial assistance to Direct Air in committing the foregoing fraud by VNB's breach of its duty to charter participants to properly manage the escrow account."). Merrick alleges "to the extent passengers suffered losses and were reimbursed by Merrick, Merrick is equitably subrogated into the claims of those passengers." Merrick TAC ¶ 122.

8    Because Merrick has not advanced any additional arguments why it has standing to bring an aiding and abetting fraud claim against VNB, the Court does not reach the merits of its aiding and abetting fraud claim with respect to Merrick.

9    The parties also dispute which law governs for claims on behalf of passengers. <u>See</u> VNB Br. as to Merrick at 11–12. The Court does not reach the choice of law issue because Plaintiffs cannot bring its aiding and abetting claims on behalf of passengers.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 42 of 83 PageID: 142

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

2018 WL 3019887
Only the Westlaw citation is currently available.
**\*NOT FOR PUBLICATION\***
United States District Court, D. New Jersey.

Ode OBATAIYE, Plaintiff,

v.

Gary LANIGAN et al., Defendants.

Civ. No. 14–5462 (FLW) (TJB)

|

Signed 06/18/2018

**Attorneys and Law Firms**

Ode Obataiye, Rahway, NJ, pro se.

Robert P. Preuss, Office of the Attorney General, Division of Law, Trenton, NJ, for Defendants.

**OPINION**

FREDA L. WOLFSON, United States District Judge

## I. INTRODUCTION

**\*1** Plaintiff, Ode Obataiye ("Obataiye"), is a state prisoner, presently incarcerated at East Jersey State Prison, in Rahway, New Jersey. He is proceeding *pro se* with a Fourth Amended Complaint, asserting claims under 42 U.S.C. § 1983. (ECF No. 47.) Presently before the Court is a motion by defendants, Gary Lanigan ("Lanigan"), Charles E. Warren ("Warren"), Jimmy Barnes ("Barnes"), Michelle Ricci ("Ricci"), and Dr. Flora DeFilippo ("DeFilippo") (collectively, "Defendants"), seeking dismissal of the Fourth Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 51.) For the following reasons, the motion is granted in part and denied in part.

## II. BACKGROUND AND PROCEDURAL HISTORY

### A. Underlying Circumstances

As the facts underlying this case are included in detail in the Court's Opinion resolving Defendants' motion to dismiss the Second Amended Complaint, (ECF No. 28), only the most relevant facts are repeated here. Obataiye is serving a sentence imposed by the Connecticut state court. (ECF No. 47 ¶ 1.) After being charged with assaulting a guard in a Connecticut prison, Obataiye was administratively transferred to New Jersey State Prison ("NJSP") on January 17, 2008. (*Id.* ¶¶ 11–14.) Upon his arrival at NJSP, Obataiye was assigned to the Management Control Unit ("MCU"), [1] and he was initially placed on close observation, which apparently involved constant observation and the confiscation of his shoes. (*Id.* ¶¶ 15–23.) Despite his efforts to be reassigned to the general population of the prison via quarterly and annual reviews, Obataiye remained in the MCU for six and a half years, until he was finally reassigned to the general population in August or September 2014. (*Id.* ¶¶ 79–87.)

### B. Commencement and Removals of the Action

Obataiye originally commenced this action on February 1, 2013, by filing a Verified Complaint with the Superior Court of New Jersey, Mercer County, Law Division. (Notice of Removal, Ex. A, Ver. Compl., ECF No. 1–1, at ECF pp. 5–36.) That Verified Complaint alleged claims under the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment, as well as provisions of the New Jersey Constitution. His claims relate to his past assignment to the MCU, his initial close observation, and the temperature and unsanitary conditions of his cell. (*See id.*) That case was removed to this Court, *Obataiye v. Lanigan*, Civ. No. 13–4323 (FLW) (TJB), but, after Obataiye was granted leave to file an amended pleading that omitted his federal claims, the action was remanded to Superior Court. *See* Civ. No. 13–4323, Order, ECF No. 23.

Once back in state court, Obataiye filed a new amended pleading that reasserted federal claims, and Defendants again removed the action to this Court, on September 3, 2014. (*See* ECF No. 1.) The operative complaint at that time ("the First Amended Complaint") [2] alleged due-process violations, namely that all of Obataiye's reviews as to potential release from the MCU "were no more than perfunctory sham hearings"; that he did not timely receive relevant paperwork; and cruel and unusual punishment by way of close observation, temperature extremes, and unsanitary conditions in his cell. (*See* Notice of Removal, Ex. N, Am. Compl., ECF No. 1–2, at ECF pp. 70–95.) The First Amended Complaint specifically alleged that DeFilippo, who was a voting member of the MCU review committee ("MCURC"), had admitted in a separate civil action that she did not examine the facts or evidence in any case and signed MCURC decisions without realizing what they were. (*Id.* ¶¶ 19–26.)

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 43 of 83 PageID: 143

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

## C. The Second Amended Complaint and Corresponding Dismissal Motion

**\*2**  In response to a motion by Defendants to dismiss his claims, Obataiye sought leave to file a Second Amended Complaint, which the Court granted. (*See* ECF Nos. 14, 17, & 22.) The Second Amended Complaint was largely based on the same circumstances previously complained of and asserted four counts against Defendants in their personal and official capacities and various John Doe defendants. (*See* 2d Am. Compl., ECF No. 23.) Count One alleged a conspiracy by Defendants to violate Obataiye's rights by failing give him "written notice" or to "comply with the requirements of L.C. 36 Criteria Board Sheet" within 24 hours of his placement in MCU, and failing to give him a timely hearing until more than 50 days after his placement in MCU, instead of 10 as he alleged was required. (*Id.* ¶¶ 27–30.) He further asserted that Defendants had violated his rights by placing and maintaining him in the MCU for six and a half years, when he had already spent 19 months in administrative segregation in a Connecticut prison for his assault on a guard and had not subsequently been in trouble. (*Id.* ¶¶ 32–40.)

Count Two alleged that Defendants had violated Obataiye's due-process rights by maintaining him in MCU despite his prior punishment and no new infractions. (*Id.* ¶¶ 42–46.) Obataiye alleged that the MCURC held 17 "routine reviews" and six "annual reviews," but that these "sham and perfunctory hearings" violated his rights. (*Id.*)

In Count Three, Obataiye alleged that Defendants had subjected him to cruel and unusual punishment by keeping him in the unsanitary and hazardous conditions of the MCU for six and a half years. (*Id.* ¶¶ 48–68.) He alleged that he was initially subjected to "close observation," which involved being watched by a corrections officer outside his cell 24 hours a day; Obataiye claims that such observations resulted in humiliation and stigmatization. (*Id.* ¶¶ 49–51.) In addition, Obataiye explained that the toilet in his cell was covered in feces, that conditions in the M.C.U. were generally very unsanitary, that his cell and the surrounding areas were consequently infested with rodents, and that he could not get cleaning supplies because he was on close observation. (*Id.* ¶¶ 52, 64–66.) Moreover, he alleged that his cell was "extremely cold" or "freezing cold," as it was winter, and there was vent blowing in cold air; in that connection, Obataiye claimed that he was given only one pair of underwear, one shirt, and one pair of pants, with no shoes or socks, and without "proper" blankets or bedding. (*Id.* ¶¶ 53–54.) Obataiye represented that

the temperature "was an ongoing issue" (also characterizing it as "a long historical documented M.C.U. issue"), that he filed grievances regarding it, and that Defendants did not fix the temperature or provide blankets. (*Id.* ¶¶ 55–58.) He insisted that these conditions resulted in various health problems, including headaches, difficulty breathing, exhaustion, a "dried and bloody nose," and hypertension. (*Id.* ¶¶ 59–61, 66.) Obataiye also alleged that other MCU inmates' constant screaming and banging caused him continual stress and psychiatric problems. (*Id.* ¶¶ 62–63, 67.)

Count Four alleged supervisory liability against Defendants, arguing that they created a policy or custom that led to the violation of his constitutional rights, had knowledge of his situation, and were deliberately indifferent to his harm. (*Id.* ¶¶ 70–80.)

Defendants moved to dismiss the Second Amended Complaint on a variety of bases under Federal Rule of Civil Procedure 12(b)(6). (Mot., ECF No. 27.) They argued that the claims against them in their official capacities warranted dismissal because they, in their official capacities, are not "persons" for the purposes of § 1983. (Br. in Supp., ECF No. 27–4, at 6–11.) They argued that the claims against Lanigan, Warren, Barnes, and Ricci should be dismissed for failure to show sufficient personal involvement to establish supervisory liability. (*Id.* at 11–15.) Defendants contended that the Second Amended Complaint had failed to plead sufficient facts supporting a claim of conspiracy and that Obataiye admitted that he had received an initial hearing regarding his assignment to MCU, as well as periodic reviews. (*Id.* at 16–26.) They further argued that the Eighth Amendment claims should be dismissed as Obataiye had not shown that Defendants were deliberately indifferent to his conditions of confinement. (*Id.* at 26–29.) Defendants argued that the claims must be dismissed under the doctrine of qualified immunity, as their actions were constitutional and as there was no clearly established law that they were not. (*Id.* at 29–33.) Finally, they asserted that the applicable statute of limitations barred any claim that accrued before February 1, 2011. (*Id.* at 33–35.) Obataiye filed no opposition to the motion.

**\*3**  On September 26, 2016, the Court issued an Opinion and Order that granted in part and denied in part the motion. (ECF Nos. 28 & 29.) The Court dismissed with prejudice Obataiye's claims against Defendants in their official capacities, finding that they would not be considered persons for the purposes

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 44 of 83 PageID: 144

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

of ⚑ § 1983, and the Court dismissed without prejudice Obataiye's demands for declaratory relief, noting that declaratory judgment cannot be granted solely as to past conduct. (ECF No. 28 at 10–12.) Finding that Obataiye failed to plead facts showing any agreement between defendants, the Court dismissed his conspiracy claim without prejudice. (*Id.* at 12–14.)

Addressing Obataiye's due-process claims, the Court found that his "more than six–year duration of his confinement coupled with the conditions he alleges in the MCU appear to state an atypical and significant hardship that implicates a liberty interest." (*Id.* at 14–15.) Nevertheless, the Court dismissed the due process claims without prejudice, finding that the Second Amended Complaint failed to plead facts sufficiently supporting the claim that Obataiye did not receive sufficient due process by being placed or maintained in the MCU. (*Id.* at 15–18.) The Court found that when Obataiye allegedly did not timely receive paperwork or an initial hearing, he had not been in the MCU long enough to trigger due-process protections and, in any case, those defects were cured by the initial review he subsequently received. (*Id.* at 16–17.) As to the alleged due-process issues with subsequent reviews, the Court found that Obataiye "has not alleged that he was denied the opportunity to respond or be heard in any of his hearings; nor does he argue that the prison authorities failed to consider favorable information or provide any <u>facts</u> suggesting that prison officials dealt with his case in a perfunctory fashion." (*Id.* at 17.) The Court emphasized that due process revolves around whether a person received fair procedures, not particular results. (*Id.* at 18.) The Court also dismissed Obataiye's related claims for supervisory liability, finding the claims of supervisory knowledge of and deliberate indifference to a policy of sham reviews to be conclusory. (*Id.* at 18–20.)

The Court found Obataiye's allegation that Defendants were on notice of the conditions of his confinement to be generally conclusory, but held that he had adequately alleged that problems with extreme heat and cold were sufficiently long running to put Warren and Ricci, both of whom were allegedly in charge of prison operations, on notice. (*Id.* at 22–23.) Accordingly, the Court permitted the Eighth Amendment claims for extreme temperatures to proceed against Warren and Ricci, but dismissed those claim as against the other defendants, as Obataiye alleged no facts showing the remaining defendants should have had notice of the problem. (*Id.* at 23.) The Court dismissed the remainder of the Eighth Amendment claims finding that Obataiye had not alleged

facts showing notice of the other conditions to Defendants. (*Id.* at 23–24.)

The Court declined to find that the surviving Eighth Amendment claims against Warren and Ricci were barred by the doctrine of qualified immunity, as the allegation of deliberate indifference to extreme temperatures had stated a potential constitutional violation and as opinions from the Supreme Court and various Courts of Appeals had recognized that a prisoner's constitutional rights may be violated by subjection to extreme temperatures. (*Id.* at 24–26.) The Court granted Obataiye leave to submit, within 45 days, a Third Amended Complaint addressing the claims dismissed without prejudice. (*Id.* at 27.)

### D. The Third and Fourth Amended Complaints

**\*4** Shortly thereafter, Obataiye filed a motion seeking summary judgment for the extreme-temperature claims against Warren and Ricci, (ECF No. 33), and he subsequently filed a Third Amended Complaint alleging exclusively due-process violations, (ECF No. 34). Defendants asked the Court to deny the motion for summary judgment and moved to dismiss the Third Amended Complaint. (ECF Nos. 35 & 40.) The Court then denied summary judgment as moot, denied Defendants' dismissal motion, and permitted Obataiye "one final opportunity" to file an all-inclusive Fourth Amended Complaint. (ECF Nos. 45 & 46.)

Obataiye then filed his Fourth Amended Complaint, which is the operative pleading in this action. (ECF No. 47.) While completely reformatted, the substantive allegations included in the Fourth Amended Complaint are largely the same as those included in the Second Amended Complaint, though Obataiye no longer alleges a conspiracy claim. (*See id.*) The Court will focus primarily on Obataiye's new allegations.

As in his Second Amended Complaint, Obataiye alleges that he was consistently subjected to extreme cold in the winter, while provided only a shirt and pants and, initially, no bedding, as well as extreme heat in the summer, causing various health problems. (*Id.* ¶¶ 25–43, 171–179.) He again alleges that his initial cell was "disgusting" and that he was denied cleaning supplies until he received an initial MCU hearing two months later. (*Id.* ¶¶ 44–67.) Obataiye also now alleges that for the first 19 months he was at NJSP, although considered to be "on MCU," he was not housed in the MCU unit, meaning that instead of frequent outdoor exercise, he was only permitted to go outside twice a month, "alone in a dog kennel." (*Id.* ¶¶ 75–78.)

Obataiye newly complains of an incident when, while exercising in a "kennel," he passed out and collapsed (perhaps in relation to his hypertension and anemia.) (*Id.* ¶¶ 94–101.) He alleges that he was prescribed a regimen of cortisone shots to treat weakness or atrophy in his legs caused by lack of exercise, but that these shots were then discontinued. (*Id.* ¶¶ 102–103.) He alleges that he "complained and filed numerous remedies using the prisons Inmate Remedy System," and that, though he was initially told he would be seen by the prison medical director, he never was. (*Id.* ¶¶ 104–106.) Obataiye alleges that he filed an appeal which was "eventually denied at the final level." (*Id.* ¶¶ 106–107.)

In regards to his due-process claims, Obataiye alleges that he completed required programs intended to facilitate release from the MCU to the general population, but that, despite this, the MCURC declined to release him until August or September 2014. (*Id.* ¶¶ 68–74, 79–85.) Obataiye again alleges that the MCURC's initial decision to place him in the MCU and the subsequent reviews violated his due-process rights. (*Id.* ¶¶ 120–164.) He bases this primarily on the fact that DeFilippo participated in his initial hearing and on DeFilippo's alleged admissions in a 2009 deposition that "she never reviewed a single report (ie. evidence) regarding any inmate's hearing, never asked or answered a single question regarding any inmate's placement hearing, nor had she ever participated in any decision to place or release an inmate from the MCU Housing Unit." (*Id.* ¶¶ 90–92, 126–132.)

Obataiye alleges that his subsequent review hearings suffered from the same defects, and were "mere formalities that generally lasted no more than a minute or two," though he asserts that "at each and every one" of the review hearings he "would inform the committee that he was in compliance with NJAC 10A:5–2.10 & NJAC 10A:5–2.11, and thus should be released from the MCU unit." (*Id.* ¶¶ 137–139.) He specifically contends that DeFilippo did not review any information for either his initial or his subsequent review hearings, and he argues that no MCURC member ever presented evidence suggesting he was a threat so as to justify keeping him in the MCU. (*Id.* ¶¶ 141–149.)

**\*5** Obataiye further alleges that he always told Barnes, the chairperson of the MCURC, that he was in compliance with applicable rules, but that "[t]here was never any dialog between Plaintiff and ChairPerson Barnes about the information and evidence favorable to the Plaintiff" and that Barnes "treated the hearing in a perfunctory manner ... by

reciting the same statement he ended every hearing with, "you will hear from the committee soon." (*Id.* ¶¶ 150–153.) He further alleges that Barnes violated his rights by allowing MCURC members to sign decisions to keep Obataiye in MCU "despite knowing that the members (DeFillipo in particular) had not reviewed any evidence nor casted [sic] a vote." (*Id.* ¶¶ 133–136, 154.) Obataiye also asserts that after the review hearings, he filed appeals to Warren, then the prison administrator, "that almost always went unanswered." (*Id.* ¶¶ 93, 156.)

### E. The Present Motion to Dismiss

Presently before the Court is Defendants' motion to dismiss the Fourth Amended Complaint. (ECF No. 51.) Defendants' arguments are largely the same as those they raised in their motion to dismiss the Second Amended Complaint. (*See* Br. in Supp., ECF No. 51–1.) They first argue that the applicable statute of limitations bars claims regarding all injuries that occurred before February 1, 2011, or two years before Obataiye filed his initial complaint. (*Id.* at 8–10.) For the first time, Defendants contend that Obataiye failed to exhaust administrative remedies before filing this action. (*Id.* at 10–11.) The claims against Lanigan, Warren, Barnes, and Ricci must be dismissed, Defendants argue, as the Fourth Amended Complaint does not allege personal involvement by them in the alleged violations. (*Id.* at 11–17.) They reason that the due-process claims against Barnes are premised explicitly on a theory of *respondeat superior* and that Obataiye has not made specific allegations to show that Ricci or Warren knew of the extreme temperature problems and other conditions of confinement. (*Id.* at 15–16, 26–30.) Defendants also maintain that Obataiye has not properly alleged that the temperature conditions presented a risk to health and safety or identified what the actual temperature was, instead simply describing it as unpleasant. (*Id.* at 28–29.)

Defendants insist that Obataiye's due-process claims concern the initial MCU determination in 2008, too soon for a liberty interest to have accrued, and that Obataiye "concedes that he was given the 32 routine and 6 annual reviews to which he was entitled." (*Id.* at 17–22.) They argue that, even if testimony from DeFilippo's 2009 deposition could invalidate Obataiye's prior hearings, she also indicated that she subsequently corrected her participation, thus only supporting attacks on the earlier hearings. (*Id.* at 24–26.)

