# Exhibit A

Caution
As of: August 25, 2026 4:31 PM Z

# *DeFazio v. Wells Fargo Bank Nat'l Ass'n*

United States District Court for the District of New Jersey

April 16, 2020, Decided; April 16, 2020, Filed

Civil Action No. 20-375 (SRC)

**Reporter**
2020 U.S. Dist. LEXIS 66848 *; 101 U.C.C. Rep. Serv. 2d (Callaghan) 999; 2020 WL 1888252

FRED DEFAZIO, Plaintiff, v. WELLS FARGO BANK NATIONAL ASSOCIATION, et al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] For FRED DE FAZIO, Plaintiff: GREGG S. SODINI, LEAD ATTORNEY, LAW OFFICES OF GREGG S. SODINI, LLC, FREEHOLD, NJ.

For WELLS FARGO BANK NATIONAL ASSOCIATION, Defendant: JUSTIN E. KERNER, BALLARD SPAHR LLP, CHERRY HILL, NJ.

For STEPHEN S. BIRD, ESQ., LAW OFFICES OF STEPHEN S. BIRD, LLC, Defendants: PAUL A. CARBON, LEAD ATTORNEY, MARGOLIS EDELSTEIN, BERKELEY HEIGHTS, NJ.

**Judges:** STANLEY R. CHESLER, United States District Judge.

**Opinion by:** STANLEY R. CHESLER

## Opinion

**CHESLER**, District Judge

This matter comes before the Court on two motions to dismiss the Complaint: Defendant Wells Fargo Bank N.A.'s ("Wells Fargo") motion to dismiss for failure to state a claim upon which relief may be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)* and Defendants Stephen S. Bird and Law Offices of Stephen S. Bird, LLC's (the "Bird Defendants") motion to dismiss for lack of in personam jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)* and, in the alternative, for failure to state a claim pursuant to *Rule 12(b)(6)*. Plaintiff Fred DeFazio ("Plaintiff" or "DeFazio") has opposed both motions. The Court has considered the papers filed by the parties. It proceeds to rule on the motion without oral argument, pursuant to *Federal Rule of Civil Procedure 78*. For the reasons expressed below, the Court will grant both motions to dismiss.

### I. BACKGROUND [*2]

This action arises out of the attempt by Plaintiff DeFazio, a New Jersey resident, to purchase property in South Carolina. According to the Complaint, some unknown third party defrauded Plaintiff by gaining unauthorized access to the computer systems of the Bird Defendants and causing DeFazio to wire funds to the fraudster's Wells Fargo bank account instead of the Bird Defendants' escrow account. Plaintiff brings this action seeking to hold Wells Fargo and the Bird Defendants liable for their alleged role in allowing the fraud to be committed.

The following summary of the facts is drawn from the allegations of the Complaint, the documents referenced therein, and, where appropriate, sources outside of the Complaint insofar as the information concerns the question of personal jurisdiction.

In January 2019, DeFazio agreed to purchase real property located at 640 Flatwater Drive in Bluffton, South Carolina (the "Property") from non-party HL Development, LLC for $224,910.00. Upon the suggestion of HL Development, DeFazio contacted attorney Bird, who maintains a law office in Bluffton, to represent him in the real estate transaction and to act on DeFazio's behalf at the closing. In connection [*3] with retaining the Bird Defendants, DeFazio advised that he was a New Jersey resident. According to the Complaint, Bird assured him his firm regularly represented out-of-state clients in property closings. The Bird Defendants also advised DeFazio they would primarily communicate with him via email.

Over the next few weeks, DeFazio exchanged various emails with attorney Bird and two employees of the Bird law firm, namely Karin Cimino ("Cimino") and Krista Shooltz ("Shooltz"). To highlight the most important: On January 17, 2019, Cimino sent DeFazio an email confirming receipt of DeFazio's $25,000 deposit in connection with the Property purchase and advising that "all funds for closings must be in the form of a wire." (Compl. ¶ 7.) This email, copied to Bird and Shooltz, bore a sender's email address of "kcimino@sbirdlaw.com." (Id.) On January 25, 2019, Cimino again emailed DeFazio to advise that the closing would take place on January 31, 2019 and to provide various documents which included wire instructions in connection with the closing. In particular, the email instructed DeFazio "to wire the sum of $203,000.19 to the account titled 'Law Office of Stephen S. Bird, LLC Escrow Account' [*4] as designated in the wire instructions." (Id. ¶ 9; see also Carbon Cert. Ex. C.). Those referenced instructions were set forth in a document bearing the Bird law firm letter head. The document specified the payee account information, including the name of the receiving bank (Synovus Bank), routing and account number, and beneficiary (Law Office of Stephen S. Bird, LLC Escrow Account). The wire instructions also cautioned as follows: "Due to recent warnings from the South Carolina Bar Association, we ask that before you wire to Law Office of Stephen Bird, LLC, you call our office at (843) 815-3900 to verify the account information." (Carbon Cert. Ex. B.). Cimino's January 25 email reiterated the instruction to "be sure to call our office to verify the wire instructions prior to sending the money." (Id. Ex. C.) That same day, DeFazio emailed the Bird Defendants with questions about certain charges set forth on the Settlement Statement he had received. On January 28, 2019, Cimino responded, at approximately 10:12 a.m.

A few hours later, on January 28 at 2:09 p.m., DeFazio received another email which appeared to be from Cimino, as it bore a sending address of kcimino@sbirdlaw.com. This [*5] email provided DeFazio different wire instructions than had previously been supplied. The new instructions, also printed on the Bird law firm letterhead, directed DeFazio to wire the funds to an account bearing the name "Law Office of Stephen S. Bird, LLC Escrow Account" but maintained at Wells Fargo under a different account number than set forth in the previous instructions. (For simplicity, the Court will hereinafter refer to this bank account as the "Wells Fargo Account".) Over the next few days, additional emails were exchanged between DeFazio and "kcimino@sbirdlaw.com" confirming the new wiring instructions and providing updates about the wire of funds. Finally, on January 30, 2019, DeFazio sent an email to Cimino confirming that the wire of $203,000.19 was "done" as instructed in the January 28, 2019 2:09 p.m. email from the Bird Defendants. A reply email from kcimino@sbirdlaw.com advised "Great thanks." (Compl. ¶ 13.)

However, the Bird Defendants did not receive the funds. On February 4, 2019, four days after the scheduled closing date, attorney Bird "contacted Mr. DeFazio by telephone and advised him that the funds had not been received and that the Bird Defendants did not [*6] have an account at Wells Fargo." (Id. ¶ 14.) Upon realizing that he had sent the funds to an unintended payee, DeFazio contacted both his own bank, where the payor account was maintained, and Wells Fargo. DeFazio advised the banks that a fraud had been committed. According to the Complaint, Wells Fargo "acknowledged the receipt of funds into the account to which the funds were wired but would not provide any other information and apparently took no action to freeze the account into which the funds had been wired." (Id.) With the assistance of his bank, DeFazio was able to locate and recover $126,200.98 of the funds he had been misled to wire to the Wells Fargo Account.

DeFazio filed this lawsuit in the Superior Court of New Jersey on or about November 27, 2019. Defendant Wells Fargo removed the action, with the Bird Defendants' consent, on January 10, 2020. Wells Fargo is a citizen of South Dakota, and the Bird Defendants are citizens of South Carolina. This Court has subject matter jurisdiction pursuant to *28 U.S.C. § 1332(a)*.

**II. WELLS FARGO'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

The Complaint pleads for relief from Wells Fargo under the following four causes of action: negligence, gross negligence [*7] and recklessness; aiding and abetting fraud and conversion; conversion; negligent supervision/respondeat superior. Wells Fargo moves to dismiss these claims for failure to state a claim upon which relief may be granted, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. In turn, the Court will evaluate each of the claims against Wells Fargo according to the well-established legal standard for evaluating whether a claim has been sufficiently pleaded under the Federal Rules of Civil Procedure.

To meet the pleading requirements of *Rule 8(a)*, a complaint must contain "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing *Twombly, 550 U.S. at 556*). *Rule 9(b)*, which applies to claims sounding in fraud, sets a heightened requirement: the complaint must "state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. The Third Circuit has held that to satisfy *Rule 9(b)*'s stringent standard, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision [*8] or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)*. On a *Rule 12(b)(6)* motion, the Court must accept as true the well-pleaded facts of a complaint and any reasonable inference that may be drawn from those facts but need not credit conclusory statements couched as factual allegations. *Iqbal, 556 U.S. at 678* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In the First Count of the Complaint, Plaintiff alleges that Wells Fargo was negligent "in opening the Fraudulent Wells Fargo Account, allowing transfers of the proceeds from the Wire and possible other wires out of the Fraudulent Wells Fargo Account and failing to prevent further transfers of funds out of the Wells Fargo Account after being made aware of facts putting Wells Fargo on notice that the Fraudulent Wells Fargo Account was being utilized to facilitate fraud and steal money . . . ." (Compl., First Count, ¶ 3.) Wells Fargo raises two grounds for dismissal of this claim. One, it argues that insofar as the negligence claim relates to wire transfers, the claim is barred by *Article 4A of the Uniform Commercial Code* ("UCC") as adopted by New Jersey statute as *N.J.S.A. 12A:4A-101, et seq.* Two, it argues that the negligence claim must be dismissed because [*9] Wells Fargo owed no duty to Plaintiff, a non-customer of the bank, regarding the opening and/or monitoring of the Account. The Court agrees with both arguments.

*Article 4A of the UCC* applies to the subject of electronic funds transfers, broadly defined as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." *ADS Assoc. Group, Inc. v. Oritani Sav. Bank, 219 N.J. 496, 511-12, 99 A.3d 345 (2014)* (quoting *N.J.S.A. 12A:4A-104(1)*). The New Jersey Supreme Court has held that, as made clear by Official Comment to the statute, "Article 4A comprehensively governs the rights and remedies of parties affected by funds transfers." *Id. at 518*. Comment 1 expressly provides as follows:

> Funds transfers involve competing interests . . . The rules that emerged [from the statutory drafting] represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

N.J.S.A. 12A:4A-102 cmt. 1. Guided by the New Jersey Legislature's [*10] comment and the plain language of Article 4A's provisions dealing with the issuance and acceptance of payment orders, the Supreme Court of New Jersey held in ADS that Article 4A preempts a common law negligence claim that "arises from a setting directly addressed by Article 4A." ADS, 219 N.J. at 519. Because the ADS plaintiff's negligence claim challenged a funds transfer, from one account at a bank to another at the same bank, the Court found that the claim fell within the purview of Article 4A, which therefore provided the exclusive remedy for the dispute. Id. The Supreme Court rejected the ADS plaintiff's common law negligence claim as an improper expansion of the statute's remedies, reasoning that permitting a non-customer to proceed with a cause of action for unauthorized transfers would upset the delicate balance of competing interests struck by the statute. Id. at 520.

The New Jersey Supreme Court's decision in ADS is controlling. Following the reasoning and holding of that case, this Court concludes that DeFazio's negligence claims against Wells Fargo are likewise barred by Article 4A, insofar as they are predicated on the bank's allegedly improper acceptance of funds transferred to the Account and/or the [*11] bank's transfer of funds out of the Account. Matters concerning funds transfers into and out of banking institutions are covered by Article 4A. Indeed, Subsection 207(2) specifically pertains to situations in which the originator of a funds transfer sends the receiving bank a payment order in which the beneficiary is described by name and by an identifying account number but the two pieces of information do not match, that is, the payment order contains conflicting information as to identification of the beneficiary. See N.J.S.A. 12A:4A-207(2)(b). Under those circumstances, the statute provides that the bank "may rely on the number as the proper identification of the beneficiary of the order." Id. With regard to transfers out of account, Section 404 establishes a bank's obligation to make funds available to a payment order beneficiary when the beneficiary bank accepts the order, requiring a bank to pay the amount of the order upon acceptance. N.J.S.A. 12A:4A-404. Article 4A directly addresses the funds transfer actions on which Plaintiff's negligence claim is based. Accordingly, it precludes Plaintiff's claim that Wells Fargo acted with negligence or gross negligence in accepting the funds Plaintiff erroneously transferred into the Wells [*12] Fargo Account, in transferring funds out of the Wells Fargo Account and in otherwise failing to prevent transfers from the Wells Fargo Account. ADS, 219 N.J. at 519.

Plaintiff's negligence claim is not, however, solely based on allegations involving wire transfers. The Complaint also alleges that Plaintiff was harmed by Well Fargo's lack of care in the management and maintenance of the accounts. It avers, in particular that the bank was negligent in opening the Wells Fargo Account and in failing to ensure that the Wells Fargo Account "was opened for legitimate purposes and not used in a manner to facilitate frauds and steal money." (Compl., First Count, ¶ 2.)[1] Plaintiff correctly notes this aspect of his negligence claim is not barred by Article 4A, as only claims inconsistent with Article 4A are displaced by the statute. ADS, 219 N.J. at 519-20; see also Remtek Svcs., Inc. v. Wells Fargo Bank, N.A., No. 19-12790, 2020 U.S. Dist. LEXIS 7678, 2020 WL 241332, at *4 (D.N.J. Jan. 16, 2020) (holding that Article 4A did not bar the plaintiff's claim "asserting that Wells Fargo was negligent in allowing the fraudsters to open an account in the first place."); Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 223-24 (4th Cir. 2002) (holding that the plaintiff's negligence claims were not inconsistent with UCC Article 4A insofar as they challenged the opening and management of the bank account at issue in that case).

---

[1] The Complaint has also alleged negligence for failure to prevent funds from being transferred out of the Wells Fargo Account after Wells Fargo was "made aware of facts putting [it] on notice that the Fraudulent Wells Fargo Account was being utilized to facilitate fraud and steal money." (Compl., First Count, ¶ 3.) Wells Fargo, in its moving brief, treats this allegation as sounding in negligence for failure to monitor, but Plaintiff expressly rejects this as an improper interpretation of its allegation. Indeed, Plaintiff states in his opposition brief that "[t]his is not an allegation of a duty to monitor. It is an allegation that the knowledge of Wells Fargo essentially made it complicit in the fraud and nothing in law allows a bank to sit idly by when it is aware that crimes are being committed." (Pl. Br. at 10.) Plaintiff clarifies that this aspect of the claim goes to the allegation that in preventing transfer after being made aware of facts that the Wells Fargo Account was being utilized to commit a fraud, "Wells Fargo aided, abetted and facilitate the fraudulent scheme of the holder of the Account in a manner that was negligent . . .." (Id.) Given that Plaintiff has expressly disclaimed a failure to monitor claim, and given the Complaint's conflation of negligence and fraud theories of wrongdoing with regard to "after-notice" transfers from the Wells Fargo account, the Court will analyze the claim for failure to prevent transfer of funds in furtherance of a fraudulent scheme as part of the aiding and abetting fraud claim pleaded in the Third Count.

Among other arguments raised [*13] in the motion to dismiss, Wells Fargo contends that there is no duty owed to Plaintiff relating to the manner in which the account was opened. It argues that the opening of bank accounts is governed by the *Bank Secrecy Act of 1970*, which does not "authorize a private cause of action against a financial institution or its employees." *James v. Heritage Valley Fed. Credit Union, 197 F. App'x 102, 106 (3d Cir. 2006)*. Wells Fargo further argues that it is generally recognized that, absent special circumstances, banks do not owe non-customers a duty to exercise reasonable care or to protect them from the intentional torts of their customers. *Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 400, 972 A.2d 1112 (2009)* ("in the unique context of whether a bank owes a duty to a non-customer, it is clear that 'absent a special relationship, courts will typically bar claims of non-customers against banks.'") (quoting *City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 60, 764 A.2d 411 (2001))*; see also *Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006)* ("[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers."; *Eisenberg, 301 F.3d at 225-26* (noting that courts of numerous jurisdictions, including New Jersey, have held that a bank does not owe a duty of care to a non-customer, and holding that the plaintiff therefore had no negligence claim involving the opening of a fraudulent bank account).

In response, Plaintiff maintains that Wells Fargo's argument [*14] is misplaced because the Complaint does not seek relief under the Bank Secrecy Act. What Plaintiff does not do is cite to any binding legal authority to rebut Wells Fargo's argument, supported by caselaw, that it did not owe Plaintiff a duty of care with regard to the opening of an account for some third party or, for that matter, with regard to its management of the account. It is axiomatic that a negligence claim requires "a duty of care owed by the defendant to the plaintiff." *Robinson v. Vivirito, 217 N.J. 199, 208, 86 A.3d 119 (2014)*. Moreover, "the issues of whether defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide." Id. Here, the Complaint fails to plead facts establishing that Wells Fargo owed non-customer DeFazio a duty of care under New Jersey law. The lack of this essential element prevents DeFazio's negligence claim against Wells Fargo from proceeding.

Accordingly, the Court will dismiss the negligence claim asserted in the First Count of the Complaint in its entirety. It will not, moreover, grant leave to amend so that Plaintiff may plead for relief under Article 4A or allege additional facts in support of his negligence claim, as such repleading would be futile. [*15] See *Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002)* (holding that upon granting a defendant's motion to dismiss a deficient complaint, a district court should grant the plaintiff leave to amend within a set period of time, unless amendment of the complaint would be inequitable or futile). Plaintiff is indisputably not a customer of Wells Fargo, as defined by Article 4A, and thus cannot assert the statutory cause of action. See *12A:4A-105(1)(c)* (defining "customer" as one "having an account with a bank"); *ADS, 219 N.J. at 519* (holding that the cause of action recognized by Article 4A to address unauthorized bank transfers is available only to a bank's customers). Moreover, there is no indication that he and Wells Fargo have the "special relationship" contemplated by the New Jersey Supreme Court that might give rise to a duty of care. See *ADS, 219 N.J. at 517-18* (discussing *City Check Cashing, 166 N.J. at 62*, and noting that, although it rejected the non-customer plaintiff's common law claim against a bank, the Court recognized that a "special relationship" may be "created by agreement, undertaking, or contract" giving rise to a duty of care owed by a bank to a non-customer).