Finally, Defendants assert that they are shielded from liability by qualified immunity. (*Id.* at 30–39.) They contend that no cases clearly establish that the process Obataiye received

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 46 of 83 PageID: 146

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

in review hearings after 2009 violated due process. (*Id.* at 35–36.) Defendants argue that the allegations regarding sanitary problems in the MCU are "far too vague to either violate the Plaintiff's Eighth Amendment Rights, or to form a basis by which the court could determine whether the law was clearly established with regard to those specific conditions." (*Id.* at 36–37.) They again insist that Obataiye's allegations as to extreme temperatures are not sufficiently specific to support an Eighth Amendment claim or to determine whether precedential cases are applicable. (*Id.* at 37–38.) Defendants argue that the cases concerning extreme temperatures previously cited by the Court "may indeed stand for the general proposition that under the right circumstances, temperature extremes can violate the Eighth Amendment," but they assert that these cases do not show that Obataiye's specific circumstances constituted a clearly established rights violation. (*Id.* at 38–39.)

**\*6** Obataiye filed no opposition to this motion.

### III. ANALYSIS

#### A. Dismissal Standard Under Rule 12(b)(6)
In resolving a motion to dismiss under Rule 12(b)(6), " 'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.' " *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) ); *see also Zimmerman v. Corbett*, 873 F.3d 414, 417–18 (3d Cir. 2017); *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal*, 556 U.S.

at 678 (quoting *Twombly*, 550 U.S. at 555). In addition to the allegations of the complaint, a court may consider matters of public record, documents specifically referenced in or attached to the complaint, and documents integral to the allegations raised in the complaint. *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2004).

*Pro se* pleadings, as always, will be liberally construed. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Glunk v. Noone,* 689 F. App'x 137, 139 (3d Cir. 2017). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

#### B. Claims Under 42 U.S.C. § 1983
As a general matter, a plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of constitutional rights. That section provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and that the alleged

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 47 of 83 PageID: 147

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

deprivation was committed or caused by a person acting under color of state law. *See* [Harvey v. Plains Twp. Police Dep't, 635 F.3d 606, 609 (3d Cir. 2011)](); *see also* [West v. Atkins, 487 U.S. 42, 48 (1988).]() [3]

### C. Due Process Claims

**\*7**  The first step in assessing a procedural due-process claim is to determine whether the alleged injury implicates a "liberty or property" interest under the language of the Fourteenth Amendment. [Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000)]() (citing [Fuentes v. Shevin, 407 U.S. 67 (1972)]() ). Once the court determines that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it. *Id.* (citing [Morrissey v. Brewer, 408 U.S. 471, 481 (1972)]() ). In its prior Opinion, the Court found that Obataiye's allegations in his Second Amended Complaint concerning his confinement to the MCU for over six years "state an atypical and significant hardship that implicates a liberty interest." (ECF No. 28 at 14–15.) As Obataiye raises the same issues in his Fourth Amended Complaint and Defendants do not contest the point, the Court sees no reason to revisit that analysis.

Where a liberty interest is implicated, the next inquiry under the Fourteenth Amendment focuses on whether a plaintiff was provided with the process he was due. In the context of this case, due process includes a meaningful opportunity to respond and be heard at the initial MCU placement hearing, at each routine review, and at each annual review. *See* [Allah v. Bartkowski, 574 F. App'x 135, 139 (3d Cir. 2014)](). For example, the Third Circuit found that the plaintiff in *Allah v Bartkowski* had adequately

alleged a litany of defects during [his MCU review] hearings that violated his due process rights. Primarily, Allah alleged that several of his administrative appeals were ignored; that members of the MCU RC were unfamiliar with and often violated, *inter alia*, Sections 10A:5–2.3 to .5 of the New Jersey Administrative Code governing MCU RC proceedings; that MCU RC hearings were perfunctory and without substance; that at least

one MCU RC member, Dr. Flora DeFillipo, was unaware that she was an MCU RC member; that Dr. DeFillipo signed off on MCU RC decisions without realizing she had done so; and that Dr. DeFillipo never engaged in factfinding or weighing of the evidence.

*Id.* at 139–40 (finding that Allah had stated Fourteenth Amendment claims that should not have been dismissed at screening for failure to state a claim); *see also* [City of W. Covina v. Perkins, 525 U.S. 234, 239 (1999)](); [Sourbeer v. Robinson, 791 F.2d 1094, 1101 (3d Cir.1986)]() ).

In its prior Opinion, the Court found that Obataiye had not sufficiently pleaded facts showing that he was denied due process during the initial decision to place him in MCU or during subsequent review hearings. [4] (ECF No. 28 at 15–21.) Construing the *pro se* plaintiff's Fourth Amended Complaint liberally, the Court reads it as alleging that, in connection with Obataiye's initial MCURC hearing, DeFilippo did not review any reports or evidence, asked no questions, and did not participate in the decision to assign Obataiye to the MCU, despite being a member of the committee. (*See* ECF No. 47 ¶¶ 128–132.) Obataiye alleges that Barnes should be liable for permitting the hearing to take place while knowing that DeFilippo was not meaningfully participating. (*Id.* ¶¶ 133–136.) The Court further construes the Fourth Amended Complaint as alleging that these defects continued during each subsequent review. (*See id.* ¶¶ 137–138, 143–144, 148–149, 154.) Obataiye also contends that he filed administrative appeals to then-Administrator Warren "that almost always went unanswered." (*Id.* ¶¶ 93, 156.)

**\*8**  Obataiye seemingly admits that he had opportunities to respond and be heard at his various reviews before the MCURC. (*See id.* ¶¶ 139, 150–151, 153.) Nevertheless, the Court finds that Obataiye has alleged facts sufficient to support a due-process claim, at least against DeFilippo, Barnes, and Warren. Like the plaintiff in *Allah*, Obataiye alleges that DeFilippo did not consider any facts or evidence or otherwise participate in MCURC decisions to place or maintain him in the MCU, despite signing such decisions. *See* [Allah, 574 F. App'x at 140](). Obataiye also alleges, like Allah, that most of his appeals of MCURC decisions were

Case 2:26-cv-06421-WJM-CF Document 16-4 Filed 07/14/26 Page 48 of 83 PageID: 148

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

ignored. *See* 🚩*id.* at 139–40. Given the similarities between Obataiye's claims and those in *Allah*, complete dismissal of the due-process claims is not warranted.

Contrary to Defendants' argument that Obataiye's due-process claim against Barnes is premised explicitly on *respondeat superior*, the Fourth Amended Complaint, liberally construed, alleges facts sufficient to support a claim for supervisory liability against Barnes. The Third Circuit has noted that supervisory liability requires personal involvement by the supervisor, which may include when a supervisor has knowledge of unconstitutional conduct and acquiesces in it. 🚩*Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds by* 🚩*Taylor v. Barkes*, 135 S. Ct. 2042 (2015); 🚩*A.M. ex rel. J.M.K. v. Luzerne Cty. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Obataiye alleges that Barnes, as chair of the MCURC, permitted decisions to go forward without DeFilippo's participation and that he knowingly accepted the signature of DeFilippo or other committee members on such decisions "despite knowing that [they] had not reviewed any evidence nor casted [sic] a vote." (ECF No. 47 ¶¶ 134–136, 153–155.) The Fourth Amended Complaint thus alleges not a theory of pure *respondeat superior*, but instead knowledge of, and acquiescence to, violations of Obataiye's constitutional rights.

Furthermore, the Court rejects Defendants' argument that Obataiye's claims must be dismissed because he has not pleaded exhaustion of administrative remedies. (*See* ECF No. 51–1 at 10–11.) The requirement of the Prisoner Litigation Reform Act that prisoners exhaust administrative remedies before filing a 🚩§ 1983 claim creates an affirmative defense to be pleaded by the defendant—not an element required to be pleaded by the plaintiff. *See* 🚩*Jones v. Bock*, 549 U.S. 199, 211–17 (2007); *see also* 🚩*Ray v. Kertes*, 285 F.3d 287, 291–95 (3d Cir. 2002). Accordingly, whether Obataiye pleaded exhaustion of administrative remedies is irrelevant to the analysis on this motion under Rule 12(b)(6): whether the Fourth Amended Complaint states a claim.

Defendants' argument that, following the 2009 deposition, DeFilippo changed her practices and began actively participating in MCURC decisions is an improper attempt to argue the facts on this motion to dismiss. (*See* ECF No. 51–1 at 24–26.) DeFilippo's testimony regarding her

changed behavior may be relevant at some stage of this case, but it is not on this motion, when the Court must accept Obataiye's factual allegations as true. *See* 🚩*Fowler*, 578 F.3d at 210. Because Defendants also base their argument regarding qualified immunity to the due process claims on DeFilippo's changed behavior, this argument also fails. (*See* ECF No. 51–1 at 35–36 ("The State Defendants are aware of no cases that establish that the procedure accorded Plaintiff after the reforms that occurred after DeFilippo's June, 2009 deposition, violated his rights.") ).

Obataiye's due-process claims will be limited, however, by the applicable statute of limitations. Claims under 🚩§ 1983 are subject to New Jersey's two-year statute of limitations for personal-injury claims. *See Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013) (citing 🚩*Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) ); *Evans v. Gloucester Twp.*, 124 F. Supp. 3d 340, 349 (D.N.J. 2015) (citing *Pittman v. Metuchen Police Dep't*, 441 F. App'x 826, 828 (3d Cir. 2011) ). The accrual of a cause of action is a matter of federal law and generally coincides with the time that the plaintiff knew or should have known of the alleged injury. *See* 🚩*Kach v. Hose*, 589 F.3d 626, 634–35 (3d Cir. 2009).

 **\*9** Obataiye alleges that his due-process rights were violated at each hearing held before the MCURC. There is no indication that Obataiye did not or should not have known of the alleged injury at the time of each review, and accordingly, his claims will be considered to have accrued at the time of each review when he was assigned to or maintained in the MCU. Defendants argue that Obataiye's claims must be limited to those that accrued on or after February 1, 2011, which is two years before he filed his original complaint raising these allegations. (*See* ECF No. 51–1 at 8–10.) The Court agrees, and finds that allegations of Obataiye's due-process claims pertaining to Defendants' actions or inactions that occurred before February 1, 2011, are dismissed as untimely.

Finally, the Fourth Amended Complaint does not appear to assert due-process claims against any defendant other than DeFilippo, Barnes, and Warren; but, to the extent they are asserted against Lanigan and Ricci, those claims are dismissed.

**D. Eighth Amendment Claims**

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 49 of 83 PageID: 149

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

As explained in the Court's prior Opinion, the Eighth Amendment requires that prison officials provide humane conditions of confinement. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "For the conditions of confinement to rise to the level of an Eighth Amendment violation, they must deny the 'minimal civilized measure of life's necessities.' " *Betts*, 621 F.3d at 256 (quoting *Farmer*, 511 U.S. at 835). Unsanitary conditions can be cruel and unusual. *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir.1992), *superseded by statute*, Prison Litigation Reform Act of 1996, Pub. L. No. 104–134, 110 Stat. 1321. To establish deliberate indifference a prison official must both know of and disregard an excessive risk to an inmate's health or safety. *See Farmer*, 511 U.S. at 837. Thus, "[t]o assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective ('Was the deprivation sufficiently serious?') and subjective ('Did the officials act with a sufficiently culpable state of mind?') test." *Allah*, 574 F. App'x at 138 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) ).

The Court previously concluded that Obataiye's general allegations that Defendants had notice of his conditions of confinement were conclusory, but found that he had alleged that the temperature extremes were sufficiently ongoing and documented to support a claim that the former prison administrators, Warren and Ricci, were deliberately indifferent to the problem. (*See* ECF No. 28 at 22–24.) This Court held that as the administrators, Warren and Ricci were assumed to have knowledge of prison conditions, such as the allegedly extreme temperatures in Plaintiff's prison cell. The Fourth Amended Complaint does not change this analysis. As to the remaining defendants, Obataiye again alleges that the temperature problems are longstanding and that he and other inmates had complained about the problem "over the years." (ECF No. 47 ¶¶ 30–31, 39–41, 172–174.) He does not, however, allege facts that could show those defendants had notice of the alleged unsanitary conditions or other problems, but rather, simply stating in a conclusory fashion that "Defendants were in fact notified of these risks and, the injuries plaintiff has already suffered due to this ongoing confinement." (*See id.* ¶¶ 187, 197.) Obataiye suggests that those defendants knew of his conditions because of progress reports transmitted to the Connecticut prison system, but does not allege that such progress reports would have discussed

his conditions of confinement or identify who allegedly prepared or received these reports. (*See id.* ¶¶ 192–193, 199, 201.) Accordingly, any Eight Amendment claims will again be dismissed against all defendants except for the Eight Amendment claims related to extreme temperatures against Warren and Ricci.

**\*10** In that regard, the Court rejects Defendants' argument that Obataiye's allegations regarding the extreme temperatures are insufficiently specific to establish a risk to health and safety. Defendants contend that Obataiye "tells us nothing more than that the temperature he was exposed to was something he personally found unpleasant," and they complain that he does not specify the actual temperatures to which he was subjected. (ECF No. 51–1 at 28–29.) Contrary to this assertion, Obataiye alleges that, during the winter, his cell was "freezing," that "the vent in the Plaintiff's cell was blowing extremely hard and the air coming out of the vent was freezing cold," and that he was provided only with a shirt and pants, initially receiving no bedding. (ECF No. 47 ¶¶ 24–31, 171–172, 174.) Obataiye claims that his subjection to these temperatures caused him to suffer ongoing muscle and joint pain, as well as sleep deprivation. (*Id.* ¶¶ 31–37, 176.) He also alleges that, during the summer, the vent in his cell blew hot air and caused him to suffer "excessively hot temperatures." (*Id.* ¶¶ 40–41, 176–177.) He asserts that this heat caused him headaches, breathing problems, a "constant dried and bloody nose," and exhaustion. (*Id.* ¶ 42.)

Obataiye thus alleges considerably more than that he was subjected to temperatures that were uncomfortable, instead claiming that they caused him a wide variety of health problems. That Obataiye did not allege that he was exposed to any particular temperature—assuming he was not provided with a thermometer—is not fatal to his claim. At the pleading stage, Plaintiff need not allege the temperature with such specificity.

Finally, Defendants argue that the Eighth Amendment claim related to temperature extremes should be dismissed on the basis of qualified immunity. (*See* ECF No. 51–1 at 37–39.) Qualified immunity is 'an entitlement not to stand trial or face the burdens of litigation.' " *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ). Under this doctrine, a government official is immune from claims for damages unless, interpreting the allegations most favorably to the plaintiff, they show (1) that the official violated the plaintiff's constitutional rights and (2) that the

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 50 of 83 PageID: 150

Obataiye v. Lanigan, Not Reported in Fed. Supp. (2018)

constitutional right violated was clearly established. *Id. at 201*; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."). A right is considered clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alterations omitted); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). A right is thus clearly established where existing precedent has " 'placed the statutory or constitutional question beyond debate.' " *Taylor*, 135 S. Ct. at 2044 (quoting *Ashcroft v. Al–Kidd*, 563 U.S. 731, 741 (2011) ).

In its prior Opinion, the Court noted that the Supreme Court had stated in dictum that "a low cell temperature at night combined with a failure to issue blankets" may amount to a violation of Eighth Amendment rights. *See Wilson*, 501 U.S. at 304. It noted opinions from Courts of Appeal recognizing " 'the right of a prisoner not to be confined in a cell at so low a temperature as to cause severe discomfort,' " (ECF No. 28 at 25 (quoting *Chandler v. Baird*, 926 F.2d 1057, 1065–66 (11th Cir. 1991) (collecting appellate cases) ) ), and also various cases finding potential Eighth Amendment violations from exposure to high temperatures, (*id.* at 26).

Defendants argue that these cases only "stand for the general proposition that under the right circumstances, temperature extremes can violate the Eighth Amendment," comparing these cases to the Supreme Court's holding in *Mullenix v. Luna*, 136 S. Ct. 305 (2015). (ECF No. 51–1 at 38.) In that case the Court of Appeals for the Fifth Circuit had rejected an argument of qualified immunity, finding that "the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a sufficiently substantial and immediate threat, violated the Fourth Amendment." *Mullenix*, 136 S. Ct. at 308. The Supreme Court reversed, finding this principle not sufficiently specific to clearly establish that an officer's shooting at an intoxicated fugitive who was engaged in a high-speed car chase and who had made threats of violence against other officers could violate the fugitive's constitutional rights. *Id.* at 308–12.

**\*11** Defendants' comparison is inapt. The Court perceives very little similarity between the rejected-analysis of the Fifth Circuit in *Mullenix* (applying the principle that the propriety of using deadly force depends upon a substantial and immediate threat to a case involving an officer's shooting at a fugitive in a high-speed chase) and the analysis in this Court's prior Opinion (applying precedent identifying potential Eighth Amendment violations where prisoners are subjected to extreme cold or extreme hot to a case where a prisoner alleges subjection to extreme temperatures). Defendants argue that Obataiye's allegations regarding temperature are not sufficiently specific to draw comparisons to other cases; but, even if there are some variation in the details between those published decisions and this case, the Supreme Court has noted that the clearly established prong " 'do[es] not require a case directly on point.' " *Taylor*, 135 S. Ct. at 2044 (quoting *Al–Kidd*, 563 U.S. at 741).

Like his due-process claims, however, Obataiye's Eighth Amendment claims are also limited by the statute of limitations. Accordingly, any recovery will be limited to conditions of confinement on or after February 1, 2011.

The Court additionally notes that it might be possible to construe Obataiye's allegations regarding his collapse while exercising and related medical treatment as an attempt to assert a claim for deliberate indifference to a serious medical need. (*See* ECF No. 47 ¶¶ 94–109.) To the extent that Obataiye indeed seeks to assert such a claim, it will be dismissed as an unpermitted amendment under Federal Rule of Civil Procedure 15. Obataiye's leave to amend was limited to efforts to cure deficiencies in the claims that were previously dismissed by the Court—it did not permit him to add any new claims he desired. (*See* ECF No. 28 at 27; ECF No. 46 ¶ 7.)