The Second Count of the Complaint pleads a claim against Wells Fargo for aiding and abetting an alleged fraud committed against Plaintiff. [*16] To establish liability for aiding and abetting fraud, a plaintiff must establish the underlying wrongdoing (i.e., the fraud committed by another party), that the defendant was aware of his role in the tortious activity at the time it was committed, and that the defendant "knowingly and substantially assist[ed] the principal violation." *State Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, 387 N.J. Super. 469, 483, 904 A.2d 775 (App. Div. 2006)* (quoting *Tarr v. Ciasulli, 181 N.J 70, 84, 853 A.2d 921 (2004)* and finding that the New Jersey Supreme Court's adoption of the Restatement definition of aiding and abetting liability in the context of another tort applies with equal force to a claim for aiding and abetting a fraud); see also *Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC, No. 12-7242, 2013 U.S. Dist. LEXIS 142191, 2013 WL 5467093, at *19 (D.N.J. Sept. 30, 2013)* (applying the elements recognized by McCormac v. Qwest to a claim for aiding and abetting fraud). The Complaint is completely devoid of facts which, if true, would establish that Wells Fargo knowingly and substantially assisted a third party's fraud on Plaintiff, as described in the Complaint. It merely alleges that Wells Fargo "aided, abetted and facilitated the fraudulent scheme of one or more of the Doe

Defendants" by opening the Account, accepting wires into the Account, allowing funds to be transferred out of the Account, and failing to prevent further transfers after being put on notice of the fraud. (Compl., [*17] Second Count, ¶ 3.) As to the latter point, regarding Wells Fargo's knowledge that it was participating in or facilitating a fraud, the Complaint is particularly lacking in factual allegations. It states as follows: "Wells Fargo either had actual knowledge, is charged with actual knowledge, was on notice and/or chose to be willfully ignorant of the fact that the Fraudulent Wells Fargo Account was being utilized to facilitate frauds and steal money and, despite being made aware of these facts, refused to take steps to prevent damage to Mr. DeFazio and others similarly situated." (Id.) This conclusory allegation is precisely the type of "unadorned, the-defendant-unlawfully-harmed-me accusation" the Supreme Court has held does not suffice to withstand a *Rule 12(b)(6)* motion to dismiss. *Iqbal, 556 U.S. at 678*. As Wells Fargo points out, the Complaint fails to allege what was communicated to Wells Fargo, when and how the communication took place, and who was involved in the communication. In short, the claim for aiding and abetting fraud meets neither the plausibility standard of *Rule 8* nor the heightened standard *Rule 9(b)* applicable to claims sounding in fraud.[2]

Plaintiff, in his opposition, gives no indication that he could [*18] allege particular facts showing that Wells Fargo knew it was assisting the alleged fraud at the time the violation was committed. Instead, he argues that Wells Fargo has failed to "produce a Certification from anyone nor has there been any discovery of what Wells Fargo knew and when it knew it with respect to the concededly fraudulent nature or [sic] the Account and transactions processed through the Account." (Pl. Br. at 10.) This approach reverses the applicable burdens of proof. The burden is on the Plaintiff to plead facts showing that Wells Fargo is liable for aiding and abetting the fraud, not on Wells Fargo to establish that it did not have the requisite knowledge.

Next, in the Third Count, Plaintiff asserts a claim for conversion against Wells Fargo. To state a claim for unlawful conversion of money, a plaintiff must allege the "wrongful exercise of dominion or control over [the] property of another without authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 456, 978 A.2d 281 (App. Div. 2009)*. The Complaint alleges no facts whatsoever regarding how Wells Fargo exercised control over Plaintiff's funds, much less that such control was exercised wrongfully and without authorization. This [*19] claim is based on threadbare allegations that merely repeat the elements of the cause of action. It will be dismissed pursuant to *Rule 12(b)(6)*, without leave to replead.

Finally, the Fourth Count of the Complaint asserts another negligence claim against Wells Fargo, seeking to hold the bank liable for the actions of its employees under a theory of respondeat superior. The allegedly wrongful conduct on which this claim is based is identical to the alleged misconduct on which the First Count is based. For the same reasons that the First Count fails to state a plausible negligence claim, this claim must likewise be dismissed.

### III. BIRD DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The Complaint asserts claims for breach of contract, legal malpractice and "negligent supervision/respondeat superior" against the Bird Defendants, based on their alleged failure to safeguard their computer network and email system. The Bird Defendants move to dismiss the claims against them pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, on the grounds that that they lack sufficient contacts with the state of New Jersey to support personal jurisdiction. On a *Rule 12(b)(2)* motion, the burden is on the plaintiff to "prove by affidavits or other competent [*20] evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330, 51 V.I. 1219 (3d Cir. 2009)*.

---

[2] Additionally, DeFazio's reliance on published news reports related to Wells Fargo's involvement in schemes which include opening fraudulent bank accounts and the creation of fake accounts is completely unavailing. See, generally, Sodini Cert., Ex. A-C. Apart from raising these matters outside of the pleadings, Plaintiff fails to plead any facts linking the wrongdoing at issue in these reports and the allegations of wrongdoing committed against Plaintiff by some third party in using the Wells Fargo Account to defraud Plaintiff.

The Third Circuit has held that a federal district court sitting in diversity, "may assert personal jurisdiction over a nonresident defendant to the extent allowed under the law of the forum state." Id. New Jersey's long-arm statute, *N.J. Ct. R. 4:4-4*, authorizes personal jurisdiction "as far as is permitted by the *Fourteenth Amendment to the United States Constitution*." *Decker v. Circus Hotel, 49 F. Supp. 2d 743, 746 (D.N.J. 1999)*; see also *Avdel Corp. v. Mecure, 58 N.J. 264, 268, 277 A.2d 207 (1971)* (holding that New Jersey's long-arm rule "permits service on nonresident defendants subject only to 'due process of law'"). The *Fourteenth Amendment's due process clause* "limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*. It is well-established that a determination of whether due process permits a court to assert its power over a nonresident defendant must focus on "the defendant's relationship to the forum State." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., 582 U.S. ---, 137 S. Ct. 1773, 1779, 198 L. Ed. 2d 395 (2017)*.

In that regard, Supreme Court jurisprudence has recognized two types of personal jurisdiction, general ("all purpose") jurisdiction and specific ("case-linked") jurisdiction, which are distinct based on the nature and extent of the defendant's contacts with the forum. Id.; *Goodyear Dunlop Tires Operations., S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)*. General jurisdiction applies when the defendant's "affiliations with the [*21] State are so 'continuous and systematic as to render them essentially at home in the forum state." *Goodyear, 564 U.S. at 919* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 317, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*. Where general jurisdiction exists, the defendant's contacts with the state need not be related to the litigation, and, indeed, the forum court "may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different state." *Bristol-Myers Squibb, 137 S. Ct. at 1780* (citing *Goodyear, 564 U.S. at 919*). Specific jurisdiction, in contrast, exists where the litigation arises out of or relates to the defendant's contacts with the forum. Id. This means that "there must be 'an affiliation between the forum and the underlying controversy, principally [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" Id. (quoting *Goodyear, 564 U.S. at 919*) (alteration in original). Where a court has specific jurisdiction, its authority is limited to adjudicating issues related to the very controversy on which that jurisdiction is based. Id.; see also *Chavez v. Dole Food Co., Inc., 836 F.3d 205, 223 (3d Cir. 2016)* (holding that courts may exercise specific jurisdiction over foreign defendants "when the cause of action arises from the defendant's forum related activities").

In their motion to dismiss, the Bird Defendants argue that Plaintiff [*22] cannot establish either general or specific jurisdiction over them in New Jersey. They point out that Bird and his law firm are citizens of South Carolina, maintain an office in South Carolina and represented DeFazio in connection with a real estate closing for property located in South Carolina. They further note that, according to the Complaint itself, DeFazio contacted them to retain the firm; in other words, there is no evidence that the Bird Defendants solicited business, and in particular DeFazio's business, in New Jersey. DeFazio "concedes that there is no general jurisdiction over either of the Bird Defendants in this matter" (Pl. Br. at 2). However, he maintains that there is specific jurisdiction in this forum because the Bird Defendants undertook the representation knowing that DeFazio resided in New Jersey and because they affirmatively initiated email communications directed to DeFazio in New Jersey. DeFazio adds that the Bird Defendants sent their retainer agreement to DeFazio, which he signed in New Jersey.

For specific personal jurisdiction to attach to an out-of-state defendant, the following three requirements must be met: (1) the defendant has 'purposefully directed' [*23] his activities at the forum; (2) the litigation arises out of or relates to those activities; and (3) the exercise of jurisdiction otherwise comports with fair play and substantial justice. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*; *O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007)*. The Supreme Court has consistently held that, to establish that a defendant has sufficient "minimum contacts" with a forum to support specific jurisdiction, "there must be an 'affiliation between the forum and the underlying controversy, principally [an] activity or occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co., 137 S. Ct. at 1781* (quoting *Goodyear, 564 U.S. at 919*); see also *Int'l Shoe, 326 U.S. at 316 (1945)* (holding that, for a court to subject a defendant to personal jurisdiction, the defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.") (quotation omitted). "Minimum contacts" has been defined as "some act by which the defendant purposefully avails itself of the privilege of conducting activities within

the forum State, thus invoking the benefits and protections of its laws." *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* (quoting *Burger King Corp., 471 U.S. at 475*). In other words, for specific jurisdiction to exist, the non-resident defendant's "suit-related conduct must create a substantial connection with the forum [*24] State." *Walden v. Fiore, 571 U.S. 277, 284, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*.

DeFazio's effort to establish specific jurisdiction falls far short of the minimum contacts required by well-established jurisprudence. The only "suit-related conduct" linking the Bird Defendants and New Jersey is their communication with New Jersey resident DeFazio, which occurred primarily by email. There is no evidence that the Bird Defendants solicited clients in New Jersey, either in general or specifically targeted to the transaction underlying this suit. There is no evidence that any aspect of the underlying property sale transaction occurred in New Jersey. And there is no evidence that the Bird Defendants traveled to New Jersey to meet with DeFazio in connection with their representation of DeFazio in the transaction. The fact that DeFazio received messages from the Bird Defendants in New Jersey and responded from that location does not, without more, establish a substantial connection with the state or demonstrate that the Bird Defendants purposefully availed themselves of the privileges and benefits of conducting business in New Jersey. *IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 n.3 (3d Cir. 1998)* (noting that the weight of authority among courts of appeal holds that phone calls and letters between a defendant and a plaintiff [*25] in the forum state, without more, do not provide sufficient minimum contacts to satisfy due process); see also *Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452 (3d Cir. 2003)* (holding, where a defendant's web site was accessible in the forum state, that evidence of the defendant's intentional targeting of the site to the forum state to conduct business was required to satisfy the "purposeful availment" requirement of a minimum contacts analysis); cf. *Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 149-50 (3d Cir. 1992)* (finding that the defendant's attendance at a meeting with the plaintiff in New Jersey coupled with the telephone calls and letters to New Jersey sufficed to establish minimum contacts).

The claims against the Bird Defendants involve South Carolina actors practicing law in South Carolina for the purpose of DeFazio's purchase of a South Carolina property. For the reasons set forth above, Plaintiff has failed to meet his burden of establishing that the Bird Defendants are subject to personal jurisdiction in New Jersey in connection with this lawsuit. Accordingly, all claims asserted in the Complaint against the Bird Defendants will be dismissed pursuant to *Federal Rule of Civil Procedure 12(b)(2)*.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant Wells Fargo's motion to dismiss for failure to state a claim upon [*26] which relief may be granted, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, and will also grant the Bird Defendants' motion to dismiss for lack of personal jurisdiction, pursuant to *Federal Rule of Civil Procedure 12(b)(2)*. An appropriate Order will be filed.

/s/ Stanley R. Chesler

STANLEY R. CHESLER

United States District Judge

Dated: April 16, 2020

## ORDER

**CHESLER**, District Judge

This matter having come before the Court on two motions to dismiss the Complaint: Defendant Wells Fargo Bank N.A.'s ("Wells Fargo") motion to dismiss for failure to state a claim upon which relief may be granted pursuant to

*Federal Rule of Civil Procedure 12(b)(6)* [ECF 6] and Defendants Stephen S. Bird and Law Offices of Stephen S. Bird, LLC's (the "Bird Defendants") motion to dismiss for lack of in personam jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)* and, in the alternative, for failure to state a claim pursuant to *Rule 12(b)(6)* [ECF 9]; and Plaintiff Fred DeFazio having opposed both motions; and the Court having considered the papers filed by the parties; and the Court opting to rule on the motions without oral argument, pursuant to *Federal Rule of Civil Procedure 78*; and for the reasons expressed in the Opinion filed herewith,

**IT IS** on this 16th day of April, 2020,

**ORDERED** that Wells Fargo's motion to dismiss [ECF 6] be and hereby is **GRANTED**; and it is further

**ORDERED** that all claims in [*27] the Complaint asserted against Wells Fargo are dismissed pursuant to *Federal Rule of Civil Procedure 12(b)(6)*; and it is further

**ORDERED** that the Bird Defendants' motion to dismiss [ECF 9] be and hereby is **GRANTED**; and it is further

**ORDERED** that all claims in the Complaint asserted against the Bird Defendants are dismissed pursuant to *Federal Rule of Civil Procedure 12(b)(2)*.

/s/ Stanley R. Chesler

STANLEY R. CHESLER

United States District Judge

---

**End of Document**

Positive
As of: August 25, 2026 4:34 PM Z

# Deotare v. Wells Fargo Bank, N.A.

United States District Court for the Northern District of Georgia, Atlanta Division

March 26, 2018, Decided; March 26, 2018, Filed

1:17-cv-699-WSD

**Reporter**
2018 U.S. Dist. LEXIS 49094 *; 95 U.C.C. Rep. Serv. 2d (Callaghan) 552; 2018 WL 1470897

RAJANI T. DEOTARE, and CHANDANI V. PATEL, Plaintiffs, v. WELLS FARGO BANK, N.A., Defendant.

**Counsel:** [*1] For Rajani T. Deotare, Chandani V. Patel, Plaintiffs: Auden L. Grumet, The Law Office of Auden L. Grumet, LLC, Atlanta, GA.

For Wells Fargo Bank, N.A., Defendant: Jarrod Sean Mendel, LEAD ATTORNEY, McGuire Woods LLP-GA, Atlanta, GA.

**Judges:** WILLIAM S. DUFFEY, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** WILLIAM S. DUFFEY, JR.

## Opinion

**OPINION AND ORDER**

This matter is before the Court on Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss Plaintiffs' First Amended Complaint [15]; Plaintiffs Rajani T. Deotare, and Chandani V. Patel's ("Plaintiffs") Motion to File Excess Pages [19]; and Plaintiffs' Motion to Strike Wells Fargo's Reply Brief [22].

### I. BACKGROUND

A. Facts

Plaintiffs allege that on or about November 8, 2014, Niveda Dave ("Ms. Dave") borrowed $350,000 from Plaintiffs to purchase property at a tax foreclosure sale. (Amended Complaint [13] ("Compl.") ¶ 9). In return for the $350,000, Ms. Dave executed a promissory note promising repayment of the $350,000, with interest. (Id.).

On or about January 21, 2015, Plaintiffs received two checks drawn on Ms. Dave's Wells Fargo checking account, made payable to Plaintiff Deotare. (Id. ¶ 10). One was in the amount of $300,000 and the other in the amount of [*2] $65,000 (the "Checks"). (Id.). Later that day, Plaintiff Deotare deposited the Checks into her account at Wells Fargo. (Id. ¶ 11). Plaintiffs allege that a Wells Fargo bank teller told them that the Checks had cleared and the funds were available for immediate withdrawal. (Id. ¶ 12). Based on this statement, Plaintiffs marked the promissory note "Satisfied" and returned it to Ms. Dave. (Id. ¶ 14).

On January 22, 2015, the day after the deposit was made, Plaintiff Deotare attempted to make an online transfer of $365,000 to Plaintiff Patel's account. (Id. ¶ 13). On January 23, 2015, without notice or explanation, Wells Fargo reversed the deposit of the Checks by Plaintiff Deotare and re-credited the funds to Ms. Dave's account. (Id. ¶ 15). On January 26, 2015, Wells Fargo froze the accounts Plaintiff Deotare used in the transfer from Ms. Dave and to Plaintiff Patel. (Id. ¶ 16). After Wells Fargo re-credited the funds to Ms. Dave's account, a relative allegedly

convinced Ms. Dave to transfer the re-credited funds to an unidentified third party. Plaintiffs allege they have no recourse against Ms. Dave because "she does not have any other assets to speak of." (Id. ¶ 23). Plaintiffs allege [*3] that in March 2015, Wells Fargo permanently closed Plaintiffs' and Ms. Dave's accounts. (Id. ¶ 22).

The Amended Complaint alleges that upon Plaintiff Deotare's inquiry, a branch manager at a Wells Fargo location refused to explain why the Checks were re-deposited into Ms. Dave's account. Approximately one week after the Checks were re-credited, Plaintiffs hand-delivered a letter to Wells Fargo demanding an explanation of the re-deposit and demanding a refund of the amount of the Checks. ([13.1]). Wells Fargo did not respond to the letter.

B. Procedural History

On January 23, 2017, Plaintiffs filed their "Tort & Damage Complaint" in the Superior Court of Gwinnett County [1.1].

On February 24, 2017, Wells Fargo removed the action to this Court pursuant to *28 U.S.C. §§ 1332*, *1441*, and *1446* on the grounds that Plaintiffs and Wells Fargo have complete diversity of citizenship, and the amount in controversy exceeds $75,000.00 [1].