## IV. CONCLUSION

For the foregoing reasons, the pending, unopposed dismissal motion is granted in part and denied in part, insofar as described herein. To the extent that Obataiye asserts due-process claims against Lanigan and Ricci, such claims are dismissed for failure to state a claim against those defendants. Furthermore, Obataiye's due-process claims insofar as they

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 51 of 83 PageID: 151

seek recovery based on injuries that occurred before February 1, 2011 are dismissed with prejudice as barred by the applicable statute of limitations. Obataiye's due-process claims against Warren, Barnes, and DeFilippo that accrued on or after February 1, 2011 shall be permitted to proceed. To the extent that Obataiye asserts Eighth Amendment claims against Lanigan, Barnes, and DeFilippo, such claims are dismissed for failure to state a claim against those defendants. Any Eighth Amendment claims pertaining to conditions other than extreme temperatures are dismissed for failure to state a claim, and the Eighth Amendment claims are dismissed with prejudice insofar as they concern injuries occurring before February 1, 2011. The extreme-temperature claims against Warren and Ricci that accrued on or after February 1, 2011 shall be permitted to proceed.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3019887

---

### Footnotes

1   The MCU at NJSP is a close custody unit to which inmates are assigned if they pose a substantial threat (1) to the safety of others, (2) of damage to or destruction of property, or (3) of interrupting the operation of a state correctional facility. *See* N.J. Admin. Code § 10A:5–1.3; N.J. Admin. Code tit. 10a, ch. 5, subch. 2.

2   The Court notes that this was at least the third pleading Obataiye had filed during all underlying proceedings, but the first operative pleading under this docket number. Nonetheless, it will refer to this as the First Amended Complaint, and will number successive pleadings accordingly, consistent with the parties' references to the various pleadings.

3   To the extent that Plaintiff raises claims under the New Jersey Civil Rights Act mirroring his § 1983 claims, they will be addressed in tandem with his federal causes of action. *See Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443–44 (D.N.J. 2011); *see also Armstrong v. Sherman*, Civ. No. 09–716, 2010 WL 2483911, at *5 (D.N.J. Jun. 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983."); *Chapman v. New Jersey*, Civ. No. 08–4130 (AET), 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart ....").

4   As the Court noted then, an inmate is assigned to the MCU based upon a determination made by the MCURC. N.J. Admin. Code § 10A:5–2.5. A formal review of each inmate placed in MCU must occur before the MCURC every three months. N.J. Admin. Code § 10A:5–2.10(a). At each review hearing, the MCURC "shall again review the information upon which the decision was based to assign the inmate to the MCU." N.J. Admin. Code § 10A:5–2.10(e). Additionally, the Department of Corrections is to conduct a hearing at least once a year to determine whether an inmate's release from MCU would be appropriate. N.J. Admin. Code § 10A:5–2.11(a).

---

**End of Document**                                 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 890182
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

OWAL, INC., Plaintiff,

v.

CAREGILITY CORPORATION, Michael
Brandofino and Ronald J. Gaboury, Defendants.

Civil Action No. 3:21-cv-13407
|
Signed 03/25/2022

**Attorneys and Law Firms**

Evan Newman, Jacobowitz Newman Tversky LLP,
Cedarhurst, NY, for Plaintiff.

Christopher J. Marino, Matthew Nicholas Fiorovanti,
Giordano Halleran & Ciesla, PC, Red Bank, NJ, for
Defendants.

**MEMORANDUM AND ORDER GRANTING
IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

PETER G. SHERIDAN, U.S.D.J.

**\*1**  This case is before the Court on Defendants' motion to
dismiss Plaintiff's complaint. (ECF No. 15). The Court heard
oral argument on February 23, 2021. For the reasons that
follow, Defendants' motion to dismiss Plaintiff's complaint is
granted in part and denied in part. Fed. R. Civ. P. 12(b)(6)

This Court has original jurisdiction over this matter pursuant
to 28 U.S.C § 1331. This Court has supplemental jurisdiction
over Plaintiff's state law claims pursuant to 28 U.S.C §
1367(a). Additionally, this Court has diversity jurisdiction
over Plaintiff's state law claims pursuant to 28 U.S.C §
1332 because (1) Plaintiff is a resident of New York and
Delaware while Defendants are residents of New Jersey, and
(2) Plaintiff alleges damages in excess of $75,000. (Complaint
¶¶6-9, ECF No. 1). Venue is proper in the District of New
Jersey under 28 U.S.C § 1391(b), because Defendants are
citizens of New Jersey and a substantial part of the events
giving rise to Plaintiff's claims took place in New Jersey. (Id.
at ¶12).

**I.**

The litigation stems from the collapse of talks between
OWAL, Inc. (OWAL) and Caregility Corporation concerning
the possible acquisition of OWAL, Inc. by Caregility
Corporation (corporate acquisition).[1]  According to OWAL's
Complaint, OWAL began discussions with Defendant
Caregility Corporation ("Caregility") about a corporate
acquisition "sometime in 2020." (Id. at¶14). OWAL "is
an information technology company in the business of
developing proprietary security systems software and other
technology with applications across a broad range of
industries." (Id. at ¶13). Caregility's business "involves
the implementation of telehealth solutions for third party
clients." (Id. at ¶15). Defendant Michael Brandofino
("Brandofino") is Caregility's Chief Operating Officer
(COO), and Defendant Ronald J. Gaboury ("Gaboury") is
the Chief Executive Officer (CEO) (Gaboury, Brandofino
and OWAL are collectively referred herein as, "Defendants").
OWAL was interested in a corporate acquisition so
OWAL could obtain a new source of funding necessary
to further develop its proprietary technologies and to
"broaden the applications and potential markets for OWAL's
technologies." (Id. at ¶14). Caregility was interested in
a corporate acquisition because OWAL's "technology,
infrastructure[,] and personnel" could have been adopted into
its telehealth business. (Id. at ¶15).

The parties entered into several interim agreements to
safeguard their respective interests as they mutually disclosed
confidential information in order to effectuate a corporate
acquisition.

a. The Memorandum of Understanding
The parties entered into a memorandum of understanding
(MOU) on May 18, 2020. (Id. at ¶16); (Motion to Dismiss
Ex. B, ECF No. 15-2). The MOU made clear that aside
from agreements on confidentiality and non-solicitation,
"this MOU shall be non-binding on the parties, and is
subject to the formal execution" of a corporate acquisition
agreement. (Id. at 1). Most of the MOU was an outline of
terms and conditions that would be more fully developed
and eventually incorporated into a corporate acquisition
agreement. (Id.). In the interim, OWAL agreed to develop
software for monitoring hospital patients, which would
be compatible with Caregility's software. (Id. at 9). With

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 53 of 83 PageID: 153

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

respect to confidentiality, Caregility agreed: "(1) to hold [OWAL]'s Proprietary Information in strict confidence; (2) not to disclose [OWAL]'s Proprietary Information to any third parties, except as described below; and (3) not to use any Proprietary Information except to perform its obligation and exercise its rights under this MOU...." (*Id.* at 4-5). "Proprietary Information" was defined as: "business and financial information, software, source code and specifications, hardware, designs, trade secrets, technical information, business forecasts and strategies, personnel information, and proprietary information of third parties." (*Id.* at 4). With respect to non-solicitation, the parties agreed: "During the term of this MOU ... and for two (2) years afterwards, neither Party shall solicit the other Party's officers, staff[,] or employees for such Party's employment or benefit without the other Party's prior written consent." (*Id.* at 5). The term of the MOU was from April 1, 2020 to April 1, 2021. (*Id.* at 9).

b. The Confidentiality Agreement

**\*2** On September 1, 2020, the parties entered into a confidentiality agreement (CA) in anticipation of "negotiations leading to a possible [corporate acquisition]." (Complaint at ¶24); (Motion to Dismiss Ex. C, ECF No. 15-2). Caregility agreed to keep confidential certain information ("Confidential Information") it would receive from OWAL over the course of the negotiations. (*Id.* at 1). This information included:

> all information, whether written or oral, relating to [OWAL] provided to or obtained by [Caregility] in whatever form including by observation for purposes of its evaluation of its interest in engaging in the Proposed [corporate acquisition], including all information contained therein and all notes, analyses, compilations, studies, or other documents which are prepared by [Caregility] or at its direction after its receipt of such information to the extent containing or otherwise reflecting or derived from such information....

(*Id.*). Further, Caregility agreed to be held liable for any breaches of confidentiality by it or its employees and officers. (*Id.* at 1-2). The CA also included a two-year non-solicitation term prohibiting the parties from soliciting or hiring the employees of the other party. (*Id.* at 2-3). The CA made clear that aside from "obligations which are expressly identified as being binding ... no contract or agreement shall be deemed to exist between the parties unless and until a definitive [corporate acquisition] agreement has been executed and delivered by each of the parties thereto.... [T]he term 'definitive [corporate acquisition] agreement' does not include an executed letter of intent or any other preliminary written agreement, nor does it include any written or oral acceptance of any offer...." (*Id.* at 4-5).

c. The Letter of Intent

In December 2020, the parties signed a letter of intent (LOI) proposing that OWAL would be acquired by Caregility. (Motion to Dismiss, Ex. D). The LOI made clear that it was "for discussion purposes only, and ... no binding obligations shall exist or be implied or be construed with respect to the matters described in" the LOI "or the subsequent conduct of the parties" until a definitive corporate acquisition agreement was signed and executed by the parties. (*Id.* at 1). Further the LOI "represents only the expression of intent of the parties, does not constitute a contract or agreement, is not binding, and shall not be enforceable against Caregility or OWAL." (*Id.* at 4, ¶9).

The only binding aspects of the LOI were: (1) Caregility would conduct due diligence "to its sole satisfaction"; (2) OWAL would continue to conduct its regular business; (3) OWAL would not seek a "sale, merger, combination, consolidation, joint venture, partnership, recapitalization, restructuring refinancing, or other disposition of all or any material part of OWAL" through January 31, 2021 and for an additional thirty days absent notice by OWAL; (4) the LOI "supersedes and replaces all prior understandings and agreements among the parties ... relating to the subject matter hereof." (*Id.* at 3-4, ¶¶4, 6-8, 10-11). The LOI outlined a purchase price of OWAL totaling $11 million, comprised of: $500,000 in cash, $2.5 million in promissory notes, and four percent of Caregility's shares, which were valued at $8 million. (*Id.* at 1-2, ¶2); (Complaint at ¶35).

Once the exclusivity period of the LOI expired on February 1, 2021, "Caregility's officers expressed their continued interest in closing on the proposed acquisition

of OWAL...." (Complaint at ¶38). On February 16, 2021, Caregility's counsel told OWAL's counsel "that Caregility anticipated closing on the [corporate acquisition] in March 2021." (*Id.*). On February 26, 2021, "Caregility indicated that it was preparing a draft [corporate acquisition] agreement." (*Id.*). On March 5, 2021, Caregility's counsel "reassured OWAL's counsel that while Caregility had been focused on a capital raise, it anticipated returning its focus to the [corporate acquisition] and picking up the pace in the following week." (*Id.* at ¶41). On March 21, 2021, Caregility's counsel "informed OWAL's counsel that he was under a lot of pressure from Caregility to complete a draft [corporate acquisition] agreement, and that he would provide the draft in the following week." (*Id.* at ¶42). Additionally, Caregility included OWAL on "multiple joint activities, including customer meetings and industry research." (*Id.* at ¶39). OWAL contends that "Caregility conducted itself as if the [m]erger was a done deal and the parties were integrated into a single entity...." (*Id.*).

**\*3** On March 19, 2021, Caregility asked OWAL for a "pitch deck" so it could "use some slides 'to present to potential investors groups about OWAL.' " (*Id.* at ¶46). OWAL "provided two slide decks to Caregility;" but OWAL did not provide any written consent to share the pitch decks with a third party. (*Id.* at ¶¶46-47). Further, "Caregility incorporated other data and information obtained from OWAL into its investor presentations, and also verbally disclosed facts about OWAL and the intended [corporate acquisition]," without OWAL's written consent. (*Id.* at ¶48).

d. The Non-Disclosure Agreement

On March 25, 2021, the parties entered into a "Mutual Confidentiality and Non-Disclosure Agreement" (NDA). (*Id.* at ¶51); (Motion to Dismiss Ex. E, ECF No. 15-2). In sum, the NDA restricted Caregility's use of "any and all proprietary or confidential information of [OWAL]" in evaluating the potential corporate acquisition with OWAL unless Caregility obtained OWAL's written consent. (Complaint at ¶¶54-56); (Motion to Dismiss Exh. E at 1-2). This information was identified as "Evaluation Materials." (Complaint at ¶¶52-54); (Motion to Dismiss Exh. E at 1-2). The NDA also included a "non-solicitation" provision prohibiting Caregility from soliciting OWAL's employees for employment at Caregility. (Motion to Dismiss Ex. E at 3, ¶2). The NDA was for a two-year period. (*Id.* at 3, ¶2). Like the other agreements, the NDA made clear: "The Parties hereto agree that unless and until definitive documentation with respect to the [corporate acquisition] has been signed and delivered by the Parties,

none of the Parties shall have any legal obligation of any kind whatsoever to enter into a business transaction involving the Parties by virtue of this [NDA] or any other written or oral communication with respect to the [corporate acquisition]." (*Id.* at 4, ¶5).

The parties continued to collaborate and trade information. Sometime in March 2021, Caregility apparently "unleashed its sales team to market and sell OWAL's technology to third parties" without OWAL's consent; OWAL "shut down" this effort. (Complaint at ¶61). Throughout the months of April and May 2021, the parties continued to hold discussions related to the potential corporate acquisition, discussed the roles of their officers in the combined company, and traded financial statements and valuation models. (*Id.*). Caregility's counsel sent OWAL a draft of a corporate acquisition agreement on April 26, 2021. (*Id.*). On April 28, 2021, Caregility's counsel indicated Caregility did not want to close on the deal before May 10, 2021, for tax purposes. (*Id.*). The parties traded comments on the draft corporate acquisition agreement the latter part of May 2021. (*Id.*). Evidently, at the end of May 2021, OWAL surmised that Caregility was stalling and delaying the closing of the corporate acquisition. As OWAL stated in the Complaint:

> Caregility used the LOI and related agreements to string OWAL along with the promise and expectation of the corporate acquisition so that Caregility could gain access to OWAL's technology and use it as leverage to enhance Caregility's profile for its own capital raising efforts and even to attract a third-party buyer for Caregility.

(*Id.* at ¶62). While continuing to discuss and negotiate a corporate acquisition with OWAL, Caregility solicited a third party, Hill-Rom to acquire Caregility. (*Id.* at ¶63). Caregility "assured OWAL that the Hill-Rom Acquisition would not interfere with the parties' plan to consummate the [corporate acquisition] in early June 2021." (*Id.* at ¶64).

**\*4** In late May, "Caregility mispresented" to Hill-Rom that OWAL's business and technology were "targeted to the nursing home and assisted living business." (*Id.* at ¶70). On June 3, 2021, Caregility "displayed a slide presentation to

Hill-Rom" in order "to persuade Hill-Rom of the importance of OWAL's technology for Caregility's business model." (*Id.* at ¶66). Hill-Rom declined to provide additional funding so Caregility could purchase OWAL, because "Caregility could always just continue licensing OWAL's technology and acquire OWAL at a later date." (*Id.* at ¶71). Additionally, Hill-Rom was uninterested in the nursing home and assisted living business, and did not see any value in the corporate acquisition because OWAL was "unlikely to add revenue within the next two years." (*Id.* at ¶72).

On June 4, 2021, Caregility informed OWAL it would not be "moving forward" with the corporate acquisition because Hill-Rom was acquiring Caregility and Hill-Rom did not have any interest in OWAL. (*Id.* at ¶65). Subsequently, Caregility "terminated its [corporate acquisition] with OWAL" and informed OWAL it would "simply take OWAL's source code and ... hire OWAL's engineers for itself, in direct violation of the non-solicit clauses contained in the [corporate acquisition] agreements between the parties." (*Id.* at ¶74).

## II.

Defendants moved to dismiss all eleven counts of Plaintiff's Complaint on August 13, 2021. (ECF No. 15). The Counts alleged are:

- Count One: breach out contract (against all Defendants);

- Count Two: breach of duty of good faith and fair dealing (against all Defendants);

- Count Three: violation of the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, *et seq.* (against all Defendants);

- Count Four: common law misappropriation (against all Defendants);

- Count Five: violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* (against all Defendants);

- Count Six: trade libel (against all Defendants);

- Count Seven: conversion (against all Defendants);

- Count Eight: "permanent injunction" (against all Defendants);

- Count Nine: promissory estoppel (against all Defendants);

- Count Ten: fraudulent inducement (against all Defendants);

- Count Eleven: tortious interference with prospective economic advantage (against Brandofino and Gaboury).

(Complaint at ¶¶75-167). On each count, Plaintiff alleges that their damages are equal to the value of the corporate acquisition transaction with Caregility, or $11 million.

Under Fed. R. Civ. P. 8(a)(2), a complaint "requires only a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss asserts a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "In deciding a Rule 12(b)(6) motion, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff." *United States v. Loving Care Agency, Inc.*, 226 F. Supp. 3d 357, 362-63 (D.N.J. 2016). The plaintiff's factual allegations must give rise to a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court should disregard legal conclusions and "recitals of the elements of a cause of action, supported by mere conclusory statements." *Santiago v. Warminster Township*, 629 F.3d 121, 128 (3d. Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

The Third Circuit set forth a three-part test for determining whether or not a complaint may survive a motion to dismiss for failure to state a claim:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

**\*5** *Id.* at 130 (alteration in original) (quoting *Iqbal*, 556 U.S. at 675, 679).

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 56 of 83 PageID: 156

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

## A. Counts One and Two: Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing

OWAL's breach of contract claim is based on Defendants' alleged disclosure of materials and information which was subject to the MOU, LOI, and NDA, [2] to potential investors and Hill-Rom. (Complaint at ¶¶75-81). Additionally, Defendants misrepresented information about OWAL to potential investors and Hill-Rom. (*Id.*). OWAL also alleges that because Defendants breached their promise by disclosing certain information and materials to Hill-Rom, Hill-Rom directed Caregility not to acquire OWAL, killing the corporate acquisition. (*Id.* at ¶80).

OWAL additionally alleges that Defendants breached the implied duty of good faith and fair dealing in their agreements by "unlawfully disclosing and misrepresenting information concerning OWAL and its business to potential investors and third-party buyers, including Hill-Rom, and portraying OWAL in a false and negative manner that led Hill-Rom to nix Caregility's planned [corporate acquisition] with OWAL." (Complaint at ¶91).