On May 10, 2017, Plaintiffs filed their Amended Complaint [13], asserting eighteen causes of action and five categories of damages against Wells Fargo. The Amended Complaint asserts causes of action for breach of contract (Count I), detrimental reliance and promissory estoppel (Count II), breach [*4] of the implied covenant of good faith (Count III), negligence (Count IV), conversion (Count V), theft by conversion (Count VI), theft by deception (Count VII), constructive trust (Count VIII), money had and received (Count IX), tortious interference with contractual relations (Count X), breach of fiduciary duty (Count XI), misrepresentation and fraud (Count XII), violation of the Georgia Fair Business and Uniform Deceptive Trade Practices Act (Count XIII), violation of Georgia's Uniform Commercial Code (Count XIV), violation of the *Expedited Funds Availability Act, 12 U.S.C. § 4001 et seq.*, (Count XV), violation of the *Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.*, (Count XVI), violation of *Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45*, (Count XVII), and "miscellaneous" (Count XVIII).

On May 24, 2017, Wells Fargo moved to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted [15]. In response, Plaintiffs withdrew their claims for breach of fiduciary duty (Count XI), violation of the Expedited Funds Availability Act (Count XV), violation of the Electronic Fund Transfer Act and Regulation E (Count XVI), and violation of *Section 5* of the Federal Trade Commission Act (Count XVII).

On June 26, 2017, Plaintiffs [*5] filed their Motion for Leave to file excess pages in its response to Wells Fargo's Motion to Dismiss [19]. That same day, Plaintiffs filed their Response to Wells Fargo's Motion to Dismiss [20].

On August 7, 2017, Plaintiffs filed their Motion to Strike portions of Wells Fargo's reply brief in support of its Motion to Dismiss [21].

## II. LEGAL STANDARD

On a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the Court must "assume that the factual allegations in the complaint are true and give the plaintiffs the benefit of reasonable factual inferences." *Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010)*. "'[U]nwarranted deductions of fact' are not admitted as true." *Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005)* (quoting *S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (11th Cir. 1996))*. The Court also is not required to accept conclusory allegations and legal conclusions as true. See *Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010)* (construing *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 570*). Mere "labels and conclusions" are insufficient. *Twombly, 550 U.S. at 555*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 556*). This requires more than the "mere possibility [*6] of misconduct." *Am. Dental, 605 F.3d at 1290* (quoting *Iqbal, 556 U.S. at 679*). The well-pled allegations must "nudge[] their claims across the line from conceivable to plausible." *Id. at 1289* (quoting *Twombly, 550 U.S. at 570*).

**III. ANALYSIS**

A. Pleading Standards

Wells Fargo argues the Amended Complaint fails to comply with *Rule 8(a) of the Federal Rules of Civil Procedure*, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)*. "*Rule 8* marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

So-called "shotgun pleadings" are disfavored in this circuit. See *Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 979 (11th Cir. 2008)*; accord *Byrne v. Nezhat, 261 F.3d 1075, 1130 (11th Cir. 2001)* (explaining that shotgun pleadings "wreak havoc on the judicial system"). One type of shotgun pleading is one "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1322 (11th Cir. 2015)*. A complaint is also a shotgun pleading if it is "disjointed, repetitive, disorganized and barely comprehensible." *Lampkin-Asam v. Volusia County Sch. Bd., 261 Fed. App'x. 274, 276 (11th Cir. Jan. 9, 2008)*; see also *Benjamin v. Bank of Am., N.A., No. 1:11-CV-02037-JOF, 2012 U.S. Dist. LEXIS 198984, 2012 WL 13008410, at *3 (N.D. Ga. Aug. 13, 2012)* ("The portion of Plaintiff's complaint where she sets forth the 'counts' is nearly incomprehensible in that it block cuts and pastes long passages from various Georgia [*7] statutes without alleging any facts relevant to the instant controversy."). The Eleventh Circuit has stated that, when faced with a shotgun pleading, a district court should require the parties to file an amended pleading rather than allow such a case to proceed to trial. *Byrne, 261 F. 3d at 1129*.

The Amended Complaint asserts eighteen causes of action and relies on numerous legal conclusions. The facts alleged are slight. Five of the eighteen counts contain only one paragraph in support of the claim alleged. This "kitchen sink" litigation strategy is not well viewed in our circuit, including because it creates undue burden on the Court and unreasonably increases the expense of litigation. That Plaintiffs dismissed four of their eighteen claims after Wells Fargo's motion to dismiss was filed suggests that the Amended Complaint was improperly pled originally. The Court will consider the fourteen claims remaining in the Amended Complaint. If, however, it finds that any claim violated Plaintiffs' obligations under *Rule 11 of the Federal Rules of Civil Procedure*, the Court may seek appropriate sanctions.[1]

B. Criminal Statutes

Plaintiffs assert a claim for "theft by deception" in Count VII of the Amended Complaint. Georgia law does not recognize a civil cause [*8] of action for theft by deception. See *Kabir v. Statebridge Co., LLC, No. 1:11-CV-2747-WSD, 2011 U.S. Dist. LEXIS 109778, 2011 WL 4500050, at *7 (N.D. Ga. Sept. 27, 2011)* (holding that "Plaintiff cannot allege a civil claim for theft by deception" because "*O.C.G.A. § 16-8-3* does not provide for a civil remedy

---

[1] Plaintiffs Motion to File Excess Pages was filed in June 26, 2017, the same day as their response brief. ([19]). Despite voluntarily dismissing four of their claims, Plaintiffs sought to file a 39-page response to Wells Fargo's 37-page opening brief. While the Court would normally deny such an untimely and extraordinary request, it reluctantly grants Plaintiffs' motion and will consider the entirety of Plaintiffs' response.

and a civil remedy cannot be implied to arise from a violation of that criminal statute"); *Am. Gen. Life & Accident Ins. Co. v. Ward, 509 F. Supp. 2d 1324, 1330 (N.D. Ga. 2007)* (same). Count IV is dismissed.

Count VI asserts a claim for theft by conversion "by violating *O.C.G.A. §16-8-4 (b)*." This is also a criminal statute that does not provide a private right of action. *O.C.G.A. § 16-8-4*. Count VI is also dismissed.

C. The Account Agreement

Plaintiffs allege in Count I that Wells Fargo breached its Consumer Account Agreement (the "Account Agreement"). ([15.2]). Despite asserting a breach of contract claim and quoting the relevant standards from the Account Agreement, Plaintiffs did not attach the agreement to the Amended Complaint. Ordinarily, the Court does not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss. *Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007)*. The Court recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document [*9] to its motion to dismiss. *Harris v. Ivax Corp., 182 F.3d 799, 802 n. 2 (11th Cir. 1999)*; *Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368-69 (11th Cir. 1997)*. The Court may consider these attachments in testing the Amended Complaint's sufficiency without converting a *Rule 12(b)* motion into a motion for summary judgment. *Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276-78 (11th Cir. 1999)*. Accordingly, in evaluating whether the Amended Complaint states a claim for breach of contract, the Court will consider the Account Agreement attached to Wells Fargo's Motion to Dismiss.

1. Choice of Law

A district court sitting in diversity applies the choice-of-law rules of the state in which it sits, in this case Georgia. *Rando v. Gov't Employees Ins. Co., 556 F.3d 1173, 1176 (11th Cir. 2009)*. "Georgia will honor choice of law provisions unless no reasonable basis exists for doing so or, application of the chosen state's law is contrary to a fundamental policy of Georgia." *Bryan v. Hall Chem. Co., 993 F.2d 831, 834 (11th Cir. 1993)*; see also *Convergys Corp v. Keener, 276 Ga. 808, 582 S.E.2d 84, 87 (Ga. 2003)* ("Georgia courts will not apply chosen law which would contravene the policy of, or would be prejudicial to the interests of this state."); *Carr v. Kupfer, 250 Ga. 106, 296 S.E.2d 560, 562 (Ga. 1982)* ("Absent a contrary public policy, this court will normally enforce a contractual choice of law clause.").

The Account Agreement contains a choice-of-law provision, which states:

> Your account is governed by the laws and regulations of the United States and, to the extent applicable, the laws of the state in which the office of the Bank that maintains your [*10] account is located (unless the Bank has notified you in writing that the laws of another state shall govern your account), without regard to conflicts of laws principles, or clearing house rules and the like. If you were not physically present at an office of the Bank when you opened your account (for example, if you opened your account by phone, through the mail, or over the Internet), your account will be governed by the laws of the state in which the main office of the Bank is located, unless the Bank notifies you that your account has been assigned to a particular office of the Bank.

([15.2] at 37).

Without expressly addressing which state's law governs the Account Agreement, the parties analyzed the sufficiency of Plaintiffs' breach of contract claim under Georgia law. The Amended Complaint indicates that Plaintiffs' accounts were maintained in Georgia. Plaintiffs resided in Georgia during the underlying events giving rise to their claims. A substantial part of the events giving rise to Plaintiffs' claims occurred in Georgia. (See Compl. ¶ 7, Ex. A). Plaintiffs hand delivered a letter to the Wells Fargo branch located on Peachtree Industrial Boulevard, in Chamblee, Georgia. (Compl. [*11] ¶ 17). While the record does not clearly establish that Georgia law applies given the terms of the choice-of-law provision, for purposes of this motion, the Court accepts the parties' representations and analyzes the Account Agreement under Georgia law.

2. Breach of the Account Agreement

Plaintiffs allege in Count I that Wells Fargo breached the standard of care provided in the Account Agreement by returning the Checks without explanation, causing them to incur damages. (Compl. ¶ 26). "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Houghton v. Sacor Financial, Inc., 337 Ga. App. 254, 786 S.E.2d 903 (Ga. Ct. App. 2016)* (internal citations omitted).

Whether Wells Fargo breached the Account Agreement turns on the duties imposed by the agreement. The Account Agreement addresses the standard of care required of Wells Fargo:

> The Bank will meet its standard of care for your account, provided the Bank exercises ordinary care in the transaction at issue. . . . "[O]rdinary care" does not require that the Bank examine the item. In all other cases, "ordinary care" requires only that the Bank follow standards that do not vary unreasonably from the [*12] general standards followed by similarly situated banks. The Bank's policies and procedures are general internal guidelines and do not establish a higher standard of care for the Bank than is otherwise established by the laws governing your account. If the Bank waives any of its rights as to you or your account on one or more occasions, it will not be considered a waiver of the Bank's rights on any other occasion.

([15.2] at 10).

The Account Agreement contains several other relevant provisions which Wells Fargo argues permit the actions alleged in the Amended Complaint. The Account Agreement provides:

> "Freezing" your account
>
> As part of the Bank's loss prevention program, when the Bank suspects that irregular, unauthorized, or unlawful activities may be involved with your account, the Bank may "freeze" (or place a hold on) the balance in your account (and in other accounts you maintain with the Bank) pending an investigation of such suspected activities. If the Bank freezes your account, the Bank will give any notice required by the laws governing your account.
>
> . . . .
>
> Deposited items returned
>
> The Bank has the right to charge back to or otherwise debit any account(s) you maintain with the Bank [*13] for any deposited item that is returned (assess any associated fees and to reverse or recover any associated interest that may have accrued), even if you have made withdrawals against it.
>
> . . . .
>
> Closing your account
>
> You or the Bank may close your account at any time.
>
> . . . .
>
> Verification of transactions; right to reverse erroneous credits
>
> All transactions, including without limitation, those for which the Bank has provided a receipt, are subject to the Bank's final verification. Verification of a deposit does not occur at the teller window. Consequently, the receipt that you receive at the time of your deposit is not evidence that your deposit has been verified. The Bank may reverse or otherwise adjust any credit it believes it has erroneously made to your account at any time without prior notice to you.

(Id. at 11, 16, 31, 34). Plaintiffs allege that Plaintiff Deotare went to a Wells Fargo branch to deposit the Checks from Ms. Dave into her Wells Fargo account. When Plaintiff Deotare deposited the checks, a Wells Fargo bank teller told her that the Checks had cleared and were available for immediate withdrawal. Two days after the deposit,

Wells Fargo reversed the deposit and re-credited the funds to Ms. Dave's [*14] account without providing Plaintiffs with an explanation. Plaintiffs alleged they incurred damages because they were unable to later recover the value of the Checks after the funds were returned to Ms. Dave. Despite Plaintiffs' numerous requests for an explanation of the bank's actions, Wells Fargo did not, prior to litigation, offer an explanation as to how the Checks were processed.[2] Despite the Account Agreement's provisions regarding the return of deposited items, these allegations state a claim for breach of the standard of ordinary care provided in the Account Agreement. It is plausible, on the face of the Amended Complaint, that Wells Fargo failed to exercise ordinary care in removing the deposited funds from Plaintiff Deotare's account without notice, especially when Wells Fargo had the ability to freeze the funds and conduct an inquiry. Taking the allegations of the Amended Complaint in the light most favorable to Plaintiffs, Count I states a claim for breach of the Account Agreement.

D. Breach of the Implied Covenant of Good Faith

Count III alleges a breach of the implied covenant of good faith. In Georgia, "[e]very contract implies a covenant of good faith and fair dealing [*15] in the contract's performance and enforcement." *Myung Sung Presbyterian Church, Inc. v. N. Am. Ass'n of Slavic Churches & Ministries, Inc., 291 Ga. App. 808, 662 S.E.2d 745, 748 (Ga. Ct. App. 2008)*. This implied covenant cannot be breached independently of "the contract provisions it modifies." Id. As the Eleventh Circuit has explained:

> [The implied covenant of good faith and fair dealing] is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*. But it is not an undertaking that can be breached apart from those terms.

*Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1429 (11th Cir. 1990)* (citations omitted). Thus, to state a claim for breach of the implied duty of good faith and fair dealing, "a plaintiff must set forth facts showing a breach of an actual term of an agreement." *Am. Casual Dining, LP v. Moe's Sw. Grill, LLC, 426 F.Supp.2d 1356, 1370 (N.D. Ga. 2006)* (citations omitted).

Plaintiffs' cause of action for breach of the implied covenant is separate and distinct from their breach of contract claim and may be pled simultaneously. See, e.g., *TechBios, Inc. v. Champagne, 301 Ga. App. 592, 688 S.E.2d 378, 381 (Ga. Ct. App. 2009)* (denying motion to dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing after finding that plaintiff had stated a claim for breach of contract). As found above, Plaintiffs have adequately set forth a claim for breach of contract, and therefore state a claim for breach of the implied covenant [*16] of good faith. Wells Fargo's motion to dismiss is denied as to Count III.

E. Detrimental Reliance and Promissory Estoppel[3]

Count II alleges that Plaintiffs are entitled to recover from Wells Fargo on theories of promissory estoppel and detrimental reliance. Under Georgia law, the elements of promissory estoppel are: "the defendant made a promise upon which he reasonably should have expected the plaintiff to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff forwent a valuable right."

---

[2] In its Reply Brief, Wells Fargo asserts that "the checks were returned because the signatures on the instruments did not match the account signature card for Ms. Dave's account." ([21] at 4). This assertion, contained nowhere else in the record before the Court, prompted Plaintiffs to file their "Motion to Strike" Wells Fargo's reply brief. ([22]). Plaintiffs argue that this assertion was the first time that Wells Fargo provided a reason as to why the Checks were returned. The Court grants Plaintiffs' Motion to Strike insofar as the Court will not consider factual assertions not made in the Amended Complaint or otherwise properly before the Court on Wells Fargo's Motion to Dismiss.

[3] Regarding Plaintiffs' tort claims, Georgia applies the substantive law of the place where the tort or wrong occurred, which is "the last place where the last event occurred necessary to make an actor liable." *Int'l Bus. Machs. Corp. v. Kemp, 244 Ga. App. 638, 536 S.E.2d 303, 306 (2000)*; see also *Fed. Ins. Co. v. Nat'l Distrib. Co., Inc., 203 Ga. App. 763, 417 S.E.2d 671, 673 (Ga. Ct. App. 1992)*. Here, Plaintiffs resided in Georgia at the time of the alleged wrongdoing and the harms were suffered in Georgia. Therefore, Georgia law governs Plaintiffs' non-contractual claims.

Mbigi v. Wells Fargo Home Mortg., 336 Ga. App. 316, 785 S.E.2d 8, 20 (Ga. Ct. App. 2016) (citation and quotations omitted); see also O.C.G.A. § 13-3-44.

Count II of the Amended Complaint states, in its entirety, "Alternatively, and or additionally, Plaintiffs are entitled to recover from Defendant based on principles such as promissory estoppel and detrimental reliance." (Compl. ¶ 32). This unsupported conclusion does not state facts from which the Court may find that Plaintiffs state a claim for promissory estoppel. Count II is therefore dismissed.

F. Negligence

Count IV of the Amended Complaint alleges negligence. The elements of a cause of action for negligence in Georgia are: "(1) A legal duty to conform to a standard [*17] of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." Politzer v. Xiaoyan, 342 Ga. App. 224, 801 S.E.2d 114, 115 (Ga. Ct. App. 2017) (citations omitted).

Plaintiffs allege "Defendant's misfeasance arose in the context of the (non) performance of its contractual duties. And one or more of those duties arose independent of any contract between Plaintiffs and Defendant." (Compl. ¶ 42). Under Georgia law, a defendant's failure to perform a contractual duty cannot serve as the basis for a negligence claim. Traina Enters., Inc. v. RaceTrac Petroleum, Inc., 241 Ga. App. 18, 525 S.E.2d 712, 714 (Ga. Ct. App. 1999). Plaintiffs cannot assert a breach of the common law duty of ordinary care based on their allegations that Wells Fargo breached the standard of care provided in the Account Agreement. See Ceasar v. Wells Fargo Bank, N.A., 322 Ga. App. 529, 744 S.E.2d 369, 373 (Ga. Ct. App. 2013); WESI, LLC v. Compass Envtl., Inc., 509 F. Supp. 2d 1353, 1361 (N.D. Ga. 2007) ("A breach of contract does not, by itself, give rise to a cause of action in tort; and when the allegation that a tort was committed adds nothing of substance to the breach of contract claim, it is mere surplusage.") (citing Faircloth v. A.L. Williams & Assocs., Inc., 206 Ga. App. 764, 426 S.E.2d 601 (Ga. Ct. App. 1992)).