In support of the motion to dismiss, Defendants principally argue that the Complaint should be dismissed because damages alleged by OWAL are the value of the corporate acquisition ($11 million) as opposed to the reasonable expectations of loss under the LOI, NDA, MOU and CA. (Motion to Dismiss at 18-20). OWAL counters that even if its measure of damages is incorrect, it has set forth a plausible claim of relief. (Opposition 11-14, ECF No. 18).

The Complaint adequately alleges a plausible cause of action for breach of contract and a breach of the covenant of good faith and fair dealing. In New Jersey, there are four elements to a breach of contract claim:

> first, that the parties entered into a contract containing certain terms; second, that [the] plaintiff did what the contract required [the plaintiff] to do; third, that [the] defendant did not do what the contract required [the defendant] to do, defined as a breach of the contract; and fourth, that [the] defendant's breach, or failure to do

what the contract required, caused a loss to the plaintiff.

*Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d 386, 392 (N.J. 2019) (quoting *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)); *see also Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 342 (D.N.J. 2020). To prove a defendant breached the implied covenant of good faith and fair dealing, a plaintiff must demonstrate that the defendant acted in bad faith to deny the plaintiff the benefit of the contract. *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 397, 396 (N.J. 2005); *Morrison v. Amer. Int'l Ins. Co. of Am.*, 887 A.2d 166, 173-74 (N.J. Super. Ct. App. Div. 2005). *Red Hawk Fire & Sec., LLC v. Siemens Indus.*, 449 F. Supp. 3d 449, 462 (D.N.J. 2020).

As noted above, Defendants do not focus on the elements of the cause of action, but rely on the measure of damages. Rather, Defendants dispute the fourth element, arguing that the alleged breach of the LOI, NDA, MOU and CA may have caused a loss to the Plaintiff, but it is not a loss equal to the value of the corporate acquisition ($11 million), as that is not a natural and probable consequence of Defendants' breach. (Motion to Dismiss at 18-19).

**\*6** It is agreed that a party who breaches a contract is "liable for all of the natural and probable consequences of the breach of [the] contract." *Wyotas*, 206 A.3d at 393 (quoting *Pickett v. Lloyd's (A Syndicate of Underwriting Members)*, 621 A.2d 445, 454 (N.J. 1993)). "[T]he damages 'must be a reasonably certain consequence of the breach although the exact amount of the loss need not be certain.'" *Nelson v. Elizabeth Bd. of Educ.*, 246 A.3d 802, 812 (N.J. Super. Ct. App. Div. 2021) (quoting *Donovan v. Bachstadt*, 453 A.2d 160, 166 (N.J. 1982)). However, OWAL's allegedly mistaken measure of damages does not warrant dismissal as the Complaint sets forth a plausible cause of action, and the remedy can be determined at a later date. Therefore, Defendants' motion to dismiss Counts One and Two of the Complaint is denied.

## B. Counts Three, Four and Five: Violation of the New Jersey Trade Secrets Act; Common Law

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 57 of 83 PageID: 157

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

**Misappropriation; Violation of the Defend Trade Secrets Act**

In Counts Three, Four, and Five of its Complaint, OWAL alleges that Defendants violated the New Jersey Trade Secrets Act (NJTSA), N.J.S.A. 56:15-1, *et seq.*, committed common law misappropriation of trade secrets, and violated the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, *et seq.* (Complaint at ¶¶93-114). In sum, OWAL alleges that: it shared trade secrets with Defendants; OWAL protected those trade secrets; Defendants unlawfully shared those trade secrets; as a result, the corporate acquisition between OWAL and Caregility collapsed and, in turn, OWAL suffered damages. (*Id.* at ¶¶93-99, 107-114). Defendants' sole argument to dismiss these counts is that OWAL has failed to describe any trade secrets with sufficient specificity. (Motion to Dismiss at 33-35). OWAL counters that its Complaint does not need to reveal its trade secrets, and the Complaint places Defendants on notice "as to the specific trade secrets at issue." (Opposition at 24-27).

Because the statutory schemes of the NJTSA and DTSA are "substantially similar as a whole," courts often combine the analyses of the two schemes. *Oakwood Labs. ⚑LLC v. Thanoo*, 999 F.3d 892, 905 n.11 (3d Cir. 2021). The Third Circuit has described the elements of NJTSA and DTSA claims as:

> (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, ⚑18 U.S.C. § 1839(3); (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]" *id.* § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, ⚑*id.* § 1839(5).

⚑*Oakwood Labs*, 999 F.3d at 905. To prevail on a claim for misappropriation of trade secrets under the NJTSA, a party must establish: "(1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to [third party]; (3) disclosed by the [third party] in breach of that confidence; (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff." *Merckle GmbH v. Johnson & Johnson*, 961 F. Supp. 721, 730 (D.N.J. 1997); ⚑*Rycoline Prods., Inc. v. Walsh*, 756 A.2d 1047, 1052 (N.J. Super. Ct. App. Div. 2000). A common law misappropriation claim has similar requirements, but adds a sixth element. That is, the plaintiff took precautions to maintain the secrecy. ⚑*Walsh*, 756 A.2d at 1052.

This Court recently defined "trade secret" for the purposes of the NJTSA:

> [T]he first step in any trade secret case is to determine whether the information is "in fact, a trade secret." *Merckle*, 961 F. Supp. at 730. NJTSA defines "trade secret" as information that derives economic value from being not known or readily ascertainable by others through proper means, and which the holder endeavors to keep confidential. N.J.S.A. § 56:15-2. In assessing whether information is a trade secret, courts typically consult six factors: (1) knowledge of the information outside the business; (2) knowledge of the information by employees and others in the business; (3) measures taken by the owner to keep the information secret; (4) the value of the information to the business and competitors; (5) the money or effort expended to develop the information; and (6) the ease or difficulty with which others could acquire or duplicate the information by proper means.

**\*7** *Intech Powercore Corp. v. Albert Handtmann Elteka GmbH & Co. KG*, No. 14-05508, 2021 WL 1138124 at \*7 (D.N.J. Mar. 24, 2021). The party who asserts the trade secret bears the burden of proving that the information is a secret and not a matter of general knowledge in the industry. ⚑*Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 431 (3d Cir. 1982).

"To plead the existence of a trade secret," a plaintiff "must sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such." ⚑*Oakwood Labs*, 999 F.3d at 905. A "generic list" of "categories of business and technical

Case 2:26-cv-06421-WJM-CF Document 16-4 Filed 07/14/26 Page 58 of 83 PageID: 158

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

information" which "could be used to describe documents found in any number of corporations," will not suffice. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 382 (3d Cir. 2021). Yet "a plaintiff need not spell out the details of the trade secret to avoid dismissal." *Oakwood Labs*, 999 F.3d at 906 (internal quotation marks omitted). "Rather, the subject matter of the trade secret must be described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.* (internal quotation marks omitted).

Here, OWAL's Complaint identifies the "Evaluation Materials" described in the NDA and the "Confidential Information" described in the CA as the trade secrets subject to the NJTSA and DTSA claims, and common law misappropriation claims. (Complaint at ¶¶93-114). "Confidential Information" included "notes, analyses, compilations, studies, or other documents" prepared by OWAL. (Motion to Dismiss, Exh. C at 1). "Evaluation Materials" included "financial information, business plans and strategies, marketing plans, customer, provider, supplier, licensor, licensee, member, investor, lender and vendor information and lists, software, systems, products, services, and website designs, code, algorithms and technology, trade secrets, records, notes, market studies, reports, financial statements, projections, forecasts, and other documents and information...." (Motion to Dismiss, Exh. E at 1). These descriptions are more than "generic lists" of categories of information, *Oakwood Labs*, 999 F.3d at 907, because OWAL has specified that the "trade secrets" are contained in the materials OWAL provided to Caregility under the NDA and CA. More specifically, OWAL has identified the materials it provided to Caregility in two pitch decks as having been wrongfully utilized. (Complaint at ¶¶46-48). Therefore, the description in the Complaint separates the trade secrets "from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and ... permit[s] the defendant[s] to ascertain at least the boundaries within which the secret lies." *Id.* at 906. Overall, OWAL points to a reasonably finite category of information as containing its trade secrets. As such, Defendants' motion to dismiss Counts Three, Four, and Five of the Complaint is denied.

**C. Count Six: Trade Libel**

**\*8** OWAL alleges in Count Six of its Complaint that Defendants "misrepresented the nature and quality of Plaintiff's business to Hill-Rom," specifically by mispresenting that OWAL's business was "exclusive to the nursing home and assisted living business." (Complaint at ¶116). Defendants did so knowingly or recklessly, and the misrepresentations were allegedly "calculated to prevent Hill-Rom from dealing with Plaintiff and to interfere adversely with Caregility's planned [corporate] acquisition of Plaintiff." (*Id.* at ¶117). As a result, OWAL lost the opportunity to be acquired by Caregility. (*Id.* at ¶¶118-19). Defendants submit OWAL has failed to allege malice or special damages, which are required to plead a trade libel claim. (Motion to Dismiss at 36-38).

Trade libel has four elements: 1) communication; "2) with malice; 3) of false allegations concerning its property, product or business, and 4) special damages, i.e. pecuniary harm." *Read v. Profeta*, 397 F. Supp. 3d 597, 651 n.37 (D.N.J. 2019); *see also* *Enriquez v. W. Jersey Health Sys.*, 777 A.2d 365, 378 (N.J. Super. Ct. App. Div. 2001). "A plaintiff alleging trade libel must demonstrate that Defendant's statements were false or that they were written with reckless disregard for the truth or falsity." *Id.* (internal quotation marks omitted). To allege special damages, "requires that [p]laintiffs allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Id.* (internal quotation marks omitted). Critically, "vague, conclusory allegation[s are] not enough." *Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 63 (N.J. Super. Ct. App. Div. 1986). Rather, a complaint alleging trade libel must allege the who, what, when, where, and how of the libelous statement; that is, a complaint must identify who made the statement, what was said, when the statement was made, and where/how the statement was communicated. *Id.* at 62; *see also* *Russo v. Nagel*, 817 A.2d 426, 434-35 (N.J. Super. Ct. App. Div. 2003).

OWAL alleges the following communication:

70. Additionally, in a prior, late-May presentation, Caregility misrepresented certain facts concerning OWAL to Hill-Rom, including mischaracterizing the nature of OWAL's business. Specifically, Caregility described OWAL's business and technology as primarily and substantially targeted to the nursing home and assisted living business when, in fact, OWAL's technology is in

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 59 of 83 PageID: 159

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

no way unique to the nursing home and assisted living business. Rather, OWAL's technology has applications across a diverse array of industries.

71. When Caregility subsequently made the June 3 Presentation, Caregility again tried to extract extra funding for the OWAL acquisition, but Hill-Rom declined, telling Caregility it did not want Caregility to acquire OWAL and that Caregility could always just continue licensing OWAL's technology and acquire OWAL at a later date.

72. Following the presentation, Caregility terminated the [corporate acquisition] deal based on Hill-Rom's lack of interest. As Brandofino admitted to Reiss, Hill-Rom's lack of interest was based, inter alia, on (i) Caregility's misrepresentations about OWAL's emphasis on the nursing home / assisted living space, because Hill-Rom was not interested in entering the nursing home and assisted living space, and (ii) the fact that Hill-Rom did not see value in the Merger because OWAL was unlikely to add revenue within the next two years, a fact that Gaboury independently confirmed to Michael Barr on June 4, 2021.

....

116. Plaintiff misrepresented the nature and quality of Plaintiff's business to Hill-Rom by, among other things, making representations to Hill-Rom that Plaintiff's business was exclusive to the nursing home and assisted living business.

**\*9** 117. The misrepresentations that Defendants made to Hill-Rom were made knowingly and recklessly and were of a kind calculated to prevent Hill-Rom from dealing with Plaintiff and to interfere adversely with Caregility's planned acquisition of Plaintiff.

118. Defendants' misrepresentations played a material and substantial part in Hill-Rom's decision to nix Caregility's acquisition of Plaintiff.

119. As a result of Defendants' misrepresentations concerning Plaintiff's business, Plaintiff incurred substantial pecuniary harm, including the lost business opportunity to merge into or otherwise be acquired by Caregility and has been damaged in an amount to be determined at trial, but not less than $12 million.

(Complaint at ¶¶70-72, 116-19).

In sum, OWAL has alleged a very specific communication: a representation made at a late-May and June 3, 2021 presentation by Caregility to Hill-Rom that OWAL's technology was geared toward nursing homes and assisted living facilities. This allegation covers the who, what, when, where, and how of the libelous statement. With respect to malice, OWAL has alleged that Defendants made the representations to Hill-Rom in order to derail the corporate acquisition, a fact which suggests Defendants made the statements knowingly and recklessly. *Intervet, Inc. v. Mileutis, Ltd.*, No. 15-371, 2016 WL 740267, at \*7 (D.N.J. Feb. 24, 2016). With respect to special damages, although Defendants argue that OWAL could not have reasonably expected the value of the corporate acquisition, (Motion to Dismiss at 38), this is a question of fact that should not be decided on a motion to dismiss. Overall, OWAL has stated a claim for trade libel.

### D. Count Seven: Conversion

In Count Seven, OWAL alleges Defendants converted OWAL's Evaluation Materials and Confidential Information during the acquisition discussions. (Complaint at ¶¶120-25). In sum, OWAL alleges Defendants misused the Confidential Information and Evaluation Materials by "disclosing the materials and information to Hill-Rom and other third parties without Plaintiff's prior authorization and consent," which "exceeded the authorized purposes for which the materials and information were made available to Defendants." (*Id.* at ¶123). Defendants submit that OWAL claims they converted "intangible" property, which cannot be subject to a conversion claim and that OWAL's damages are limited to recovery of the value of the property. (Motion to Dismiss at 38-40). In their reply brief, Defendants add that OWAL merely alleges that Defendants misused the property. (Reply Brief 14-15, ECF No. 18).[3]

Under New Jersey law, "conversion is the intentional exercise of dominion and control over chattel that seriously interferes with the right of another to control that chattel." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 661 (N.J. 2020). A claim for conversion gives rise to the following considerations:

> [T]here must first be an assessment of whether defendant has independent dominion and control over the subject property, as that inquiry affects other requirements for this tort.

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 60 of 83 PageID: 160

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

Additionally, where the defendant lawfully acquired plaintiff's property, the plaintiff must show that he demanded the return of the property and that the defendant refused compliance.

**\*10**  *Id.* at 661. A defendant exercises "independent dominion or control" where he uses property as his own. *Id.* at 661-62. While intangible property, like intellectual property, cannot be converted, *see Impact Protective Equip. v. Xtech Protective Equip.*, No. A-0879-19, 2021 WL 1395618, at \*11 (N.J. Super. Ct. App. Div. Apr. 14, 2021), it appears the Complaint refers to tangible documents that OWAL provided to Defendants (Complaint at ¶¶25, 54).

Where possession of property is initially lawful:

> The demand is the linchpin that transforms an initial lawful possession into a setting of tortious conduct. Accordingly, in such circumstances, a demand is essential; a claimant must make a demand at a time and place and under such circumstances as defendant is able to comply with if he is so disposed, and the refusal must be wrongful. The demand puts the defendant on notice and is crucial when the initial possession is lawful or when it cannot be said that the holder is exercising independent dominion or control.

*Id.* at 661. Demand for the return of the property is required unless doing so would be futile. *Id.*

Here, Defendants' initial possession of the Evaluation Materials and Confidential Information was authorized by OWAL; OWAL provided Defendants with the property as Caregility considered acquiring OWAL. (Complaint at ¶¶120-25). But nowhere in the Complaint does OWAL allege any demand for return of the property or that doing so would have been futile. Therefore, OWAL has failed to state a claim for conversion. Count Seven is dismissed without prejudice.

OWAL may amend its Complaint to allege a demand for the return of the property or that doing so would have been futile.

### E. Count Eight: "Permanent Injunction"

In Count Eight, OWAL seeks a permanent injunction to enjoin Defendants from misusing the Evaluation Materials and Confidential Information. (Complaint at ¶¶126-33). Defendants seek dismissal of Count Eight, because "permanent injunction" is a form of relief and not a cause of action. (Motion to Dismiss at 3 n.1). Generally, "because an injunction is a remedy and not a cause of action, '[a] separate claim for injunctive relief is unnecessary.' " *Lara v. Cool Clouds Distrib.*, No. 20-8030, 2021 WL 613842, at \*13 (D.N.J. Feb. 16, 2021) (quoting *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 681 (E.D. Pa. 2018)); *see also Kabbaj v. Google Inc.*, 592 Fed. Appx. 74, 74 n.2 (3d Cir. 2015). To me it is a professional courtesy to give notice that such relief will be sought, so I see no harm to the allegations. Since the Complaint includes a separate demand for injunctive relief, (Complaint at 36), Count Eight is unnecessary. Count Eight is dismissed with prejudice, but the demand remains.

### F. Count Nine: Promissory Estoppel

In Count Nine, OWAL alleges claim of promissory estoppel. There are four elements to a promissory estoppel claim: "(1) a clear and definite promise; (2) made with the expectation that the promise will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (internal quotation marks omitted). OWAL alleges "Defendants represented to OWAL that it was ready ... to close on the [corporate acquisition] ... only subject to ordinary due diligence," but despite those representations, did not close because of the Hill-Rom transaction. (Complaint at ¶¶134-145). OWAL lists three of Defendants' representations:

> **\*11**  a. On February 16, 2021 Caregility's counsel communicated to OWAL's counsel that Caregility anticipated closing on the Merger in March 2021;
>
> b. On April 22, 2021, Brandofino represented to Reiss via email that Caregility anticipated closing on the Merger on or about May 11 or 12, 2021; and
>
> c. On May 20, 2021, Brandofino informed Reiss that Caregility would likely close on the Merger in the first week of June 2021.

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 61 of 83 PageID: 161

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

(Complaint at ¶137).

Defendants argue the MOU, CA, LOI, and NDA provide that they are not a formal written agreement of a corporate acquisition. Where parties clearly intend for an agreement to later be put into writing in order to take effect, "preliminary promises" are not binding. *Morales v. Santiago*, 526 A.2d 266, 269 (N.J. Super. Ct. App. Div. 1987).