The Amended Complaint does not establish that Wells Fargo [*18] owed Plaintiffs a legal duty outside of their contractual relationship. Plaintiffs quote the general standard for common law negligence but do not identify any non-contractual legal duty that Wells Fargo violated by re-crediting the Checks and closing their accounts. See Commercial Bank & Trust Co. v. Buford, 145 Ga. App. 213, 243 S.E.2d 637, 638-39 (Ga. Ct. App. 1978) (rejecting claim that bank breached a legal duty by initiating foreclosure proceedings; noting that "the only relationship between [the borrower] and the bank was that which arose out of the note and security deed."); Holmes v. Wells Fargo Bank, N.A., No. 114-cv-00626-JEC-GGB, 2014 U.S. Dist. LEXIS 189200, 2014 WL 12199986, at *3 (N.D. Ga. Aug. 12, 2014) (rejecting claim against bank for negligent loan servicing, stating that plaintiff "ha[d] not established that any of the Defendants owed him a legal duty outside of the contractual relationship"). Count IV fails to state a claim for negligence and is therefore dismissed.

G. Conversion

Count V asserts a claim for the tort of conversion. To establish a claim for conversion under Georgia law, a party must demonstrate "an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized [*19] appropriation." Capital Fin. Servs. Group, Inc. v. Hummel, 313 Ga. App. 278, 721 S.E.2d 108, (Ga. Ct. App. 2011) (citing J. Kinson Cook of Ga., Inc. v. Heery/Mitchell, 284 Ga. App. 552, 644 S.E.2d 440 (Ga. Ct. App. 2007)). The Amended Complaint does not allege that Wells Fargo remained in possession of Plaintiffs' funds at any time. Plaintiffs merely allege that Wells Fargo reversed the Checks and credited the funds back to Ms. Dave's account. Plaintiffs' conversion claim must fail for this reason. "Where there is no evidence that the defendant possesses any of the funds or items allegedly converted, an action for conversion must fail." J. Kinson Cook of Georgia, Inc. v. Heery/Mitchell, 284 Ga. App. 552, 644 S.E.2d 440, 447 (Ga. Ct. App. 2007). Count V fails to state a claim for conversion and is therefore dismissed.

H. Constructive Trust

Count VIII of the Amended Complaint asserts that Plaintiffs are entitled to a constructive trust. "[A] constructive trust is a remedy created by a court in equity to prevent unjust enrichment. Such a trust is impressed upon property when it is against equity that the person holding title to the property be allowed to enjoy the beneficial interest in the property." *GMRI, Inc. v. Indep. Bank of Georgia, 212 F. Supp. 3d 1306, 1313-14 (N.D. Ga. 2016)* (quoting *Vinings Bank v. Brasfield & Gorrie, LLC, 328 Ga. App. 636, 759 S.E.2d 886 (Ga. Ct. App. 2014))*. "Constructive trust is a remedy, not a cause of action." Id. "[W]hen the property in question is money as in this case, it must comprise an identifiable fund to support an action for conversion." *Id. at 1314* (citing *Levenson v. Word, 294 Ga. App. 104, 668 S.E.2d 763 (Ga. Ct. App. 2008))*. Here, Plaintiffs' request for a constructive trust fails because Wells [*20] Fargo no longer has possession of the funds at issue. Plaintiffs allege that Ms. Dave transferred those funds to an unknown individual. (Compl. ¶ 23). Count VIII alleging entitlement to a constructive trust fails to state a cause of action and is therefore dismissed.[4]

I. Tortious Interference with Business Relations

Count X alleges a claim for "tortuous interference with business relations." To prevail on a claim for tortious interference with contractual relations, a claimant must show the defendant (1) acted improperly and without privilege, (2) acted purposefully and with malice with the intent to injure, (3) caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff, and (4) by tortious conduct proximately caused damage to the plaintiff. *Sowell v. Blackman, 236 Ga. App. 705, 512 S.E.2d 713, 716 (Ga. Ct. App. 1999)*.

Here, there is no allegation that Wells Fargo had any involvement with the business relationship between Plaintiffs and Ms. Dave. A relative of Ms. Dave, not Wells Fargo, convinced her to transfer the funds to an unknown third-party. (Compl. ¶ 23). There is no factual assertion suggesting that Wells Fargo acted with malice or intended to injure Plaintiffs. All that is alleged is that [*21] Wells Fargo froze access to the deposited funds, froze Plaintiffs' accounts, and returned the deposited funds to Ms. Dave. Plaintiffs do not allege that Wells Fargo knew that the funds were the result of a contractual or business relationship, much less allege facts even tending to establish that Wells Fargo acted "purposefully and with malice with intent to injure" that contractual or business relationship. See *Ziemba v. Am. Home Mortg. Servicing, Inc., No. 1:10-CV-02781-RWS, 2011 U.S. Dist. LEXIS 86040, 2011 WL 3420646, *5 (N.D. Ga. Aug. 4, 2011)*. Count X is dismissed.

J. Misrepresentation and Fraud

Count XII alleges a claim for fraud. Under Georgia law, "the tort of fraud consists of five elements: (1) false representation by defendant; (2) scienter; (3) intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff." *Smith-Tyler v. Bank of Am., N.A., 992 F. Supp. 2d 1277, 1282 (N.D. Ga. 2014)* (quoting *Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1027 (11th Cir. 2003)* (internal quotation marks omitted)). *Rule 9(b) of the Federal Rules of Civil Procedure* imposes a heightened pleading requirement to state a claim for fraud. *Rule 9(b)* requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. "The rule requires this particularity in order to alert defendants to the precise misconduct with which they [*22] are charged and to protect defendants against spurious charges of immoral and fraudulent behavior." *Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006)* (citing *Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1986))*.

---

[4] Plaintiffs' claim for "money had and received" must also be dismissed because Wells Fargo did not maintain possession of the funds at issue. In Georgia, a claim for money had and received "is comprised of the following elements: a person has received money of the other that in equity and good conscience he should not be permitted to keep; demand for repayment has been made; and the demand was refused." *Cappuccitti v. DirecTV, Inc., 623 F.3d 1118, 1127 (11th Cir. 2010)* (quoting *Fernandez v. WebSingularity, Inc., 299 Ga. App. 11, 681 S.E.2d 717, 721 (Ga. Ct. App. 2009)*. Because Plaintiffs cannot establish the first element, Count IX is dismissed.

The Amended Complaint contains no allegations regarding either scienter or intent, much less particularized facts establishing those elements. Count XII is dismissed.

K. Violation of the Georgia Fair Business Practices Act and Georgia's Uniform Deceptive Trade Practices Act

Plaintiffs allege in Count XIII that Wells Fargo violated the Georgia Fair Business Practices Act ("FBPA") and the Georgia Deceptive Trade Practices Act ("UDTPA"). Georgia's FBPA prohibits any "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." *O.C.G.A. § 10-1-393(a)*. The FBPA further provides that the FBPA shall not "apply to . . . [a]ctions or transactions specifically authorized under laws administered by or rules and regulations promulgated by any regulatory agency of this state or the United States." *O.C.G.A. § 10-1-396(1)*. The Court of Appeals of Georgia has observed that "[t]he General Assembly intended that the Georgia FBPA have a restricted application only to the unregulated consumer marketplace and that FBPA not apply in regulated areas of activity, because [*23] regulatory agencies provide protection or the ability to protect against the known evils in the area of the agency's expertise." *Chancellor v. Gateway Lincoln-Mercury, Inc., 233 Ga. App. 38, 502 S.E.2d 799, 805 (Ga. Ct. App. 1998)*.

The FBPA does not apply in extensively regulated areas of the marketplace such as consumer banking. See *Taylor v. Bear Stearns & Co., 572 F.Supp. 667, 675 (N.D. Ga. 1983)* (holding allegations of unauthorized trades or churning not cognizable under FBPA); *Chancellor v. Gateway Lincoln—Mercury, Inc., 233 Ga. App. 38, 502 S.E.2d 799 (Ga. Ct. App. 1998)* ("area of finance charges, disclosure, and truth in lending falls outside the FBPA, except where expressly covered"); *Ferguson v. United Ins. Co. of Am., 163 Ga. App. 282, 293 S.E.2d 736 (Ga. Ct. App. 1982)* ("[I]nsurance transactions are among those types of transactions which are exempt from the Fair Business Practices Act.").

Rather than the FBPA, the Georgia Uniform Commercial Code, *O.C.G.A. §§ 11-1-101 et seq.*, ("UCC") expressly regulates Wells Fargo's actions and obligations with regard to the transactions at issue in the Amended Complaint. The Georgia UCC provides:

> If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, [*24] whether or not it is able to return the item.

*O.C.G.A. § 11-4-214*. Thus, the conduct involving the return of the Checks is regulated by the Georgia UCC and is not the FBPA, which applies "only to the unregulated consumer marketplace." *Brogdon ex rel. Cline v. Nat'l Healthcare Corp., 103 F. Supp. 2d 1322, 1336 (N.D. Ga. 2000)*.

Plaintiffs also allege in Count XIII that Wells Fargo committed unfair and deceptive trade practices in violation of the UDTPA. The Eleventh Circuit Court of Appeals has interpreted Georgia's UDTPA as having commercial, rather than consumer, application. *Kason Industries, Inc. v. Component Hardware Group, Inc., 120 F.3d 1199, 1204 (11th Cir. 1997)* ("[I]t is clear to us that the FBPA is significantly different from the UDTPA and the Lanham Act, because of the former statute's focus on the consumer (as opposed to the commercial) marketplace."); see also *Robinson v. Bank of Am. Home Mortg., No. 1:14-CV-3428-HLM, 2014 U.S. Dist. LEXIS 188666, 2014 WL 12465447, at *6 (N.D. Ga. Nov. 19, 2014)* ("Plaintiff is a consumer and therefore does not have a viable claim under the UDTPA."). Plaintiffs here are consumers and therefore have no viable UDTPA claim. Count XIII is dismissed.

L. Violations of Georgia's Uniform Commercial Code

Plaintiffs allege in Count XVII that Wells Fargo failed to give proper notice of the returned Checks in violation of *Section 11-4-214 of Georgia's UCC*. That section gives a bank the right under certain conditions to revoke a "settlement" given to a customer with respect [*25] to an "item," to charge back to a customer's account the amount of any credit given for an item, and the right to obtain a refund from its customer "if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts." *O.C.G.A. § 11-*

4-214 (a); see also O.C.G.A. § 11-4-302 (requiring notice of dishonor). The Amended Complaint states that Wells Fargo never gave Plaintiffs any notice of the facts underlying the reversal of the Checks, even after several phone calls, visits, and a letter sent to Wells Fargo.

The requirements of the Georgia UCC are default provisions that may be altered by contract. The Georgia UCC provides:

> The effect of provisions of Titles 1 through 10 of this article may be varied by agreement, except as otherwise provided in Titles 1 through 10 of this article and except that the obligations of good faith, diligence, reasonableness and care prescribed by Titles 1 through 10 of this article may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

O.C.G.A. § 11-1-102(3). The Account Agreement provides that Wells [*26] Fargo "has the right to charge back to or otherwise debit any account(s) you maintain with the Bank for any deposited item that is returned . . . even if [Plaintiffs] have made withdrawals against it." ([15.2] at 16). The Account Agreement eliminates Plaintiffs' right to notice:

> This right of charge back or debit is not affected by the expiration of any applicable midnight deadline, provided the Bank does not have actual knowledge that such deadline has expired or, having such knowledge, the Bank concludes that . . . [t]he deposited item is returned in accordance with the laws governing your account . . . The Bank need not give you any prior notification of its actions with respect to the claim.

Id. The Account Agreement is a permitted modification of the Georgia UCC's default rules regulating Wells Fargo's conduct with respect to the transactions at issue. The Georgia UCC thus does not provide grounds for a separate cause of action. The Amended Complaint fails to state a claim under the Georgia UCC and Count XVII is dismissed.[5]

**IV. ORDER TO SHOW CAUSE**

An attorney who presents to the Court any paper, motion, or pleading certifies that "to the best of the person's knowledge, information, [*27] and belief, formed after an inquiry reasonable under the circumstances" that there is "evidentiary support" for any allegations or factual contentions. Fed. R. Civ. P. 11(b)(3). Rule 11 sanctions are proper:

> (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when the party files a pleading in bad faith for an improper purpose.

Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996) (quoting Jones v. International Riding Helmets, Ltd., 49 F.3d 692, 694 (11th Cir. 1995)). Rule 11 provides that the district court, on its own initiative, may require a party to "show cause" why its conduct has not violated Rule 11(b). Fed. R. Civ. P. 11(c)(3). Imposing sanctions pursuant to Rule 11 is committed to the district court's discretion. See Attwood v. Singletary, 105 F.3d 610, 612 (11th Cir. 1997). Before sanctions are imposed, however, due process requires notice and an opportunity to respond. Id. at 613; see also Fed. R. Civ. P. 11(c).

Plaintiffs assert a claim for theft by conversion in Count VI and theft by deception in Count VII. As noted above, these are criminal statutes that do not confer a civil cause of action in Georgia. Plaintiffs also brought a claim for violation of the Federal Trade Commission Act (Count XVII), even though it is well-settled that there is no

[5] Count XVIII of the Amended Complaint entitled "Miscellaneous" does not set forth a plausible cause of action or connect facts to any allegations and therefore does not set forth a claim upon which relief can be granted. Count XVIII is dismissed.

private [*28] right of action under that statute. See *Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1174 n.5 (11th Cir. 1985)* ("Most importantly, consumers were given a private right of action to enforce the provisions of the FDCPA against debt collectors, *15 U.S.C.A. § 1692k*, a right which does not exist under the FTC Act."); *Valet Apartment Servs., Inc. v. Atlanta Journal and Constitution, 865 F.Supp. 828, 833 (N.D. Ga. 1994)*. Count XVII was later voluntarily withdrawn by Plaintiffs in response to Wells Fargo's motion to dismiss. Plaintiffs also withdrew their claim for breach of fiduciary duty (Count XI). Under Georgia law, there is no fiduciary relationship between a bank and its customers. *Gilliard v. Fulton Fed. Sav. & Loan Ass'n, 182 Ga. App. 678, 356 S.E.2d 734, 735 (Ga. Ct. App. 1987)*; *Big Bend Agri-Svcs. v. Bank of Meigs, 174 Ga. App. 493, 330 S.E.2d 422 (Ga. Ct. App. 1985)*.

The above deficiencies in the Amended Complaint should have been readily apparent to any attorney conducting basic legal and factual due diligence before filing a complaint. The Court therefore orders Plaintiffs' counsel to show cause why he should not be sanctioned for filing claims in the Amended Complaint that do not have a basis in law and were required to be dismissed. In complying with this Order, Plaintiffs must describe the actions, research, and investigation taken before filing the Amended Complaint, including the basis for Plaintiffs' and their counsel's decision to assert Counts VI, VII, XI, and XVII.

## V. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Wells Fargo, N.A.'s [*29] Motion to Dismiss [15] is **GRANTED** in part and **DENIED** in part. It is **DENIED** with respect to Counts I and III of the Amended Complaint. It is **GRANTED** as to the remaining counts.

**IT IS FURTHER ORDERED** that Plaintiffs Rajani T. Deotare, and Chandani V. Patel's Motion to File Excess Pages [19] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Wells Fargo's Reply Brief [22] is **GRANTED** in part.

**IT IS FURTHER ORDERED** that Plaintiffs should show cause before April 20, 2018, why they should not be sanctioned pursuant to *Rule 11 of the Federal Rules of Civil Procedure*.

**SO ORDERED** this 26th day of March, 2018.

/s/ William S. Duffey, Jr.

WILLIAM S. DUFFEY, JR.

UNITED STATES DISTRICT JUDGE

---

**End of Document**

Positive
As of: August 25, 2026 4:37 PM Z

# *Essgeekay Corp. v. TD Bank, N.A.*

United States District Court for the District of New Jersey

December 19, 2018, Decided; December 19, 2018, Filed

Civil Action No. 18-3663 (ES) (CLW)

**Reporter**
2018 U.S. Dist. LEXIS 214691 *; 97 U.C.C. Rep. Serv. 2d (Callaghan) 597; 2018 WL 6716830

ESSGEEKAY CORPORATION d/b/a AMERICAN PRESCRIPTION SURGICAL CENTER, Plaintiff, v. TD BANK, N.A., Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] For ESSGEEKAY CORPORATION, doing business as AMERICAN PRESCRIPTION SURGICAL CENTER, Plaintiff: A. ROSS PEARLSON, LEAD ATTORNEY, BRIGITTE M. GLADIS, Chiesa Shahinian & Giantomasi PC, WEST ORANGE, NJ.

For TD BANK N.A., Defendant: MICHAEL SALVATORE ZULLO, LEAD ATTORNEY, KELLY K. HUFF, DUANE MORRIS LLP, PHILADELPHIA, PA.

**Judges:** Esther Salas, United States District Judge.

**Opinion by:** Esther Salas

## Opinion

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant TD Bank, N.A.'s ("TD") motion to dismiss Plaintiff Essgeekay Corporation's ("Plaintiff") Complaint under *Federal Rule of Civil Procedure 12(b)(6)*. (D.E. No. 3). The Court has jurisdiction pursuant to *28 U.S.C. § 1332*. Having considered the parties' submissions, the Court decides this matter without oral argument. *See* *Fed. R. Civ. P. 78(b)*. As set forth below, the Court DENIES TD's motion to dismiss as to Count I and GRANTS TD's motion to dismiss as to Count II and Count III.