However, OWAL's promissory estoppel claim is more nuanced. Essentially, OWAL claims that it relied on Defendants' representations that they were genuinely interested in a corporate acquisition, when Caregility never actually intended to acquire OWAL. (Complaint at ¶¶136-38). That is, Defendants intended for OWAL to rely on that representation in order to lull OWAL in so that Defendants could inflate its own value when negotiating with another investor like Hill-Rom. (*Id.* at ¶¶138-41). OWAL relied on Caregility's genuine interest in a corporate acquisition to its detriment by forgoing other potential acquisitions – which the LOI required – and by laying off employees. (*Id.* at ¶¶142-44). Therefore, OWAL has stated a plausible claim for promissory estoppel. *Goldfarb*, 245 A.3d at 577. As such, Defendants' motion to dismiss Count Nine of the Complaint is denied.

### G. Count Ten: Fraudulent Inducement

Claims of fraud are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b). "In alleging fraud ..., a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "Fraud in the inducement does not differ materially from common law fraud." *Square Two, LLC v. JJJ Square Solutions, LLC*, No. A-3065-18, 2021 WL 851091, at *7 (N.J. Super. Ct. App. Div. Mar. 8, 2021).

The elements of common law fraud are that the defendant:

> (1) made a false representation of a material fact, (2) knew or should have known that the representation was false, and (3) intended to induce the plaintiff to rely on the representation. In addition, the plaintiff: (4) must have actually relied on the representation

in a manner justifiable under the circumstances and (5) suffered damage as a result of his reliance.

*Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 468 (D.N.J. 2009); *see also Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 261 (N.J. 2005).

In Count Ten, OWAL alleges that Defendants falsely assured that they fully intended to acquire OWAL, when in fact, the Defendants were pursuing other offers. That is, the Defendants used the Evaluation Materials and Confidential Information "to boost Caregility's own perceived value and obtain an inflated buyout." (Complaint at ¶¶146-57). As a result of that false representation, OWAL refrained from pursuing other acquisition opportunities and was "forced to lay off" employees. (*Id.* at ¶154-56). Accordingly, OWAL has stated a plausible claim for fraudulent inducement. *Agostino*, 256 F.R.D. at 468. The motion to dismiss Count Ten is denied.

### H. Count Eleven: Tortious Interference with a Prospective Economic Advantage

**\*12** In Count Eleven, OWAL alleges tortious interference with a prospective economic advantage against Brandofino and Gaboury.

"Tortious interference developed under common law is to protect parties to an existing or prospective contractual relationship from outside interference." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 38 (N.J. 1989). A plaintiff must demonstrate: (1) "reasonable expectation of economic advantage" from a business relationship; (2) interference "done intentionally and with malice," which means "the harm was inflicted intentionally and without justification or excuse"; (3) "the interference caused the loss of the prospective gain"; and (4) damages as a result of the loss. *Id.* at 37 (internal quotation marks omitted).

Interference is actionable "even where there is no enforceable contract." *Id.* at 36-27. However, "the right protected is plaintiff's right to *pursue* business." *Id.* at 38 (internal quotation marks omitted) (emphasis added). "[I]f

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 62 of 83 PageID: 162

OWAL, Inc. v. Caregility Corporation, Not Reported in Fed. Supp. (2022)

an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie." 🚩*Vosough v. Kierce*, 97 A.3d 1150, 1160 (N.J. Super. Ct. App. Div. 2017) (quoting 🚩*Dimaria Const., Inc. v. Interarch*, 799 A.2d 555, 561 (N.J. Super. Ct. App. Div. 2001)). Recovery is barred unless employees act "outside the scope of their employment and ... for personal motives, out of malice, beyond their authority, and otherwise not in good faith in the interests of the" employer. *Id.* "[T]he employee's wrongful conduct may be so far removed from the scope of his duties that the conduct cannot be viewed as within the scope of the employment." 🚩*Id.* at 1161.

OWAL alleges "Brandofino and Gaboury intentionally and maliciously caused Caregility to terminate its corporate acquisition of OWAL by misrepresenting OWAL's Evaluation Materials and Confidential Information to Hill-Rom, and then used the Confidential Information to solicit OWAL's key employees, including its engineers." (Complaint at ¶¶158-67). Defendants argue dismissal is appropriate for two reasons: 1) the corporate acquisition of Caregility and OWAL was tentative, so it cannot be considered a "prospective economic advantage" (Motion to Dismiss at 29-30); and 2) the Complaint fails to allege that Brandofino or Gaboury acted outside the scope of their employment or acted in their own interest. (*Id.* at 31-33).

Here, the Complaint does not claim that Brandofino and Gaboury had an ulterior motive or were acting outside of the scope of their duties in their dealings with OWAL. Therefore,

Count Eleven is dismissed without prejudice. OWAL may amend this Count of the Complaint.

### ORDER

**THIS MATTER** having come before the Court on Defendants' Motion to Dismiss (ECF No. 15); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 25th day of March, 2022,

**ORDERED** that Counts Seven and Eleven of Plaintiff's Complaint are **DISMISSED WITHOUT PREJUDICE**; and Plaintiff may amend these Counts within thirty (30) days; and it is further

 **\*13 ORDERED** that Count Eight is **DISMISSED WITH PREJUDICE;** and

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss is **DENIED** as to Counts One, Two, Three, Four, Five, Six, Nine, and Ten.

### All Citations

Not Reported in Fed. Supp., 2022 WL 890182

---

### Footnotes

1      The words "merger," "acquisition," "potential transaction," and other derivatives are used interchangeably by the parties; but as stated above, the term "corporate acquisition" is utilized herein.

2      The Complaint mistakenly omits the CA from this list. (Opposition at 11 n.1).

3      "[A] moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015) (internal quotation marks omitted).

---

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3329181
Only the Westlaw citation is currently available.
United States District Court,
W.D. Oklahoma.

PUBLIC SERVICE COMPANY OF
OKLAHOMA, an Oklahoma corporation, Plaintiff,
v.
A PLUS, INC., an Oklahoma corporation, a/
k/a Jarvis Furniture, a/k/a A Plus Spraying;
Randel R. Stone, an individual; Kimberly A.
Stone, an individual; Patricia Ann Williams, an
individual; Jerry Duayne Williams, an individual;
and First State Bank of Anadarko, Defendants.

No. CIV–10–651–D.
|
Aug. 2, 2011.

**Attorneys and Law Firms**

Jon E. Brightmire, Kenneth T. Short, Kristen L. Brightmire, Doerner Saunders Daniel & Anderson, Tulsa, OK, for Plaintiff.

G. Rudy Hiersche, Jr., Justin T. Hiersche, Hiersche Law Firm, Heidi M. Nichols, Conner & Winters, Oklahoma City, OK, R. Richard Love, III, Conner & Winters, Tulsa, OK, for Defendants.

## *ORDER*

TIMOTHY D. DeGIUSTI, District Judge.

 **\*1**  Before the Court is the Motion to Dismiss [Doc. No. 55] of Defendant First State Bank of Anadarko ("the Bank"). Pursuant to Fed.R.Civ.P. 12(b)(6), the Bank contends the factual allegations in the Amended Complaint fail to state a claim upon which relief may be granted against the Bank. Plaintiff Public Service Company of Oklahoma ("PSO") timely responded to the motion, and the Bank filed a reply.

*Background:*
PSO brought this action to recover sums it paid to A Plus, Inc. a/k/a Jarvis Furniture a/k/a A Plus Spraying (collectively, "A Plus") pursuant to invoices submitted to PSO by A Plus and/or its owners, defendants Randel R. Stone and Kimberly

A. Stone (the "Stones"). PSO alleges the invoices were false or fraudulent because they reflected work which was never performed by A Plus. According to PSO, its payments based on the allegedly false invoices totaled nearly $600,000.00 during the time period of 2006 through 2009.

In the Amended Complaint, PSO named additional defendants, including the Bank.[1] A Plus and the Stones maintained accounts at the Bank during the relevant time period. According to PSO, it paid the amounts reflected on the allegedly fraudulent invoices by checks made payable to A Plus. PSO further alleges the Stones, acting on behalf of A Plus, did not deposit these checks in the A Plus account at the Bank; instead, they cashed the checks, asked the Bank to convert them into cashier's checks made payable to the Stones or a third party, or deposited the checks in the Stones' personal account at the Bank.

PSO's claims against the Bank are set forth in its Sixth Cause of Action. PSO asserts claims of negligence and gross negligence against the Bank, alleging it breached a duty to PSO arising under common law or statute. According to PSO, the Bank was negligent in allowing the Stones to engage in the foregoing banking transactions and in failing to report those transactions "as required by law." Amended Complaint, ¶¶ 66–67. PSO alleges the Bank had a duty to accept the checks only for deposit into the A Plus account, and it was negligent in allowing the Stones to obtain cash or cashier's checks and/ or to deposit the checks into their personal account. PSO also alleges the Bank failed to generate "anti-structuring" reports regarding these transactions, and that it was required to do so by law. Amended Complaint ¶¶ 33–34, 17–18. PSO alleges the Bank's negligent conduct resulted in injury to PSO.

The Bank seeks dismissal of these claims pursuant to Fed.R.Civ.P. 12(b)(6). It argues the common law negligence claim against it must be dismissed because the Bank does not, as a matter of law, have a duty to PSO on which an Oklahoma common law negligence claim can be based. The Bank also argues PSO cannot base its negligence claim on the Bank's alleged violation of statutory bank reporting requirements because there is no private cause of action based on those requirements. PSO argues the Bank owed it a duty under both theories, asking the Court to find that Oklahoma would recognize a common law cause of action in negligence under these circumstances. Alternatively, PSO contends the Bank is not entitled to dismissal because PSO has also alleged a claim against the Bank based on the contention that it aided and abetted the Stones and A Plus in committing fraud. PSO also

seeks leave to amend to cure the deficiencies in the Amended Complaint; if the Court finds it has not properly alleged an aiding and abetting claim, it seeks leave to add that claim in an amended complaint.

*Standards applicable to Rule 12(b)(6):*

**\*2** To avoid dismissal pursuant to Rule 12(b)(6), a complaint "must contain enough factual allegations 'to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008); *VanZandt v. Oklahoma Dept. of Human Services,* 276 F. App'x 843, 846 (10th Cir.2008) (unpublished opinion). To state a plausible claim, "the Plaintiff has the burden to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *VanZandt,* 276 F. App'x at 846 (quoting *Robbins,* 519 F.3d at 1247.) "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Thus, plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 570; *Robbins,* 519 F.3d at 1247. The "mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007) (emphasis in original). Although the Court must construe well-pleaded facts as true, not all factual allegations are "entitled to the assumption of truth." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1951 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* The Court need not accept as true the assertions in a complaint which contain only "labels and conclusions" or "amount to nothing more than a 'formulaic recitation of the elements' " of a claim. *Ashcroft,* 129 S.Ct. at 1951 (quoting *Twombly,* 550 U.S. at 554–555).

In its response to the Bank's motion, PSO devotes most of its argument to a recitation of its allegations against A Plus and the Stones, including a discussion of evidence it

claims to have obtained in discovery. Those arguments are not responsive to the Bank's motion because material outside the pleadings is not properly considered in connection with a Rule 12(b)(6) motion. [2] "In deciding a Rule 12(b)(6) motion, a federal court generally "should not look beyond the confines of the complaint itself." *MacArthur v. San Juan County,* 309 F.3d 1216, 1221 (10th Cir.2002) (citing *Dean Witter Reynolds, Inc. v. Howsam,* 261 F.3d 956, 960 (10th Cir.2001), *rev'd on other grounds,* 537 U.S. 79 (2002)). The question presented by the Bank's motion is not whether PSO has stated a claim for relief against the Stones and/or A Plus or whether PSO can present evidence that the Stones and/or A Plus presented false invoices to PSO. The sole issue presented by the Bank's motion is whether PSO has alleged sufficient facts in the Amended Complaint to state a plausible claim for relief based on the Bank's purported negligence. Accordingly, the Court will confine its ruling to that issue.

*Application:*

*Common law negligence:*

**\*3** To state a claim for relief based on negligence under Oklahoma common law, a plaintiff must plead facts sufficient to show (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach of its duty was the proximate cause of injury to the plaintiff. *Consolidated Grain & Barge Co. v. Structural Systems, Inc.,* 212 P.3d 1168, 1171 n. 8 (Okla.2009). The threshold question in a negligence action is whether the defendant owes the plaintiff a duty of care. *First Natl. Bank in Durant v. Honey Creek Entertainment Corp.,* 54 P.3d 100, 105 (Okla.2002). " 'It is an established rule of law that there can be no actionable negligence where the defendant has breached no duty owed to the plaintiff.' " *Henry v. Merck and Co ., Inc.,* 877 F.2d 1489, 1492 (10th Cir.1989) (citing *Nicholson v. Tacker,* 512 P.2d 156, 158 (Okla.1973)). Even if a defendant "has created a risk which harmed the plaintiff that does not mean that, in the absence of some duty to the plaintiff, the defendant will be held liable." *Id.*

"The issue of the existence of a duty is a question of law for the court." *Jennings v. Badgett,* 230 P.3d 861, 865 (Okla.2010). A court determines the existence of a duty by examining "whether the defendant stands in such a relationship to a plaintiff that the law will impose upon the defendant an obligation of reasonable conduct for the benefit

of the plaintiff." *Gaines–Tabb v. ICI Explosives USA, Inc.,* 995 F.Supp. 1304, 1316 (W.D.Okla.1996), *aff'd,* 160 F.3d 613 (10th Cir.1998); *Delbrel v. Doenges Bros. Ford, Inc.,* 913 P.2d 1318, 1320–21 (Okla.1996).

In this case, the Bank argues PSO has not pled facts sufficient to show the Bank owed PSO any legal duty on which a common law negligence claim could be based. As the Bank points out, PSO does not allege that it was a depositor or customer of the Bank or that it had any legal relationship with the Bank; in its response, PSO concedes that it cannot do so. Further, the Court notes that no facts are alleged which suggests PSO relied upon the Bank for any action or information during the course of conduct complained of here. As the Bank also argues, Oklahoma courts have never recognized a duty owed by a state bank to one who is not its depositor under circumstances similar to those in the present case. Thus, the Bank contends that, even if the facts alleged are taken as true, they cannot form the basis for a plausible claim for relief based on common law negligence.

In its response, PSO concedes no Oklahoma court has held that a state bank owes a duty to a third-party non-bank customer under these circumstances, and it does not dispute that it had no business relationship with the Bank. The parties' briefs suggest that the Oklahoma courts have not been presented with the question whether a bank owes a duty to a third-party non-customer which may support a cognizable common law negligence claim. Recognizing the absence of authority to support such a claim, PSO argues that Oklahoma *should* recognize such a duty and asks this Court to hold the Oklahoma Supreme Court would do so if presented with the question. The Bank argues that Oklahoma decisions regarding negligence claims do not support that argument; further, the Bank argues other jurisdictions addressing the question have rejected claims that a bank owes such a duty to a non-customer. When assessing the sufficiency of pleadings based on a claim governed by state law, the Court must "ascertain and apply" the state's law. *Wade v. EMCASCO Ins. Co.,* 483 F.3d 657, 665 (10th Cir.2007). In doing so, the Court must "follow the most recent decisions of the state's highest court." *Coll v. First American Title Ins. Co.,* 642 F.3d 876, 2011 WL 1549233, at *5 (10th Cir. April 26, 2011) (for publication) (citations omitted). Where no controlling state decision exists, the Court "must attempt to predict what the state's highest court would do." *Id.* To do so, the Court "may seek guidance from decisions rendered by lower courts

in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Coll,* 642 F.3d at ——, 2011 WL 1549233, at *5 (citing *Wade,* 483 F.3d at 665–66). The Court will follow that procedure in this case by considering Oklahoma's decisions regarding common law negligence; because the parties agree there is no direct Oklahoma authority on the question raised, the Court will also consider other jurisdictions' decisions regarding the existence of a bank's duty to a non-customer in order to determine the weight of authority on that question.

**\*4** Oklahoma follows the generally accepted principle that a defendant does not have "a duty to anticipate and prevent the intentional or criminal acts of a third party" which resulted in harm to the plaintiff. *J.S. v. Harris,* 227 P.3d 1089, 1092 (Okla.Civ.App.2009). Oklahoma also recognizes an exception to that rule where certain "special circumstances" exist. *Id.* The types of special circumstances recognized in Oklahoma are those in which: 1) the actor/defendant has a special responsibility toward the person who suffers the harm; or 2) the actor's " 'own *affirmative* act has created or exposed the other to a recognizable high degree of risk of harm" caused by the misconduct of another, and that risk would have been taken into account by a reasonable person. *Id.* (quoting *Joyce v. M & M Gas Co.,* 672 P.2d 1172, 1174 (Okla.1983)) (emphasis in original). The first circumstance arises where the defendant and the plaintiff had a pre-existing relationship, and the specific risk to the plaintiff was reasonably foreseeable to the defendant. *Gaines–Tabb,* 995 F.Supp. at 1317; *Henry v. Merck and Co., Inc.,* 877 F.2d 1489, 1492–93 (10th Cir.1989) (applying Oklahoma law). In that situation, the foreseeability of harm to the plaintiff is the most important consideration. *J. S.,* 227 P.3d at 1093. The second circumstance arises where the defendant's affirmative act created or exposed the plaintiff to a recognizable high degree of risk of harm from the reasonably foreseeable conduct of third persons. *Gaines–Tabb,* 995 F.Supp. at 1317; *Joyce,* 672 P.2d at 1174.

In this case, PSO's allegations cannot support the existence of the first category of "special circumstances" which would warrant imposition of a duty upon the Bank because PSO concedes that it had no pre-existing relationship with the

Bank. Construing its argument most liberally in its favor, PSO apparently relies on the second category which requires a showing that the Bank's affirmative acts exposed PSO to a "recognizable high degree of risk of harm" to PSO based on the reasonably foreseeable conduct of the Stones. *Joyce, 672 P.2d at 1174.*

Although the "special relationship" analysis of a legal duty has not been applied in Oklahoma to a claim against a bank brought by one who is not its customer, PSO urges the Court to find Oklahoma would adopt the view expressed in an Alabama decision holding that a bank has a fiduciary relationship with the general public, *Security Trust & Savings Bank v. Marion County Banking Co.,* 253 So.2d 17 (Ala.1971). As the Bank points out, however, *Security Trust* did not involve a negligence claim by a non-customer against a bank; instead the court addressed the public policy reasoning underlying special Alabama legislation prohibiting state banks from creating branches. *Id.,* at 21. Thus, the Alabama court was not faced with the question raised by PSO's claim against the Bank. Even if the Alabama court had held that a bank has a fiduciary responsibility to non-customers on which a negligence claim may be based, however, the Oklahoma Supreme Court has expressly rejected a contention that a bank has a fiduciary relationship with a non-customer. *First Nat'l Bank and Trust Co. of Vinita v. Kissee,* 859 P.2d 502, 510 (Okla.1993) (court rejected a guarantor's claim that the bank owed it a fiduciary obligation, noting the guarantor was not a bank customer or depositor). Accordingly, the Court finds that, contrary to PSO's contention, the Oklahoma Supreme Court would not accept its argument that the Bank owed it a fiduciary duty.