### I. BACKGROUND[1]

Plaintiff is a pharmacy located in Fort Lee, New Jersey, represented by Sreedhar Vajinepalli and Kalpesh Dave. (D.E. No. 1-1, Complaint ("Compl.") ¶¶ 5& 9). In February of 2009, Vajinepalli and Dave opened a TD business checking account on behalf of Plaintiff, over which they had sole control. (*Id.* at ¶¶ 8-9). Upon opening the account, TD provided each Vajinepalli [*2] and Dave independent login credentials to access the online banking system—credentials that they did not share with each other or anyone else. (*Id.* ¶¶ 10-12). As an additional security protocol, Vajinepalli and Dave selected individualized security questions and provided confidential responses. (*Id.* ¶¶ 11-12).

---

[1] The Court must accept Plaintiff's factual allegations as true for purposes of resolving the pending motion to dismiss. *See* *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *Bistrian v. Levi, 696 F.3d 352, 358 n.1 (3d Cir. 2012)*.

As a matter of business, each month Vajinepalli arranged five to six wire transfers to pay various pharmacy wholesalers operating in New York and New Jersey. (*Id.* ¶¶ 13-14). Plaintiff alleges that "wire transfers were not generally made for any other purpose" and Dave was not involved in the wire transfers and never initiated a transfer from his online account. (*Id.* ¶¶ 13-14). Whenever Vajinepalli attempted to login to the online account from an unfamiliar computer, TD would lock the account and require him to call the bank and "provide identifying corporate information . . . as well as the answers to his specific security questions." (*Id.*).

Sometime after June 7, 2016, Vajinepalli logged into the online account with his personal username and noticed three unauthorized wire transfers to bank accounts in California, Oklahoma, and Texas. (*Id.* ¶¶ 16-17). The transfers totaled approximately [*3] $176,000. (*Id.* ¶ 16). Plaintiff alleges that none of these transfers were consistent with either the identity or location of the usual payees involved in prior wire transfers. (*Id.*). Soon after, Vajinepalli discovered that the transfers were initiated from Dave's online account without Dave's approval, rather than Vajinepalli's account, as was the usual process. (*Id.* ¶¶ 15 & 17). Upon discovery of the transfers, Dave attempted to login to his account, but was unable to because security procedures had locked him out. (*Id.* ¶ 17).

When Dave called TD to report the issue, the representative informed him that TD had locked his account because TD suspected fraudulent activity. (*Id.* ¶ 18). TD did not, however, explain the basis of this suspicion. (*Id.* ¶ 25). TD claimed that before processing the transfers, it attempted to contact Dave by phone and email to obtain approval for the transfers. (*Id.* ¶¶ 26-27). TD "ultimately authorized the transfers" even though TD "never received such approval from Dave for any of the transfers." (*Id.* ¶ 27). Dave asked TD representatives to disclose the contact information they had used to contact him, but TD did not provide the information. (*Id.* ¶ 26).

On June [*4] 13, 2016, Vajinepalli visited the Parsippany branch of TD seeking answers about the fraudulent transfers. (*Id.* ¶ 20). However, TD representatives informed Vajinepalli that the Bank required "a police report before TD . . . could take action with respect to recovering the funds." (*Id.* ¶ 19). Vajinepalli immediately filed a report with the Parsippany-Troy Hills Police department, but Plaintiff alleges that even then, TD failed to effectuate a reversal of the fraudulent transfers and failed to provide Plaintiff with any additional information about the transfers or TD's purported investigation. (*Id.* ¶¶ 20-22). This prompted Dave to call TD two to three times a day to seek more information, but each time he was transferred from one department to another without ever receiving the requested information. (*Id.* ¶ 23).

Four days later, on June 17, 2016, TD assigned the case to a corporate security representative and attempted to reverse the transfers, but was unable to do so as the transferee(s) had already removed the funds. (*Id.* ¶¶ 24, 28 & 30-31). On June 20, 2016, TD informed Plaintiff by phone that the funds were lost, and that they would be unable to process the reversal. (*Id.* ¶¶ 30-31). [*5] Plaintiff filed this action in the Superior Court of New Jersey and TD subsequently removed the case to this Court. (*See* D.E. No. 1).

## II. LEGAL STANDARD

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"When reviewing a motion to dismiss, [a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011)*. But the court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal, 556 U.S. at 678*.

---

[2] Unless otherwise indicated, all citations and internal quotation marks are omitted, and all emphasis is added.

Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public [*6] record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)*; *see also* *Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006)*; *In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1426 (3d Cir. 1997)*.

**III. ANALYSIS**

The parties make a number of arguments in favor of their respective positions. The Court addresses only arguments relevant to the disposition of TD's motion. As outlined below, the Court denies TD's motion as to Count I because Plaintiff has pleaded sufficient facts to state a claim for violation of the New Jersey Uniform Commercial Code ("UCC") provisions codified at *N.J.S.A. § 12A:4A-202* and *N.J.S.A. § 12A:4A-203*. However, the Court dismisses Counts II and III because these common law claims are displaced by the New Jersey UCC.

**A. Count I: Violation of *N.J.S.A. § 12A:4A-202* and *N.J.S.A. § 12A:4A-203***

TD argues the Court should dismiss Count I as a matter of law because Plaintiff admits that TD had security procedures in place, which were effective in the past, and which were followed for the alleged fraudulent transfers. (D.E. No. 4 ("Def. Mov. Br.") at 6).[3] As a result, TD avers that under the New Jersey UCC the risk of loss shifted to Plaintiff and TD is not liable for the loss. (Def. Mov. Br. at 7).

Plaintiff counters that it has sufficiently alleged that that TD's security procedures were not "commercially reasonable" [*7] as required by *N.J.S.A. § 12A:4A-202*. (Pl. Opp. at 9). Particularly, Plaintiff argues that while the determination of commercial reasonableness is a question of law, it requires consideration of fact-sensitive inquiries which are not appropriate at the motion to dismiss stage. (*Id.* at 10). Additionally, Plaintiff argues that even if TD's security measures were commercially reasonable, Plaintiff has sufficiently alleged that the bank failed prove that "it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer. . . ." (*Id.* at 14).

*N.J.S.A. § 12A:4A-202(2)* provides that the customer will be liable for an alleged fraudulent transfer if the bank and customer have agreed upon "a security procedure to verify the authenticity of payment orders" that is commercially reasonable and "the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer. . . ." Whether a bank's security procedure is commercially reasonable is an issue of law for the Court to determine. *N.J.S.A. § 12A:4A-202(3)*. The comments to Article *4A-203* illustrate a desire to define commercial reasonableness based on the facts [*8] of each case. *See* *N.J.S.A. § 12A:4A-203* cmt. 4. There is very little jurisprudence discussing commercially reasonable security procedures in the context of *UCC Section 202*. Therefore, the Court is guided primarily by the language of *N.J.S.A. § 12A:4A-202* and standard industry practice.

According to the official comments the purpose of the statute, as it pertains to electronic transfers, is to authenticate the identity of the individual who sends the payment order as well as to prevent mistakes. *N.J.S.A. § 12A:4A-203* cmt. 4. The Federal Financial Institutions Examinations Council ("FFIEC")[4] issued specific guidance to banks for

---

[3] TD attaches as an exhibit to its motion an account agreement allegedly binding Plaintiff. (*See* D.E. No. 3-2; Def. Mov. Br. at 2-3, 6 & 12). However, Plaintiff did not attach or otherwise referred to any such agreement in its Complaint, and Plaintiff disputes that the exhibit is the agreement it entered with TD when Plaintiff opened the account. (D.E. No. 13 ("Pl. Opp.") 12). Therefore, the Court does not rely on Defendant's exhibit or any of the arguments that rely or quote language from it. *Cf.* *Mayer, 605 F.3d at 230*.

adopting security measures to avoid fraudulent transfers. *See* FFIEC, *Authentication in an Internet Banking Environment* (Oct. 12, 2005), *available at* https://www.ffiec.gov/pdf/authentication_guidance.pdf (hereinafter "FFIEC Guidelines"). The FFIEC Guidelines were intended to aid financial institutions in "evaluating and implementing authentication systems and practices whether they are provided internally or by a service provider." *Id.* at 1. The FFIEC recommends that modern banking security procedures involve two-factor authentication selected from three types of factors: (i) something the user knows (*e.g.*, PIN or security question answer); (ii) [*9] something the user has (*e.g.*, card or device); (iii) and something the user is (*e.g.*, biometrics). *Id.* at 3. Several sister courts in jurisdictions that have adopted very similar language to *New Jersey's UCC section 202* have applied the FFIEC Guidelines when determining the commercial reasonableness of a bank's security procedures. *See, e.g., Choice Escrow and Land Title, LLC v. BancorpSouth Bank, 754 F.3d 611, 619-20 (8th Cir. 2014)*; *Patco Const. Co., Inc. v. People's United Bank, 684 F.3d 197, 201 (1st Cir. 2012)*.

As a threshold matter, the Court disagrees with Plaintiff's argument that the determination of commercial reasonableness is not appropriate at the motion to dismiss stage. While under the statute the determination of commercial reasonableness will depend on the facts of each case, *N.J.S.A. § 12A:4A-203* cmt. 4, that does not prevent the Court from making a legal determination based on the facts as alleged by the Complaint. After all, the legal question at the motion to dismiss stage is whether, taking all the facts as alleged by Plaintiff to be true, the Complaint shows that Plaintiff has stated a claim for which relief can be granted. *See* *Iqbal, 556 U.S. at 678*. Answering that question at this stage does not require the Court to look beyond the facts alleged in the Complaint and the documents that are integral to the Complaint.

Here, Plaintiff concedes that TD had various security procedures in place and that these procedures [*10] effectively barred access to the online accounts on previous occasions. (*See* Pl. Opp. at 4). Plaintiff describes at least three protocols implemented by TD for the purpose of securing the account. First, both representatives for Plaintiff were "provided with independent login information to access the online banking system." (Compl. ¶ 10). Second, Vajinepalli and Dave selected independent security questions and answers that were to be used to identify themselves for the purpose of accessing the account. (*Id.* ¶ 11). Both the login information and security questions constitute "something the user knows." *See* FFIEC Guidelines at 3. Third, Plaintiff's account was configured to lock out a user if a login was attempted from an unrecognized computer, requiring Plaintiff's representatives to call TD and provide corporate information and security question answers to regain access. (Compl. ¶ 14). The unfamiliar device lockout constitutes "something the user has," i.e. a familiar computer. *See* FFIEC Guidelines at 3. Accordingly, the Court finds for purposes of the current motion that, as alleged by the Complaint, TD's implemented two-factor authentication procedure is commercially reasonable.

The risk of a fraudulent payment order remains [*11] with TD, however, unless TD "proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer. . . ." *N.J.S.A § 12A:4A-202(2)*. This is a question of fact. *N.J.S.A. § 12A:4A-203* cmt. 4. The code defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing." *N.J.S.A. § 12A:1-201(20)*. "This two-pronged definition has both a subjective component—honesty in fact—and an objective component—the observance of reasonable commercial standards of fair dealing." *BancorpSouth Bank, 754 F.3d at 622*. The subjective prong concerns whether the bank accepted the payment order honestly. *See* *id. at 623*. The objective prong concerns whether the bank accepted the payment order in accordance with the security procedures "in a way that reflects the parties' reasonable expectations as to how those procedures will operate." *Id.* Thus, Defendant must show that its employees accepted and executed the payment orders in a way that comported with Plaintiff's "reasonable expectations, as established by reasonable commercial standards of fair dealing." *Id.*[5]

---

[4] The FFIEC is an interagency body created by Congressional statute and charged with "establish[ing] uniform principles and standards and report forms for the examination of financial institutions which shall be applied by the Federal financial institutions regulatory agencies." *12 U.S.C. § 3305(a)*.

[5] Though "there may be some evidentiary overlap" between evaluating the commercial reasonableness of the security procedure and the bank's compliance, "the commercial reasonableness inquiry concerns the *adequacy* of a bank's security procedures,

Plaintiff notes that on previous occasions when Vajinepalli attempted to access the account from an unfamiliar computer, the [*12] bank's security procedures blocked access to the account before any transfers were made. (Compl. ¶ 14; Pl. Opp. at 13-14). Therefore, this effective response is the foundation upon which Plaintiff's expectations rest. Plaintiff claims that TD failed to act with this previously-demonstrated effectiveness. (Pl. Opp. at 13-14). To support this claim, Plaintiff asserts among other things that an unauthorized user was able to access the account using Dave's information "from a different computer" and made several large transfers, and TD failed to promptly recognize this activity and lock the account as it had previously done. (Compl. ¶ 15). At its core, Plaintiff essentially argues that the unfamiliar device lockout procedure failed to stop an individual from logging into the account on an unfamiliar device.

TD argues that the "Complaint admits that the transfers initiated from Dave's user login" and that the security procedure verified the transfers. (Def. Mov. Br. at 7). As such, TD argues that the "only reasonable inference to draw from [these] allegations is that" someone used Dave's login information on his own "known" computer to initiate the transfers; i.e. that this was an "inside [*13] job." (*Id.*). But this ignores that at the motion to dismiss stage the Court must draw all reasonable inferences in favor of Plaintiff. *See* *Malleus, 641 F.3d at 563*. Additionally, TD's argument ignores that TD apparently attempted to contact Dave to confirm the transfers, and ultimately locked Dave's account, because TD *suspected* that the activity was fraudulent. (Def. Mov. Br. at 3; Compl. ¶ 18 & 26-27). Thus, taking the Complaint's factual allegations as true and drawing all reasonable inferences in favor of Plaintiff, as the Court must do, the inference can be drawn that TD failed to prevent an unauthorized individual from accessing the account on an unknown computer, and that TD permitted these transfers to go through *despite* being unable to confirm their authenticity with Dave and *despite* suspicions that they were fraudulent. (*See* Compl. ¶ 18 & 26-27). As such, Plaintiff has sufficiently pleaded that TD failed to accept the payment orders in good faith and in compliance with the security procedure. Therefore, the Court finds that Plaintiff's *Article 4A-202* claim is sufficiently well-pled and denies TD's motion to dismiss Count I.[6]

**B. Common Law Clams**

TD argues that New Jersey's adoption of the above UCC provisions displaces [*14] the common law negligence claim in Count II and the fiduciary duty claim in Count III. (Def. Mov. Br. at 8). Plaintiff counters that upon creation of the account, TD "assumed a duty to use reasonable care to keep Plaintiff's [a]ccount information private and secure," and that by investigating the transfers TD "assumed a duty to assist Plaintiff in the recovery of the funds stolen from its Account." (Compl. ¶¶ 42-43; *see also* Pl. Opp. at 18). In reply, TD avers that "the facts pled support displacement of the common law claims by the UCC" and that in any event, Plaintiff's does not allege any facts supporting creating a special relationship. (D.E. No. 14 at 7).

---

[whereas] the objective good faith inquiry" concerns the manner in which the bank complied or acted in accordance with the implemented security procedure. *BancorpSouth Bank, 754 F.3d at 623*.

[6] Even assuming the transfers were valid under *Article 4A-202*, the Court finds that Plaintiff has sufficiently pleaded facts to support its claim under *Article 4A-203*. *Article 4A-203* provides an exception to *Article 4A-202* in which the customer may shift the loss to the bank upon proof that he is not responsible for compromising of the confidential access information. *N.J.S.A. § 12A:4A-203* cmt. 5. New Jersey law places the burden of "safeguard[ing] confidential security information and access to transmitting facilities" on the customer. *Id.* at cmt. 4. The parties agree that the alleged fraudulent transfers were initiated using Dave's confidential login credentials. (Compl. ¶ 15). Thus, it appears that Plaintiff failed to meet its burden of safeguarding Dave's login credentials. But, as the exception allows, Plaintiff is permitted to rebut this apparent failure with evidence that it or its agents are not responsible for the disclosure of login credentials. *N.J.S.A. § 12A:4A-203(1)(b)*.

A showing that the credentials were not obtained from the customer will shift the loss to the bank. *Id.* at cmt. 5. Plaintiff avers that Dave's security credentials were not disclosed to anyone, and that even Vajinepalli did not know Dave's login information or security question responses. (Compl. ¶ 12). Thus, for purposes of the present motion, the Court must draw the reasonable inference that Plaintiff was not at fault for the compromising of the confidential login information. As such, the Court finds that the Article 4A-203 claim is sufficiently pled for purposes of the present motion.

The Official Comment to N.J.S.A. 12A:4A-102 "provides that Article 4A comprehensively governs the rights and remedies of parties affected by funds transfers." ADS Associates Group, Inc. v. Oritani Sav. Bank, 219 N.J. 496, 99 A.3d 345, 359 (N.J. 2014) (citing N.J.S.A. § 12A:4A-102 cmt. 1 ("Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.")). "[T]he UCC displaces the common law where reliance on the common law would thwart the purposes of the UCC." Psak, Graziano & Whitelaw v. Fleet Nat. Bank, 390 N.J. Super. 199, 915 A.2d 42, 45 (N.J. Super. Ct. 2007). "Only in very rare instances should a court upset the legislative scheme of loss [*15] allocation and permit a common law cause of action." City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 764 A.2d 411, 416 (N.J. 2001) (quoting Bank Polska Kasa Opieki v. Pamrapo Sav. Bank, 909 F. Supp. 948, 956 (D.N.J. 1995)). Thus, "unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [UCC]." City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 764 A.2d 411, 416 (N.J. 2001).