**\*5** *Kissee* is helpful to the Court because it suggests the Oklahoma Supreme Court has limited the legal duties of banks to non-customers. However, it does not address the specific question raised by PSO's negligence claim.[3] Accordingly, the Court has examined decisions in other jurisdictions which have considered whether a bank owes a legal duty to non-customers on which a negligence claim may be based. Based on that review, the Court concludes the majority of courts considering the question have held that a bank does not have a duty to third-party non-customers, even if a bank customer engages in misconduct harmful to the non-customer.

In *Eisenberg v. Wachovia Bank, N. A.,* 301 F.3d 220 (4th Cir.2002),* the Fourth Circuit, applying North Carolina law,

expressly held a bank does not have a duty of care to a non-customer on which a negligence claim can be based. In reaching that conclusion, the Fourth Circuit examined decisions from other jurisdictions, and concluded most reject the existence of such a duty:

> Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship. *See Weil v. First Nat'l Bank of Castle Rock,* 983 P .2d 812, 815 (Colo.Ct.App.1999); *Volpe v. Fleet Nat'l Bank,* 710 A.2d 661, 664 (R.I.1998); *Miller–Rogaska, Inc. v. Bank One,* 931 S.W.2d 655, 664 (Tex.App.1996); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.,* 49 Cal.App.4th 472, 56 Cal.Rptr.2d 756, 760–63 (1996); *Portage Aluminum Co. v. Kentwood Nat'l Bank,* 106 Mich.App. 290, 307 N.W.2d 761, 764–65 (1981); *Pa. Nat'l Turf Club, Inc. v. Bank of W. Jersey,* 158 N.J.Super. 196, 385 A.2d 932, 936 (1978); *Gesell v. First Nat'l City Bank,* 24 A.D.2d 424, 260 N.Y.S.2d 581, 581–82 (1965).

*Eisenberg,* 301 F.3d at 225. *See also Zabka v. Bank of America Corp.,* 127 P.3d 722, 723–24 (Wash.Civ.App.2005) ("absent a direct relationship or statutory duty, a bank does not owe a duty to third party noncustomers"); *Commerce Bank/Pennsylvania v. First Union Nat'l Bank,* 911 A.2d 133 (Pa.2006).

In *Commerce Bank,* the court explained the rationale for rejecting the existence of a bank duty to non-customers, even where the bank was aware of a customer's suspicious conduct; the court held a bank had no duty to take action against its depositor to protect another bank from possible "check kiting" by the depositor. In doing so, the court applied

the rule, also followed in Oklahoma, that the existence of a legal duty must be predicated upon a relationship that exists between the parties. The court found the two banks at issue had no relationship warranting the imposition of a duty sufficient to support a negligence claim. *Id.* at 138. The Pennsylvania Superior Court expressly declined "to make banks the guarantors of their clients' trustworthiness." *Id.* According to the court, imposing a duty on a bank in such circumstances "would inevitably force banks to close or restrict the clients' accounts on the least degree of suspicion ... in order to avoid unspecified liability" to third parties; thus, imposing such a duty was found contrary to public policy. *Commerce Bank,* 911 A.2d at 139–40.

 **\*6** More specifically applicable to PSO's claims in this case are decisions expressly holding a bank does not have a duty to third-party non-customers to detect and prevent a bank customer's fraudulent conduct. *Grad v. Associated Bank, N.A.,* 2011 WL 2184335 (Wis. Civ.App. June 7, 2011) (unpublished opinion) (citing *Hoida, Inc. v. M & I Midstate Bank,* 717 N.W.2d 17 (Wis.2006) and *Commercial Discount Corp. v. Milwaukee W. Bank,* 214 N.W.2d 33 (Wis.1974)); *McCallum v. Rizzo,* 1995 WL 1146812 (Mass.Super.Ct. Oct. 13, 1995) (unpublished opinion). In *McCallum,* the Massachusetts court held "a bank's failure to investigate a customer's suspicious activity ... does not give rise to liability to the third party who is injured by the customer's fraud." *Id.,* at \*2. The court held:

> The mere fact that a bank account can be used in the course of perpetrating a fraud does not mean that banks have a duty to persons other than their own customers. To the contrary, the duty is owed exclusively to the customer, not to the persons with whom the customer has dealings.

*McCallum,* 1995 WL 1146812, at \*2. Noting the question was one of first impression in Massachusetts, the court examined other courts' decisions, and concluded "there is an abundance of precedent from other jurisdictions holding that a bank owes no duty of care to third parties who are not bank customers." *Id.* (citing *Guidry v. Bank of LaPlace,* 740

F.Supp. 1208, 1218–19 (E.D.La.1990), *rev'd in part,* 954 F.2d 278 (5th Cir.1992); *E.F. Hutton Mortgage Co. v. Equitable Bank, N.A.,* 678 F.Supp. 567, 579 (D.Md.1988); *Chicago Title Insurance Co. v. California Canadian Bank,* 174 Cal.App.3d 1142, 1158–59, 220 Cal.Rptr. 507 (1986); *Portage Aluminum Co. v. Kentwood National Bank,* 307 N.W.2d 761, 764–65 (Mich.1981); *Pennsylvania National Turf Club Inc. v. Bank of West Jersey,* 385 A.2d 932, 936 (N.J.1978)).

In a recent decision, the United States District Court for the District of Massachusetts considered whether Connecticut courts would hold a bank has a duty to third-party non-customers. *VIP Mortgage Corp. v. Bank of America, N. A.,* 769 F.Supp.2d 20, 2011 WL 573601, at \*6 (D.Mass. Feb. 11, 2011) (for publication). The Court determined the question was one of first impression in Connecticut. Examining decisions from other jurisdictions, the Court found an overwhelming majority rejected the existence of such a duty; it concluded there is a "now *almost universal rule* that banks do not owe a common law duty of care to third-party non-customers." *Id.* (emphasis added).

In this case, PSO has not presented persuasive authority suggesting that the Oklahoma Supreme Court would disagree with the recognized majority view. It argues Oklahoma would extend a duty to the bank in this case because it has previously found defendants have a duty to third parties in other circumstances. *See, e.g., Brigance v. Velvet Dove Restaurant, Inc.,* 725 P.2d 300 (Okla.1986). In *Brigance,* the Oklahoma Supreme Court recognized a duty of a vendor to withhold service of alcohol to a noticeably inebriated customer; in doing so, it relied on strong public policy concerns designed to reduce incidents of drunk driving resulting in injuries and fatalities. *Brigance,* 725 P.2d at 304.

 **\*7** PSO's argument is not persuasive. The facts presented by *Brigance* are clearly distinguishable from those in this case. Furthermore, the jurisdictions rejecting imposition of a duty by a bank to non-customers have found no public policy supports the imposition of such a duty; in fact, several decisions have noted public policy would not be served thereby. *See, e.g., Commerce Bank/Pennsylvania,* 911 A.2d at 139–140.

Having fully considered the issue, the Court concludes that, if faced with the question, the Oklahoma Supreme Court would join the majority of other jurisdictions and hold that a bank does not have a duty to a third-party non-customer on which a common law negligence claim can be based. Accordingly, the Court concludes that PSO has failed to allege facts sufficient to state a plausible claim for relief based on Oklahoma's common law of negligence and gross negligence because PSO cannot, as matter of law, plead facts sufficient to satisfy the essential element of a duty on the part of the Bank. The Bank's motion to dismiss the common law negligence claim is granted.

*Violation of statutory requirements:*
In the Sixth Cause of Action, PSO also seeks to hold the Bank liable on a negligence theory based on the Bank's alleged failure to report the Stones' transactions "as required by law." Amended Complaint at ¶ 66. Although PSO fails to identify the law on which it relies, it refers in other portions of the Amended Complaint to "anti-structuring transaction reports," which it contends the Bank should have generated with regard to the Stones' transactions. *Id.* at ¶ 34. In its motion, the Bank argues the only law that could be implicated is the Bank Secrecy Act ("Act"), 31 U.S.C. § 5318. PSO's response to the Motion establishes that the Act is the law on which it relies. Accordingly, construing the allegations most liberally in PSO's favor, the Court will construe the allegations as based on the Act and accompanying regulations.

According to the Act, financial institutions are required to report single or aggregated transactions of more than $10,000.00. *Id.;* 31 C.F.R. § 103.22. Pursuant to the applicable statute and regulations, a bank must file a Currency Transaction Report ("CTR") with the Internal Revenue Service within 15 days following such a transaction; if it appears the transaction was structured to avoid the $10,000.00 reporting requirement, the bank must submit a Suspicious Activity Report ("SAR"). 31 U.S.C. § 5324(a); 12 C.F.R. 21.11. Pursuant to the applicable regulations, "[a] SAR, and any information that would reveal the existence of a SAR, is confidential." 12 C.F.R. § 21.11(k). A national bank or agent thereof is not permitted to disclose to third parties a SAR or information that would reveal its existence. *See* 12 C.F.R. § 21 .11(i).

In this case, PSO contends the Bank failed to generate a required SAR for the Stones' transactions involving PSO's checks; it further contends the Bank had a duty to do so under the Act, and its failure to do so resulted in injury to PSO.[4] The Bank argues that this claim fails as a matter of law because there is no private right of action under the Act.

**\*8** The Bank is correct that the Act and its implementing regulations do not create a private right of action; in fact, it is "well settled that the anti-money-laundering obligations of banks, as established by the Bank Secrecy Act, obligate banks to report certain customer activity to the government but do not create a private cause of action." *El Camino Resources, Ltd. v. Huntington Nat. Bank,* 722 F.Supp.2d 875, 923 (W.D.Mich.2010); *see also Nouri v. TCF Bank,* 2011 WL 836764, at * 6 (E.D.Mich. March 9, 2011) (unpublished opinion) (citing *AmSouth v. Dale,* 386 F.3d 763, 777 (6th Cir.2004)); *Armstrong v. American Pallet Leasing, Inc.,* 678 F.Supp.2d 827, 874–875 (N.D.Iowa 2009); *Quinn v. United States,* 2003 WL 22133715, at *2 (W.D.Okla. July 10, 2003) (unpublished opinion) (citing *Martinez Colon v. Santander National Bank,* 4 F.Supp.2d 53 (D.P.R.1998)).

Courts have repeatedly rejected negligence claims based on a bank's duty arising under the Act, concluding a bank's duty created by the Act is owed *only* to the government and not to private parties. "[B]ecause the Bank Secrecy Act does not create a private right of action, the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements." *In re Agape Litigation,* 681 F.Supp.2d 352, 360–361 (E.D.N.Y.2010). Finding the plaintiffs failed to allege the bank breached a cognizable legal duty on that basis, the court dismissed the negligence claims against the defendant bank. *Id.,* at 361 (citing *Aiken v. Interglobal Mergers and Acquisitions,* 2006 WL 1878323, at *2 (S.D.N.Y. July 5, 2006) (unpublished opinion)) (the Act did not create a private right of action and therefore did not provide a basis for imposing a duty of care upon the defendant bank). In fact, "courts have uniformly rejected" an argument that the Act creates a duty of a bank to private parties. *Armstrong,* 678 F.Supp.2d at 874.

In *Marlin v. Moody Natl. Bank,* 2006 WL 2382325, at *7 (S.D.Tex. Aug. 16, 2006) (unpublished opinion), the court explained its reasons for rejecting the plaintiff's contention that the Act imposed upon a bank a duty to private parties. According to the court, a bank's "obligation under that statute is to the government rather than some remote victim," and, by the Act, "banks do not become guarantors of the integrity of

the deals of their customers. It does not create a private right of action and, therefore, does not establish a standard of care." *Id.; see also James v. Heritage Valley Fed. Credit Union,* 197 F. App'x. 102, 106 (3d Cir.2006)(unpublished opinion), *cert. denied,* 550 U.S. 939 (2007).

PSO offers no argument or legal authority to support its contention that its negligence claim may be based on the theory that the Act imposed upon the Bank a duty to PSO or any other party having business dealings with the Stones and/or A Plus. As a matter of law, PSO has not, and cannot, state a plausible claim for relief on the basis of this contention. Accordingly, the Bank's motion to dismiss is granted.

*Leave to amend:*

 **\*9** As an alternative to dismissal, PSO asks the Court to grant it leave to file another amended complaint. Where a motion to dismiss is granted, "if it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief, the court should dismiss with leave to amend." *Brever v. Rockwell International Corp.,* 40 F.3d 1119, 1131 (10th Cir.1994) (citations omitted). Leave to amend is not automatic, however, and may be denied where an amendment would be futile; a court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment. *Bauchman for Bauchman v. West High School,* 132 F.3d 542, 562 (10th Cir.1997)(citing *AM Int'l, Inc. v. Graphic Management Assocs., Inc.,* 44 F.3d 572, 578 (7th Cir.1995) and *Wilson v. American Trans Air, Inc.,* 874 F.2d 386, 392 (7th Cir.1989)).

In this case, it would be futile to allow PSO to amend to attempt to state a common law negligence claim against the Bank because, as discussed at length herein, the majority of courts have rejected such claims because a bank has no duty to a non-customer, even where the bank's customer engages in suspicious conduct. PSO offers no argument sufficient to persuade the Court that Oklahoma would depart from the majority view. Accordingly, PSO cannot state a plausible claim against the Bank, and amending in an attempt to do so would be futile. Nor can PSO base a negligence claim on a purported duty of the Bank to comply with the reporting requirements of the Bank Secrecy Act. Because the Act does not create a private right of action and does not create a duty

owed to private parties, allowing leave to amend regarding this claim would also be futile. Accordingly, leave to amend is denied.

In its response brief, however, PSO argues that it has asserted an additional claim for relief against the Bank—it contends that it has alleged the Bank aided and abetted the Stones in committing fraud in connection with the allegedly false invoices submitted to PSO.

As the Bank correctly argues in its reply, its motion does not seek dismissal of such a claim because the Amended Complaint does not contain an aiding and abetting cause of action asserted against the Bank or any other defendant. In the Amended Complaint, each of the causes of action asserted identifies the defendant or defendants against whom it is asserted; the only cause of action asserted against the Bank is the Sixth Cause of Action, which contains PSO's allegations of negligence and gross negligence. The claims of fraud are asserted against the Stones and A Plus in the Second Cause of Action. PSO argues the Court should look beyond the labels PSO selected in the Amended Complaint and find that the allegations, in their entirety, support an aiding and abetting claim.

PSO's fraud allegations against the Stones and A Plus are based on the harm it allegedly suffered as a result of their submission of false or fraudulent invoices. However, PSO alleges no facts to support a contention that the Bank had reason to know the Stones had submitted false or fraudulent invoices when they submitted the PSO checks to the Bank. In its response brief, PSO speculates that the Bank employees knew the Stones were engaged in some form of wrongdoing because the Bank is located in a town of 7,000 people, and "it's hard *not* to know what everyone is up to." PSO's response, at p. 15 (emphasis in original). In addition, PSO argues that Mrs. Stone's mother formerly worked at the Bank and was employed there for many years, and suggests this supports PSO's belief that the Bank had reason to suspect the Stones. Allegations based on mere suspicion or speculation are insufficient to satisfy the plausibility requirements of *Twombly. See Ashcroft,* — U.S. ——, 129 S.Ct. 1937, 1951.

 **\*10** Furthermore, as the Bank argues in its reply, the Oklahoma Supreme Court has not recognized a civil cause of action based on aiding and abetting fraud. Even if it had done so, the allegations on which PSO relies in support of its contention that it has asserted such a claim are insufficient

to state a claim for relief against the Bank on this theory. A person may be liable in a civil action for aiding and abetting only upon proof 1) that another person committed a wrong; 2) the aider and abettor knew of the existence of that wrong; and 3) the aider and abettor substantially assisted the wrongdoer in committing that wrong. *Adelphia Recovery Trust v. Bank of America, N. A.,* 624 F.Supp.2d 292, 312 (S.D.N.Y.2009) (citing *Landry v. Federal Deposit Ins. Corp.,* 486 F.2d 139, 162–63 (3d Cir.1973)). To satisfy the pleading requirements of Fed.R.Civ.P. 9(b) [5] and Fed.R.Civ.P. 12(b)(6), a plaintiff must "plead facts showing the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission." *Id.* (citing *Wight v. BankAmerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000).

In this case, PSO alleges the fraud purportedly committed by the Stones and A Plus consisted of the submission to PSO of false invoices representing work that was never performed. There are no factual allegations that the Bank knew false invoices were being submitted; in fact, there are no allegations that the Bank was even aware the Stones and/or A Plus performed work for PSO until PSO had paid the allegedly false invoices and the Stones submitted PSO's checks for handling at the Bank. Contrary to PSO's argument, the Amended Complaint does not allege facts sufficient to state a claim for relief against the Bank on a theory of aiding and abetting the alleged commission of fraud by the Stones, A Plus, or any other defendant.

PSO argues, however, that if the Court finds its purported aiding and abetting allegations insufficient, it should be granted leave to amend to assert an aiding and abetting claim against the Bank. PSO's request for leave to amend to assert a new claim is not properly presented in response to a motion to dismiss the *existing* claims. The Bank's motion sought dismissal only of the claims presented against it in the Sixth Cause of Action in the Amended Complaint, asserting negligence. The Court has granted that motion and concluded the deficiencies in the cause of action cannot be cured by amendment. Where a motion to dismiss is granted, leave to amend may be properly requested only for the purpose of curing the deficiencies raised in the motion to dismiss; thus, a plaintiff may not, in response to a Rule 12(b)(6) motion, obtain leave to amend to assert new

claims. *See Ambrose Packaging, Inc. v. Flexsol Packaging Corp.,* 2004 WL 2075457, at * 3 (D.Kan. Sept. 16, 2004) (unpublished opinion). Instead, a plaintiff must comply with the requirements of Fed.R.Civ.P. 15(a) by separately filing a motion seeking leave to amend to assert a new claim.