Under New Jersey law, "[t]he standard deposit agreement between a bank and a depositor does not create a special relationship." Estate of Paley v. Bank of Am., No. A-4391-07T3, 2011 N.J. Super. Unpub. LEXIS 1055, 2011 WL 1598974, at *12 (N.J. Super. Ct. App. Div. Apr. 29, 2011) (citing Globe Motor Car Co. v. First Fid. Bank, 273 N.J. Super. 388, 641 A.2d 1136 (Super. Ct. Law Div. 1993), *aff'd*, 291 N.J. Super. 428, 677 A.2d 794 (Super. Ct. App. Div. 1996)). Additionally, the relationship between a bank and a depositor is that of a creditor-debtor. Estate of Paley v. Bank of Am., No. A-4391-07T3, 2011 N.J. Super. Unpub. LEXIS 1055, 2011 WL 1598974, at * 12 (N.J. Super. Ct. App. Div. Apr. 29, 2011) (citing Klemm v. Labor Coop. Nat'l Bank, 117 N.J.L. 284, 187 A. 640 (N.J. 1936). A creditor-debtor relationship will rarely give rise to a fiduciary duty because the positions of the creditor and the debtor are essentially adversarial. *See* Paradise Hotel Corp. v. Bank of Nova Scotia, 842 F.2d 47, 53, 23 V.I. 450 (3d Cir. 1988); *see also* United Jersey Bank v. Kensey, 306 N.J. Super. 540, 704 A.2d 38, 44 (N.J. Super. Ct. App. Div. 1997) (noting that "there is no presumed fiduciary relationship between a bank and its customer" because "their respective positions are essentially adversarial"). As such, common law claims cannot proceed where they would "contravene the provisions of UCC Article 4." ADS Associates Group, Inc., 99 A.3d at 358.

The scope of Article 4A encompasses the very situation alleged by Plaintiff in which "[a] payment order purporting to be that of Customer is received by [*16] Receiving Bank but the order was fraudulently transmitted by a person who had no authority to act for Customer." *See* N.J.S.A. § 12A:4A-203 cmt. 2. Plaintiff's attempt to convert TD's conduct (the investigation of the transfers upon receiving a police report and the attempt to process a reversal of the transfers) into a special undertaking giving rise to a special relationship is thus, misplaced. Indeed, the comments to the UCC assume that such an investigation will occur. *See* N.J.S.A. § 12A:4A-203 cmt. 5 ("Because of bank regulation requirements, in this kind of case there will always be a criminal investigation as well as an internal investigation of the bank to determine the probable explanation for the breach of security.").

Further, Plaintiff does not identify any particular facts, or case law for that matter, to show that TD was acting on behalf of anyone else other than for its own self-interest when it undertook those actions. (*See* Pl. Opp.). After all, TD did not act until it had received a police report. And importantly, banks like TD are subject to various regulatory duties including the requirement to prepare Suspicious Activity Reports in connection with suspicious transactions and suspected violations of federal [*17] banking law. *See, e.g.*, 12 C.F.R. § 21.11. Additionally, section 12A:4A-204(1) places the risk of loss on the bank when there is a violation of section 12A:4A-202 or section 12A:4A-203. N.J.S.A. § 12A:4A-204 cmt. 1 ("Subsection (a) of Section 4A-204 states that the bank must recredit the account or refund payment to the extent the bank is not entitled to enforce payment.").

Therefore, Plaintiff's allegations are insufficient to overcome the "heavy presumption" that a creditor-debtor relationship like the one at issue here does not give rise to a special relationship. Galayda v. Wachovia Mortg., FSB, No. 10-1065, 2010 U.S. Dist. LEXIS 135496, 2010 WL 5392743, at *17 (D.N.J. Dec. 22, 2010). Plainly, Article 4A provides a comprehensive remedy to address Plaintiff's injury arising out of the alleged fraudulent transfers, and to allow Plaintiff's common law claims to go forward in the absent of such a special relationship would be to allow Plaintiff to sidestep the "careful and delicate" scheme of loss allocation contemplated and expressed by the legislature. *See* ADS Assocs. Grp., Inc., 99 A.3d at 361 ("In Article 4A, the Legislature has treated electronic funds transfers as *a distinct category* of transactions governed by special rules, and has carefully limited the liability of

banks to refund money transferred in accordance with a payment order that the customer has not authorized."); *Girard Bank v. Mount Holly State Bank, 474 F.Supp. 1225, 1239 (D.N.J. 1979)* ("Courts should be hesitant to improvise new remedies outside the already intricate scheme of [*18] *Articles 3* and *4*"); *see also* *New Jersey Bank, N.A. v. Bradford Securities Operations, Inc., 690 F.2d 339, 345 (3d Cir. 1982)* (holding that a common-law tort action is barred where *Article 8* provides a "comprehensive remedy").

For these reasons, the Court dismisses Counts II and III *with prejudice*.

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES TD's motion to dismiss as to Count I and GRANTS TD's motion to dismiss as to Counts II and III *with prejudice*. An appropriate Order accompanies this Opinion.

*/s/ Esther Salas*

**Esther Salas, U.S.D.J.**

**ORDER**

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant TD Bank, N.A.'s motion to dismiss Plaintiff Essgeekay Corporation's Complaint under *Federal Rule of Civil Procedure 12(b)(6)* (D.E. No. 3); and the Court having considered the parties' submissions and having decided the matter without oral argument under *Federal Rule of Civil Procedure 78(b)*; and for the reasons stated in the Court's accompanying Opinion,

IT IS on this 19 day of December 2018,

**ORDERED** that Defendant's motion to Dismiss (D.E. No. 3) is GRANTED-IN-PART and DENIED-IN-PART; and it is further

**ORDERED** that Defendant's motion is DENIED as to Count I but GRANTED as to Counts II and III; and it is further

**ORDERED** that Count II and Count III are DISMISSED *with prejudice*; and it is further

**ORDERED** that the Clerk of Court shall TERMINATE [*19] Docket Entry Number 3.

*/s/ Esther Salas*

**Esther Salas, U.S.D.J.**

---

End of Document

Cited
As of: August 25, 2026 4:43 PM Z

# Hudson v. Valcorp, Inc.

United States District Court for the District of New Jersey

May 22, 1990; May 22, 1990, Filed

Civil Action No. 88-2383

**Reporter**
1990 U.S. Dist. LEXIS 6145 *; 1990 WL 69173

PAUL C. HUDSON, P.A. PENSION TRUST, et al., Plaintiffs, v. VALCORP, INC., et al., Defendants

**Notice:** [*1] NOT FOR PUBLICATION

**Counsel:** CHARLES JARVIS MURRAY, ESQ., San Francisco, California, Attorney for Plaintiffs.

DANIEL D. CALDWELL, ESQ., Wolff & Samson, Roseland, New Jersey, Attorney for defendant United Jersey Bank.

**Opinion by:** WOLIN

## Opinion

Alfred M. Wolin, United States District Judge.

*OPINION*

Defendant United Jersey Bank ("UJB") moves for summary judgment asserting that no genuine issues of material fact exist and UJB is entitled to judgment as a matter of law. Plaintiffs allege that fact issues remain which preclude the entry of summary judgment. The Court has reviewed all the submissions of the parties, including supplemental briefs allowed by the Court concerning certain newly discovered material, and has heard oral argument. For the reasons which follow, the Court finds that no genuine issues of material fact exist and defendant UJB is entitled to judgment as a matter of law. Therefore, the Court will grant UJB's motion for summary judgment and dismiss the complaint as against UJB.

*I. BACKGROUND*

The facts in this case are either undisputed or have been admitted by the parties for the purposes of this summary judgment motion. Plaintiffs' claims against UJB all pertain to $ 500,000.00 deposited directly into [*2] UJB Account No. 101-136722 whose sole record owner was Valcorp, Inc. ("Valcorp"). Plaintiff Paul C. Hudson ("Hudson") wired the money directly into the Valcorp account. The source of the $ 500,000.00 was securities owned by plaintiff Paul C. Hudson, P.A. Pension Trust ("the Trust"). The deposit was made to serve as collateral security for the extension of a line of credit to defendant Valcorp. In addition, Hudson signed a personal guarantee for the line of credit and signed a subordination agreement presented and executed by UJB. The funds were never placed in any account owned by any of plaintiffs. The funds were deposited into the Valcorp account on December 16, 1983 and remained in that account until June 9, 1986. At that time, the collateral was released to Valcorp, the record owner, because Valcorp had previously paid off the full balance due on its line of credit on June 2, 1986. No notice was given to plaintiffs of the release of the collateral. For the purposes of this motion, defendant UJB has assumed that Hudson orally told UJB when the funds were deposited, and that consequently, UJB knew, that Hudson, or the Trust was the source of the funds and that Hudson expected the [*3] funds to be returned to him when the Valcorp line of

credit was paid off. On June 14, 1985, Valcorp and UJB increased the line of credit and altered the agreement between Valcorp and UJB, apparently without the knowledge, consent, or signature of Hudson. This agreement altered the conditions under which the deposit served as collateral, although it did not decrease the deposit in any manner. On January 22, 1986, Hudson telephoned UJB and informed the bank of his concern as guarantor and subordinated creditor that the deposit held as collateral might be in jeopardy unless efforts were made to pay down the line of credit. Hudson followed up his telephone conversation with a letter dated January 23, 1986. UJB did not reply to this letter. Apparently, no further communications took place between Hudson and UJB after this point, until after the collateral had been released by UJB.

*II. DISCUSSION*

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [*4] *Fed. R. Civ. P. 56(c)*; *Hersch v. Allen Products Co., 789 F.2d 230, 232 (3d Cir. 1986)*. In making this determination, a court must make all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983)*, cert. dismd, *465 U.S. 1091 (1984)*. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)*. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. Id. Moreover, if the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)*. Therefore, when the non-moving party's evidence is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson [*5] , 477 U.S. at 249-50, 106 S. Ct. at 2511*.

There is no dispute that New Jersey law clearly governs this diversity action. UJB has moved for summary judgment on that grounds that *N.J. Stat. Ann. § 17:9A-223* (West 1984) ("Section 223") controls the legal duties which UJB owed to Hudson and is a complete statutory defense to this action. UJB contends that the facts asserted by plaintiffs entitle UJB to summary judgment pursuant to section 223. Plaintiffs oppose this motion on the grounds that the statute "presumes" notice to a suspected adverse claimant prior to the release of any funds, that UJB failed to give the required notice, that the factual record is insufficient to support a motion for summary judgment, and that, if the Court should hold that the section is applicable to this situation, then it does not apply because Valcorp was a fiduciary to Hudson.

After reviewing the affidavits, exhibits and memoranda of counsel, the Court finds that a there is a sufficient factual record to support a motion for summary judgment under *Fed. R. Civ. P. 56(b)*. Section 223 provides in pertinent part that:

Notice to any banking institution Of an adverse claim to a deposit to the credit of any [*6] person shall not be effectual to cause the banking institution to recognize the adverse claimant unless the adverse claimant shall either procure a restraining order, injunction or other appropriate process against the banking institution . . . or shall execute and deliver to the banking institution, in form and with surety acceptable to it, a bond indemnifying the banking institution against any liability, loss, damage, costs and expenses . . .

This section shall not apply when the person to whose credit the deposit stands is a fiduciary for the adverse claimant, and the facts showing such relationship and reasonable cause for belief that the fiduciary is about to misappropriate the deposit are made to appear by affidavit of the claimant.

Section 223 describes the conditions under which a bank may be held liable to a third party for the release of a deposit to a record owner where the third party has asserted an adverse claim to that deposit. The statute requires that specific affirmative measures be undertaken before a bank's duty to recognize and protect a person's interest in a deposit held by the bank where that person is not the denominated depositor is triggered. The statute [*7] requires that the adverse claimant either obtain a restraining order, injunction or other appropriate process against

the bank, or execute and deliver to the bank a bond indemnifying the bank against any liability, loss, damage, costs and expenses for the bank's having failed to release funds to a record owner of those funds. It is undisputed by plaintiffs that none of these actions were undertaken. Section 223 specifically states that no other notice to the bank will be effectual to cause the bank to recognize an adverse claim.

Plaintiffs' argument that the language of the statute presumes prior notice by the bank is legally untenable. In fact, the very purpose of this statute was to put the initial onus on the adverse claimant to come forward and affirmatively assert his claim before any duty on the part of the bank would arise. *cite*. Requiring a bank to contact any person it might suspect of having an adverse claim to an account is counter to the express language of the statute and would create a logistical nightmare for banking institutions. See *Goldstein v. Riggs National Bank, 459 F.2d 1161, 1163 (D.C. Cir. 1972)*. Plaintiffs have offered no legal authority for their contention [*8] that UJB had a duty to provide prior notification to any potential adverse claimant. Plaintiffs also misconstrue the language of the statute concerning fiduciaries. Section 223 does not apply when the record owner of the account is a fiduciary for the adverse claimant and facts evidencing that relationship and reasonable cause for belief that the fiduciary is about to misappropriate the deposit are made to appear by affidavit of the adverse claimant. Plaintiffs ask this Court to consider Hudson's letter dated January 23, 1986 as the affidavit under this provision of the statute. The language of the section is specific and clear. Hudson's letter is not the equivalent of an affidavit and will not satisfy the statutory criteria.

Based on the foregoing discussion, the Court finds that section 223 is applicable to this situation and delineates the duties, obligations and potential liabilities of UJB to plaintiffs. Plaintiffs' complaint alleges that UJB converted the $ 500,000.00 deposit (count one), breached the loan agreement by conspiring to convert the deposit with the other defendants (count three), committed negligence in allowing the conversion to be committed (count four), breached [*9] their fiduciary duty to plaintiffs by their alleged act of conversion (count five), conspired with the other defendants to convert the deposit (count six), and breached the covenant of good faith and fair dealing attendant to Hudson's personal guarantee of the line of credit by wrongfully releasing the deposit to the record owner of the account. (count seven). All the allegations of plaintiffs' complaint which are directed at defendant UJB concern the release of the $ 500,000.00 deposit to Valcorp, the record owner of the account. Section 223 declares that a bank will not be liable to any adverse claimant who has failed to affirmatively assert their claim in the manners prescribed in the section. It is without dispute that plaintiffs have failed to do so. The issue before this Court is not whether there was, or is, an adverse claim to that deposit. The issue for the Court to decide is whether plaintiffs properly asserted that claim so that a duty arose in the bank to recognize that adverse claim. Based on the facts plead by plaintiffs, this Court finds that plaintiffs did not satisfy the requirements of the section. Therefore, UJB was under no obligation to recognize any interest [*10] of plaintiffs in the $ 500,000.00 deposit. Also, it is undisputed that the deposit was at all times placed in an account whose sole record owner was Valcorp. As a matter of law, UJB can not be held liable to plaintiffs for conversion of property which plaintiffs did not own. Therefore, the Court will grant defendant UJB's motion for summary judgment and will dismiss all claims as against UJB.

*III. CONCLUSION*

For the foregoing reasons, the Court finds that no genuine issues of material fact exist and defendant UJB is entitled to judgment as a matter of law. Therefore, the Court will grant UJB's motion for summary judgment and dismiss the complaint as against UJB.

An appropriate order is attached.

Dated: May 22, 1990.

ORDER

In accordance with an opinion of the Court filed herewith,

It is on this 22nd day of May, 1990,

ORDERED that the motion for summary judgment of defendant United Jersey Bank is granted; and it is further

ORDERED that the complaint as against defendant United Jersey Bank is dismissed.

---

End of Document

Positive
As of: August 25, 2026 4:44 PM Z

# *Midwest Feeders, Inc. v. Regions Bank (Inc.)*

United States District Court for the Middle District of Georgia, Albany Division

September 30, 2016, Decided; September 30, 2016, Filed

CASE NO.: 1:15-CV-00013 (LJA)

**Reporter**
2016 U.S. Dist. LEXIS 135054 *; 90 U.C.C. Rep. Serv. 2d (Callaghan) 1147

MIDWEST FEEDERS, INC., a Kansas Corporation, Plaintiff, v. REGIONS BANK (INC.) (ALABAMA), an Alabama Corporation, Defendant.

**Subsequent History:** Affirmed by *Midwest Feeders v. Regions Bank (Inc) (Alabama), 2018 U.S. App. LEXIS 77 (11th Cir. Ga., Jan. 3, 2018)*

**Counsel:** [*1] For MIDWEST FEEDERS INC, a Kansas Corporation, Plaintiff: JOHN O'BRIEN, SCOTT C SANDBERG, TIMOTHY G O'NEILL, LEAD ATTORNEY, SNELL & WILMER LLP, DENVER, CO; TROY J ARAMBURU, LEAD ATTORNEY, SALT LAKE CITY, UT.

For REGIONS BANK (INC) (ALABAMA), an Alabama Corporation, Defendant: WILLIAM J HOLLEY, II, LEAD ATTORNEY, TIFFANY R JOHNSON, Trishanda L. Treadwell, ATLANTA, GA.

**Judges:** LESLIE J. ABRAMS, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LESLIE J. ABRAMS

## Opinion

**ORDER**

Before the Court is Defendant Regions Bank (Inc.) (Alabama)'s, ("Defendant"), Motion to Dismiss Plaintiff Midwest Feeders, Inc.'s Complaint. (Docs. 1, 9). For the reasons set forth below, Defendant's Motion, (Doc. 9), is **GRANTED.**

**I. PROCEDURAL BACKGROUND**

On January 21, 2015, Plaintiff initiated this diversity action by filing a Complaint against Defendant alleging five claims: (1) Conversion of Instruments under Georgia's version of the Uniform Commercial Code, *O.C.G.A. § 11-3-420*, ("*Georgia UCC § 11-3-420*" or "*§ 11-3-420*"); (2) Failure to Exercise Ordinary Care under *Georgia UCC § 11-3-404(d)*; (3) Common Law Conversion of Funds; (4) Common Law Negligence; and (5) Common Law Negligent Hiring and Supervision. (Doc. 1). On March 11, 2015, Defendant filed a Motion to Dismiss all of Plaintiff's claims under *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*. (Doc. 9). On March 20, [*2] 2015, Plaintiff filed its Response. (Doc. 10). On April 6, 2015, Defendant filed its Reply. (Doc. 11). Accordingly, Defendant's Motion to Dismiss Plaintiff's Complaint, (Doc. 9), is now ripe for review. *See M.D. Ga. L.R. 7.3.1(a)*.