**\*11** Even if PSO's request had been properly asserted in response to the Bank's motion, however, the Court would not grant it. "Courts have been unwilling to grant leave to amend when a plaintiff seeks to add factual allegations or claims for relief at the end of discovery or after existing claims have been dismissed." *Snyder v. American Kennel Club,* 2009 WL 395161, at *3 (D.Kan. Feb. 18, 2009) (unpublished opinion) (citing *Pallottino v. City of Rio Rancho,* 31 F.3d 1023, 1027 (10th Cir.1994) and *Woolsey v. Marion Labs., Inc.,* 934 F.2d 1452, 1462 (10th Cir.1991)). Although leave to amend should be given freely, "this does not mean that it can go on indefinitely." *A.E. and R.R. v. Mitchell,* 724 F.2d 864, 868 (10th Cir.1983).

As discussed above, PSO's own allegations establish that it would be futile to amend to assert a claim against the Bank based on aiding and abetting the alleged fraudulent conduct of the Stones and A Plus. As the Bank argues, and PSO apparently agrees, Oklahoma has not expressly recognized a cause of action based on a bank's alleged aiding and abetting a bank customer's purported fraudulent conduct. Even if Oklahoma were to do so, the decisions in other jurisdictions recognizing such a cause of action reflect that PSO cannot plead the facts necessary to support the essential elements of that cause of action against the Bank in this case.

*Conclusion:*

For the foregoing reasons, the Bank's Motion to Dismiss [Doc. No. 55] is GRANTED in all respects. PSO's request for leave to amend its allegations against the Bank is DENIED. The case will proceed on PSO's claims against the remaining defendants. As a result of the dismissal, the Bank's separate motion for a protective order [Doc. No. 75] is MOOT.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3329181

---

**Footnotes**

1    PSO also names Patricia Ann Williams and Jerry Duane Williams as additional defendants in the Amended Complaint. The claims asserted against them are not at issue in this motion.

2    The Court may, in some cases, consider material outside the pleadings, e.g., where a plaintiff relies on such material in support of the allegations and/or incorporates such material by reference in a complaint. *See* ⚑ *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997). Those exceptions are inapplicable here.

3    Under certain circumstances, not present here, banks have been held to owe duties of disclosure to non-customers. *See, e.g.,* ⚑ *MSA Tubular Products, Incorporated v. First Bank and Trust Company, Yale, Oklahoma,* 869 F.2d 1422 (10th Cir.1989) (bank providing account information had duty to do so accurately).

4    PSO does not explain how the purported failure to generate SARs allegedly contributed to the harm it suffered from the alleged presentation of fraudulent invoices by the Stones and A Plus. Although it contends the alleged absence of SARs prevented PSO from tracing the Stones' checking transactions, it does not explain how it could have obtained confidential SARs or similar information, as the federal regulations prohibit the disclosure of such information. Furthermore, PSO apparently otherwise obtained information to trace the transactions, as the Amended Complaint lists in detail the transactions which it contends reflect its payment for fraudulent invoices.

5    ⚑ Rule 9(b) requires that fraud be pled with particularity, and the particularity requirement applies to allegations of aiding and abetting fraud. ⚑ *Adelphia,* 624 F.Supp.2d at 312.

---

**End of Document**                                 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

## [Remtek Servs. v. Wells Fargo Bank, N.A.](#)

United States District Court for the District of New Jersey

January 16, 2020, Decided; January 16, 2020, Filed

Civil No. 19-12790 (RBK/KMW)

**Reporter**

2020 U.S. Dist. LEXIS 7678 *; 101 U.C.C. Rep. Serv. 2d (Callaghan) 18; 2020 WL 241332

REMTEK SERVICES, INC., Plaintiff, v. WELLS FARGO BANK, N.A., Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** **[*1]** For REMTEK SERVICES, INC., Plaintiff: PRISCILLA J. TRIOLO, ROBERT ANTHONY DIEHL, LEAD ATTORNEYS, BITTIGER ELIAS & TRIOLO P.C., PARAMUS, NJ.

For WELLS FARGO BANK, N.A., Defendant: WILLIAM PATRICK REILEY, BALLARD SPAHR, CHERRY HILL, NJ.

**Judges:** ROBERT B. KUGLER, United States District Judge.

**Opinion by:** ROBERT B. KUGLER

## Opinion

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss (Doc. No. 6) Plaintiff Remtek Services, Inc.'s ("Remtek") Complaint (Doc. No. 1 at 11-24 ("Compl.")). Remtek contends it was the victim of a scheme by which fraudsters sought to steal from it, its suppliers, and its customers using Wells Fargo bank accounts. Believing Wells Fargo to be at least partly responsible, Remtek brought suit, seeking damages for Wells Fargo's negligence and breach of fiduciary duty, as well as injunctive relief. Ultimately, the Court concludes that none of Remtek's claims are viable, and therefore **GRANTS** Wells Fargo's Motion.

### I. BACKGROUND

Remtek's skeletal Complaint provides only a thin outline of the alleged fraud and Wells Fargo's involvement. Remtek is a commercial roofing company in Deptford, New Jersey. (Compl. at □ 5). **[*2]** On December 17, 2018, one of Remtek's customers, Prince Minerals, Inc., contacted Remtek's President, Timothy Nuhfer, about a request purportedly from Remtek to wire $94,000 to a new Wells Fargo bank account established in Remtek's name. (*Id.* at □ 6). After investigating this request, Remtek discovered that a fraudster had accessed Nuhfer's email account and had been impersonating Nuhfer in conversations with Prince Minerals, Inc. (*Id.* at □ 7). Remtek then took unspecified action to address the theft of Nuhfer's identity. (*Id.* at □ 8).

Remtek also discovered that the fraudster had attempted to make four withdrawals from Remtek's real bank account at PNC Bank into the fraudulent Wells Fargo account. (*Id.* at □ 9). These attempted withdrawals totaled $11,000. (*Id.*). Remtek was able to cancel these withdrawals and to close its account at PNC Bank. (*Id.* at □12).

On December 20, 2018, Everest Systems, one of Remtek's suppliers, contacted Remtek about an outstanding invoice for $64,109.96. (*Id.* □ 10). Upon investigation, Remtek discovered that fraudsters had been impersonating Everest Systems employees since October 3, 2018, and had directed Remtek to make the $64,109.96 payment into a Wells **[*3]** Fargo bank account on November 9, 2018. (*Id.* at □ 11).

2020 U.S. Dist. LEXIS 7678, *3

Although Remtek has repeatedly notified Wells Fargo about these fraudulent accounts, Wells Fargo has refused to discuss these accounts with Remtek or its representatives. (*Id.* at □ 13). Further, Wells Fargo has not taken action to address the accounts created in Remtek's name. (*Id.* at □ 12).

Apparently frustrated with Wells Fargo's intransigence, Remtek commenced this lawsuit in New Jersey Superior Court on April 8, 2019. (Doc. No. 1 at □ 1). Count I of the Complaint charges Wells Fargo with negligence and Count II with breach of fiduciary duty, while Count III seeks injunctive relief. On May 22, 2019, Wells Fargo timely removed the action, invoking this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. (*Id.* at □ 5). Wells Fargo then filed the present Motion to Dismiss on June 12, 2019.


## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff **[*4]** may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

To make this determination, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 680). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Finally, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). A complaint cannot survive a motion to dismiss where a court can only infer that a claim is merely possible rather than plausible. *Id.*


## III. DISCUSSION

Remtek alleges three separate instances when fraudsters attempted to extract funds either from it or its customers: (1) when the fraudsters attempted to solicit a $94,000 payment **[*5]** from Prince Minerals, Inc. into a Wells Fargo bank account opened by the fraudsters in Remtek's name; (2) when the fraudsters attempted to extract funds from Remtek's actual bank account into a Wells Fargo bank account opened by the fraudsters in Remtek's name; and (3) when the fraudsters[1] successfully impersonated Remtek's supplier, Everest Systems, extracting a $64,109.96 payment from Remtek into a Wells Fargo bank account. With respect to the first two instances, Remtek's theory is that Wells Fargo should be liable for permitting the fraudsters to open an account in Remtek's name; with respect to the third, Remtek's theory is not clearly stated.

The Court begins by assessing whether Remtek has sufficiently pled negligence with respect to the creation of the fraudulent bank accounts in its name. Next the Court examines whether the negligence claim relating to the $64,109.96 wire transfer is preempted by Article 4A of the Uniform Commercial Code ("U.C.C."). Finding that the Complaint does not allege any viable negligence claims, the Court then considers whether Remtek may still press a claim for breach of fiduciary duty. Finally, the Court turns to Remtek's demand for injunctive relief.

---

[1] It is unclear if Remtek is alleging that the fraudsters were the same individuals in each instance, but as their identity is immaterial at the present stage, the Court refers to them as though they were the same.

2020 U.S. Dist. LEXIS 7678, *5

**A. Negligence—Bank Accounts in Remtek's [*6]  Name**

In New Jersey, a plaintiff pleading negligence bears the burden of establishing four elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." Townsend v. Pierre, 221 N.J. 36, 110 A.3d 52, 61 (N.J. 2015) (internal quotation omitted). Remtek's allegations raise the question of whether banks have a state common law duty to protect against identity thieves opening bank accounts in their victims' names. Wells Fargo contends that New Jersey law definitively forecloses the existence of such a duty, relying on Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 972 A.2d 1112 (N.J. 2009). (Doc. No. 15 ("Reply") at 10). Wells Fargo reads Brunson for more than it is worth; although the New Jersey Supreme Court found that the bank in that case owed no duty to the plaintiff, it specifically left open the possibility that "in appropriate circumstances, a bank may have a duty of care to an innocent, unrelated third party harmed by the theft of his or her identity." Brunson, 972 A.2d at 1125 n.13.[2]

Nevertheless, Remtek's negligence claims still fail because it has not alleged actual damages. Through good luck and quick action, Remtek was able to prevent the fraudsters' efforts to elicit the $94,000 payment from Prince Minerals, Inc. and to withdraw funds from Remtek's legitimate bank account. As such, [*7]  on the face of the Complaint, Remtek has not suffered any harm from Wells Fargo's failure to prevent the fraudsters from opening a bank account in Remtek's name. Consequently, these claims must be dismissed, without prejudice. See Signature Bank v. Check-X-Change, LLC, No. 12-2802, 2013 U.S. Dist. LEXIS 90880, 2013 WL 3286154, at *4 (D.N.J. June 27, 2013) (dismissing negligence claim because damages allegations were conclusory).

**B. Negligence—the $64,109.96 Payment**

Remtek contends that Wells Fargo's negligence claim related to the $64,109.96 payment is preempted by Article 4A of the U.C.C. as adopted by the New Jersey legislature at N.J.S.A. 12A:4A-101 et seq. (Doc. No. 6-1 ("Def. Brief") at 16-18). Article 4A sets out specialized rules for funds transfers, and the parties do not seem to dispute that the $64,109.96 payment was a funds transfer within the meaning of the statute. The Official Comment to Article 4A makes clear that its provisions are "intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation [they cover]." N.J.S.A. 12A:4A-102 cmt. 1. Further, the New Jersey Supreme Court has held that Article 4A preempts common law negligence claims that "contravene" its provisions, as when the "case arises from a setting directly addressed by Article 4A." ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 99 A.3d 345, 358-59 (N.J. 2014). As such, if a provision of Article 4A directly applies to the circumstances surrounding [*8]  the $64,109.96 payment, Remtek's negligence claim related to that payment is preempted.

Wells Fargo contends that Section 4A-207(2)(b) directly applies. (Def. Brief at 17). That section specifically provides that:

> (2) If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:

---

[2] In Brunson, an identity thief opened a bank account in the plaintiff's name and proceeded to use the account to cash a series of fraudulent checks. Id. at 1114-15. Once the bank discovered that the checks were fraudulent, it investigated and filed criminal complaints against the plaintiff, leading to his arrest and detention. Id. at 1115-16. The New Jersey Supreme Court feared that allowing the plaintiff to pursue a negligence claim would create a "back door" avoiding the demanding requirements of a malicious prosecution claim, and therefore refused to find that the bank owed the plaintiff a duty of care. Id. at 1124-1125. As both these facts and the concern about circumventing the requirements of a malicious prosecution claim are inapposite to the present case, Brunson does not control.

2020 U.S. Dist. LEXIS 7678, *8

(a) . . . [I]f the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.

(b) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

N.J.S.A. 12A:4A-207(2)(b).

The main effect of Section 4A-207(2)(b) is to authorize banks to process payment orders by relying only on the provided account number. *See [\*9]* N.J.S.A. 12A:4A-207 cmt. 2 (explaining that the beneficiary's bank "has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order"). As such, banks are immune from liability if they fail to confirm that the name of the beneficiary on the payment order matches the name on the bank account identified by the provided account number, unless they have actual knowledge of the discrepancy. Because negligence claims do not have this actual knowledge requirement, courts have repeatedly found that Article 4A preempts negligence clams where the bank processed a payment order despite the existence of a discrepancy between the beneficiary identified on the payment order and the name on the account identified by the provided account number. *See Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A., 18-60250, 2018 U.S. Dist. LEXIS 58341, 2018 WL 8334591, at \*3-4 (S.D. Fla. April 4, 2018)* (interpreting identical Florida U.C.C. provision as preempting common law negligence claim based on fraudulent funds transfer); *Sliders Trading Co. L.L.C. v. Wells Fargo Bank NA, No. 17-04930, 2017 U.S. Dist. LEXIS 211169, 2017 WL 6539843, at \*5 (N.D. Cal. Dec. 21, 2017)* (interpreting identical California provision and concluding that because the U.C.C. provides a remedy for a bank's processing of fraudulent payment orders, it displaces common-law claims"). Consequently, to **[\*10]** the extent Remtek is claiming that Wells Fargo was negligent when processing the $64,109.96 payment, such claim is clearly preempted and must be dismissed.

By contrast, "claims alleging negligence in the opening of an account that are not inconsistent with Article 4A may go forward." *ADS Assocs. Grp., 99 A.3d at 370* (citing *Wachovia Bank, N.A., 301 F.3d 220, 224 (4th Cir. 2002)* (finding negligence claim against bank was not preempted where fraudster convinced plaintiff he was an executive at Bear Stearns and had the plaintiff wire $1,000,000 to a bank account he had opened in Bear Stearns' name)). As such, Article 4A may not preempt Remtek from bringing a claim asserting that Wells Fargo was negligent in allowing the fraudsters to open an account in the first place.[3] But the face of the Complaint is unclear as to whether Remtek is pursuing such theory, as it only says the account was "fraudulent." (Compl. at □ 11).[4] Without more detail, the Court can only speculate as to why Wells Fargo was negligent in permitting this account to be opened.

Although the Court must view the Complaint in the light most favorable to Remtek, it is still Remtek's burden to allege facts that add up to a plausible claim to relief. As such, the Court will not reward the Complaint's ambiguity, but **[\*11]** will only dismiss these claims without prejudice. *See Bobo v. Wildwood Public Schs. Bd. of Educ., 13-5007, 2014 U.S. Dist. LEXIS 72932, 014 WL 2215935, at \*7 (D.N.J. May 28, 2014)* (explaining that "the Court is not required to read facts into Plaintiff's Complaint that simply do not exist"). If Remtek wishes to amend its Complaint to include allegations setting forth how Wells Fargo was negligent when it permitted the fraudsters to open the account to which Remtek wired $64,109.96, it may attempt to do through a timely filed motion.

---

[3] Nothing in this Opinion should be read as deciding this issue one way or the other.

[4] Remtek's Opposition Brief is similarly unhelpful, merely saying that "there are various scenarios through which the Plaintiff could maintain successful causes of action against Wells Fargo whether or Article 4A is implicated" without explaining what those scenarios are. (Doc. No. 14 ("Pl. Brief") at 30). Although the brief repeatedly stresses that Wells Fargo was negligent in allowing the fraudsters to open accounts in Remtek's name, it makes no similar statement that Wells Fargo was negligent when it allowed the fraudsters to open the account to which Remtek wired $64,109.96.

2020 U.S. Dist. LEXIS 7678, *11

## C. Fiduciary Duty

Although it is an open question whether Wells Fargo owed Remtek *some* duty to protect against fraudsters opening bank accounts, Wells Fargo certainly did not owe Remtek a *fiduciary* duty. Assessing the existence of a fiduciary duty is a question of law. *United Jersey Bank v. Kensey,* 306 N.J. Super. 540, 704 A.2d 38, 43 (N.J. Super. Ct. App. Div. 1997). "A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *F.G. v. MacDonell,* 150 N.J. 550, 696 A.2d 697, 704 (N.J. 1997). Generally, "there is no presumed fiduciary relationship between a bank and its customer." *United Jersey Bank,* 704 A.2d at 44.

The Complaint alleges no facts suggests that Wells Fargo owed Remtek a fiduciary duty; indeed, it contains no suggestion that Wells Fargo and Remtek had any relationship whatsoever **[*12]** prior to the filing of this lawsuit.[5] As the Complaint simply provides no reason for the Court to conclude that Wells Fargo owed Remtek a fiduciary duty, these claims must be dismissed.

## D. Injunctive Relief

In Count III, Remtek seeks an injunction requiring Wells Fargo to: (1) immediately close the fraudulent Wells Fargo accounts created in Remtek's name; and (2) provide Remtek with records relating to these accounts. (Compl. at □ 32). Wells Fargo argues that Remtek lacks standing to seek such injunctive relief.[6] (Def. Brief at 22-24). When seeking injunctive relief, it is not enough to allege past injury from the defendant's actions; rather, the plaintiff "must establish that she is likely to suffer future injury from the defendant's conduct." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.,* 903 F.3d 278, 292 (3d Cir. 2018) (internal quotation omitted).

Remtek fails to carry its burden. Although the Complaint alleges that Wells Fargo has permitted fraudsters to open accounts in Remtek's name, and that the fraudsters have attempted to use these accounts to steal from Remtek in the past, it does not allege that these accounts are currently being used in any scheme to defraud Remtek, nor that they will be in the future. Rather, Remtek seems principally concerned **[*13]** about "resolving the injury and damage incurred by the cyberattack and related fraud." (Compl. at □ 30). But as discussed above, the fraudsters were unsuccessful in their attempts to use the accounts they created in Remtek's name to steal from Remtek and Prince Minerals, Inc., making it unclear what "injury and damage" Remtek is referring to. Consequently, Remtek has not established that its proposed injunction would protect it from likely future harm or alleviate existing harm, meaning that Count III must be dismissed for lack of standing.