**II. FACTUAL BACKGROUND**[1]

Plaintiff alleges that in 2010, Moseley Cattle, a non-party limited liability corporation, entered into a loan agreement with Plaintiff in which Plaintiff provided Moseley Cattle with financing for the purchase of livestock in exchange for a security interest in that livestock. (Doc. 1 ¶¶ 5, 9, 10). Pursuant to the agreement, Plaintiff deposited money into an account with the Alva State Bank ("Alva State Bank Account") and Moseley Cattle was permitted to withdraw money from the Alva State Bank Account to purchase livestock. (*Id.* ¶¶ 9, 10). After purchasing the livestock, Moseley Cattle would contract to resell the livestock through auctions, forward purchase contracts, or on the spot market to livestock purchasers. (*Id.* ¶ 11). Moseley Cattle was then obligated to issue invoices to the livestock purchasers and make arrangements [*3] for them to send their payments to the Alva State Bank Account by delivery to a specified post office box in Alva, Oklahoma (the "Alva State Bank Lockbox"). (*Id.*) Monies paid by the livestock purchasers and sent to the Alva State Bank Lockbox were required to be used to repay Plaintiff's loan to Moseley Cattle. (*Id.*)

John F. Moseley, III ("Trip Moseley") is the managing principal of Moseley Cattle. (*Id.* ¶ 6). Trip Moseley's father, John Moseley, Jr., was employed by and worked at Moseley Cattle. (*Id.*) Prior to March 12, 2014, John Moseley, Jr. was married to Cheryl Lynn Moseley ("Cheryl Moseley"). (*Id.*) Trip Moseley had an account with Defendant named "Mosley Cattle Auction LLC," ("Regions Bank Depository Account"), that was used in connection with Moseley Cattle's livestock business. (*Id.* ¶ 7).

On March 12, 2014, Cheryl Moseley confessed to the following activity that Plaintiff alleges to be fraudulent:

• Cheryl Moseley wrote checks drawn on the Alva State Bank Account payable to purported cattle sellers. (*Id.* ¶12(a)). Some of the purported cattle sellers did not exist or did not conduct business with Moseley Cattle. (*Id.* ¶12(a)). In some instances, the purported cattle seller did exist [*4] and did conduct business with Moseley Cattle, but did not enter into the transaction which was the subject of the checks. (*Id.* ¶12(a)).

• Cheryl Moseley, who is not an authorized signatory on the Alva State Bank Account, signed the checks for the fraudulent transactions using the signature of her husband, John Moseley, Jr., or one of her three sons Trip Moseley, Will Moseley, or Joey Moseley. (*Id.* ¶12(b)).

• Cheryl Moseley endorsed the checks by signing the name of a fictitious third-party payee and then endorse the check in the name of her husband or sons, followed by language "For Deposit Moseley Cattle[.]" (*Id.* ¶ 12(c)).

• Defendant accepted the checks for deposit by crediting Moseley Cattle's Regions Bank Depository Account. (*Id.* ¶ 12(d)).

• Defendant presented the checks to Alva State Bank for payment on the Alva State Bank Account that Plaintiff funded. (*Id.* ¶ 12(e)).

• Alva State Bank paid Defendant for the checks. (*Id.* ¶ 12(f)).

• Plaintiff deposited money into the Alva State Bank Account to cover all checks written on the Alva State Bank Account by Moseley Cattle. (*Id.* ¶ 12(g)).

• Defendant credited the funds from the checks to the Regions Bank Depository Account. (*Id.* ¶ 12(h)).

[*5] • Cheryl Moseley and Moseley Cattle withdrew funds from the "Regions Bank Depository Account" for reasons other than purchasing cattle. (*Id.* ¶ 12(i)).

---

[1] On a motion to dismiss under *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*, the Court accepts all facts alleged in Plaintiff's Complaint, (Doc. 1), as true. *See Fed. Rs. Civ. P. 12(b)(1)*, *(b)(6)*; *Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)*; *Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)*.

In March 2014, Plaintiff began noticing irregularities in the invoices and checks purportedly generated by Moseley Cattle. (*Id.* ¶ 13). During the week of March 10, 2014, Mr. Jeffrey Sternberger, Plaintiff's employee, made various phone calls to Trip Moseley in order to discuss these irregularities. (*See id.*) On March 12, 2014, Mr. Sternberger received a call from Cheryl Moseley in which she confessed to obtaining credit from Plaintiff through false pretenses. (*Id.* ¶ 14). Specifically, Cheryl Moseley confessed to drafting the checks and submitting invoices to cover the scheme. (*Id.*) On March 12, 2014, Cheryl Moseley confessed her role in the check scheme to her husband. (*Id.* ¶ 15). Later that day, Cheryl Moseley took her own life and passed away at her family's home in Blakely, Georgia. (*Id.*) In meetings and telephone conversations subsequent to March 12, 2014, Trip Moseley and his brothers reviewed with Plaintiff the subject checks and confirmed that none was related to legitimate cattle purchases. (*Id.* ¶ 16).

The bank statements provided [*6] to Plaintiff from Alva State Bank did not include copies of the reverse side of checks that were drawn on the Alva State Bank Account by Moseley Cattle. (*Id.* ¶ 17). After March 12, 2014, in light of Cheryl Moseley's confession, Plaintiff requested copies of the front and back of the checks from Alva State Bank. (*Id.*) When Alva State Bank provided copies of both sides of the checks in March, 2014, Plaintiff confirmed Cheryl Moseley's scheme for the first time. (*Id.* ¶ 18). Cheryl Moseley issued at least 153 fraudulent checks and deposited them for credit to the Regions Bank Depository Account totaling more than $23 million between January, 2012 and March, 2014. (*Id.* ¶¶ 20-22).

Prior to March, 2014, Defendant made no inquiry to Moseley Cattle as to why more than $23 million of checks, handwritten by Moseley and payable to third-party payees, were purportedly endorsed by the third-party payees but were being deposited by Cheryl Moseley into the Regions Bank Depository Account. (*See id.* ¶ 24). The subject checks deposited by Cheryl Moseley represented a significant percentage of all deposits for all customers accepted by Defendant at its Fort Gaines branch on a month to month basis since [*7] at least January, 2013. (*Id.* ¶ 25).

## III. LEGAL STANDARD

Defendant moves to dismiss all of Plaintiff's claims for lack of standing and lack of subject matter jurisdiction under *Federal Rule of Civil Procedure 12(b)(1)*, and for failure to state a claim under *Rule 12(b)(6)*.

"Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under *Fed. R. Civ. P. 12(b)(1)*." *Stalley v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008)* (per curiam). A *Rule 12(b)(1)* standing challenge "come[s] in two forms[:]" facial or factual. *Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990)* (per curiam). "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [its] complaint are taken as true for the purposes of the motion." *Stalley, 524 F.3d at 1232-33* (internal quotations marks omitted) (citing *McElmurray v. Consol. Gov't of Augusta-Richmond Cty., 501 F.3d 1244, 1250 (11th Cir. 2007))*. "By contrast, a factual attack . . . challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony." *Stalley, 524 F.3d at 1233* (citing *McElmurray, 501 F.3d at 1251*). Here, Defendant has not introduced any material extrinsic from the pleadings, therefore the Court construes Defendant's motion as a facial challenge to standing under *Rule 12(b)(1)*. "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing [*8] a *Rule 12(b)(6)* motion-the court must consider the allegations of the complaint to be true." *Lawrence, 919 F.2d at 1529* (citing *Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981)*, cert. denied, *454 U.S. 897, 102 S. Ct. 396, 70 L. Ed. 2d 212 (1981))*.

To survive a dismissal under *Rule 12(b)(6)*, "a complaint must contain specific factual matter, accepted as true to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (internal quotation marks omitted) (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. A claim is plausible on its face if the complaint alleges enough facts to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. A complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence"

of the defendant's liability. *Twombly, 550 U.S. at 556*. While "all well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff," *Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)*, the same liberal reading does not apply to legal conclusions. *Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009)*, *abrogated on other grounds by* *Mohamad v. Palestinian Auth., 566 U.S. 449, 132 S. Ct. 1702, 182 L. Ed. 2d 720 (2012)*. "[A] plaintiff armed with nothing more than conclusions" cannot "unlock the doors of discovery." *Iqbal, 556 U.S. at 678-79*. Additionally, "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Id. at 678*.

## IV. ANALYSIS

### A. UCC Claims

Plaintiff raises two claims under the UCC, a conversion claim pursuant to [*9] *UCC § 11-3-420* and a failure to exercise ordinary care claim under *§ 11-3-404(d)*. Both claims fail because Plaintiff is not among the three classes of persons who may bring an action to enforce a financial instrument, like a check. Under the UCC, "'[p]ersons entitled to enforce' an instrument means: (i) the holder of the instrument;[2] (ii) a nonholder in possession of the instrument who has the rights of a holder;[3] or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to [*Georgia UCC § 11-3-309* or *§ 11-3-418(d)*]."[4] *O.C.G.A § 11-3-301*. In its first claim, Plaintiff alleges that Defendant is liable for conversion under *Georgia UCC § 11-3-420* "by allowing negotiable instruments . . . to be deposited by Cheryl Moseley and credited to the [Regions Bank Depository Account] over forged signatures when Cheryl Moseley had no right to enforce the negotiable instruments or receive payment." (Doc. 1 ¶ 37). *Georgia UCC § 11-3-420* provides:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or [*10] receive payment.

*O.C.G.A. § 11-3-420*.

In its second claim, Plaintiff alleges that "[Defendant's] conduct, actions, and inactions . . . constitute failure to exercise ordinary care" under *Georgia UCC § 11-3-404(d)*. (Doc. 1 ¶¶ 41-46). *Georgia UCC § 11-3-440(d)* provides:

> [I]f a person . . . taking [the instrument] for value or for collection fails to exercise ordinary care in . . . taking the instrument and that failure substantially contributes to loss resulting from payment [*11] of the instrument, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

*O.C.G.A. § 11-3-404(d)*.

---

[2] A holder of a check is a person in possession of a check made payable to bearer or to the person in possession. *Georgia UCC § 11-1-201(20)(a)*.

[3] A non-holder in possession can obtain the rights of a holder by transfer from a holder. *See* *Hampton Island, LLC v. Asset Holding Co. 5, LLC, 320 Ga. App. 880, 882, 740 S.E.2d 859 (2013)* (transfer of a negotiable instrument "vests in transferee any right of the transferor to enforce the instrument, including any rights as a holder in due course").

[4] Under *Georgia UCC § 11-3-309*, a *person who was in possession* of a check and entitled to enforce the check when he or she lost possession, may be entitled to enforce a lost, destroyed, or stolen check. *Georgia UCC § 11-3-418(d)* also provides that when a person is not in possession of a check because it was paid or accepted by mistake, that person may have rights as a person entitled to enforce the check. Neither section is relevant under the circumstances alleged in the Complaint.

Plaintiff does not allege that it is among any of the three categories of entities that the Georgia UCC expressly lists as "[p]ersons entitled to enforce" an allegedly fraudulently endorsed check. Instead, Plaintiff alleges that its standing arises under the exclusionary provision of *§ 11-3-420(a)(i)-(ii)* which provides, "[a]n action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument; or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee." Specifically, Plaintiff argues, "when *§ 11-3-420(a)(i)-(ii)* expressly excepts two of many persons interested in the [subject checks], [Plaintiff] must be regarded as having been deliberately excluded from the exceptions which Defendant asks this Court to adopt." (Doc. 10 at 7) (internal citation omitted).

Plaintiff's argument is not supported by law. In *Dees v. Logan*, the Supreme Court of Georgia stated, "when a statute expressly mentions one of many things, the omitted things must be regarded [*12] as having been deliberately excluded." *282 Ga. 815, 816, 653 S.E.2d 735 (2007)* (citing *Alexander Properties Group v. Doe, 280 Ga. 306, 309, 626 S.E.2d 497 (2006)*; *C. Brown Trucking v. Rushing, 265 Ga. App. 676, 677, 595 S.E.2d 346 (2004)*. Thus, because the Georgia UCC expressly enumerates only three types of "persons entitled to enforce" a financial instrument, and because Plaintiff does not allege facts showing that she qualifies as any of the enumerated "persons," the Court must regard Plaintiff "as having been deliberately excluded" from those "persons" entitled to bring a cause of action for conversion of a financial instrument under the Georgia UCC. *See Jenkins v. Wachovia Bank Nat'l Ass'n, 309 Ga. App. 562, 566, 711 S.E.2d 80 (2011)* (holding that plaintiff with no right to enforce an allegedly converted check lacked standing to bring a conversion claim under the Georgia UCC).

Moreover, Plaintiff "appears to be confusing an interest in the funds backing the checks with an interest in the checks themselves. . . . The terms of [the] debt, however, are tied to [the] ancillary contract, not the negotiable instruments in question.").[5] *Am. Nat'l Ins. Co. v. Citibank, 543 F.3d 907, 910 (11th Cir. 2008)*. Furthermore, Plaintiff cites to no legal authority granting a person standing to bring suit against a bank under *Georgia UCC § 11-3-404(d)* based on facts similar to those in this action. *See Promissor, Inc. v. Branch Bank and Trust Co., No. 1:08-CV-1704-BBM, 2008 U.S. Dist. LEXIS 98472, 2008 WL 5549451, at *6 (N.D. Ga. Oct. 31, 2008)* (finding that substantially similar *§ 11-3-405* "do[es] not give rise to any cause of action which [*13] would allow Promissor to collect damages. . ."). Accordingly, Plaintiff does not have standing to sue under the UCC.

**B. Third Claim-Common Law Conversion of Funds**

Plaintiff alleges that Defendant is liable for common law conversion based on its "acceptance for deposit and cashing of the checks in question and the refusal to repay the monies in question. . . ." (Doc. 1 ¶ 52); *see also* (Doc. 10 at 10-12). In support of its claim, Plaintiff cites to [*14] numerous cases, none of which permits common law conversion claims by a non-customer against a bank to proceed in light of the statutory scheme established by *§ 11-3-420*. On the contrary, under Georgia law *§ 11-3-420* preempts Plaintiff's common law conversion claim. Where a "[p]laintiff attempts to assert a common law claim for conversion, *§ 11-3-420* preempts [the common law conversion] claim because *§ 11-3-420* clearly addresses conversion." *Ownbey Enterprises, Inc. v. Wachovia Bank, N.A., 457 F. Supp.2d 1341, 1353-54 (N.D. Ga. 2006)* (citing *Jacobs v. Metro Chrysler-Plymouth, Inc., 125 Ga. App. 462, 467, 188 S.E.2d 250, 253 (1972)*; *Promissor, 2008 U.S. Dist. LEXIS 98472, 2008 WL 5549451, at * 6* (same). Accordingly, because the Court has found that Plaintiff does not have standing to bring suit for conversion under

[5] The terms of Illinois's version of the UCC at issue in the *Citibank* case mirror the terms of the Georgia UCC at issue here:

(a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

*810 I.L.C.S. 5/3-420(a)*.

*Georgia UCC § 11-3-420* and that *§ 11-3-420* preempts a suit for common law conversion, Plaintiff's common law conversion claim fails.

**C. Fourth and Fifth Claims-Common Law Negligence, and Negligent Hiring and Supervision**

Finally, Plaintiff alleges common law negligence and common law negligent hiring and supervision claims. (Doc. 1 ¶¶ 41-67). To state a cause of action for common law negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct for the protection of others against reasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or [*15] damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty. *Gullock v. Spectrum Sciences and Software, Inc., 146 F. Supp.2d 1364, 1376 (M.D. Ga. 2001)* (citation omitted). Plaintiff alleges that Defendant breached its "obligation under . . . its own corporate policies, commercially reasonable banking standards, and regulations to prevent misuse of accounts under [its] control. . . ." (Doc. 1 ¶¶ 57, 54-56, 58-60). Plaintiff further alleges that "[Defendant] is liable for its negligence in failing to properly instruct its employees, or failing to assure that the corporate policies of the Bank were followed, and [Defendant] knew of should have known that its employees were not following Bank policies in accepting deposit of the [subject checks]." (Doc. 1 ¶¶65, 61-64, 66-67). However, a "negligence action requires a duty or obligation recognized by law and] [Plaintiff] has identified no duty" that Defendant owed to Plaintiff, a non-customer. *Promissor, 2008 U.S. Dist. LEXIS 98472, 2008 WL 5549451, at *4*.

Furthermore, while there is no case law in Georgia or the Eleventh Circuit that directly addresses whether a bank owes a duty to a non-customer, other Circuits have found that a bank owes no duty to a non-customer who alleges a common law tort claim. *See* *Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 225 (4th Cir. 2002)* (a bank owes no duty to a "noncustomer [*16] who is defrauded by the bank's customer through use of its services" and finding no duty where noncustomer had "no direct relationship" with the defendant bank) (collecting cases)); *National Union Fire Ins. Co. of Pittsburg, PA v. Raczkowski, 764 F.3d 800, 805-06 (8th Cir. 2014)* (bank owed no duty to noncustomer whose employee opened account in its name and fraudulently deposited noncustomer's checks into account); *VIP Mortg. Corp. v. Bank of America, N.A., 769 F. Supp. 2d 20, 27 (D. Mass. 2011)* (reiterating "the now almost universal rule that banks do not owe a common law duty of care to third party noncustomers"); *National Grange Mut. Ins. Co. v. Verizon's Benefits Center, 541 F. Supp. 2d 745, 750-51 (D. Md. 2008)* (bank owed no duty to non-customer for allowing bank customer to deposit the plaintiff's guardianship funds into customer's personal accounts). Accordingly, Plaintiff has failed to state a claim for common law negligence and negligent hiring and supervision.

**V. <u>CONCLUSION</u>**

Having considered the pleadings, the arguments of the Parties, and the applicable law, the Court **HEREBY GRANTS** Defendant's Motion to Dismiss Plaintiff's Complaint without prejudice. (Doc. 9).