## IV. CONCLUSION

For the forgoing reasons, Wells Fargo's Motion to Dismiss is **GRANTED** and Remtek's Complaint is **DISMISSED WITHOUT PREJUDICE** pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(h)(3). Remtek may file a

---

[5] In its opening brief, Wells Fargo asserts that Remtek does have a line of credit with Wells Fargo, (Def. Brief at 7 n.1), which Remtek appears to confirm in its Opposition. (Pl. Brief at 11-12). Even if it is true that Remtek is a Wells Fargo customer, Remtek's claim would still fail. Because creditor-debtor relationships are adversarial, "[t]he virtually unanimous rule is that [they] rarely give rise to a fiduciary duty." *United Jersey Bank,* 704 A.2d at 44. The Complaint provides no indication that the relationship between Remtek and Wells Fargo was exceptional.

[6] Because standing goes to the Court's subject-matter jurisdiction, Wells Fargo should have raised this argument in a Rule 12(b)(1) motion to dismiss, rather than a motion pursuant to Rule 12(b)(6). Nevertheless, because constitutional standing is mandatory, the Court must consider standing issues wherever and whenever they present themselves. *Hayes v. Wal-Mart Stores, Inc.,* 725 F.3d 349, 360 n.9 (3d Cir. 2013). Further, the Court has the power to dismiss claims for lack of subject-matter jurisdiction *sua sponte* pursuant to Federal Rule of Civil Procedure 12(h)(3).

motion to amend its Complaint, consistent with this Opinion, Federal Rule of Civil Procedure 8, and Local Civil Rule 15.1, on or before January 30, 2020. An Order follows.

Dated: 1/16/2020

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Judge


**ORDER**

**KUGLER**, United States District Judge:

**THIS MATTER** having come before the Court upon Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss (Doc. No. 6) Plaintiff Remtek Services, Inc.'s Complaint (Doc. No. 1 at 11-24 ("Compl.")); and for the reasons expressed in the Opinion of this **[*14]** date

**IT IS HEREBY ORDERED** that Defendant's Motion is **GRANTED** and Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE** pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(h)(3). Remtek may file a motion to amend its Complaint, consistent with this Opinion, Federal Rule of Civil Procedure 8, and Local Civil Rule 15.1, on or before January 30, 2020.

Dated: 1/16/2020

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Judge

---

**End of Document**

**2017 WL 4869517 (Nev.Dist.Ct.) (Trial Order)**
District Court of Nevada.
Clark County

TANG, LLC, a Nevada limited liability company, Plaintiff,

v.

MAJ SERVICES, LLC, a business entity; JP Morgan Chase Bank, N.A., a bank doing

business in Nevada; Professional Led Corporation Limited d/b/a Pledco, a business entity;

John Does and Jane Does I through XX, and Roe Entities I through XX, Defendants.

No. 13A686949.
September 19, 2017.

**Order Granting Motion for Summary Judgment**

David R. Hall, NV Bar No. 9571, Parsons Behle & Latimer, 3753 Howard Hughes Parkway, Suite 200, Las Vegas, Nevada 89169, Telephone: (702) 599-6000, Facsimile: (702) 599-6001; Robert W. DeLong, NV Bar No. 10022, Parsons Behle & Latimer, 50 W. Liberty Street, Suite 750, Reno, Nevada 89501, Telephone: (775) 323-1601, Facsimile: (775) 348-7250, for defendant, JPMorgan Chase Bank, N.A.

**\*1** Dept. No. XXVI

Hearing Date: August 8, 2017

Hearing Time: 9:30 a.m.

Defendant JPMorgan Chase Bank, N.A. ("Chase") filed its Motion for Summary Judgment on June 19, 2017. Plaintiff, Tang, LLC ("Tang") filed its Opposition to Motion for Summary Judgment on July 14, 2017, and Chase filed its Reply in Support of the Motion on August 2, 2017.

This matter came on for hearing on August 8, 2017, the Honorable Gloria Sturman presiding. Appearances were made by Robert W. DeLong, Esq. of Parsons Behle & Latimer for Defendant Chase and Daniel Markoff, Esq. for Plaintiff Tang. The Court, having reviewed the papers and considered the argument presented during the hearing, and finding good cause, hereby GRANTS the motion as stated orally at the hearing and incorporated by reference herein.

THE COURT FINDS:

1. That the Plaintiff Tang entered into a contract with Defendant Pledco to construct an electronic billboard for the Plaintiff, and Pledco required a $90,000 initial payment for the work;

2. The Plaintiff received an e-mail that was purportedly sent from Pledco instructing the Plaintiff to wire the $90,000 to an account owned by a customer of Chase;

3. The Plaintiff utilized Nevada State Bank to send the wire transfer;

4. The Plaintiff authorized the wire transfer to be sent to a customer of Chase, as provided for in the e-mail instructions;

5. Upon sending the wire transfer, Plaintiff notified Pledco that the funds were sent to the account specified in Pledco's email;

6. Pledco, upon being notified that Plaintiff wired the funds, advised Plaintiff that the wiring instructions sent to him were erroneous, and fraudulent;

7. Within about two (2) hours after authorizing the wire transfer, the Plaintiff contacted Nevada State Bank and requested that they stop the wire transfer;

8. Chase accepted the payment order within minutes of it being sent by Nevada State Bank;

9. Chase credited its customer's account pursuant to the wire instructions;

10. Chase notified Nevada State Bank that it would not place a stop payment on the transfer, or freeze the funds in its customer's account, until it received a hold harmless agreement;

11. Chase did not timely receive a hold harmless agreement;

12. When Chase did receive the hold harmless agreement, the Chase account holder to whom the funds were wired had already withdrawn approximately $74,000;

13. After receiving the hold harmless agreement, Chase returned approximately $16,000 to the Plaintiff, which constituted the remaining funds in the Chase customer account;

14. Chase had no contractual relationship with the Plaintiff;

15. Under NRS 104A.4404, Chase was required to deposit the funds in the customer account;

16. Some proof of Chase's negligence was required for the Plaintiff to maintain its claims against Chase;

17. Chase made a demand for indemnity (the hold harmless agreement) and it wasn't given, and it was unclear what Chase could have done; and

18. There was no evidence that Chase was going to freeze the customer account.

THE COURT HOLDS that the Defendant Chase properly fulfilled its obligations under the Uniform Commercial Code and has no duty to a non-customer as a matter of law based on the facts of this case.

 **\*2** THE COURT FURTHER HOLDS that there are no genuine issues of material fact in this case that could create a duty for Chase.

THE COURT THEREFORE GRANTS summary judgment in Chase's favor regarding the Eighth Claim for Relief (Negligence Against JPMorgan Chase Bank) and the Ninth Claim for Relief (Negligence Per Se), the only claims directed against Chase within the First Amended Complaint.

Because all claims against Defendant Chase have been resolved in this matter, and no other defendants have been served, the Court hereby orders the case closed.

The Oct. 10, 2017 Status check 13 [illegible text]

Case 2:26-cv-06421-WJM-CF    Document 16-4    Filed 07/14/26    Page 80 of 83 PageID: 180

DATED this 15 day of September, 2017.

<<signature>>

DISTRICT COURT JUDGE

Submitted by:

<<signature>>

PARSONS BEHLE & LATIMER

David R. Hall, NV Bar No. 9571

Robert W. DeLong, NV Bar No. 10022

50 W. Liberty Street, Suite 750

Reno, Nevada 89501

Telephone: (775) 323-1601

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

Reviewed and Approved:

<<signature>>

DANIEL MARKOFF (NV Bar No. 000321)

Attorney for the Plaintiff Tang LLC

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 81 of 83 PageID: 181

Towne Auto Sales, LLC v. Tobsal Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 5467012
Only the Westlaw citation is currently available.
United States District Court, N.D. Ohio, Eastern Division.

TOWNE AUTO SALES, LLC, Plaintiff,

v.

TOBSAL CORPORATION; Tobias Trucks, LLC; Bryan Avery; Chris Gentile; Sergejs Traskovs; Bank of America National Association; and Suzel Yapor, Defendants.

CASE NO. 1:16-cv-02739
|
Signed 11/14/2017

**Attorneys and Law Firms**

Gregory D. Seeley, Thomas G. Haren, Seeley, Savidge, Ebert & Gourash, Westlake, OH, for Plaintiff.

Bryan T. Kostura, McGlinchey Stafford, Cleveland, OH, for Defendants.

## OPINION AND ORDER

CHRISTOPHER A. BOYKO, United States District Judge

**\*1** This matter comes before the Court on Defendant Bank of America's ("BANA") Motion to Dismiss (ECF DKT #20) Plaintiff's claims for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Defendant's Motion is granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL HISTORY

According to its Second Amended Complaint (ECF DKT #15), Plaintiff Towne Auto Sales, LLC ("Towne") is an Ohio limited liability company in the business of buying and selling pre-owned vehicles. On or about November 5, 2015, Plaintiff negotiated with Defendant Tobias Trucks for the purchase of a 1958 Corvette. As a result of this negotiation, Towne wired $27,050 from its Chase Bank account to a BANA account believed to be that of Tobias. The listed account holder, however, was Tobsal Corporation ("Tobsal"). Towne's President, Mark Powers, called BANA's customer service line to inform a representative that he believed something fraudulent was occurring. Although he instructed the representative not to process the wire transaction, BANA

processed it the following day. Tobias subsequently failed to deliver the vehicle to Towne.

Plaintiff's Second Amended Complaint also alleges that Sergejs Traskovs, the purported President of Tobsal, opened a bank account at BANA on October 23, 2015 with the assistance of Suzel Yapor, a BANA employee. Plaintiff's Second Amended Complaint asserts that Yapor and BANA negligently allowed Traskovs to open the account; and in doing so, violated the Bank Secrecy Act and the Patriot Act.

## II. LAW AND ANALYSIS

### A. Legal Standard

When presented with a motion to dismiss, the Court must test the sufficiency of the complaint and determine whether "accepting the allegations in the complaint as true and construing them liberally in favor of the plaintiff, the complaint fails to allege 'enough facts to state a claim for relief that is plausible on its face.' " *Ashmus v. Bay Vill. Sch. Dist. Bd. of Educ.*, 2007 U.S. Dist. LEXIS 62208 (N.D. Ohio 2007), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007). Claims alleged in the complaint must be "plausible," not merely "conceivable." *Id.* Dismissal is warranted if the complaint lacks an allegation as to a necessary element of the claim raised. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485 (6th Cir. 1990).

### B. Jurisdiction

While personal jurisdiction flows from the Due Process Clause, the requirement may be waived by the actions of the defendant. *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006). Plaintiff asserts that Defendant waived its ability to raise a defense for lack of jurisdiction in its Motion (ECF DKT #20) in response to the Second Amended Complaint because Defendant did not raise this defense in its previous Motion to Dismiss (ECF DKT #5). "Although ... an amended complaint supersedes the initial complaint and becomes the operative pleading in the case, the filing of an amended complaint does not automatically revive all defenses or objections that the defendant may have waived in response to the initial complaint." *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194 (11th Cir. 2011) (citation omitted). Under Fed.R.Civ.P. 12(h), a party waives the right to contest personal jurisdiction by failing to assert the defense in a responsive pleading or by making a general appearance.

[🚩](*Reynolds v. Int'l Amateur Athletic Fed'n*), 23 F.3d 1110 (6th Cir. 1994). However, a party is not entirely barred from raising such defenses in the event of an amended complaint. The *Krinsk* court stated that a defendant may raise defenses, which otherwise would have been barred, when the amended complaint changes the theory or scope of the case. [🚩](*Krinsk*, 654 F.3d at 1202).

**\*2** Defendant argues that Plaintiff changed the theory of the case when it filed the Second Amended Complaint, which included allegations of a phone call made by Towne's President to a BANA representative. Defendant claims that by adding an allegation that BANA assumed a duty owed to Plaintiff based upon this conversation, Plaintiff changed its theory of liability by changing the source of Defendant's duty to Plaintiff, thus allowing a defense based upon lack of personal jurisdiction to be raised. However, despite the new allegations in the Second Amended Complaint, both the theory and the scope of the case remain the same. In *Krinsk*, the amended complaint changed the definition of the class, increasing its size from hundreds to potentially tens of thousands of members. [🚩](*Id.* at 1199-1203). The court stated that this change in the potential putative class sufficiently changed the scope of litigation to allow defendant to rescind its previous waiver. [🚩](*Id.* at 1204). BANA points out, in reply to Plaintiff's Brief in Opposition, that it has participated in this litigation for far less time than the defendant in *Krinsk*, where the court found no waiver. *See* Def.'s Reply Mem. Supp. Mot. Dismiss p. 4. However, the court in *Krinsk* specifically relied on the expansion of the potential class (i.e., the expansion of the theory and scope of the case) as the basis for reviving defendant's affirmative defense for lack of jurisdiction. [🚩](*Krinsk*, 654 F.3d at 1204). Here, no additional claims have been alleged. Nor have any claims been amended that would subject BANA to broader potential liability than was claimed in the First Amended Complaint. Plaintiff's Second Amended Complaint added allegations of a telephone conversation between Towne's President and a BANA employee in support of its claim for negligence under the theory that this conversation resulted in a duty owed by BANA. The argument remains that BANA breached a duty owed to Plaintiff. Importantly, at this stage detailed factual allegations are not necessary. [🚩](*Twombly*, 550 U.S. at 555). Since neither the scope nor the theory of the case has changed as a result of Plaintiff's Second Amended Complaint, Defendant cannot raise a defense for lack of personal jurisdiction having waived it by failing to present

the defense in a prior motion. As such, jurisdiction over Defendant BANA in this court is proper and Defendant's Motion to Dismiss is denied as it relates to lack of jurisdiction.

## C. Negligence (Count IV)

In Ohio, a claim for negligence requires "the existence of a duty on the part of the one sued not to subject the [one seeking recovery] to the injury complained of, a failure to observe such duty, and an injury resulting proximately therefrom." *Feldman v. Howard*, 10 Ohio St. 2d 189, 193, 226 N.E.2d 564, 567 (1967). "Ohio follows the prevailing rule that a bank owes no duty to a person who is neither a customer nor an account-holder." *Driessen v. Woodforest Nat. Bank*, 940 F.Supp.2d 584, 590 (S.D. Ohio 2013). In *Driessen*, as here, the defendant bank owed no duty to the plaintiff since there was no evidence showing any relationship between the two parties. *Id.* at 591. In this case, Plaintiff was a customer of Chase Bank, not of Defendant. (Pl. Sec. Am. Compl. ¶ 15). Defendant, therefore, owed no duty to Plaintiff, a non-customer.

Plaintiff contends that BANA assumed a duty as a result of a telephone conversation that Plaintiff's President, Mark Powers, had with a BANA customer service representative. The breach of this assumed contractual duty, the argument goes, is the foundation for a claim for negligence. However, the Second Amended Complaint does not sufficiently state allegations which would amount to a contract between the parties. Therefore, Plaintiff has not established a contractual duty.

Because Plaintiff's Second Amended Complaint does not set forth sufficient facts to establish the element of duty required for a negligence claim, it is not necessary for the Court to analyze proximate causation.

Defendant further asserts that Plaintiff's negligence claims must fail because its injury is only economic. "The general rule applicable to situations in which privity of contract is lacking is there is no duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things." *Laurent v. Flood Data Serv., Inc.*, 766 N.E.2d 221, 227 (Ohio Ct. App. 2001). Plaintiff did not have a contractual relationship with BANA. Plaintiff's only alleged injury is $27,050 it purportedly paid in exchange for a Corvette it did not receive. Since the general rule does not allow a plaintiff to recover under a theory for negligence for loss that is solely economic, Plaintiff's claim fails. [🚩](*Floor Craft Floor*

Case 2:26-cv-06421-WJM-CF   Document 16-4   Filed 07/14/26   Page 83 of 83 PageID: 183

Towne Auto Sales, LLC v. Tobsal Corporation, Not Reported in Fed. Supp. (2017)

*Covering, Inc. v. Parma Community General Hosp. Ass'n*, 560 N.E.2d 206 (Ohio 1990).

Defendant's Motion to Dismiss Count IV is granted.

### D. Negligence *Per Se* (Count V)

The Patriot Act and the Bank Secrecy Act impose a duty on banks and financial institutions to report suspicious activity indicative of criminal activities to the government of the United States. *Spitzer Management, Inc. v. Interactive Brokers, LLC*, 2013 WL 6827945 (N.D. Ohio 2013). "Neither of these statutes creates a private cause of action...." *Id.* at

*2; *see also* In re Agape Litig., 681 F.Supp.2d 352, 360 (E.D.N.Y. 2010) ("[B]ecause the Bank Secrecy Act does not create a private right of action, the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements."); *Armstrong v. American Pallet Leasing Inc.*, 678 F.Supp.2d 827 (N.D. Iowa 2009) (stating that neither the Bank Secrecy Act nor the Patriot Act impose a duty of care to plaintiffs because neither creates a private right of action). Since neither Act establishes a private cause of action, Defendant's Motion to Dismiss Count V is granted.

### E. Respondeat Superior (Count VI)

 **\*3**  In Ohio, "a principal or employer may generally be held liable for tortious acts committed by its agents or employees if such acts occur within the scope of the employment relationship." *Riotte v. Cleveland*, 195 Ohio App.3d 387, 960 N.E.2d 496 (8th Dist. 2011). Additionally, "employees do not possess a duty to a third party whom they deal with only on behalf of their employer." *In re Donahue Sec., Inc.*, 318 B.R. 667, 676 (S.D. Ohio 2004). In the absence of a duty,

there can be no liability on account of negligence. *Jaronovic v. Iacofano*, 2012 WL 1187744, 2012-Ohio-1581 (11th Dist. 2012). Since Yapor, BANA's employee, owed no duty to Plaintiff, BANA cannot be held liable for negligence under a theory of respondeat superior.

As discussed *supra*, Section D, Plaintiff's negligence *per se* claim must also fail since neither the Bank Secrecy Act nor the Patriot Act establishes a private cause of action. Thus, Defendant cannot be held liable for negligence *per se* under either respondeat superior or vicarious liability.

Defendant's Motion to Dismiss Count VI is granted.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF DKT #20) is denied in part and granted in part. The Motion is denied as it relates to jurisdiction because Defendant waived the defense by failing to raise it in an earlier motion. The Motion to Dismiss is granted for failure to state a claim under Fed.R.Civ.P. 12(b)(6) as it relates to the claims of Negligence, Negligence per se and Respondeat Superior (Counts IV-VI), the only claims asserted against Defendant Bank of America, N.A.

Therefore, Plaintiff's Second Amended Complaint is dismissed as against Defendant BANA.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2017 WL 5467012

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.