**SO ORDERED**, this 30th day of September, 2016.

/s/ Leslie J. Abrams

**LESLIE J. ABRAMS, JUDGE**

**UNITED STATES DISTRICT COURT**

---

End of Document

Positive
As of: August 25, 2026 4:48 PM Z

# Remtek Servs. v. Wells Fargo Bank, N.A.

United States District Court for the District of New Jersey

January 16, 2020, Decided; January 16, 2020, Filed

Civil No. 19-12790 (RBK/KMW)

**Reporter**
2020 U.S. Dist. LEXIS 7678 *; 101 U.C.C. Rep. Serv. 2d (Callaghan) 18; 2020 WL 241332

REMTEK SERVICES, INC., Plaintiff, v. WELLS FARGO BANK, N.A., Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] For REMTEK SERVICES, INC., Plaintiff: PRISCILLA J. TRIOLO, ROBERT ANTHONY DIEHL, LEAD ATTORNEYS, BITTIGER ELIAS & TRIOLO P.C., PARAMUS, NJ.

For WELLS FARGO BANK, N.A., Defendant: WILLIAM PATRICK REILEY, BALLARD SPAHR, CHERRY HILL, NJ.

**Judges:** ROBERT B. KUGLER, United States District Judge.

**Opinion by:** ROBERT B. KUGLER

## Opinion

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss (Doc. No. 6) Plaintiff Remtek Services, Inc.'s ("Remtek") Complaint (Doc. No. 1 at 11-24 ("Compl.")). Remtek contends it was the victim of a scheme by which fraudsters sought to steal from it, its suppliers, and its customers using Wells Fargo bank accounts. Believing Wells Fargo to be at least partly responsible, Remtek brought suit, seeking damages for Wells Fargo's negligence and breach of fiduciary duty, as well as injunctive relief. Ultimately, the Court concludes that none of Remtek's claims are viable, and therefore **GRANTS** Wells Fargo's Motion.

### I. BACKGROUND

Remtek's skeletal Complaint provides only a thin outline of the alleged fraud and Wells Fargo's involvement. Remtek is a commercial roofing company in Deptford, New Jersey. (Compl. at □ 5). [*2] On December 17, 2018, one of Remtek's customers, Prince Minerals, Inc., contacted Remtek's President, Timothy Nuhfer, about a request purportedly from Remtek to wire $94,000 to a new Wells Fargo bank account established in Remtek's name. (*Id.* at □ 6). After investigating this request, Remtek discovered that a fraudster had accessed Nuhfer's email account and had been impersonating Nuhfer in conversations with Prince Minerals, Inc. (*Id.* at □ 7). Remtek then took unspecified action to address the theft of Nuhfer's identity. (*Id.* at □ 8).

Remtek also discovered that the fraudster had attempted to make four withdrawals from Remtek's real bank account at PNC Bank into the fraudulent Wells Fargo account. (*Id.* at □ 9). These attempted withdrawals totaled $11,000. (*Id.*). Remtek was able to cancel these withdrawals and to close its account at PNC Bank. (*Id.* at □12).

On December 20, 2018, Everest Systems, one of Remtek's suppliers, contacted Remtek about an outstanding invoice for $64,109.96. (*Id.* □ 10). Upon investigation, Remtek discovered that fraudsters had been impersonating

Everest Systems employees since October 3, 2018, and had directed Remtek to make the $64,109.96 payment into a Wells [*3] Fargo bank account on November 9, 2018. (*Id.* at □ 11).

Although Remtek has repeatedly notified Wells Fargo about these fraudulent accounts, Wells Fargo has refused to discuss these accounts with Remtek or its representatives. (*Id.* at □ 13). Further, Wells Fargo has not taken action to address the accounts created in Remtek's name. (*Id.* at □ 12).

Apparently frustrated with Wells Fargo's intransigence, Remtek commenced this lawsuit in New Jersey Superior Court on April 8, 2019. (Doc. No. 1 at □ 1). Count I of the Complaint charges Wells Fargo with negligence and Count II with breach of fiduciary duty, while Count III seeks injunctive relief. On May 22, 2019, Wells Fargo timely removed the action, invoking this Court's diversity jurisdiction pursuant to *28 U.S.C. § 1332*. (*Id.* at □ 5). Wells Fargo then filed the present Motion to Dismiss on June 12, 2019.

## II. LEGAL STANDARD

*Federal Rule of Civil Procedure 12(b)(6)* allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff [*4] may be entitled to relief." *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)* (quoting *Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008))*. In other words, a complaint survives a motion to dismiss if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

To make this determination, courts conduct a three-part analysis. *Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010)*. First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 675, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))*. Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal, 556 U.S. at 680*). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal, 556 U.S. at 678*). Finally, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal, 556 U.S. at 679*). A complaint cannot survive a motion to dismiss where a court can only infer that a claim is merely possible rather than plausible. *Id.*

## III. DISCUSSION

Remtek alleges three separate instances when fraudsters attempted to extract funds either from it or its customers: (1) when the fraudsters attempted to solicit a $94,000 payment [*5] from Prince Minerals, Inc. into a Wells Fargo bank account opened by the fraudsters in Remtek's name; (2) when the fraudsters attempted to extract funds from Remtek's actual bank account into a Wells Fargo bank account opened by the fraudsters in Remtek's name; and (3) when the fraudsters[1] successfully impersonated Remtek's supplier, Everest Systems, extracting a $64,109.96 payment from Remtek into a Wells Fargo bank account. With respect to the first two instances, Remtek's theory is that Wells Fargo should be liable for permitting the fraudsters to open an account in Remtek's name; with respect to the third, Remtek's theory is not clearly stated.

The Court begins by assessing whether Remtek has sufficiently pled negligence with respect to the creation of the fraudulent bank accounts in its name. Next the Court examines whether the negligence claim relating to the $64,109.96 wire transfer is preempted by *Article 4A of the Uniform Commercial Code* ("U.C.C."). Finding that the

---

[1] It is unclear if Remtek is alleging that the fraudsters were the same individuals in each instance, but as their identity is immaterial at the present stage, the Court refers to them as though they were the same.

Complaint does not allege any viable negligence claims, the Court then considers whether Remtek may still press a claim for breach of fiduciary duty. Finally, the Court turns to Remtek's demand for injunctive relief.

**A. Negligence—Bank Accounts in Remtek's** [*6] **Name**

In New Jersey, a plaintiff pleading negligence bears the burden of establishing four elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Townsend v. Pierre, 221 N.J. 36, 110 A.3d 52, 61 (N.J. 2015)* (internal quotation omitted). Remtek's allegations raise the question of whether banks have a state common law duty to protect against identity thieves opening bank accounts in their victims' names. Wells Fargo contends that New Jersey law definitively forecloses the existence of such a duty, relying on *Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 972 A.2d 1112 (N.J. 2009)*. (Doc. No. 15 ("Reply") at 10). Wells Fargo reads *Brunson* for more than it is worth; although the New Jersey Supreme Court found that the bank in that case owed no duty to the plaintiff, it specifically left open the possibility that "in appropriate circumstances, a bank may have a duty of care to an innocent, unrelated third party harmed by the theft of his or her identity." *Brunson, 972 A.2d at 1125 n.13*.[2]

Nevertheless, Remtek's negligence claims still fail because it has not alleged actual damages. Through good luck and quick action, Remtek was able to prevent the fraudsters' efforts to elicit the $94,000 payment from Prince Minerals, Inc. and to withdraw funds from Remtek's legitimate bank account. As such, [*7] on the face of the Complaint, Remtek has not suffered any harm from Wells Fargo's failure to prevent the fraudsters from opening a bank account in Remtek's name. Consequently, these claims must be dismissed, without prejudice. *See* *Signature Bank v. Check-X-Change, LLC, No. 12-2802, 2013 U.S. Dist. LEXIS 90880, 2013 WL 3286154, at *4 (D.N.J. June 27, 2013)* (dismissing negligence claim because damages allegations were conclusory).

**B. Negligence—the $64,109.96 Payment**

Remtek contends that Wells Fargo's negligence claim related to the $64,109.96 payment is preempted by *Article 4A of the U.C.C.* as adopted by the New Jersey legislature at *N.J.S.A. 12A:4A-101 et seq.* (Doc. No. 6-1 ("Def. Brief") at 16-18). *Article 4A* sets out specialized rules for funds transfers, and the parties do not seem to dispute that the $64,109.96 payment was a funds transfer within the meaning of the statute. The Official Comment to *Article 4A* makes clear that its provisions are "intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation [they cover]." *N.J.S.A. 12A:4A-102* cmt. 1. Further, the New Jersey Supreme Court has held that *Article 4A* preempts common law negligence claims that "contravene" its provisions, as when the "case arises from a setting directly addressed by *Article 4A*." *ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 99 A.3d 345, 358-59 (N.J. 2014)*. As such, if a provision of Article 4A directly applies to the circumstances surrounding [*8] the $64,109.96 payment, Remtek's negligence claim related to that payment is preempted.

Wells Fargo contends that *Section 4A-207(2)(b)* directly applies. (Def. Brief at 17). That section specifically provides that:

---

[2] In *Brunson*, an identity thief opened a bank account in the plaintiff's name and proceeded to use the account to cash a series of fraudulent checks. *Id. at 1114-15*. Once the bank discovered that the checks were fraudulent, it investigated and filed criminal complaints against the plaintiff, leading to his arrest and detention. *Id. at 1115-16*. The New Jersey Supreme Court feared that allowing the plaintiff to pursue a negligence claim would create a "back door" avoiding the demanding requirements of a malicious prosecution claim, and therefore refused to find that the bank owed the plaintiff a duty of care. *Id. at 1124-1125*. As both these facts and the concern about circumventing the requirements of a malicious prosecution claim are inapposite to the present case, *Brunson* does not control.

> (2) If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:
>
> (a) . . . [I]f the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.
>
> (b) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

*N.J.S.A. 12A:4A-207(2)(b)*.

The main effect of *Section 4A-207(2)(b)* is to authorize banks to process payment orders by relying only on the provided account number. *See [*9] N.J.S.A. 12A:4A-207* cmt. 2 (explaining that the beneficiary's bank "has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order"). As such, banks are immune from liability if they fail to confirm that the name of the beneficiary on the payment order matches the name on the bank account identified by the provided account number, unless they have actual knowledge of the discrepancy. Because negligence claims do not have this actual knowledge requirement, courts have repeatedly found that Article 4A preempts negligence clams where the bank processed a payment order despite the existence of a discrepancy between the beneficiary identified on the payment order and the name on the account identified by the provided account number. *See Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A., 18-60250, 2018 U.S. Dist. LEXIS 58341, 2018 WL 8334591, at *3-4 (S.D. Fla. April 4, 2018)* (interpreting identical Florida U.C.C. provision as preempting common law negligence claim based on fraudulent funds transfer); *Sliders Trading Co. L.L.C. v. Wells Fargo Bank NA, No. 17-04930, 2017 U.S. Dist. LEXIS 211169, 2017 WL 6539843, at *5 (N.D. Cal. Dec. 21, 2017)* (interpreting identical California provision and concluding that because the U.C.C. provides a remedy for a bank's processing of fraudulent payment orders, it displaces common-law claims"). Consequently, to [*10] the extent Remtek is claiming that Wells Fargo was negligent when processing the $64,109.96 payment, such claim is clearly preempted and must be dismissed.

By contrast, "claims alleging negligence in the opening of an account that are not inconsistent with Article 4A may go forward." *ADS Assocs. Grp., 99 A.3d at 370* (citing *Wachovia Bank, N.A., 301 F.3d 220, 224 (4th Cir. 2002)* (finding negligence claim against bank was not preempted where fraudster convinced plaintiff he was an executive at Bear Stearns and had the plaintiff wire $1,000,000 to a bank account he had opened in Bear Stearns' name)). As such, Article 4A may not preempt Remtek from bringing a claim asserting that Wells Fargo was negligent in allowing the fraudsters to open an account in the first place.[3] But the face of the Complaint is unclear as to whether Remtek is pursuing such theory, as it only says the account was "fraudulent." (Compl. at □ 11).[4] Without more detail, the Court can only speculate as to why Wells Fargo was negligent in permitting this account to be opened.

Although the Court must view the Complaint in the light most favorable to Remtek, it is still Remtek's burden to allege facts that add up to a plausible claim to relief. As such, the Court will not reward the Complaint's ambiguity, but [*11] will only dismiss these claims without prejudice. *See Bobo v. Wildwood Public Schs. Bd. of Educ., 13-5007, 2014 U.S. Dist. LEXIS 72932, 014 WL 2215935, at *7 (D.N.J. May 28, 2014)* (explaining that "the Court is not required to read facts into Plaintiff's Complaint that simply do not exist"). If Remtek wishes to amend its Complaint

---

[3] Nothing in this Opinion should be read as deciding this issue one way or the other.

[4] Remtek's Opposition Brief is similarly unhelpful, merely saying that "there are various scenarios through which the Plaintiff could maintain successful causes of action against Wells Fargo whether or Article 4A is implicated" without explaining what those scenarios are. (Doc. No. 14 ("Pl. Brief") at 30). Although the brief repeatedly stresses that Wells Fargo was negligent in allowing the fraudsters to open accounts in Remtek's name, it makes no similar statement that Wells Fargo was negligent when it allowed the fraudsters to open the account to which Remtek wired $64,109.96.

to include allegations setting forth how Wells Fargo was negligent when it permitted the fraudsters to open the account to which Remtek wired $64,109.96, it may attempt to do through a timely filed motion.

**C. Fiduciary Duty**

Although it is an open question whether Wells Fargo owed Remtek *some* duty to protect against fraudsters opening bank accounts, Wells Fargo certainly did not owe Remtek a *fiduciary* duty. Assessing the existence of a fiduciary duty is a question of law. *United Jersey Bank v. Kensey, 306 N.J. Super. 540, 704 A.2d 38, 43 (N.J. Super. Ct. App. Div. 1997)*. "A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *F.G. v. MacDonell, 150 N.J. 550, 696 A.2d 697, 704 (N.J. 1997)*. Generally, "there is no presumed fiduciary relationship between a bank and its customer." *United Jersey Bank, 704 A.2d at 44*.

The Complaint alleges no facts suggests that Wells Fargo owed Remtek a fiduciary duty; indeed, it contains no suggestion that Wells Fargo and Remtek had any relationship whatsoever [*12] prior to the filing of this lawsuit.[5] As the Complaint simply provides no reason for the Court to conclude that Wells Fargo owed Remtek a fiduciary duty, these claims must be dismissed.

**D. Injunctive Relief**

In Count III, Remtek seeks an injunction requiring Wells Fargo to: (1) immediately close the fraudulent Wells Fargo accounts created in Remtek's name; and (2) provide Remtek with records relating to these accounts. (Compl. at □ 32). Wells Fargo argues that Remtek lacks standing to seek such injunctive relief.[6] (Def. Brief at 22-24). When seeking injunctive relief, it is not enough to allege past injury from the defendant's actions; rather, the plaintiff "must establish that she is likely to suffer future injury from the defendant's conduct." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig., 903 F.3d 278, 292 (3d Cir. 2018)* (internal quotation omitted).

Remtek fails to carry its burden. Although the Complaint alleges that Wells Fargo has permitted fraudsters to open accounts in Remtek's name, and that the fraudsters have attempted to use these accounts to steal from Remtek in the past, it does not allege that these accounts are currently being used in any scheme to defraud Remtek, nor that they will be in the future. Rather, Remtek seems principally concerned [*13] about "resolving the injury and damage incurred by the cyberattack and related fraud." (Compl. at □ 30). But as discussed above, the fraudsters were unsuccessful in their attempts to use the accounts they created in Remtek's name to steal from Remtek and Prince Minerals, Inc., making it unclear what "injury and damage" Remtek is referring to. Consequently, Remtek has not established that its proposed injunction would protect it from likely future harm or alleviate existing harm, meaning that Count III must be dismissed for lack of standing.

**IV. CONCLUSION**

---

[5] In its opening brief, Wells Fargo asserts that Remtek does have a line of credit with Wells Fargo, (Def. Brief at 7 n.1), which Remtek appears to confirm in its Opposition. (Pl. Brief at 11-12). Even if it is true that Remtek is a Wells Fargo customer, Remtek's claim would still fail. Because creditor-debtor relationships are adversarial, "[t]he virtually unanimous rule is that [they] rarely give rise to a fiduciary duty." *United Jersey Bank, 704 A.2d at 44*. The Complaint provides no indication that the relationship between Remtek and Wells Fargo was exceptional.

[6] Because standing goes to the Court's subject-matter jurisdiction, Wells Fargo should have raised this argument in a *Rule 12(b)(1)* motion to dismiss, rather than a motion pursuant to *Rule 12(b)(6)*. Nevertheless, because constitutional standing is mandatory, the Court must consider standing issues wherever and whenever they present themselves. *Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 360 n.9 (3d Cir. 2013)*. Further, the Court has the power to dismiss claims for lack of subject-matter jurisdiction *sua sponte* pursuant to *Federal Rule of Civil Procedure 12(h)(3)*.

For the forgoing reasons, Wells Fargo's Motion to Dismiss is **GRANTED** and Remtek's Complaint is **DISMISSED WITHOUT PREJUDICE** pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *12(h)(3)*. Remtek may file a motion to amend its Complaint, consistent with this Opinion, *Federal Rule of Civil Procedure 8*, and *Local Civil Rule 15.1*, on or before January 30, 2020. An Order follows.

Dated: 1/16/2020

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Judge

**ORDER**

**KUGLER**, United States District Judge:

**THIS MATTER** having come before the Court upon Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss (Doc. No. 6) Plaintiff Remtek Services, Inc.'s Complaint (Doc. No. 1 at 11-24 ("Compl.")); and for the reasons expressed in the Opinion of this [*14] date

**IT IS HEREBY ORDERED** that Defendant's Motion is **GRANTED** and Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE** pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *12(h)(3)*. Remtek may file a motion to amend its Complaint, consistent with this Opinion, *Federal Rule of Civil Procedure 8*, and *Local Civil Rule 15.1*, on or before January 30, 2020.

Dated: 1/16/2020

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Judge

---

End of Document